**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION, | ) | |
| | ) | No. 508-88L |
| Plaintiff, | ) | |
| v. | ) | Senior Judge Eric G. Bruggink |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**THE UNITED STATES' MOTION FOR ADOPTION**
**OF PROPOSED CASE MANAGEMENT PLAN**
**AND**
**MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . iii

**EXHIBIT LIST** . . . . . . . . . . v

**MOTION AND MEMORANDUM** . . . . . . . . . . 1

**I. Background of this Case** . . . . . . . . . . 1

**A. The Bennett Freeze and the District Court Litigation** . . . . . . . . . . 1

**B. Plaintiff's Claims and Procedural History** . . . . . . . . . . 6

**II. Resolution of Certain Issues Rather Than Engaging In Further Open-Ended Discovery Would Benefit Both Parties and the Court and Facilitate Resolution of this Case** . . . . . . . . . . 9

**III. Proposed Case Management Plan** . . . . . . . . . . 12

**IV. Conclusion** . . . . . . . . . . 12

## TABLE OF AUTHORITIES

### FEDERAL CASES

Agins v. Tiburon, 447 U.S. 255 (1980) . . . . . . . . . . 7, 11

Cane Tenn., Inc. v. United States, 71 Fed. Cl. 432 (2005),
aff'd 214 Fed. Appx. 978 (Fed. Cir. Jan. 10, 2007) . . . . . . . . . . 11

Casitas Mun. Water Dist. v. United States, 76 Fed. Cl. 100 (2007) . . . . . . . . . . 11

Healing v. Jones, 210 F.Supp. 125 (D. Ariz. 1962) . . . . . . . . . . 2

Lingle v. Chevron, 544 U.S. 528 (2005) . . . . . . . . . . 7, 11

Masayesva v. Zah, 65 F.3d 1445 (9th Cir. 1995),
cert. denied, 517 U.S. 1168 (1996) . . . . . . . . . . 2, 5

Masayesva v. Zah, 816 F.Supp. 1387 (D. Ariz. 1992) . . . . . . . . . . 3-5

Masayesya v. Zah, 792 F.Supp. 1155 (D. Ariz. 1992) . . . . . . . . . . 4

Masayesya v. Zah, 793 F.Supp. 1495 (D. Ariz. 1992) . . . . . . . . . . 4

Menominee Tribe v. United States, 221 Ct. Cl. 506, 607 F.2d 1335 (1979),
cert. denied, 445 U.S. 950 (1980) . . . . . . . . . . 10

Secakuku v. Hale, 108 F.3d 1386 (9th Cir. 1997) (unpublished) . . . . . . . . . . 1

Secakuku v. Hale, 517 U.S. 1168 (1996) . . . . . . . . . . 5

Sekaquaptewa v. McDonald, 448 F.Supp. 1183 (D. Ariz. 1978),
rev'd in part, 619 F.2d 801 (9th Cir. 1980),
cert. denied, 449 U.S. 1010 (1980) . . . . . . . . . . 3

### FEDERAL STATUTES

25 U.S.C. § 640d-7(a) (1974) . . . . . . . . . . 3

25 U.S.C. § 640d-9(f) (1988) . . . . . . . . . . 4-6

Act of June 14, 1934, ch. 521, 48 Stat. 960 . . . . . . . . . . 1

Pub. L. No. 93-531, 25 U.S.C. §§ 640d, et seq. (1974) . . . . . . . . . . 2-3

Pub. L. No. 96-305, 94 Stat. 930 (codified at 25 U.S.C. § 640d-9(f) (1980)) . . . . . . . . . . . . . . . . . 3

**OTHER CONGRESSIONAL MATERIALS**

126 Cong. Rec. 16822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

**EXHIBIT LIST**

| **Exhibit Number** | **Description** |
|---|---|
| 1 | September 26, 1988 Order in Sidney v. MacDonald, Case No. 58-579 PCT-EHC (D. Ariz.) |
| 2 | December 4, 2006 Order in Honyoama v. Shirley, Case No. 74-842 PHX-EHC (D. Ariz.) |
| 3 | March 28, 1990 Order |
| 4 | First Amended Complaint, dated June 29, 1990 |

## MOTION AND MEMORANDUM

In the United States' Status Report, dated October 22, 2007 (Docket No. 94), and the Plaintiff's Status Report, dated October 23, 2007 (Docket No. 95), the parties suggested that they file scheduling proposals on or before December 18, 2007, in order to address how this case should proceed. The parties have been unable to agree upon a joint proposal. In accordance with its October 22 Status Report, then, the United States submits the following proposed case management plan. Because the United States expects Plaintiff to object to this proposal, the following memorandum includes a brief description of the background of this case and the basis for the United States' proposed management plan. For the reasons stated below, the United States respectfully requests that the Court adopt the United States' proposed case management plan.

### I. Background of this Case

#### A. The Bennett Freeze and the District Court Litigation

In June 1934, Congress enacted legislation to define the exterior boundaries of the Navajo Indian Reservation in Arizona. See Act of June 14, 1934, ch. 521, 48 Stat. 960 (the "1934 Act"). Among other provisions, the 1934 Act conveyed an equitable interest in certain lands to the Navajo Nation and "such other Indians as may already be located thereon." Id. Members of the Hopi Tribe have historically lived in the Village of Moenkopi and other areas described in the 1934 Act, and were, therefore, arguably entitled to an equitable interest in the reservation. See Secakuku v. Hale, 108 F.3d 1386, *1 (9th Cir. 1997) (Table) ("The reservation was intended not only for the Navajo people, but also for 'such other Indians as may already be located thereon.'"). The Hopi Tribe and the Navajo Nation have disagreed on their tribes' respective rights to lands in northeastern Arizona for centuries, and the tribes have disagreed

about the interpretation of the 1934 Act since its passage. See Masayesva v. Zah, 65 F.3d 1445, 1450 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996).

In 1966, Robert Bennett, Commissioner of Indian Affairs, issued an administrative rule that required each tribe to obtain the consent of the other tribe before undertaking any unilateral development of certain lands. This administrative rule became known as the "Bennett Freeze." As the Ninth Circuit later noted, the Bennett Freeze

> reduced the incentive for either tribe to develop the jointly occupied lands between the time when the freeze was imposed, and the time when the court would partition jointly held lands based on "fairness on equity." Otherwise, either tribe, anticipating that a judge would want to avoid allocating land occupied by members of one tribe to the other, would have an incentive to manipulate the expected partition by creating occupancy during the litigation period.

Id. at 1460.[1/]

Following imposition of the Bennett Freeze, the tribes engaged unsuccessfully in a series of negotiations that lasted several years. In December 1974, Congress enacted the Navajo-Hopi Settlement Act "to provide for the final settlement of the conflicting rights and interests of the Hopi and Navajo Tribes to and in . . . lands lying within the reservation created by the [1934 Act]." Pub. L. No. 93-531, 25 U.S.C. §§ 640d, et seq. (1974) ("Settlement Act"). Among other relief, the Settlement Act afforded each tribe the right to bring a quiet title action against the other in the United States District Court for the District of Arizona ("District Court").

---

[1/] While this factual background is not intended to be exhaustive, it is important to note that the Bennett Freeze was imposed in the midst of a related dispute between the Navajo Nation and the Hopi Tribe with respect to the reservation created in 1882 by Executive Order. The 1882 Executive Order had created a reservation for the Hopi Tribe along with "such other Indians as the Secretary may see fit to settle thereon." See Healing v. Jones, 210 F.Supp. 125, 129 n.1 (D. Ariz. 1962). The Healing litigation (and related cases), as well as the extraordinarily difficult relocation efforts that followed the court's partitioning of portions of the 1882 Reservation, lasted decades and played an important role in the genesis of the Bennett Freeze.

See 25 U.S.C. § 640d-7(a) (1974).

The tribes sued each other in 1974. See Masayesva v. Zah, 816 F.Supp. 1387, 1393 (D. Ariz. 1992). While the purpose of that case (the "District Court litigation") can be simply stated – to determine Hopi rights and interests in the 1934 Reservation – the legal and factual analysis necessary to resolve that conflict was extraordinarily complicated. Certainly neither the District Court nor the parties anticipated in 1974 that the District Court litigation would continue for the next 32 years.

The District Court issued its first decision in April 1978, but the Ninth Circuit reversed in part in May 1980. See Sekaquaptewa v. McDonald, 448 F.Supp. 1183 (D. Ariz. 1978), rev'd in part, 619 F.2d 801 (9th Cir. 1980), cert. denied, 449 U.S. 1010 (1980). In its decision, the Ninth Circuit directed the District Court to determine "what land the Hopis 'possessed, occupied, or used' in 1934" in the disputed land in order to determine the Hopi Tribe's interest in the 1934 Reservation. Sekaquaptewa, 619 F.2d at 809. The Ninth Circuit recognized the difficulty in that task, and acknowledged the possibility that the tribes may have used some land jointly in 1934. Id.

In July 1980, two months after the Ninth Circuit's decision, Congress amended the Settlement Act. See Pub. L. No. 96-305, 94 Stat. 930 (codified at 25 U.S.C. § 640d-9(f) (1980)). Among other provisions, the 1980 Amendment codified the Bennett Freeze. See id. ("Any development of [certain] lands in litigation pursuant to [the Settlement Act] . . . shall be carried out only upon the written consent of each tribe. . . ."). The purpose of codifying the consent requirement was "to preserve the parties' rights subject to a final adjudication." Masayesva, 816 F.Supp. at 1398 (D. Ariz. 1992); see also 126 Cong. Rec. 16822, 16824 (June 25, 1980) ("By

requiring both tribes to approve development in that area . . . neither tribe will be able to attain an unfair advantage over the other.").

In September 1988, the District Court issued a preliminary injunction in Sidney v. MacDonald, Case No. 58-579 PCT-EHC (D. Ariz.), following efforts by the Navajo Tribal Chairman Peter MacDonald to implement an aggressive building campaign in the Bennett Freeze area. See Def.'s Ex. 1. Finding that Chairman MacDonald's efforts would result in substantial damage, the District Court issued an injunction that, among other things, required the Navajo Nation to make "written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze. . . ." Id. at 15. The District Court's order required any proposed development application to include specific information, "including location, estimated cost, and justification for the proposal." Id. at 16.

In November 1988, shortly after the District Court's preliminary injunction order, Congress amended the Settlement Act again. In the 1988 Amendment, Congress provided that the consent requirement would not apply if the proposal "does not involve new housing construction" and if "the Secretary of the Interior determines that [the proposed project] is necessary for the health or safety of the Navajo Tribe, the Hopi Tribe, or any individual who is a member of either tribe." 25 U.S.C. § 640d-9(f)(3)(A) (1988).

The District Court issued three decisions in 1992 designating certain discrete lands as belonging exclusively to the Navajo or Hopi Tribes, and partitioning the land that the two tribes had jointly used. See Masayesya v. Zah, 792 F.Supp. 1155 (D. Ariz. 1992) (regarding certain discrete lands purchased exclusively by or on behalf of the Navajo Nation); Masayesya v. Zah, 793 F.Supp. 1495 (D. Ariz. 1992) (regarding the Hopi Tribe's interest in certain lands); Masayesva v. Zah, 816 F.Supp. 1387 (D. Ariz. 1992) (partitioning the land which the two tribes

had jointly used). Because the District Court felt its decisions resolved the litigation between the two parties, the District Court's third decision, issued in December 1992, terminated the Bennett Freeze. See Masayesva, 816 F.Supp. at 1424 (stating "[t]hat the 'Bennett Freeze' restriction on construction and development within the 1934 Reservation, and codified by 25 U.S.C. § 640d-9, is lifted").

The Ninth Circuit considered the three District Court decisions jointly and affirmed in part and reversed in part in a decision issued in December 1995. See Masayesva v. Zah, 65 F.3d 1445 (9th Cir. 1995). Of particular significance to this case, the Ninth Circuit vacated the District Court's lifting of the Bennett Freeze, and held that the "freeze remains in effect for the lands 'in litigation'":

> The district court had no authority to lift the freeze. Congress wrote law which prohibited development of "lands in litigation" without written consent of both tribes. The litigation was not concluded when the district court entered judgment.

Id. at 1460. The Ninth Circuit did not specifically identify the "lands in litigation," but stated that "[t]hose lands include, at the least, areas where the Hopis claim religious shrines and other religious occupancy." Id. The Supreme Court denied certiorari in 1996, and the matter was remanded to the District Court for further proceedings. See Secakuku v. Hale, 517 U.S. 1168 (1996).

On March 31, 1997, the District Court entered an order approving a stipulation between the Navajo Nation and Hopi Tribe that provided that certain specified areas were no longer in litigation. The Navajo Nation alleged that after the approval of the stipulation, approximately "700,000 to 800,000 acres remain[ed] subject to the [Bennett Freeze]." Joint Status Report, dated Sept. 30, 1997 (Docket No. 40).

The District Court litigation continued for the next ten years. Finally in December 2006, the Hopi Tribe and the Navajo Nation settled the District Court litigation, and the District Court lifted the Bennett Freeze in its entirety. See Def.'s Ex. 2 ("The Court hereby finds that no lands are any longer 'in litigation' for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the 'Bennett Freeze,' are no further force or effect.").

**B. Plaintiff's Claims and Procedural History**

Plaintiff filed this matter on August 25, 1988, shortly before Congress passed the 1988 Amendment to the Settlement Act. The United States filed a motion to dismiss pursuant to Rule 12(b) of the Rules of the Court of Federal Claims on April 7, 1989 (Docket No. 3), and the matter was fully briefed (Docket Nos. 4, 5). The Court conducted oral argument on March 27, 1990, and issued an Order one day later. See Def.'s Ex. 3.[2/] The Court's March 28, 1990 Order permitted Plaintiff to file an amended complaint and denied the United States' Motion to Dismiss without prejudice.

Plaintiff's First Amended Complaint, submitted on June 29, 1990, identified three claims for relief: (1) a violation of the Fifth Amendment; (2) a breach of trust; and (3) a denial of equal protection. See Def.'s Ex. 4. At the core of each claim is Plaintiff's allegation that the Bennett Freeze "prohibited Plaintiff and its members from development and construction on a substantial portion of their land except with the consent of another Indian Tribe, the Hopi Tribe." Id. at 1.

From October 1990 to October 1993, the parties submitted periodic status reports regarding the District Court litigation, and conducted discovery. The parties eventually filed

---

[2/] The Court's electronic PACER docket does not identify several filings made between 1989 and 1994. Where appropriate, the cited document is attached as an exhibit to this motion.

cross motions for summary judgment, which the Court resolved in an unpublished decision issued on March 8, 1996 (Docket No. 29).

The summary judgment briefing addressed each of Plaintiff's claims:

1. **Plaintiff's taking claim**: Plaintiff alleged that the Bennett Freeze effected a taking because it "does not substantially advance any legitimate governmental interest." First Am. Compl. ¶ 17. Alternatively, Plaintiff alleged that the Bennett Freeze violated the Fifth Amendment because the Freeze "is unreasonably and unnecessarily broad in scope and it has substantially deprived Plaintiff and its members of their reasonable investment-backed expectations and of economically viable use of their land." Id. ¶ 18. In summary judgment briefing, Plaintiff argued that a taking had occurred under the so-called Agins test because the Bennett Freeze did not "substantially advance a legitimate state interest." Agins v. Tiburon, 447 U.S. 255, 260 (1980); see Pl.'s Mot. for Summ. J. at 21 (arguing that the United States was liable for a taking because the Bennett Freeze "was vastly disproportionate to any legitimate government purpose"). Although the Court held in 1996 that the parties' cross motions could not be resolved, it is now clear that Plaintiff's position must be dismissed as a matter of law. See Lingle v. Chevron, 544 U.S. 528, 545 (2005) (holding that the "'substantially advances' formula is not a valid takings test" and overruling Agins).

2. **Plaintiff's breach of trust claim**: Plaintiff argued that certain statutory provisions and "implied contracts [had] established fiduciary responsibilities in [the United States]," which the United States had breached by passage of the 1980 Amendment to the Settlement Act. First Am. Compl. ¶¶ 26, 27, 30. The United States argued, *inter alia*, that Plaintiff had failed to identify a statute or regulation that could be fairly interpreted

as mandating compensation for the damages alleged. Regarding this claim, the Court noted the following: "I am going to leave the breach of trust claim in there, but I view this primarily as a takings claim." Argument Tr. at 49.

3. **Plaintiff's equal protection claim**: Plaintiff argued that the United States had violated the Equal Protection Clause. See First Am. Compl. ¶¶ 34-37. The Court concluded that it lacked jurisdiction over this claim and dismissed it. See Order, dated Mar. 8, 1996 (Docket No. 29).

The parties engaged in extensive discovery before the Court issued its March 1996 Order. For example, before 1996, Plaintiff transmitted 74 Interrogatories, 39 Requests for Documents, and 37 Requests for Admission to the United States. The United States transmitted 44 Interrogatories and 7 Requests for Documents. After the Court issued its March 1996 Order, the parties engaged in additional written discovery to supplement their earlier efforts. In 2002, for example, the United States responded to an extraordinarily broad document request from Plaintiff by making available thousands of documents from six different government offices located in Arizona (Phoenix, Tuba City, Fort Defiance and Window Rock) and New Mexico (Gallup). On January 11, 2008, the United States transmitted to Plaintiff several hundred additional documents that the United States located in these offices in order to supplement its 2002 production.

In addition, counsel for the United States recently coordinated a trip with Plaintiff's counsel to view documents stored at the American Indian Records Repository in Lenexa, Kansas. The parties jointly reviewed thousands of pages of documents at this facility in October and November 2007. Plaintiff, too, has recently produced a large number of documents. In

total, the United States estimates that the parties have copied and exchanged approximately 32,000 pages of documents, and viewed many more.

## II. Resolution of Certain Issues Rather Than Engaging In Further Open-Ended Discovery Would Benefit Both Parties and the Court and Facilitate Resolution of this Case

The parties have discussed a variety of proposals for further proceedings in this case, most recently in a January 7, 2008 conference. As the United States understands Plaintiff's position, Plaintiff intends to ask the Court to allow the parties to engage in a substantial amount of additional open-ended discovery, lasting approximately the next twenty months. Under Plaintiff's proposal, beginning in September 2009, the parties would engage in liability-related briefing, eventually proceeding to trial in mid-2010. Plaintiff's proposal is both inefficient and impracticable.

As discussed below, there are fundamental issues that could be resolved now. Moreover, it is necessary to resolve these issues in order to help the parties and the Court focus the remainder of this case on material issues that the parties actually dispute. Plaintiff's proposal prevents the parties from resolving these important issues until after discovery has closed. Plaintiff's proposal virtually guarantees that the parties will engage in unnecessarily broad and wasteful discovery, only to arrive at trial in mid-2010 with significantly different understandings of what this case is about and what issues are actually in dispute.

In order to focus further proceedings in this case, the United States proposes that the parties be allowed to engage in motions practice before conducting additional discovery. There are several issues that should be addressed, including the following:

1. Plaintiff's claims focus on actions that arose decades ago, more than six years before the filing of this lawsuit. For example, the Bennett Freeze was established in 1966, more

than 22 years before Plaintiff filed this lawsuit. The 1980 Amendment, which first codified the Bennett Freeze, was also enacted and implemented more than six years before Plaintiff filed this lawsuit. Although the government's earlier motion for summary judgment addressed the question of statute of limitations (primarily with respect to the takings claim), that motion was denied on the ground that there appeared to be material facts in dispute. After the taking of additional discovery, the United States is unaware of any material facts actually in dispute with regard to this issue, and believes that summary judgment is appropriate.

2. Plaintiff's breach of trust claim appears to allege a violation of a trust based on the passage of an act of Congress, the 1980 Amendment to the Settlement Act. The Court lacks jurisdiction over such a claim. See Menominee Tribe v. United States, 221 Ct. Cl. 506, 520, 607 F.2d 1335, 1344 (1979) ("[W]hen the valid acts of Congress itself are assailed as unjust, unfair, in bad faith, or blind to the Indians' interest – in a case not raising a constitutional claim – we do not believe that Congress intended in sections 1491 or 1505 to repose that unusual authority . . . in this court."), cert. denied, 445 U.S. 950 (1980). An act of Congress cannot effect a breach of trust because Congress created, and therefore defined, the very trust upon which a tribe must sue. Plaintiff's breach of trust claim must be rejected under these principles.

3. When the parties briefed the merits of Plaintiff's takings claim in the earlier summary judgment briefing, Plaintiff relied on the liability principles articulated in Agins, a case that the United States Supreme Court has expressly overturned. See Lingle, 544 U.S. at 545. Plaintiff's taking claim, therefore, must be rejected. To the extent Plaintiff intends to articulate a Penn Central claim, the parties will presumably have to address the alleged

economic impact caused by the Bennett Freeze. The parties disagree on how such potential economic impact should be measured, an issue that could be resolved most efficiently by cross motions for summary judgment. For example, the United States believes Plaintiff's economic harm extends, at most, to those written proposals for income-producing public projects that were actually submitted for approval and denied; Plaintiff will apparently take a much more expansive view. If the parties do not resolve this issue now, it will be virtually impossible to properly instruct an expert appraiser, and the parties will arrive at trial in three years without a clear picture of what this case is about, and with very different theories about how any potential harm should be measured.[3/]

Each of these issues could be resolved by summary judgment, and the Court should endorse early resolution of these issues to avoid unnecessary, wasteful expenditure of attorney and judicial resources.

---

[3/] The United States' proposal is hardly novel. This Court often addresses such questions before trial for the same reasons the United States articulates here. E.g., Cane Tenn,, Inc. v. United States, 71 Fed. Cl. 432, 434-35 (2005) (noting that the Court addressed the "parcel as a whole" question and determined two of the three Penn Central factors prior to trial), aff'd, 214 Fed. Appx. 978 (Fed. Cir. Jan. 10, 2007); Casitas Mun. Water Dist. v. United States, 76 Fed. Cl. 100 (2007) (addressing, in a motion for summary judgment, whether plaintiff's allegation is recognizable as a physical or regulatory takings claim).

## III. Proposed Case Management Plan

For the above-stated reasons, the United States requests that the Court adopt the following schedule:

| Event | Date |
|---|---|
| The United States files Motion for Summary Judgment | June 2, 2008 |
| Plaintiff files Response to United States' Motion for Summary Judgment | July 2, 2008 |
| The United States files a Reply in Support of Motion for Summary Judgment | July 16, 2008 |
| Oral Argument | At the Court's convenience |
| Joint Status Report, to suggest further proceedings, if necessary | Two weeks after resolution of the United States' Motion for Summary Judgment |

## IV. Conclusion

For the reasons set forth above, the United States respectfully requests that the Court adopt the proposed case management plan.

Dated: January 14, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

_/s/ William J. Shapiro__________________
WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, California 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

MARK BARRON
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, DC 20530
(202) 305-0490 (phone)
(202) 305-0506 (fax)

Of Counsel
Daniel Jackson
Solicitor's Office
United States Department of the Interior
Phoenix, AZ