COPY
OF
ORIGINAL FILED ON THIS DATE
SEP 26 1988
RICHARD H. WEARE, CLERK
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IVAN L. SIDNEY, et al., Plaintiffs v. PETER MACDONALD, et al., Defendants. | No. CIV 58-579 PCT-EHC<br>ORDER GRANTING PRELIMINARY INJUNCTION |

NATURE OF PROCEEDING

The United States filed a Motion for a Preliminary Injunction on September 14, 1988, seeking to enjoin the Navajo Tribe from implementing programs recently announced by Navajo Tribal Chairman Peter MacDonald having to do with Navajo Tribal activities on Hopi partitioned lands (HPL) and 1934 Act lands (Bennett Freeze).

The Government's concern was first prompted by Chairman MacDonald's letter to the Navajo-Hopi Indian Relocation Commission (Relocation Commission), dated August 15, 1988, in which after a series of statements critical of the Navajo-Hopi relocation process and his perceptions of conditions on these areas, he stated:

////////

> I am compelled by this reality to tell you that if I do not receive by August 25, 1988 the clearest possible commitment from the federal government to conduct the needed repairs and related construction, I will personally undertake to provide more suitable housing from [sic] those on the HPL, including resistors, and for those most in need on the Bennett Freeze, and especially to find housing, on the HPL itself if need be, for the refugee families who left the HPL but have no place else to go. I will spare no effort in this regard.

A copy of this letter was noted as going to Ross Swimmer, Assistant Secretary of Interior. It is unclear why this letter was not directed to the Department of Interior, in view of responsibilities imposed on the Secretary by the 1974 Navajo-Hopi Indian Relocation Act, 25 U.S.C. § 640d, et seq, and subsequent orders of this Court.

An attachment to MacDonald's letter listed 34 "Housing Assistance Requests" for Navajo Tribal members residing on either the HPL or the so-called Bennett Freeze area. The list identified the nature of the "problem", but did not provide any information regarding proposed remedial actions.

The Commission responded under date of August 19, 1988 that it would follow its policy of giving priority to relocation assistance for "relocatees from the HPL and those in emergency situations". The response went on to state:

////////

> . . . With your assistance and intervention, we feel this process can be quickened even beyond our normally expeditious fashion. Particularly in the case of Tribal approval of pending homesite leases, your personal assistance will be helpful. Since almost all of these families are in the Teesto and Hardrock areas, it would be helpful if staff persons from the Navajo-Hopi Development Office could accompany our staff on these visits. We will notify the Development Office of the schedule.(*)

MacDonald replied on August 23, 1988, stating that he was "not interested in forcing my people to leave their homelands", i.e., compliance with federal legislation and court opinions, and that "[he] may have to personally undertake to provide decent housing for those of my people on the HPL, including resistors, and for those most in need on the Bennett Freeze. I shall do what I can for those refugee families who left the HPL and are aithout homes and promised benefits."

On August 30, 1988, the Navajo-Hopi Development office wrote Hopi Tribal Chairman Ivan Sidney as follows:

> The Navajo-Hopi Development Office, on behalf of the Navajo Tribe, hereby gives notice to the

---

(*) It takes from 3 to 6 years for the Navajo Tribe to process and issue a lease for a tribal member to relocate from the HPL to an adjacent area which is included in the Navajo Reservation.

> Hopi Tribe of intended construction in the HPL and 1934 Statutory Freeze Area. The Navajo Tribe intends to repair, renovate, replace or add to dilapidated or inadequate structures belonging to the families on the enclosed list.
>
> Based on existing court guidelines, we have concluded that Hopi Tribal consent is not necessary for the types of construction we intend to do.

The list sent to the Hopi Tribe included 50 "Housing Assistance Requests", and a general location of the house. It did not specify what was proposed to be constructed at any location. The list included properties on the HPL and Bennett Freeze area.

The list mailed to the Hopi Tribal Chairman did not include the names and locations for Billy Attaki and Irene Yazzie which were on the list mailed to the Relocation Commission.

After having done nothing for a number of years to repair or replace any burned or dilapidated building, or build an addition to an existing building, for any Tribal member living on the HPL, the Tribe, under the putative direction of Chairman MacDonald, commenced an extensive and frenetic construction program on the HPL and the Bennett Freeze area in late August, 1988. One example: within a two week period, eight Navajo Tribal members employed by the tribe at minimum hourly wage rates, using $11,484 in materials provided by the Tribe and using tribal equipment and vehicles,



Exhibit 1 to the United States' Motion for Adoption of Proposed Case Management Plan

constructed a two room block house (768 sq. ft.) for Billy Attakai and his mother to replace a house that they had lived in for many years.

This construction program was commenced at or near the time that Chairman MacDonald in a four page "Paid Advertising Supplement to Navajo Times" announced his personal plan to improve the living conditions of Navajos residing on the HPL. MacDonald's statement includes his assertions of what he intends to do on the HPL:

> [W]e will keep renovating and rebuilding houses;
>
> We will start digging wells and running powerlines and stringing phone lines and building roads. We will set up a health clinic;
>
> And we may initiate a Resettlement Program. Right here in the HPL. If there are any Navajos out there who desire to return to their ancestral homelands, we will begin to resettle them.

The Government's request for a temporary restraining order was heard on Friday, September 16 and Saturday, September 17. The Navajo Tribe received notice of the hearing, and fully participated in the hearing by way of arguments and presentation of evidence. The hearing was an adversarial proceeding in every sense of the word.

Given the nature of the hearings on September 16 and 17, any order issued by the Court granting injunctive relief will be treated as a preliminary injunction. Levas and Levas v. Village of Antioch, Ill., 684 F.2d 446 (7th Cir. 1982); Walker v. O'Bannon,

487 F.Supp. 1151, (D.C. Pa. 1980), affirmed 624 F.2d 1092 (3rd Cir. 1980); MLZ, Inc., v. Fourco Glass Co., 470 F.Supp. 273 (D.C. Tenn., 1978). See also: Wright & Miller Federal Practice and Procedure, § 2951.

STANDARDS FOR GRANTING PRELIMINARY INJUNCTION

The criteria in this Circuit for granting a preliminary injunction require a moving party to establish:

(1) a strong likelihood of success on the merits;

(2) the possibility of irreparable injury to the moving party if the preliminary relief is not granted;

(3) a balance of hardships favoring the moving party; and

(4) in appropriate instances, advancement of the public interest.

The moving party may meet its burden of proof by demonstrating

(1) a combination of probable success on the merits and the possibility of irreparable injury, or

(2) that serious questions are raised and the balance of hardship tips sharply in its favor.

As noted in U-Haul Intern. Inc., v. Jartran, Inc., 522 F.Supp. 1238, 1242 (D. Ariz. 1981), affirmed 681 F.2d 1159 (9th Cir. 1982):

> The difference between these two tests is insignificant and a finding with respect to either establishes the basis for injunctive relief.

THE TWO AREAS AT ISSUE

1934 Act(*). In 1934 Congress enacted legislation describing the exterior boundaries of the Navajo Reservation in northeastern Arizona. (Act of June 14, 1934, 48 Stat. 960). The Act conveyed an equitable interest in certain of those lands to the Navajo and "such other Indians as may already be located thereon." The lands involved in the 1934 Act are separate and apart from areas involved in Healing v. Jones. For a discussion of the 1934 Act, see: Sekaquaptewa v. MacDonald, 448 F.Supp. 1183 (D. Ariz. 1978), affirmed in part and reversed in part, and remanded, 619 F.2d 801 (9th Cir. 1980), cert. denied 449 U.S. 1010 (1980).

An action is pending in this Court, filed by the Hopi Tribe pursuant to 28 U.S.C. § 640d-7, to determine Hopi tribal rights and interests in the 1934 area. Sidney v. MacDonald, CIV 74-842-PCT-EHC. This case has been set for trial in Prescott, on September 6, 1989.

Section 640d-9(f), enacted July 8, 1980, 94 Stat. 929 provides as follows with respect to development of lands in litigation under the 1934 Act:

> Any development of lands in litigation pursuant to section 640d-7 of this title and further defined as that 'portion of the Navajo Reservation lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extensions, to the reservation line, of the northern and southern boundaries of said Executive Order Reservation' shall be carried out only upon the written consent of each tribe except for the limited

(*) This area in dispute under the 1934 Act is referred to as the "Bennett Freeze."

> areas around the village of Moenkopi and around Tuba City. Each such area has been heretofore designated by the Secretary. 'Development' as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

Insofar as the record in this proceeding reflects, there have been no controversies or disputes regarding construction or development in this area prior to the current program instituted by Chairman MacDonald.

Ten construction projects identified in MacDonald's letter of August 30, 1988 to the Hopi Tribal Chairman are located in this area. As referenced earlier, this letter did not give any information regarding what was proposed to be constructed at any location; neither did it request consent for such undertakings.

MacDonald's letter to the Commission, dated August 15, 1988, stated (p.1):

> 2) Those on the Bennett Freeze - as many as 15 families are considered to be in the greatest need of housing repairs or replacements of whom we have specifically identified two at this time. There are many more.

Two of the projects listed in this letter, Nos. 9 (Wilson Zahne) 10 (Isabelle Mann) are located in the 1934 area. The record does not establish whether one or both of these locations are in the area around Tuba City excepted in section 640d-9(f).

MacDonald's purpose for including these two projects in the

letter to the Commission is unclear, inasmuch as the Commission has no present responsibilities over activities in this area.

The Navajo Tribe has completed, or is in the process of completing other construction projects in the 1934 area without notice to, or consent of the Hopi Tribe. Exhibit 4 in this proceeding discloses the following projects in this category:

| NAME | PROJECT | STATUS | DATE |
| --- | --- | --- | --- |
| Pete Smiley | Replacement House | 100% | 9/9 |
| James Jones | " " | " | " |

The scope and extent of the current activities in this area undertaken by Chairman MacDonald strongly suggest the need for an order of this Court which will implement the statute and provide procedures for the interested parties to follow if there is a dispute regarding a proposed project of either tribe.

HOPI PARTITIONED LANDS (HPL)

The HPL are those areas which were awarded to the Hopi Tribe in the Judgment of Partition in CIV 58-579 - PCT (originally Healing v. Jones):

> . . . [to] be held in trust by the United States exclusively for the Hopi Tribe and as a part of the Hopi Reservation and that the United States hold the same in trust for the Hopi Tribe severally and absolutely free from any and all claims of the Navajo Tribe and members thereof, except as hereinafter specifically set out.

Navajo Tribal members residing on the HPL do not have the right to decide whether they will remain on the HPL indefinitely. In all instances other than those persons qualifying for a life estate lease (eilgibility, timely application and lease), whether to eventually relocate - move from - the HPL is not a voluntary choice for these individuals.(*)

The original Partition Judgment in this matter, entered February 10, 1977, (paragraph 7(b) and (c), ordered:

> (b) No new construction in the area hereby partitioned to the Hopi Tribe shall hereafter be commenced or continued by the Navajo Tribe, or any member thereof, without the written authorization of the Hopi Tribe.
>
> (c) The prior orders of this Court concerning new construction are hereby prospectively modified as herein provided.

The final Judgment of Partition, entered April 18, 1979, following the Order of Remand by the Court of Appeals, reaffirmed paragraph 7b. Judge Walsh further ruled:

> This judgment shall be a final adjudication of the partition issue notwithstanding

---

(*)Statements by Navajo Tribal Counsel, Richard Stolbach, to this Court "that the relocation process is a voluntary one and that Congress has not determined that anyone has to move" is a disservice to the Navajo Tribe and those tribal members still residing on the HPL. It is also a misstatement of the law. (see p.91, Tr. of Prel. Inj. hearing, September 16, 1988).
Initial legislation provided that Navajos residing on the HPL would be removed over a five year period (approximately 1984) at a total cost of $28,800,000.

Exhibit 1 to the United States' Motion for Adoption of Proposed Case Management Plan

the fact that the Court may enter subsequent orders regarding jurisdiction over livestock reduction, range restoration, or other matters related to the partition process, to effectuate the final separation of tribal interests in the Joint Use area.

There has been a ban on "new construction" going on back as early as October 14, 1972. In an Order citing Chairman MacDonald for contempt on May 29, 1974, for new construction in violation of an earlier order, the Court found:

> . . . Representatives of the Comptroller General examined 37 of these cases prior to November 26, 1973, and reported that nine of the cases were new construction, i.e., construction that did not replace a burned or dilapidated building or construction that added to existing buildings. The report stated further, that Federal funds had been used in four of the nine cases.

A subsequent order arguably utilized this definition for new construction, without rescripting it in that instance. <u>See</u>: Judge Walsh's Order of September 11, 1980, requiring removal of a number of buildings on the HPL.

This Court's Order of March 29, 1982, finding Chairman MacDonald in contempt for "new construction" on the HPL, recognized the 1974 definition, i.e., that "new construction" did not include



Exhibit 1 to the United States' Motion for Adoption of Proposed Case Management Plan

"construction that merely replaces a burned or dilapidated building or construction that adds to an existing building." Sidney v. MacDonald, 536 F.Supp. 420, 426 (D.Ariz. 1982), aff. 718 F.Supp. 314 (9th Cir. 1983) told both tribal chairman:

> 4. Each tribe shall have jurisdiction and authority over any lands partitioned to it and all persons located thereon subject to the responsibility of the Secretary to protect the rights and property of life tenants and persons awaiting relocation.

This order was entered consistent with the 1980 amendment to the Relocation Act, section 640d-9(g). I would observe parenthetically that should the Secretary fail in these obligations, a Tribal Chairman does not succeed ipse dixit to the Secretary's rights and he cannot proceed unilaterally to do what he believes is required on the reservation of the other tribe. Rather, he is obliged to bring an appropriate proceeding in this Court, accelerated if necessary, to seek that relief on behalf of the disaffected tribal member or members.

The March 29, 1982 order, Id, 563 F.Supp. at 429 ordered Defendants "Peter MacDonald and the Navajo Tribe" to:

> Cease and desist from providing construction assistance in any form, i.e., labor or materials, to Navajos residing on Hopi partitioned lands without ascertaining whether the requesting individual has obtained the necessary prior written Hopi consent.

Exhibit 1 to the United States' Motion for Adoption of Proposed Case Management Plan

Substantial evidence presented during this injunction proceeding supports a finding that the construction activities at issue were either:

(1) undertaken without the consent of either the Hopi Tribe or interested agencies of the United States, or

(2) "new construction" under prior orders of this Court.

Substantial evidence of record supports a finding that Chairman MacDonald, acting on behalf of the Navajo Tribe, stated that the tribe would undertake development projects on the 1934 lands and HPL lands, which developments would be contrary to provisions of the Navajo-Hopi Relocation Act and/or Orders of this Court.

Substantial evidence of record supports a finding that Chairman MacDonald, acting on behalf of the Navajo Tribe, has stated "We may initiate a Resettlement Program. Right here in the HPL. If there are any Navajos out there who desire to return to their ancestral homelands, <u>we will begin to resettle them</u>." (Emphasis supplied) This practice would violate provisions of the Navajo-Hopi Relocation Act and/or prior Orders of this Court.

This Court has been given authority by Congress to enforce the judgment of partition, as well as provisions of the Relocation Act. This Court has been afforded reasonable discretion how to proceed in exercising that authority.

The Court of Appeals has recognized that there is a need

to resolve issues in the relocation process "as speedily as possible." Sekaquaptewa v. MacDonald, 575 F.2d 239, 248 (9th Cir. 1978).

Congress has repeatedly legislated towards that goal. This proposition was recently emphasized by the Court of Appeals in Sidney v. Zah, 718 F.2d 1453, 1456 (9th Cir. 1983)(*):

> . . . This case concerns the Navajo Tribe's responsibility to effectuate Congress' express intent to resolve the land dispute between the Hopi and Navajo Tribes expeditiously through judicial proceedings enforcing partition . . .

The relocation process, including the well-being of those eligible for and awaiting relocation are matters affected with the public interest. Actions intended to, or resulting in the frustation of these purposes are harmful to all concerned. Damages, both in a monetary sense and through emotional trauma caused by the creation of false hopes and expectations are inestimable. These injuries are real and irreparable; their effects can be measured only by speculation and conjecture.

The United States has shown a combination of probable success on the merits and the strong possibility of irreparable injury. The government has also shown that the equities in this

---

(*) Peterson Zah, then Chairman of the Navajo Tribe, had been substituted in the action for Peter MacDonald, pursuant to Fed.R.App. P.43(c).

proceeding tip sharply in its favor with respect to advancement of the public interest.

With the issuance of this Preliminary Injunction, I would remind the parties that cooperation, consultation and the exercise of reasoned judgment do not violate any order of this Court or their obligations under the law. Neither are they a sign of weakness by anyone exercising leadership responsibility.

Accordingly,

IT IS ORDERED, pendente lite,

(1) The Navajo Tribe shall not undertake any construction or development activities on the 1934 Act lands (Bennett Freeze) and the Hopi Partitioned Lands (HPL) except in compliance with this Order;

(2) Construction or development activities include providing materials for these purposes, as well as labor and equipment;

(3) The Navajo Tribe shall make written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze or HPL.

(a) A construction application shall include the name of person, or persons regularly residing at the dwelling, a description of the location sufficient to identify the site, a description of the proposed construction and why it is considered necessary (together with plans and specifications, if any), the materials and cost, number of employees of the Tribe to be involved in

the construction, and the estimated time to complete the project;

(b) The Hopi Tribe and the Bureau of Indian Affairs shall each notify the Navajo Tribe in writing of approval or disapproval of each application within ten (10) days after it is filed, together with reasons if an application is disapproved.

(i) The Navajo Tribe may petition this Court for review of any disapproved application within ten (10) days after receiving such disapproval. The petition may be telefaxed to the Court; it will be noticed for expedited hearing after telephone conference with counsel.

(ii) Any construction required by an act of nature (fire, storm, etc.) or because of a sudden change in health conditions, may be handled by telephone calls between Tribal representatives. An appeal to this Court will be handled in accordance with the preceding paragraph

(iii) A development application (such as a road, utility line, well, wind-mill, stock tank, reservoir) shall include specifics regarding the development, including location, estimated cost, and justification for the proposal. A development application shall be

processed in the same manner as a construction application.

(4) The Navajo Tribe shall not settle or resettle any Navajo Tribal members on the HPL without the written consent of the Hopi Tribe.

Dated this 26th day of September, 1988.

Earl Carroll

United States District Judge