Electronically Filed on January 31, 2008

**IN THE UNITED STATES**

**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION, | ) | |
| | ) | No. 88-508L |
| Plaintiff, | ) | |
| v. | ) | Senior Judge Eric G. Bruggink |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**NAVAJO NATION'S RESPONSE TO THE UNITED STATES' MOTION FOR ADOPTION OF PROPOSED CASE MANAGEMENT PLAN AND MEMORANDUM IN SUPPORT**

BRUCE R. GREENE, Attorney of Record
Greene, Meyer & McElroy, P.C.
1007 Pearl St., Ste. 220
Boulder, Colorado 80302
(303) 442-2021 (phone)
(303) 444-3490 (fax)

*Counsel for the NAVAJO NATION*

Of counsel:

SCOTT B. McELROY
M. CATHERINE CONDON
Greene, Meyer & McElroy, P.C.
1007 Pearl St., Ste. 220
Boulder, Colorado 80302
(303) 442-2021 (phone)
(303) 444-3490 (fax)

PETER J. OSETEK
412 E. Huron Street
Ann Arbor, Michigan 48104
(734) 769-4500

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. NAVAJO NATION RESERVATION LANDS IN ARIZONA . . . . . . . . . . . . . . . . . . . . 2

A. THE BENNETT FREEZE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. THE 1934 NAVAJO BOUNDARY BILL RESERVATION AND LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. THE COURT SHOULD ADOPT THE NAVAJO NATION'S CASE MANAGEMENT PROPOSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

A. THE NAVAJO NATION'S PROPOSED PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B. THE UNITED STATES' PROPOSAL TO RESOLVE CERTAIN ISSUES BY SUMMARY JUDGMENT IS INAPPROPRIATE . . . . . . . . . . . . . . . . . . . . . . 9

1. Takings Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2. Breach of Trust Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

3. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C. IF THE COURT DETERMINES THAT THE UNITED STATES' PROPOSAL IS CORRECT, THE NAVAJO NATION REQUESTS AN APPROPRIATE TIMELINE TO RESPOND TO THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . 12

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

## CASES

*Agins v. Tiburon*, 447 U.S. 255 (1980) . . . . . . . . . . 9

*Babbitt v. Youpee*, 519 U.S. 234 (1997) . . . . . . . . . . 9

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211 (1986) . . . . . . . . . . 1, 9, 10

*Healing v. Jones*, 210 F. Supp. 125 (D. Ariz. 1962)
*aff'd*, 373 U.S. 758 (1963) . . . . . . . . . . 2

*Honyoama v. Shirley*, No. CIV 74-842-PHX-EHC (D. Ariz. Dec. 4, 2006) . . . . . . . . . . 6

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005) . . . . . . . . . . 9

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) . . . . . . . . . . 9

*Masayesva v. Zah*, 65 F.3d 1445 (9th Cir. 1995) . . . . . . . . . . 2, 5

*Masayesva v. Zah*, 816 F. Supp. 1387 (D. Ariz. 1992),
*aff'd in part denied in part*, 65 F.3d 1445 (1995) . . . . . . . . . . 5

*Menominee Tribe v. United States*, 221 Ct. Cl. 506, 607 F.2d 1335 (1979) . . . . . . . . . . 10, 11

*Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) . . . . . . . . . . 9, 10

*Secakuku v. Hale*, No. CIV 74-842-PHX-EHC (D. Ariz. Apr. 1, 1997) . . . . . . . . . . 6

*Sekaquaptewa v. MacDonald*, 619 F.2d 801 (9th Cir. 1980) . . . . . . . . . . 4, 5

*Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768 (1993) . . . . . . . . . . 11

*United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) . . . . . . . . . . 1, 10

## STATUTES

Act of June 14, 1934, ch. 521, 48 Stat. 960 . . . . . . . . . . 2, 4, 5

Navajo-Hopi Settlement Act, 25 U.S.C. §§ 640d to 640d-31 . . . . . . . . . . 3, 4, 5, 6

## RULES

RCFC 56 . . . . . . . . . . 13

Plaintiff, Navajo Nation, responds herein to *The United States' Motion for Adoption of Proposed Case Management Plan and Memorandum in Support* (Jan. 14, 2008) ("Motion"). As the Court is aware, the parties assert two fundamentally different approaches for advancing this litigation. In requesting a halt to the ongoing discovery and permission to file pretrial motions, the United States argues that the Court can dispose of all or some of the case by summary judgment. At a minimum, the United States contends that the issues for trial can be narrowed through such motions. As this Court previously ruled, however, the fact-driven issues in this case are not appropriate for resolution by summary judgment. *Order* (Mar. 8, 1996) ("1996 Order") (attached hereto as Exh. A). Halting discovery without having crossed the finish line and, most importantly, prior to the preparation and exchange of expert reports, will not advance the resolution of the complex, fact-bound issues which are at the heart of this litigation. In short, the issues in this case cannot be narrowed, let alone resolved without providing the Court with the experts' analysis of the facts and their opinions regarding the import of the documentary and human history underlying the events that resulted in this litigation.

In its previous holding that the case could not be resolved or narrowed in advance of trial, the Court stated:

> 2. Defendant's motion for summary judgment on plaintiff's takings claim is DENIED. Takings cases rely on "ad hoc, factual inquiries into the circumstances of each particular case," Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224 (1986), and defendant has not demonstrated the absence of any dispute as to a material issue of fact. See also United States v. Sioux Nation of Indians, 448 U.S. 371, 415 (1980) ("the question whether a particular measure was appropriate for protecting and advancing the tribe's interests, and therefore not subject to the constitutional command of the Just Compensation Clause, is factual in nature").
>
> 3. Defendant's motion for summary judgment on statute of limitations and ripeness grounds is DENIED. Defendant has not demonstrated the absence of any dispute as to any material issue of fact. Because many of the

> same factual issues raised by the takings claim must be considered when evaluating the statute of limitations and ripeness issues, it would seem appropriate to try all of these issues together.
>
> 4. Defendant's motion for summary judgment on plaintiff's breach of trust claim is DENIED. As the court explained, the same factual issues are involved in evaluating the takings claim and the breach of trust claim.

1996 Order at 1-2. As explained below, there is no reason for the Court to reach a different result in the absence of the completion of discovery and the preparation and exchange of expert reports.

## I. NAVAJO NATION RESERVATION LANDS IN ARIZONA.

The Navajo Nation occupies a vast, arid region of high plateau country in northeastern Arizona, western New Mexico and southeast Utah. The Hopi Tribe occupies a reservation centrally located within the Arizona portion of the Navajo Reservation. There have been two significant land disputes that have arisen between the two tribes, regarding different geographic areas within the State of Arizona, based upon different legal and factual underpinnings. The first case, commonly referred to as the 1882 Litigation, relates only to the Hopi Executive Order Reservation, created in 1882. Executive Order of Chester A. Arthur (Dec. 16, 1882); *Healing v. Jones*, 210 F. Supp. 125 (D. Ariz. 1962), *aff'd*, 373 U.S. 758 (1963). Contrary to the United States' assertion that this "litigation . . . lasted decades and played an important role in the genesis of the Bennett Freeze," Motion at 2 n.1, the 1882 Litigation has virtually no bearing on the issues in this case.

In contrast, the second case, *Masayesva v. Zah*, 65 F.3d 1445 (9th Cir. 1995) ("1934 Litigation"), arose out of the Act of June 14, 1934, ch. 521, 48 Stat. 960 ("1934 Act"), addressing the exterior boundary of the Navajo Reservation in Arizona as defined by the 1934 Act, and is directly related to this litigation. Before the 1934 Litigation was authorized and filed,

the United States imposed a construction and development "freeze" on a 1.5 million-acre parcel of Navajo land, lying immediately west of the 1882 Reservation, within the 1934 Reservation. The case before this Court relates to the tragic effects of that freeze on the Navajo Nation.

**A. <u>THE BENNETT FREEZE</u>.**

In 1966, in response to urging by the Hopi Tribe, the then Commissioner of Indian Affairs, Robert Bennett, issued a directive imposing a requirement that either tribe seek the other tribe's approval before engaging in actions that could affect the land status with respect to 1.5 million designated acres of land within the 1934 Reservation. This directive became known as the "Bennett Freeze," and the subject lands the "Bennett Freeze Area" ("BFA"). The BFA was arbitrarily delineated by drawing lines extending westerly from the northern and southern boundaries of the 1882 Reservation, all the way to the Colorado River. Tuba City and the adjacent Hopi Village of Moencopi are situated within the 1.5 million-acre area. Approximately 10,000 Navajos were affected by the Bennett Freeze; a handful of Hopis were also affected. The majority of the Hopis resided in Moencopi, which was administratively exempted from the Freeze early on. Thus, the impact of the Bennett Freeze fell disproportionately on the Navajo Nation and its members.

Due to pressure from the Hopi Tribe stemming from its displeasure with the Commissioner of Indian Affairs' approval of several Navajo construction applications within the BFA, Congress codified the Bennett Freeze in 1980 and it was subsequently referred to as the "Statutory Freeze." 25 U.S.C. § 640d-9(f). Congress provided that no development was to occur on lands in the areas subject to litigation under 25 U.S.C. § 640d-7 unless written consent was obtained from both the Hopi Tribe and the Navajo Nation. If the Hopi Tribe either denied or

ignored a request to allow construction or development, the Navajo Nation or its members had no recourse.

On August 26, 1982, the Hopi Tribe unilaterally imposed "a moratorium on any and all construction activities . . . within the Bennett Freeze Order Area (BFOA), until certain issues have been addressed satisfactorily surrounding current and potential construction activities in the litigated BFOA and the entire 1934 Reservation." Letter to Calvin Nez, Division of Social Services, Western Navajo Agency, from Stanley K. Honahni, Sr., Chairman, Hopi Negotiating Committee, Hopi Tribal Council (Aug. 26, 1982) ("Honahni Letter"). Thereafter, Hopi tribal rangers trespassed on the BFA and posted cease and desist notices whenever they found alleged new construction or repairs.

On November 16, 1988, Congress amended 25 U.S.C. § 640d-9(f) by adding subsections (2) and (3). Subsection (2) provided that each tribe was required to respond to a request for development within 30 days and if it denied the request, was required to provide reasons for the denial. Subsection (3) provided that the Secretary of the Interior could approve of development denied by a tribe, with the exception of new housing construction, if necessary for the health or safety of the tribe or enrolled members.

**B. THE 1934 NAVAJO BOUNDARY BILL RESERVATION AND LITIGATION.**

In 1934, Congress enacted legislation regarding the exterior boundaries of the Navajo Reservation in Arizona. 1934 Act; *Sekaquaptewa v. MacDonald*, 619 F.2d 801, 805-807 (9th Cir. 1980). The Reservation recognized by the 1934 Act was then and is today almost exclusively used, occupied and possessed by members of the Navajo Nation. The 1934 Act sought to protect Navajo interests in existing Navajo Executive Order Reservations in Arizona by providing lands "for the benefit of the Navajo and such other Indians as may *already be*

*located thereon.*" 1934 Act § 1, 48 Stat. 960 (emphasis added). From 1934 to the present, a small group of Hopis has resided in the village of Moencopi.

In 1974, Congress enacted the Navajo-Hopi Settlement Act, 25 U.S.C. §§ 640d to 640d-31, which among other things, authorized litigation between the Navajo Nation and Hopi Tribe to address the Moencopi situation. 25 U.S.C. § 640d-7. Thus, in December 1974, the Hopi Tribe initiated litigation against the Navajo Nation claiming a one-half interest in the entire seven million-acre Navajo Reservation in Arizona. As the Ninth Circuit Court of Appeals recognized early in the first phase of the litigation, "[n]either the 1868 treaty reservation nor the 1882 reservation is at issue here." *Sekaquaptewa*, 619 F.2d at 803. The intent of Congress in the 1934 Act was to "withdraw all reservation land for the Navajos except for pockets occupied by Hopis." *Id.* at 807. The trial regarding the extent of 1934 Hopi use, occupancy and possession began in 1989 and concluded in early 1990. The federal district court in Arizona issued its opinion in 1992, which both tribes appealed. As part of its opinion and order, the district court determined that the litigation had concluded, and lifted the Statutory Freeze. *Masayesva v. Zah*, 816 F. Supp. 1387, 1424 (D. Ariz. 1992), *aff'd in part denied in part*, 65 F.3d 1445 (1995).

In 1995, the United States Court of Appeals for the Ninth Circuit affirmed in part the district court's decision regarding ownership of land within the 1934 Reservation area. *Masayesva v. Zah*, 65 F.3d 1445 (9th Cir. 1995). The appeals court also remanded the case to the district court to determine whether the Hopi Tribe was entitled to an award of identifiable locations within the 1934 Reservation used for religious purposes. *Id*. at 1455. Additionally, the Ninth Circuit ruled that the district court lacked authority to lift the Bennett Freeze and, therefore, reimposed the freeze until the litigation was concluded. *Id*. at 1460.

On April 1, 1997, the federal district court in Arizona issued an order indicating a decision would be rendered regarding locations within the 1934 Reservation used by the Hopi Tribe for religious purposes based on the existing record. *Order* at 9-10, *Secakuku v. Hale*, No. CIV 74-842-PHX-EHC (D. Ariz. Apr. 1, 1997). A hearing was held on July 25, 1997, regarding the Navajo Nation's proposed findings of fact and conclusions of law, as well as any proposed findings and conclusions of the Hopi Tribe, with respect to the Hopi religious use claims. A subsequent hearing was held on July 21, 1998, and concluded on September 11, 1998, wherein the Hopi Tribe concluded its offer of proof with respect to religious sites.

In 2002, at the urging of the district court, the attorneys for the parties in the 1934 Litigation agreed to mediate the remaining issues. Finally, in November 2006, the Navajo Nation and the Hopi Tribe signed an Intergovernmental Compact which purported to resolve all outstanding issues in the 1934 Litigation. On December 4, 2006, the federal district court in Arizona approved the Intergovernmental Compact and entered final judgment. The district court's order states that as a result of the Intergovernmental Compact, "no lands are any longer 'in litigation' for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the 'Bennett Freeze,' are of no further force or effect." *Order and Final Judgment* at 4, *Honyoama v. Shirley*, No. CIV 74-842-PHX-EHC (D. Ariz. Dec. 4, 2006).

In all, it would be 40 years before a federal district court would lift the Statutory Freeze; by that time, the entire region was blighted.

## II. <u>THE COURT SHOULD ADOPT THE NAVAJO NATION'S CASE MANAGEMENT PROPOSAL</u>.

### A. THE NAVAJO NATION'S PROPOSED PLAN.

In the absence of the completion of discovery and, in particular, the preparation and exchange of expert reports, the Navajo Nation does not believe that any of the issues in the litigation can be resolved or narrowed by summary judgment. The Navajo Nation therefore recommends the following case management plan for adoption by the Court:

A. Joint Preliminary Status Report: March 1, 2008
B. Rule 26(a)(1) disclosures: May 1, 2008
C. Deadline for amending pleadings: May 31, 2008
D. Rule 26(a)(2) disclosures:
   1. Identity of experts: September 1, 2008
   2. Expert reports: December 1, 2008
   3. Rebuttal witnesses: March 1, 2009
   4. Rebuttal witnesses' reports: May 1, 2009
E. Completion of discovery re case in chief witnesses: April 1, 2009
F. Completion of all discovery: July 1, 2009
G. Post-discovery conference: August 1, 2009
H. Pretrial Motions:
   1. Opening briefs: September 1, 2009
   2. Response briefs: November 1, 2009
   3. Reply briefs: December 1, 2009
I. Date for final pre-trial conference: April 15, 2010
J. Date for trial: May 1, 2010

Contrary to the United States' contention, the Navajo Nation is not "ask[ing] the Court to allow the parties to engage in a substantial amount of additional open-ended discovery, lasting approximately the next twenty months." Motion at 9. Rather, the Navajo Nation's proposal allows time to complete the ongoing discovery which is both limited and discrete in nature. The Navajo Nation submitted additional interrogatories and requests for production to the United States on July 13, 2007 and subsequently amended and resubmitted 22 interrogatories and 11 requests for production to the United States on December 6, 2007. The Navajo Nation seeks

limited information and documentation regarding various issues, including: (1) Solicitor's Opinions regarding construction and/or dismantling of structures within the Freeze, the United States' interpretation of its trust responsibility, interpretation of the Freeze language and the scope of the Freeze; (2) documents relating to interpretation and enforcement of the Freeze; and (3) documents relating to pre-Freeze communications between the Hopi Tribe and the federal government and between the Navajo Nation and the federal government. In addition, the Navajo Nation has challenged the United States' assertion of privilege with respect to certain documents. Although the United States has responded to the Navajo Nation's challenge, the issue has not been fully resolved.

The Navajo Nation's proposed case management proposal also provides time for the Navajo Nation's expert witnesses to complete their fieldwork and finish their reports. Once the parties have exchanged their expert reports, the parties will depose various lay and expert witnesses. In the event the experts need additional documents to complete their reports and/or witnesses disclose the existence of relevant documents not previously disclosed, additional document requests may be required.

In the absence of completion of discovery and the exchange of expert reports, there is no reason to believe that pretrial motions can resolve or narrow any of the complex issues in this case. This conclusion, of course, is consistent with the Court's prior holding that it wanted the factual record in this case presented through trial. 1996 Order at 1-2.

**B. THE UNITED STATES' PROPOSAL TO RESOLVE CERTAIN ISSUES BY SUMMARY JUDGMENT IS INAPPROPRIATE.**

The United States contends that the parties should once again engage in motion practice regarding the same issues that the Court previously addressed and dismissed in its 1996 Order -- statute of limitations, breach of trust claim and takings claims.

**1. <u>Takings Claim</u>.**

The United States mischaracterizes both the Court's previous ruling and the Navajo Nation's pleadings and arguments in regard to the regulatory takings claim. Although *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005), had not been decided at the time the United States' motion for summary judgment was argued, the Navajo Nation's takings claim, as plead and argued, did not rely on the "substantially advances" language of *Agins v. Tiburon*, 447 U.S. 255, 260 (1980), as the sole basis for its regulatory takings claim. The Navajo Nation's pleadings and arguments, as fairly read, articulate a regulatory takings claim under the authority of *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124-25 (1978) (takings factors include the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015-16 (1992) (deprivation of all economically beneficial use of the property constitutes a regulatory takings); and *Babbitt v. Youpee*, 519 U.S. 234, 244 (1997) (the "extraordinary" character of the governmental regulation must be analyzed in takings claims). Further, the Court did not rely on *Agins* as the reason for denying the United States' motion. Rather, the Court ruled:

> Defendant's motion for summary judgment on plaintiff's taking claim is DENIED. Takings cases rely on "ad hoc, factual inquiries into the circumstances of each particular case," <u>Connolly v. Pension Benefit Guaranty Corp</u>., 475 U.S. 211, 224 (1986), and defendant has not demonstrated the absence of any dispute

> as to a material issue of fact. See also United States v. Sioux Nation of Indians, 448 U.S. 371, 415 (1980) ("the question whether a particular measure was appropriate for protecting and advancing the tribe's interests, and therefore not subject to the constitutional command of the Just Compensation Clause, is factual in nature").

1996 Order at 1.

Just as when the United States' motion for summary judgment was decided, regulatory taking cases rely on "ad hoc factual inquires into the circumstances of each particular case." *Id.* (quoting *Connolly*, 475 U.S. at 224). Unless the United States is willing to concede the economic, social and appropriative effects of the regulation in this case, as well as the fact that the regulation was "not reasonably necessary to the effectuation of a substantial public purpose" and had "an unduly harsh impact upon the owner's use of the property," summary judgment remains inappropriate. *See Penn Central*, 438 U.S. at 127 (citations omitted). As the Court previously recognized in its 1996 Order, these issues are inherently factual in nature and require the completion of discovery and the benefit of expert reports and testimony to resolve.

**2. Breach of Trust Claim.**

Again, the United States misstates the Court's previous ruling and the Navajo Nation's arguments in regard to the breach of trust claim. In its complaint, the Navajo Nation did not specifically assert a violation of a trust based on the passage of the 1980 Statutory Freeze but rather alleged its breach of trust claims were founded on the Constitution, implied contracts, statutes and regulations. *See First Amended Complaint* (June 28, 1990) (Motion, Exh. 4). The Navajo Nation, however, argued in its response to the United States' previous motion for summary judgment that its breach of trust claim was based, in part, on the 1980 Statutory Freeze as implemented by the Department of the Interior. Even assuming the United States correctly characterized the Navajo Nation's arguments, *Menominee Tribe v. United States*, 221 Ct. Cl. 506,

520, 607 F.2d 1335, 1344 (1979), does not support the United States' claim that the Court lacks jurisdiction because, unlike *Menominee*, the Navajo Nation's claim in this case also includes a constitutional claim. *See also Uintah Ute Indians of Utah v. United States*, 28 Fed. Cl. 768, 781 (1993). In any event, the Court previously ruled that, "Defendant's motion for summary judgment on plaintiff's breach of trust claim is DENIED. As the court explained, the same factual issues are involved in evaluating the takings claim and the breach of trust claim." 1996 Order at 2.

**3. Statute of Limitations.**

During the hearing on the previous summary judgment motion, the Court indicated that until it looked at all the facts, it would not know whether the Navajo Nation's claims were barred by the statute of limitations. The Court's statement succinctly summarizes the difficulties in addressing this issue in a pretrial motion:

> I don't think we can say immediately it happened in '80, because I think we don't know how it's going to be applied. So it's going to be somewhere after '80. And if it's before whatever date it is in '82, then it's barred. If it's after that, then it apparently isn't barred.
>
> But I guess I can't -- I don't see how I can figure that out in a summary judgment. I would have to hear evidence on that, what was reasonable; when did all the events occur. And I mean, its not an easy issue. When did all the events occur? Well, this is a kind of continuum. It's one of these taking, temporary takings were [sic], you know, you can't necessarily pinpoint the exact moment, or maybe you can. Maybe it was the moratorium from the Hopis, and that's within the statute.
>
> . . . .
>
> It's part of the factual mix, clearly it's part of the factual mix. What you have to show is, in essence, you've got to show me I shouldn't have a trial on that issue, as to when they know, when should they have realized everything has happened. When did everything happen that would result in them, in effect having a taking.

> And I think my impression is that it's somewhat wrapped up in a lot of these facts about what was happening in 1980 and '82. I mean, I don't think I can do it on summary judgment.

Transcript of Proceedings at 44-45 (Feb. 29, 1996) ("Tr.") (statement of the Court).

The United States asserts that it "is unaware of any material facts actually in dispute with regard to [the statute of limitations] issue, . . ." Motion at 10. While it is possible that the events in question are not in dispute, the critical issue here is the conclusion drawn by the Navajo Nation from those events. Prior to the Hopi Tribe's announcement on August 26, 1982, that it would not consent to *an*y Navajo development requests, *see* Honahni Letter at 1, the Navajo Nation reasonably believed that the Hopi Tribe would act sensibly in approving proposed Navajo Nation projects and that the Secretary of the Interior would require them to act in such a fashion. To the extent that the United States disputes that assertion, this Court must address that issue through a factual finding. The issue, as the Court has noted, is "wrapped up in a lot of these facts about what was happening in 1980 and '82." Tr. at 45. In these circumstances, summary judgment is not appropriate.

## C. IF THE COURT DETERMINES THAT THE UNITED STATES' PROPOSAL IS CORRECT, THE NAVAJO NATION REQUESTS AN APPROPRIATE TIMELINE TO RESPOND TO THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT.

In the event the Court determines that the United States should be permitted to file a motion for summary judgment prior to the completion of the remaining discovery and the preparation and exchange of expert reports, the schedule proposed by the United States is not reasonable. Even without the preparation of expert reports, it will be necessary for the Navajo Nation to work closely with its experts regarding any statement of facts to be used in responding to a motion by the United States or in asserting a cross motion for summary judgment. *See*

*generally* RCFC 56(e), (h)(2). Because one of the Navajo Nation's primary experts is an academic professor who will not be able to devote a substantial amount of time to this matter until May 2008, it will be extremely difficult for the Nation to respond to the United States' motion before September 1, 2008. Moreover, because this is a complex case, it is not reasonable to require the Navajo Nation to respond to a motion for summary judgment 30 days after receiving the United States' motion for summary judgment.

To conclude, if the parties are to engage in motion practice, the Navajo Nation requests the Court to direct the parties to seek to develop a stipulation of facts prior to the submission of the United States' motion in accordance RCFC 56(h)(3) and to amend the United States' proposed schedule as follows:

A. United States' Motion for Summary Judgment is due within 60 days after the stipulation of facts is filed with the Court but no sooner than July 1, 2008.
B. Any Navajo Nation Cross Motion for Summary Judgment and Response to United States' Motion for Summary Judgment is due within 60 days after the United States files its Motion for Summary Judgment.
C. United States' Response to the Navajo Nation's Motion for Summary Judgment and a Reply to the Navajo Nation's Response is due 45 days after the Navajo Nation's Cross Motion for Summary Judgment and Response is filed.
D. Navajo Nation's Reply to the United States' Response is due within 45 days after receiving the United States' Response and Reply.
E. Oral Argument: At the Court's convenience.
F. Joint Status Report to suggest further proceedings: two weeks after resolution of the parties' Motions for Summary Judgment.

## III. CONCLUSION.

Based on the foregoing, the Navajo Nation respectfully requests that the Court adopt the Navajo Nation's proposed plan as set forth in Section II.A. of this response brief. To the extent the Court determines that the United States should be permitted to file a motion for summary judgment prior to the completion of all discovery, the Navajo Nation requests the Court adopt the Navajo Nation's alternative proposal set forth in Section II.C.

Dated: January 31, 2008

Respectfully submitted,

BRUCE R. GREENE, Attorney of Record
Greene, Meyer & McElroy, P.C.
1007 Pearl St., Ste. 220
Boulder, Colorado 80302
(303) 442-2021 (phone)
(303) 444-3490 (fax)

*Counsel for the NAVAJO NATION*

/s/ *Bruce R. Greene*
by /s/ *Scott B. McElroy*

___________________________

Of counsel:

SCOTT B. McELROY
M. CATHERINE CONDON
Greene, Meyer & McElroy, P.C.
1007 Pearl St., Ste. 220
Boulder, Colorado 80302
(303) 442-2021 (phone)
(303) 444-3490 (fax)

PETER J. OSETEK
412 E. Huron Street
Ann Arbor, Michigan 48104
(734) 769-4500

# In the United States Court of Federal Claims

* * * * * * * * * * * * * * * * * * * * * * * *

THE NAVAJO NATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * *

No. 508-88L

(Filed: March 8, 1996)

RECEIVED
MAR 18 1996
Department of Justice
Natural Resources Unit

## ORDER

Upon consideration of the representations made by the parties during the oral argument held on February 29, 1996, and for the reasons explained by the court at the close of that argument, it is hereby ORDERED:

1. Defendant's motion for summary judgment as it relates to plaintiff's equal protection claim (as applied through the Due Process Clause of the Fifth Amendment) is GRANTED. "This court has no jurisdiction over claims based upon the Due Process and Equal Protection guarantees of the Fifth Amendment, because these constitutional provisions do not obligate the Federal Government to pay money damages." Carruth v. United States, 224 Ct. Cl. 422, 445, 627 F.2d 1068, 1081 (1980).

2. Defendant's motion for summary judgment on plaintiff's takings claim is DENIED. Takings cases rely on "ad hoc, factual inquiries into the circumstances of each particular case," Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224 (1986), and defendant has not demonstrated the absence of any dispute as to a material issue of fact. See also United States v. Sioux Nation of Indians, 448 U.S. 371, 415 (1980) ("the question whether a particular measure was appropriate for protecting and advancing the tribe's interests, and therefore not subject to the constitutional command of the Just Compensation Clause, is factual in nature").

EXHIBIT

A

3. Defendant's motion for summary judgment on statute of limitations and ripeness grounds is DENIED. Defendant has not demonstrated the absence of any dispute as to any material issue of fact. Because many of the same factual issues raised by the takings claim must be considered when evaluating the statute of limitations and ripeness issues, it would seem appropriate to try all of these issues together.

4. Defendant's motion for summary judgment on plaintiff's breach of trust claim is DENIED. As the court explained, the same factual issues are involved in evaluating the takings claim and the breach of trust claim.

5. On or before March 22, 1996, the parties shall file a joint status report proposing scheduling for further discovery in this action.

ROGER B. ANDEWELT
Judge