**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION, | ) | |
| | ) | No. 508-88L |
| Plaintiff, | ) | |
| v. | ) | Senior Judge Eric G. Bruggink |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| ______________________________ | ) | |

**THE UNITED STATES' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**
**AND**
**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

EXHIBIT LIST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The 1882 Reservation and 1934 Reservation Areas . . . . . . . . . . . . . . . . . 2

1. The 1882 Reservation Area and the <u>Healing v. Jones</u> Decision . . 3

2. The 1934 Reservation Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B. The 1974 Settlement Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C. The 1980 and 1988 Amendments to the Settlement Act . . . . . . . . . . . . . 10

D. Conclusion of the District Court Litigation . . . . . . . . . . . . . . . . . . . . . . . 11

II. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. APPLICABLE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A. Standard for Deciding a Motion to Dismiss for Lack of Jurisdiction . . . 14

B. Standard for Deciding a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C. Standard for Deciding a Motion for Summary Judgment . . . . . . . . . . . . 15

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A. The Six-Year Statute of Limitations Bars Plaintiff's Takings and Breach of Trust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. The Statute of Limitations Bars Plaintiff's Breach of Trust Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

2. The Statute of Limitations Bars Plaintiff's Takings Claim . . . . . 23

B. The Court Should Reject Plaintiff's Breach of Trust Claim . . . . . . . . . . 29

1. The Court Lacks Jurisdiction Over a Non-Constitutional Breach of Trust Claim Premised on Congressional Actions . . . . 29

2. Plaintiff Cannot Identify Specific Fiduciary Obligations That Can Fairly Be Interpreted as Mandating Compensation for Damages Sustained . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. The Court Should Limit Plaintiff's Claims to an Examination of those Written Proposals that Plaintiff Actually Proposed and Was Not Allowed to Undertake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D. Plaintiff Lacks Standing to Seek Compensation for Individual Tribal Members' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E. The Court Should Reject Plaintiff's Agins-Based Takings Arguments as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

F. The Court Should Reject Plaintiff's Penn Central-Based Takings Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1. The Bennett Freeze Did Not Cause Significant Economic Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2. The Bennett Freeze Did Not Interfere with Plaintiff's Reasonable Investment Backed Expectation . . . . . . . . . . . . . . . . 42

3. The Character of the Government Action Favors a Finding of No Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

## FEDERAL CASES

Allen v. United States,
46 Fed. Cl. 677 (2000) . . . . . . . . . . 17

Alliance of Descendants of Tex. Land Grants v. United States,
37 F.3d 1478 (Fed. Cir. 1994) . . . . . . . . . . 23

Allred v. United States,
33 Fed. Cl. 349 (1995) . . . . . . . . . . 36

Appolo Fuels, Inc. v. United States,
381 F.3d 1338 (Fed. Cir. 2004), cert. denied, 543 U.S. 1188 (2005) . . . . . . . . . . 43, 44

Bair v. United States,
515 F.3d 1323 (Fed. Cir. 2008) . . . . . . . . . . 41

Bass Enters. Prod. Co. v. United States,
133 F.3d 893 (Fed. Cir. 1998) . . . . . . . . . . 25, 26

Bell Atl. Corp. v. Twombly,
127 S. Ct. 1955 (2007) . . . . . . . . . . 15

Bowles v. Russell,
127 S. Ct. 2360 (2007) . . . . . . . . . . 18

Brace v. United States,
72 Fed. Cl. 337 (2006) . . . . . . . . . . 41

California v. Watt,
668 F.2d 1290 (D.C. Cir. 1981) . . . . . . . . . . 31

Casa de Cambio Comdiv S.A., de C.V. v. United States,
291 F.3d 1356 (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003) . . . . . . . . . . 24

Catawba Indian Tribe of S.C. v. United States,
982 F.2d 1564 (Fed. Cir. 1993), cert. denied, 509 U.S. 904 (1993) . . . . . . . . . . *passim*

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 16

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Chapman Law Firm Co. v. Greenleaf Constr. Co.,
490 F.3d 934 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Clinton v. Babbitt,
180 F.3d 1081 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 10

Colvin Cattle Co. v. United States,
468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Concrete Pipe & Prods. of Cal., Inc. v. Const. Laborers Pension Trust,
508 U.S. 602 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Conti v. United States,
291 F.3d 1334 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003) . . . . . . . . . . . . . . . . 15

Creppel v. United States,
41 F.3d 627 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Delaware State College v. Ricks,
449 U.S. 250 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Edwards v. District of Columbia,
821 F.2d 651 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Erosion Victims of Lake Superior Regulation v. United States,
833 F.2d 297 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Esch v. United States,
77 Fed. Cl. 582 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fallini v. United States,
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) . . . . . . . . . . . . *passim*

First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Florida Rock Indus. v. United States,
45 Fed. Cl. 21 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fort Mojave Indian Tribe v. United States,
28 Fed. Cl. 569 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Furash & Co. v. United States,
252 F.3d 1336 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.,
45 F.3d 1550 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Golden Pac. Bankcorp. v. United States,
15 F.3d 1066 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

Grosdidier v. United States,
77 Fed. Cl. 106 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Healing v. Jones,
210 F.Supp. 124 (D. Ariz. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Hendler v. United States,
175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Hodel v. Irving,
481 U.S. 704 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

John R. Sand & Gravel Co. v. United States,
457 F.3d 1345 (Fed. Cir. 2006), aff'd, 128 S. Ct. 750 (2008) . . . . . . . . . . . . . . . . . . . . . 17

Jones v. Healing,
373 U.S. 758 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Kirby Forest Indus. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Lane v. Pena,
518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Latinos Unidos De Cheslea En Accion v. Sec'y of Hous. & Urban Dev.,
799 F.2d 774 (1st Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Masayesya v. Zah,
792 F.Supp. 1155 (D. Ariz. 1992), aff'd, 65 F.3d 1445 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996) . . . . . 12

Masayesya v. Zah,
793 F.Supp. 1495 (D. Ariz. 1992), aff'd in part, 65 F.3d 1445 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996) . . . . . 12

May v. United States,
80 Fed. Cl. 442 (2008) . . . . . 15

Menominee Indian Tribe of Wis. v. United States,
39 Fed. Cl. 441 (1997) . . . . . 30

Menominee Tribe of Indians v. United States,
221 Ct. Cl. 506, F.2d 1335 (1979), cert. denied, 445 U.S. 950 (1980) . . . . . 30

Mitchell v. United States,
10 Cl. Ct. 63 (1986) . . . . . 18, 19

Nat'l Park Hospitality Ass'n v. Dep't of the Interior,
538 U.S. 803 (2003) . . . . . 39

Navajo Nation v. United States,
501 F.3d 1327 (Fed. Cir. 2007), petition for cert. filed, (U.S. May 13, 2008) (No. 07-1410) . . . . . 34, 35

Nw. La. Fish & Game Pres. Comm'n v. United States,
74 Fed. Cl. 400 (2007) . . . . . 15

Pawnee v. United States,
830 F.2d 187 (Fed. Cir. 1987), cert. denied, 486 U.S. 1032 (1988) . . . . . 31

Penn Central Transportation Co. v. New York City,
438 U.S. 104 (1978) . . . . . *passim*

Reed Island-MLC, Inc. v. United States,
67 Fed. Cl. 27 (2005) . . . . . 24

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . 14

Rith Energy v. United States,
270 F.3d 1347 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002) . . . . . 43

Riverside Bayview Homes, Inc.,
474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Ruckelshaus v. Monsanto,
467 U.S. 968 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Scheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Secakuku v. Hale,
108 F.3d 1386 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Secakuku v. Hale,
517 U.S. 1168 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004), cert. denied, 543 U.S. 873 (2004) . . . . . . . . . . . . . . . . 41

Sekaquaptewa v. MacDonald,
626 F.2d 113 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

Sette v. United States,
42 Fed. Cl. 37 (1998), aff'd, 217 F.3d 855 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 17

Shoshone-Bannock Tribes v. Reno,
56 F.3d 1476 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Sioux Tribe of Indians v. United States,
89 Ct. Cl. 31 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Sommers Oil Co. v. United States,
241 F.3d 1375(Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

South Carolina v. Catawba Indian Tribe,
476 U.S. 498 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SRI Int'l, Inc. v. Internet Sec. Sys., Inc.,
511 F.3d 1186 (Fed. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Steward v. United States,
80 Fed. Cl. 540 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 16

Taylor v. United States,
303 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . 14

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . 34

United States v. Mitchell,
463 U.S. 206 (1983) . . . . . . . . . . 31, 32, 36

United States v. Navajo Nation,
537 U.S. 488 (2003) . . . . . . . . . . 33, 37

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . 24

United States v. White Mountain Apache Tribe,
537 U.S. 465 (2003) . . . . . . . . . . 33, 34

Voisin v. United States,
80 Fed. Cl. 164 (2008) . . . . . . . . . . 23

White Mountain Apache Tribe v. United States,
249 F.3d 1364 (Fed. Cir. 2001), aff'd, 537 U.S. 465 (2003) . . . . . . . . . . 36

Wood v. Carpenter,
101 U.S. 135, 141 (1879) . . . . . . . . . . 19

**FEDERAL STATUTES**

23 U.S.C. §§ 101 . . . . . . . . . . 35

23 U.S.C. §§ 201 . . . . . . . . . . 35

25 U.S.C. § 640d-3 . . . . . . . . . . 9

25 U.S.C. § 640d-7(a) . . . . . . . . . . 10

25 U.S.C. § 640d-9(f) . . . . . . . . . . *passim*

25 U.S.C. § 640d-9(f)(3)(A) . . . . . . . . . . 11

25 U.S.C. §§ 1601-1683 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

25 U.S.C. §§ 391-416 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

25 U.S.C. §§ 631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

25 U.S.C. §§ 640d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 1491(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

42 U.S.C. §§ 2001-2004b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

15 Stat. 667 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

48 Stat. 960 (the “1934 Act”) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

72 Stat. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

88 Stat. 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

94 Stat. 92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

Pub. L. No. 85-547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pub. L. No. 93-531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Pub. L. No. 96-30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10

**FEDERAL RULES**

RCFC 12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

RCFC 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 46

RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

RCFC 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

RCFC 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**EXHIBIT LIST**

| Number | Description | Page Number |
|---|---|---|
| 1 | Map, titled "Existing Navajo and Hopi Reservations" | DOJ1 |
| 2 | Executive Order, dated Dec. 16, 1882 | DOJ2 |
| 3 | Executive Order, dated Jan. 8, 1900 | DOJ3 |
| 4 | S. Rep. No. 93-1177 (1974) | DOJ4-DOJ12 |
| 5 | 126 Cong. Rec. H16822 (daily ed. June 25, 1980) | DOJ13-DOJ15 |
| 6 | Letter from John Boyden to Commissioner of Indian Affairs, dated May 29, 1963 | DOJ16-DOJ17 |
| 7 | Notice issued by Clyde Pensoneau, Superintendent of Hopi Agency, to Jack Frank, dated Apr. 4, 1966 | DOJ18 |
| 8 | Letter from Superintendent Clyde W. Pensoneau to W. Wade Head, Area Director, dated Apr. 8, 1966 | DOJ19-DOJ20 |
| 9 | Letter from John Boyden, Hopi Tribal Attorney, to Commissioner of Indian Affairs, dated June 11, 1966 | DOJ21-DOJ23 |
| 10 | Letter from Richmond F. Allan, Associate Solicitor of Indian Affairs, to Commissioner of Indian Affairs, dated July 1, 1966 | DOJ24-DOJ25 |
| 11 | Letter from Robert Bennett, Commissioner of Indian Affairs, to Graham E. Holmes, Navajo Area Director, dated July 8, 1966 | DOJ26-DOJ29 |
| 12 | Letter from Robert Bennett, Commissioner of Indian Affairs, to Graham E. Holmes, Navajo Area Director et al., dated Oct. 31, 1967 | DOJ30-DOJ32 |
| 13 | Letter from Acting Commissioner of Indian Affairs to Area Directors, dated Dec. 28, 1970 | DOJ33-DOJ35 |
| 14 | Letter from Sgd. Harrison Loesch, Assistant Secretary of the Interior, to Peter MacDonald, Chairman of Navajo Nation Tribal Council, dated Aug. 4, 1972 (with attachment) | DOJ36-DOJ40 |
| 15 | Letter from Deputy Commissioner of Indian Affairs to Area Directors, dated Aug. 15, 1972 (with attachment) | DOJ41-DOJ44 |

| | | |
|---|---|---|
| 16 | Letter from Leona Natsoway, Tribal Secretary of Hopi Tribal Council, to Lynn Montgomery, Acting Project Officer of Bureau of Indian Affairs, dated Sept. 9, 1975 | DOJ45 |
| 17 | Letter from Sgd. Morris Thompson, Commissioner of Indian Affairs, to Chairman Peter MacDonald, Chairman of Navajo Nation, dated July 16, 1976 | DOJ46-DOJ50 |
| 18 | Letter from Freddie Howard, Assistant Director Navajo-Hopi Land Dispute Commission, to Roy Dan, Executive Director Agency Housing Project, Bureau of Indian Affairs, dated Nov. 22, 1978 | DOJ51-DOJ52 |
| 19 | Hamilton v. MacDonald, No. 579 (D. Ariz.) (Oct. 14, 1972) (Order of Compliance) | DOJ53-DOJ56 |
| 20 | Sidney v. MacDonald, No. 58-579 PCT-EHC (D. Ariz.) (Sept. 26, 1988) (order on preliminary injunction) | DOJ57-DOJ73 |
| 21 | Honyoama v. Shirley, No. 74-842-PHX-EHC (D. Ariz.) (Dec. 4, 2006) (Order and Final Judgment, with attachments) | DOJ74-DOJ130 |
| 22 | Plaintiff's Summary of Navajo Nation Proposals, transmitted as Exhibit B to the United States' Discovery Requests | DOJ131-DOJ140 |
| 23 | Plaintiff's Record of Hopi Responses to Navajo Requests, previously submitted by Plaintiff as Plaintiff's Exhibit 32-A to Plaintiff's Motion for Summary Judgment | DOJ141-DOJ165 |
| 24 | United States' List of Navajo Nation Proposals | DOJ166-DOJ182 |
| 25 | Plaintiff's Response to Interrogatories (dated Apr. 27, 2007) (relevant portion) | DOJ183-DOJ185 |
| 26 | Declaration of William J. Shapiro, dated June 2, 2008 | DOJ186-DOJ188 |

**MOTION**

Defendant, the United States of America, hereby moves to dismiss Plaintiff's Complaint pursuant to Rule 12 of the Rules of the Court of Federal Claims ("RCFC") or, in the alternative, for summary judgment pursuant to RCFC 56. Plaintiff, the Navajo Nation, alleges a breach of trust and a temporary regulatory taking claim related to a portion of the Navajo Indian Reservation in Arizona. As discussed below, Plaintiff and the Hopi Tribe have disagreed on their tribes' respective rights to this property for decades. In 1966, the Commissioner of Indian Affairs issued an administrative policy that required each tribe to obtain the consent of the other tribe before undertaking any unilateral development in the disputed area, until such time as the tribes resolved their disagreement. Congress codified the consent requirement in 1980. See Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)). In December 2006, after thirty-two years of litigation, the Hopi Tribe and the Navajo Nation settled their dispute.

Plaintiff alleges that the imposition of the consent requirement prevented Plaintiff from developing the area in dispute, except with the consent of the Hopi Tribe. See Pl.'s First Am. Compl. at 1. Plaintiff's claims should be rejected pursuant to RCFC 12(b) or, in the alternative, RCFC 56 for several reasons. First, the six-year statute of limitations, 28 U.S.C. § 2501, bars Plaintiff's claims. The consent requirement was imposed in 1966 and codified in 1980. Both dates are more than six years before Plaintiff filed this lawsuit. Therefore, the Court should dismiss these claims for lack of jurisdiction pursuant to RCFC 12(b)(1). See Memorandum, § IV(A).

Second, Plaintiff's breach of trust claim should be dismissed because this Court lacks jurisdiction over a non-constitutional breach of trust claim premised on Congressional actions.

See Memorandum, § IV(B)(1). In addition, the Court lacks jurisdiction over Plaintiff's breach of trust claim because Plaintiff cannot show the existence of a money-mandating fiduciary duty. See Memorandum, § IV(B)(2).

Even if the Court had jurisdiction to hear Plaintiff's claims, the Court should conclude that Plaintiff's claims are limited to those written projects Plaintiff actually proposed and was not allowed to undertake. See Memorandum, § IV(C). In addition, the Court should conclude that Plaintiff lacks standing to seek compensation or damages on behalf of individual tribal members. See Memorandum, § IV(D).

Finally, the Court should reject Plaintiff's takings claims based on the test articulated in Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978). The challenged government action did not cause significant economic impact or interfere with Plaintiff's reasonable investment-backed expectations, and the character of the government action does not support an inverse condemnation claim. See Memorandum, §§ IV(E)-(F). The undisputed facts show that the United States is entitled to judgment as a matter of law on the merits of Plaintiff's takings claim, and the Court should grant summary judgment in favor of the United States.

A memorandum in support of this motion follows.

## MEMORANDUM

## I. BACKGROUND

### A. The 1882 Reservation and 1934 Reservation Areas

A full understanding of the claims involved in the instant case requires a discussion of two distinct geographical areas, the ownership of which the Hopi Tribe and Navajo Nation have litigated over the past several decades: the 1882 Reservation Area and the 1934 Reservation

Area. The area impacted by the consent requirement is that portion of the 1934 Reservation Area lying to the west of the 1882 Reservation Area. The two Reservation Areas are depicted in Defendant's Exhibit 1.

**1. The 1882 Reservation Area and the Healing v. Jones Decision**

The Navajo Reservation was created pursuant to a treaty executed in 1868 between the United States and the Navajo Nation. See Treaty Between the United States of America and the Navajo Tribe of Indians, art. II, June 1, 1868, 15 Stat. 667, 668 ("1868 Treaty"); see also Sekaquaptewa v. MacDonald, 448 F.Supp. 1183, 1185 n.1 (D. Ariz. 1978) (showing location of the area included in the 1868 Treaty), aff'd in part and rev'd in part, 619 F.2d 801 (9th Cir. 1980), cert. denied, 449 U.S. 1010 (1980). The 1868 Treaty set aside the reservation "for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them." 1868 Treaty, 15 Stat. at 668. Various executive orders and Congressional acts issued subsequent to the reservation's creation withdrew other lands that would eventually expand the reservation's boundaries. See Sekaquaptewa, 448 F. Supp. at 1185 n.1 (collecting orders and acts); see, e.g., Def.'s Ex. 3 (Jan. 8, 1900 Executive Order) (withdrawing a large area, which would eventually be included within the area to which the consent requirement applied, "from sale and settlement until further ordered," without describing a particular purpose for the withdrawn land).

By 1880, the Navajo Reservation consisted of approximately eight million acres. See Healing v. Jones, 210 F.Supp. 124, 135 (D. Ariz. 1962). The reservation's vast size was insufficient, however, to prevent numerous land boundary issues from arising:

> Despite the vast size of the Navajo reservation at that time [1880], this semi-arid land was considered incapable of providing support for all of the Navajos. Moreover, except for one or two places, the boundaries of the Navajo reservation were not distinctly marked. It is therefore not surprising that great numbers of the Navajos wandered far beyond the paper boundaries of the Navajo reservation as it existed in 1880.

Id. "By 1882, Navajos comprising hundreds of bands and amounting to about half of the Navajo population had camps and farms outside the Navajo reservation, some as far away from it as one hundred and fifty miles." Id.

On December 16, 1882, President Chester A. Arthur signed an Executive Order establishing a reservation of nearly two-and-a-half million acres in Arizona for the use and the occupation of the Hopi (then called the "Moqui") and "such other Indians as the Secretary of the Interior may see fit to settle thereon." Def.'s Ex. 2 (Dec. 16, 1882 Executive Order). Principal among the reasons for establishing the 1882 Reservation was to protect the Hopi Tribe from the pressures of Navajo migration, Mormon settlers, and non-Indian "intermeddlers." Def.'s Ex. 4 at DOJ6 (S. Rep. No. 93-1177) (1974). Nevertheless, because the Navajo population in the area on and around the Hopi Reservation grew substantially, "[c]onflicting claims to exclusive use arose between the Hopi Tribe and the Navajo Nation, producing what became known as 'the greatest title problem in the West.'" Clinton v. Babbitt, 180 F.3d 1081, 1084 (9th Cir. 1999) (quoting Healing, 210 F.Supp. at 129)).

In 1958, Congress authorized the Hopi Tribe and the Navajo Nation to institute or defend a quiet title action against the other with respect to the 1882 Reservation Area. See Act of July 22, 1958, Pub. L. No. 85-547, § 1, 72 Stat. 403. The Hopi Tribe and Navajo Nation immediately initiated conflicting quiet title actions in the United States District Court for the District of Arizona ("District Court"). See Healing, 210 F.Supp. at 130. In 1962, the District Court

concluded, *inter alia*, that the Hopi Tribe and Navajo Nation had "joint, undivided, and equal interests in and to all of the 1882 reservation lying outside the boundaries of land management district 6," which the District Court concluded belonged exclusively to the Hopi Tribe. Id. at 132.

The District Court concluded that it lacked authority to partition the jointly-held portion of the 1882 reservation (called the "joint use area" or "JUA"), see id. at 190, establishing a *de facto* mutual consent requirement for future development on the JUA. See Def.'s Ex. 18 at DOJ51 (letter from Navajo Nation to Bureau of Indian Affairs stating that problems in the former JUA "have greatly deteriorated due to the freeze imposed on September 28, 1962, by the Federal District Court"). In 1972, the District Court formally adopted the mutual consent requirement for proposed development within the JUA. See Def.'s Ex. 19 at DOJ55 (requiring that no new construction would be permitted in the JUA "without a permit issued jointly by the two tribes"). The Hopi Tribe and Navajo Nation participated in protracted legal proceedings to determine their respective rights to the JUA. See Clinton, 180 F.3d at 1083 n.2 (listing eighteen opinions the United States Court of Appeals for the Ninth Circuit issued addressing the Hopi and Navajo interests in the 1882 Reservation lands); Sekaquaptewa v. MacDonald, 626 F.2d 113, 115 n.3 (9th Cir. 1980) (listing several cases involving disputes about the JUA).

### 2. The 1934 Reservation Area

On June 14, 1934, Congress enacted legislation to define the boundaries of the Navajo Indian Reservation. See Act of June 14, 1934, ch. 521, 48 Stat. 960 (the "1934 Act"). The 1934 Act provided that the defined area was "permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon."

Id., 48 Stat. at 961. At the time the 1934 Act was passed, members of the Hopi Tribe lived in the Village of Moenkopi and other areas within the boundaries of the land Congress described, and were, therefore, "'such other Indians' entitled to an equitable interest in the 1934 Reservation." Masayesva v. Zah, 816 F.Supp. 1387, 1393 (D. Ariz. 1992), rev'd in part on other grounds, 65 F.3d 1445 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996); see also Def.'s Ex. 1 (map, showing Village of Moenkopi). The Hopi Tribe and the Navajo Nation have disagreed about the interpretation of the 1934 Act since its passage. See Masayesva v. Zah, 65 F.3d 1445, 1450 (9th Cir. 1995).

While the parties' appeal of the district court's decision in Healing was pending before the United States Supreme Court, see Jones v. Healing, 373 U.S. 758 (1963) (aff'g 210 F.Supp. 125 (D. Ariz. 1962)), the Hopi Tribe began to express concern to the Commissioner of Indian Affairs regarding the Hopi Tribe's rights to the 1934 Reservation Area. See Def.'s Ex. 6 (Letter from John Boyden to Commission of Indian Affairs, dated May 29, 1963). Referring to certain development projects the Navajo Nation proposed within the 1934 Reservation Area, the Hopi Tribe explained "that such development would definitely interfere not only with future development of the Hopi interests, but with present usage." Id. at DOJ16. Accordingly, the Hopi Tribe requested "that the Hopi rights in the area be given proper consideration." Id.

In a June 11, 1966 letter to the Commissioner, the Hopi Tribe reiterated concerns over its ability to protect its rights in the western portion of the 1934 Reservation. See Def.'s Ex. 9 (Letter from John Boyden to Commissioner of Indian Affairs, dated June 11, 1966).[1/] The

---

[1/] The Hopi Tribe's immediate concern related to the Navajo Nation's legal counsel's insistence that an application of the Arizona Public Service for a right of way over lands within the 1934 Reservation Area "contain a provision in fact denying any Hopi interest in the lands." Def.'s Ex.

Commissioner referred the June 11, 1966 letter to the Associate Solicitor for Indian Affairs, and asked the Solicitor whether the Hopi Tribe had an interest in the 1934 Reservation Area. See Def.'s Ex. 10 (Letter from Associate Solicitor Richmond F. Allan to Commissioner of Indian Affairs, dated July 1, 1966). The Associate Solicitor advised the Commissioner that, "[w]hile it is clear that the Hopi have an interest in the area described in the 1934 Act, it is not possible for us to define the nature or extent of that interest." Id. at DOJ25.

The ongoing litigation over the 1882 Reservation Area, including the 1962 Healing decision, informed the Department of the Interior's response to the Hopi Tribe. See Def.'s Ex. 11 (Letter from Commissioner Bennett to Graham E. Holmes, Area Director, dated July 8, 1966).[2] Recognizing that the 1934 Act, like the 1882 Executive Order, did not define the Hopi's or Navajo's rights to the disputed land, Robert Bennett, Commissioner of Indian Affairs, expressed the need to preserve both tribes' rights to the 1934 Reservation Area, and implemented an administrative policy that required each tribe to obtain the consent of the other tribe before undertaking any unilateral development in the portion of the 1934 Reservation Area directly west of the 1882 Reservation Area.[3] See id. at DOJ28. This consent requirement became known as the "Bennett Freeze," and the effected area is hereinafter referred to as the

---

9 at DOJ21. The Hopi Tribe's attorney threatened legal action if "anyone proceeds with the proposed right of way or transmission lines over the 1934 reservation without Hopi consent." Id. at DOJ22.

[2] At the time of the Commissioner's letter, the Department of the Interior was involved in serving notices of removal and exclusion to certain Navajo people, who were living in District 6, an area determined in Healing to be an exclusively Hopi area. See Def.'s Exs. 7-8.

[3] Although Commissioner Bennett acknowledged the "unanswered questions about the nature and extent of [the tribes' respective] rights," he declined to extend the administrative policy to the entire 1934 Reservation Area, stating that "[e]ffective administration require[d] a prudent judgment." Def.'s Ex. 11 at DOJ27.

"Bennett Freeze Area."

Between 1966 and 1980, the Department of the Interior modified the administrative policy on certain occasions. On October 31, 1967, the Department of the Interior modified the policy to allow the Commissioner to approve "public work type projects" without joint tribal approval. See Def.'s Ex. 12 (Letter from Commissioner Bennett to Graham E. Holmes, Area Director, dated Oct. 31, 1967). Under this policy, "all proposed developments as outlined in [Bennett's] July 8, 1966, letter will be submitted to the Commissioner for determination as to whether they fall within the public works category, and otherwise for his information and consideration." Id. at DOJ30. In addition to announcing the new public works procedure, the October 31, 1967 memorandum approved the Two Grey Hill School and the Tuba City Hospital projects "since these public works type projects are so vitally needed to serve the best interests of the members of both tribes." Id. at DOJ31. On December 28, 1970, the public work type project exception was eliminated. See Def.'s Ex. 13 (Letter from Commissioner of Indian Affairs to Area Directors, dated Dec. 28, 1970).

On August 4, 1972, the Department of the Interior allowed Navajo development in an area immediately surrounding Tuba City to proceed without Hopi approval and also allowed Hopi development in the Moencopi vicinity to proceed without Navajo approval. See Def.'s Ex. 14 DOJ36 (Letter from Assistant Secretary of the Interior Harrison Loesch to Chairman Peter MacDonald, dated Aug. 4, 1972); Def.'s Ex. 15 (Letter from Commissioner of Indian Affairs to Area Directors, dated Aug. 15, 1972) (notifying the area directors of the modification). The August 4, 1972 exception included leases, permits, rights of way and other transactions affecting real property. See Def.'s Exs. 14-15.

Finally, on July 16, 1976, "in order to alleviate [the Freeze's] harsh impact" during the pendency of litigation between the tribes over the 1934 Act lands, the Department of the Interior agreed to review Navajo projects in the affected areas if the Hopi Tribe refused to consent or did not respond to the Navajo construction requests. Def.'s Ex. 17 at DOJ48 (Letter from Morris Thompson to Peter MacDonald, dated July 16, 1976). Specifically, the Commissioner stated that he would "entertain a request for unilateral approval, on an ad hoc basis, for each project for which the Hopi Tribe has specifically refused to grant its consent or that failed to consider granting its consent within 30 days after being requested to do so." Id.

**B. The 1974 Settlement Act**

In 1974, Congress enacted legislation to "provide for final settlement of the conflicting rights and interest of the Hopi Tribe and the Navajo Nation to and in lands lying within the joint use area of the [1882 Executive Order Reservation], and . . . lands lying within the reservation created by the [1934 Act]." Pub. L. No. 93-531, 88 Stat. 1712 (preamble) (codified at 25 U.S.C. §§ 640d, et seq. (1974) ("1974 Settlement Act"). The 1974 Settlement Act had two significant provisions. First, the 1974 Settlement Act authorized the District Court to partition the JUA. See 25 U.S.C. § 640d-3. Pursuant to this authority, the District Court partitioned the JUA in 1979. See Sekaquaptewa, 626 F.2d at 117-19 (affirming the partition). "The 1974 Settlement Act required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission to pay for the major costs of such relocations." Clinton, 180 F.3d at 1084 (citing 25 U.S.C. §§ 640d-11 to 640d-14). A lengthy and difficult period of relocation of more than 10,000 Navajo and Hopi tribal members from the JUA followed. See id. at 1084-85.

The 1974 Settlement Act also afforded each tribe the right to bring suit against the other

in the District Court to resolve the tribes' dispute about the 1934 Reservation Area. See 25 U.S.C. § 640d-7(a). The tribes sued each other in 1974. See Masayesva, 816 F.Supp. at 1393. On April 5, 1978, the District Court held that, under the 1934 Act, the Hopi and Navajo tribes each held a one-half interest in all land that the Hopis possessed, occupied, or used in 1934 and the Navajos had exclusive trust title to the rest of the reservation. See Sekaquaptewa, 448 F. Supp. at 1196. In 1980, the Ninth Circuit reversed the District Court's decision in part. See Sekaquaptewa v. MacDonald, 619 F.2d 801 (9th Cir. 1980). The Ninth Circuit held that the Hopis had an exclusive interest – as opposed to a one-half interest – in the lands they possessed, occupied, or used in 1934, see id. at 808, and remanded the case for findings on what lands were encompassed in that description, see id. at 809. The Ninth Circuit recognized the difficulty in that task, and acknowledged the possibility that the tribes may have used some land jointly in 1934. See id.

### C. The 1980 and 1988 Amendments to the Settlement Act

In July 1980, two months after the Ninth Circuit remanded Sekaquaptewa, Congress amended the 1974 Settlement Act to codify the Bennett Freeze. See Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)) ("Any development of [certain] lands in litigation pursuant to [the Settlement Act] . . . shall be carried out only upon the written consent of each tribe. . . ."). Consistent with the purpose of the original administrative policy, the purpose of the 1980 Amendment was to "preserve the parties' rights subject to a final adjudication." Masayesva, 816 F.Supp. at 1397.

In September 1988, following Navajo Tribal Chairman Peter MacDonald's efforts to implement an aggressive building campaign in the Bennett Freeze area, the District Court issued

a preliminary injunction in Sidney v. MacDonald, No. 58-579 PCT-EHC (D. Ariz.). See Def.'s Ex. 20. Finding that Chairman MacDonald's efforts would result in substantial damage to the Hopi Tribe, the District Court issued an injunction that, among other things, required the Navajo Nation to make "written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze." Id. ¶ 3, at DOJ71. The District Court's order required any proposed development application to include specific information, "including location, estimated cost, and justification for the proposal." Id. ¶ 3(b)(iii), at DOJ72.

In November 1988, shortly after the District Court's preliminary injunction order, Congress amended the Settlement Act again. Congress modified the terms of the Freeze to create some exceptions for improvements such as those for public health and safety and to create a limited appellate mechanism whereby a development proposal that had been declined might be appealed to the Secretary of the Interior. See 25 U.S.C. § 640d-9(f)(2)-(3). In the 1988 Amendment, Congress provided that the consent requirement would not apply if the proposal "does not involve new housing construction" and if "the Secretary of the Interior determines that [the proposed project] is necessary for the health or safety of the Navajo Tribe, the Hopi Tribe, or any individual who is a member of either tribe." 25 U.S.C. § 640d-9(f)(3)(A).

**D. Conclusion of the District Court Litigation**

The District Court issued three decisions in 1992, designating certain discrete lands as belonging exclusively to either the Navajo Nation or Hopi Tribe, and partitioning the land that

the two tribes had jointly used.[4] In its September 25, 1992 decision partitioning the disputed lands, the District Court attempted to terminate the Bennett Freeze. See Masayesva, 816 F.Supp. at 1424 (ordering "[t]hat the 'Bennett Freeze' restriction on construction and development within the 1934 Reservation, and codified by 25 U.S.C. § 640d-9, is lifted").

In December 1995, the Ninth Circuit considered the three District Court decisions jointly, affirming the decisions in part and reversing them in part. See Masayesva v. Zah, 65 F.3d 1445 (9th Cir. 1995). Among other findings, the Ninth Circuit vacated the District Court's lifting of the Bennett Freeze, and held that the "freeze remains in effect for the lands 'in litigation.'" Id. at 1460. The Ninth Circuit did not specifically identify the "lands in litigation," but stated that "[t]hose lands include, at the least, areas where the Hopis claim religious shrines and other religious occupancy." Masayesva, 65 F.3d at 1460. The Supreme Court denied certiorari in 1996, and the matter was remanded to the District Court for further proceedings. See Secakuku v. Hale, 517 U.S. 1168 (1996).

On March 31, 1997, the District Court entered an order approving a stipulation between the Navajo Nation and Hopi Tribe that provided that certain specified areas were no longer in litigation. At that time, the Navajo Nation alleged that, after the approval of the stipulation, approximately "700,000 to 800,000 acres remain[ed] subject to the [Bennett Freeze]." Joint Status Report, dated Sept. 30, 1997 (Doc. No. 40).

The District Court litigation continued for the next decade. Finally, in November 2006,

---

[4] See Masayesya v. Zah, 792 F.Supp. 1155 (D. Ariz. 1992) (regarding certain discrete lands purchased exclusively by or on behalf of the Navajo Nation); Masayesya v. Zah, 793 F.Supp. 1495 (D. Ariz. 1992) (regarding the Hopi Tribe's interest in certain lands); Masayesva v. Zah, 816 F.Supp. 1387 (D. Ariz. 1992) (partitioning the jointly-used land).

the Hopi Tribe and Navajo Nation reached a settlement agreement, which resolved the District Court litigation. On December 4, 2006, the District Court entered the agreement as an Order and Final Judgment of the Court. See Def.'s Ex. 21. In entering its Final Judgment, the District Court lifted the Bennett Freeze in its entirety. See id. ¶7, at DOJ77 ("The Court hereby finds that no lands are any longer 'in litigation' for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the 'Bennett Freeze,' are of no further force or effect.").

## II. PROCEDURAL BACKGROUND

On August 25, 1988, Plaintiff filed its original complaint in this case. On April 7, 1989, the United States filed a motion to dismiss (Doc. No. 3), and the matter was fully briefed (Doc. Nos. 4-5). The Court conducted oral argument on the motion on March 27, 1990, and issued an order one day later. The Court's March 28, 1990 Order permitted Plaintiff to file an amended complaint and denied the United States' Motion to Dismiss without prejudice.

Plaintiff's First Amended Complaint, submitted on June 29, 1990, identified three claims for relief: (1) a violation of the Fifth Amendment; (2) a breach of trust; and (3) a denial of equal protection. See Pl.'s First Am. Compl., filed June 29, 1990 (Doc. No. 99-5) (added to electronic Docket on Jan. 14, 2008). At the core of each claim is Plaintiff's allegation that the Bennett Freeze "prohibited Plaintiff and its members from development and construction on a substantial portion of their land except with the consent of another Indian Tribe, the Hopi Tribe." Id. at 1.

From October 1990 to October 1993, the parties in this case submitted periodic status reports regarding the District Court litigation, and conducted discovery in this case. On June 28, 1994, the United States filed a motion for summary judgment. See Def.'s Mot. for Summ. J.,

filed June 28, 1994 (Doc. No. 7). On March 8, 1996, the Court denied the United States' motion with respect to Plaintiff's takings and breach of trust claims, and granted the United States' motion with respect to Plaintiff's equal protection claim. (Doc. No. 29).

Subsequent to the Court's resolution of the United States' summary judgment motion, the parties engaged in extensive additional discovery. In January 2008, the parties submitted separate proposed case management plans to the Court.[5] On February 14, 2008, after reviewing these competing plans, the Court authorized the United States to file this motion for summary judgment. See Order, filed Feb. 14, 2008 (Doc. No. 103).

## III. APPLICABLE LEGAL STANDARDS

### A. Standard for Deciding a Motion to Dismiss for Lack of Jurisdiction

In considering a motion to dismiss a complaint for lack of jurisdiction over the subject matter pursuant to RCFC 12(b)(1), the court must "presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff." Steward v. United States, 80 Fed. Cl. 540, 542 (2008) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)). Nevertheless, the "[p]laintiff bears the burden of showing jurisdiction by a preponderance of the evidence." Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002) (citing Thomson v. Gaskill, 315 U.S. 442, 446 (1942)). If the court determines that it lacks jurisdiction, it must dismiss the action. See RCFC 12(h)(3).

---

[5] See Pl.'s Status Report, dated Jan. 14, 2008 (Doc. No. 98); Def.'s Mot. for Adoption of Proposed Case Management Plan, dated Jan. 14, 2008 (Doc. No. 99); Pl.'s Resp. to United States' Mot., dated Jan. 31, 2008 (Doc. No. 101); Def.'s Reply, dated Feb. 13, 2008 (Doc. No. 102).

### B. Standard for Deciding a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted

In considering a motion to dismiss a complaint for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor.[6] See Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). Where it appears beyond doubt that a plaintiff cannot prove any set of facts that would entitle him to relief, a court may dismiss the cause of action. See Conti v. United States, 291 F.3d 1334, 1338 (Fed. Cir. 2002). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his claim. See Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (citing Scheuer, 416 U.S. at 236). Nevertheless, while a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulatic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citation and quotations omitted); Esch v. United States, 77 Fed. Cl. 582, 587 (2007); see also Steward, 80 Fed. Cl. at 543 (explaining that the "court must inquire whether the complaint meets the 'plausibility standard'"); May v. United States, 80 Fed. Cl. 442, 448 (2008) (emphasizing that plaintiff must establish her right to relief above the speculative level).

### C. Standard for Deciding a Motion for Summary Judgment

In the alternative, this Motion seeks relief pursuant to Rule 56 of the Rules of the Court

---

[6] "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss" under RCFC 12(b)(6). Nw. La. Fish & Game Pres. Comm'n v. United States, 74 Fed. Cl. 400, 404 (2007).

of Federal Claims. Some of the arguments presented below refer to documents outside the pleadings. To the extent reference to such documents is necessary, the Court should grant the United States' Motion pursuant to Rule 56. See RCFC 12(b) ("If . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56."); RCFC 12(c) (same). Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Although, when evaluating a motion for summary judgment, the court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion, see Colvin Cattle Co. v. United States, 468 F.3d 803, 806 (Fed. Cir. 2006), "its opponent 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" SRI Int'l, Inc. v. Internet Sec. Sys., Inc., 511 F.3d 1186, 1198 (Fed. Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Summary judgment is a "salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp., 477 U.S. at 327). Accordingly, the court should construe Rule 56 "with due regard both to those persons entitled to trial and to those persons demonstrating that the claims have no factual basis." Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc., 45 F.3d 1550, 1560 (Fed. Cir. 1995) (citing Celotex Corp., 477 U.S. at 327).

# IV. ARGUMENT

## A. The Six-Year Statute of Limitations Bars Plaintiff's Takings and Breach of Trust Claims

The Tucker Act, 28 U.S.C. § 1491, defines the subject matter jurisdiction of the United States Court of Federal Claims. See Furash & Co. v. United States, 252 F.3d 1336, 1338 (Fed. Cir. 2001). The Court of Federal Claims' jurisdictional grant includes:

> [J]urisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). In addition to this limited subject matter, the Court's jurisdiction is restricted to claims filed within six years after the date on which the claims accrue. See 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").

"The six-year statute of limitations set forth in section [28 U.S.C. § 2501] is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), aff'd, 128 S. Ct. 750 (2008). This Court has repeatedly acknowledged that "[t]his limitation period constitutes an express limitation upon the waiver of sovereign immunity contained in the Tucker Act," and must be construed strictly. Allen v. United States, 46 Fed. Cl. 677, 680 (2000). See also Sette v. United States, 42 Fed. Cl. 37, 39 (1998) ("Limitations periods traditionally have been strictly construed in suits against the United States."). In addition, the Supreme Court has ruled expressly that, because 28 U.S.C. § 2501 is jurisdictional, this Court may not "consider whether certain equitable considerations

warrant extending [the] limitations period." John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753 (2008). Accord Bowles v. Russell, 127 S. Ct. 2360, 2366 (2007) (holding that a court may not invoke equitable exceptions to a jurisdictional limitations bar, because the "Court has no authority to create equitable exceptions to jurisdictional requirements").

The United States Court of Appeals for the Federal Circuit has described it as "hornbook law" that a claim accrues when "all events necessary to fix the liability of the defendant have occurred." Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993), cert. denied, 509 U.S. 904 (1993). "The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995) (citing Menominee Tribe of Indians v. United States, 726 F.2d 718, 721 (Fed. Cir. 1984)). "Knowledge of a cause of action sufficient to trigger the running of the statute of limitations may, therefore, be as much a matter of constructive notice as of actual notice." Mitchell v. United States, 10 Cl. Ct. 63, 68 (1986).[7/]

**1. The Statute of Limitations Bars Plaintiff's Breach of Trust Claim**

Plaintiff filed its original complaint in this case on August 25, 1988. Consequently, for any breach of trust claim to be valid, the claim must have accrued on or after August 25, 1982. A breach of trust claim accrues when "all events necessary to fix the liability of the defendant have occurred." Catawba Indian Tribe, 982 F.2d at 1570. Assuming for the purposes of this

---

[7/] As the Court is aware, the United States argued that Plaintiff's claims were barred by the six-year statute of limitations in connection with its earlier dispositive motions. The Court denied the United States' motions without prejudice. The parties have conducted extensive discovery since the Court's order, much of which specifically related to the statute of limitations issue. As discussed below, there are no material facts in dispute that preclude the granting of this motion.

argument that the United States owed Plaintiff trust obligations with respect to development of the lands on the 1934 Act Reservation, any infringement of those rights began, at the latest, in June 1980, when Congress codified the Freeze that Commissioner Bennett had implemented on the 1934 Reservation Lands some 14 years earlier.[8/]

Plaintiff does not allege that it was unaware of the imposition of the Bennett Freeze or that, by 1980, Plaintiff was unfamiliar with the ramifications of a consent requirement on its lands or uncertain as to what legal remedies it might invoke. Nor does the "law . . . insist that one be certain of the existence of a course of action before the statute of limitations may commence running." Mitchell, 10 Cl. Ct. at 67. To the contrary, "whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led." Id. at 67-68 (quoting Wood v. Carpenter, 101 U.S. 135, 141 (1879)). Further, "[t]he existence of a trust relationship does not call for the application of a different rule." Mitchell, 10 Cl. Ct. at 68. In pursuing a breach of trust claim, an "Indian beneficiary of a trust, no less than any other, is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered." Id.

There is no evidence in the record that suggests the United States attempted to impose the Bennett Freeze without Plaintiff's knowledge of its conditions or effects. Indeed, Plaintiff's knowledge of the terms of the Bennett Freeze was essential for the policy's effective

---

[8/] In fact, Plaintiff's breach of trust and taking claims arose no later than July 8, 1966, when Commissioner Bennett instituted the administrative policy. See Def.'s Ex. 11. On that date, Plaintiff was legally prohibited from development on the 1934 Act lands without the Hopi Tribe's consent. As discussed above, however, it is clear that Plaintiff's claims accrued no later than 1980, since the 1980 amendment to the 1974 Settlement Act, "as a federal statute, . . . established [Plaintiff's] present and future rights." Fort Mojave Indian Tribe v. United States, 28 Fed. Cl. 569, 571 (1993).

administration. Moreover, because of the long history of land disputes between Plaintiff and the Hopi Tribe, the de facto freeze imposed on the 1882 Reservation lands after the District Court's 1962 decision in Healing v. Jones, and the administrative policy in place on the 1934 lands since 1966, Plaintiff cannot reasonably argue that it was unaware of the imposition of the Freeze. The certain conclusion is that Plaintiff had reason to know of any breach of trust cause of action more than six years before Plaintiff brought suit.

In Catawba Indian Tribe, the Federal Circuit addressed the application of 28 U.S.C. § 2501 to an analogous situation involving an Indian tribes' assertion of both breach of trust and takings claims. In that case, the United States terminated the trust relationship on July 1, 1962. See 982 F.2d at 1567. The tribe asserted that, during the course of negotiations with the federal government that led to the passage of the Termination Act, the government had repeatedly assured the tribe that the termination of the trust relationship would not affect the tribe's rights to pursue a claim against the State of South Carolina and numerous private landholders involving title to certain ancestral lands. See id.

In 1980, the tribe brought suit against various private landowners, claiming ownership to the ancestral lands. See id. The landholders responded that, subsequent to the passage of the 1962 Termination Act (and consistent with the Act's express terms), the tribe was subject to all state laws, including the law of adverse possession, and therefore any landowner who could prove the requisite continuous possession would be entitled to keep the land. See id. The district court ruled in the landowners' favor and, although the United States Court of Appeals for the Fourth Circuit reversed the district court's decision, the Supreme Court reversed the Fourth Circuit and held that the Termination Act "applied in all respects, and that the Tribe's claim to

its land was subject to any adverse possession rights which may have accrued under South Carolina law." Id. at 1567-68 (citing South Carolina v. Catawba Indian Tribe, 476 U.S. 498 (1986)).

In 1990, having lost their challenge in the district court, the tribe brought a second suit in the Claims Court. See Catawba Indian Tribe, 982 F.2d at 1568. Among other claims, the tribe asserted various breaches of the government's fiduciary obligations based on the government's assurances and affirmative acts before, during, and after the Termination Act's enactment, and a Fifth Amendment takings claim premised on the tribe's allegation that the government's actions deprived the tribe of their claim to the land (not the land itself). See id. The tribe acknowledged that its suit was filed more than six years after the enactment of the Termination Act, but argued that its claims "did not accrue until the Tribe was 'damaged,' because 'damage' was an event necessary to fix the Government's liability." Id. at 1570. The tribe contended that its claims accrued in 1986, when the Supreme Court issued its decision in South Carolina v. Catawba Indian Tribe, because, before that, it was not clear that the government's assurances regarding the Termination Act's effect on the tribe's legal position in the dispute involving its ancestral lands were incorrect. Id.

In rejecting the tribe's argument in Catawba Indian Tribe, the Federal Circuit addressed the accrual of each of the claims collectively, and did not distinguish between the tribe's breach of trust claims and its takings claim. The Federal Circuit explained that, irrespective of when the tribe suffered damages, their claims accrued in 1962:

> The difficulty with the Tribe's argument, creative though it is, is that it is contrary to one of the fundamental premises of our legal system. The argument assumes that the adverse effect of the 1962 Act did not become operative against the Tribe – the Tribe was not 'damaged' – until the Supreme Court some 25 years later so

> construed the Act. While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe ***subjectively*** first knew what the Act meant, it is fundamental jurisprudence that the Act's ***objective*** meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect.

Id. In the Federal Circuit's view, "that the existence of this legal harm was not finally adjudicated until the Supreme Court opinion in 1986 is not determinative of the basic question when the injury to the Tribe occurred." Id. at 1571.

Similar to the plaintiff in Catawba Indian Tribe, Plaintiff in this case alleges a breach of trust deriving from a discrete government action – the implementation of the Bennett Freeze. At the very latest, then, Plaintiff's claim accrued in 1980 – more than six years before Plaintiff filed its initial complaint. As in Catawba Indian Tribe, the impact and effect of the government action, if any, was fixed at least by 1980, when Congress codified the existing administrative policy (which policy had been instituted in 1966, some 14 years prior). Any subsequent judicial pronouncements related to the Freeze merely explained and clarified the particular lands to which the Freeze applied; they did not impose a new restriction on the land or somehow trigger a new cause of action. Likewise, while the Hopi's denial of individual proposals may have altered the alleged quantum of damages, those denials did not trigger a new breach of trust claim.

The only federal action occurring after 1980 was the 1988 amendment to the 1974 Settlement Act. 25 U.S.C. §§ 640d-9(f)(2)-(3) (enacted Nov. 1988). The 1988 amendment, however, alleviated the arguably harsher original codification of the Freeze by excepting proposals necessary for public health and safety, and by creating a limited appellate mechanism whereby a development proposal that had been declined might be appealed to the Secretary of the Interior. Certainly Plaintiff cannot reasonably argue that Congress' decision to apply a

less strict rule in 1988 (an action that took place after Plaintiff filed its complaint) somehow triggered a new breach of trust action (or otherwise breached some trust responsibility). Plaintiff's breach of trust claim accrued no later than 1980, and the statute of limitations bars Plaintiff's claims.

**2. The Statute of Limitations Bars Plaintiff's Takings Claim**

"The law is well settled . . . that a Fifth Amendment takings claim accrues 'on the date that the United States takes a private property interest for a public use without just compensation.'" Voisin v. United States, 80 Fed. Cl. 164, 173 (2008) (quoting Entines v. United States, 39 Fed. Cl. 673, 679 (1997)). When the government action at issue occurs pursuant to legislation or some other law-making devise, a resulting takings claim accrues on the date that the law took effect. See Fallini, 56 F.3d at 1382-83 ("For purposes of claim accrual, such a taking occurs on the date of enactment of the legislation."); Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1482 (Fed. Cir. 1994) (ruling that takings claim based on allegations that a 1941 treaty between the United States and Mexico deprived plaintiffs' right to sue to recover damages suffered in the Mexican-American War accrued in 1941); Entines, 39 Fed. Cl. at 679 ("When the government action at issue occurs pursuant to legislation, a resulting takings claim accrues on the date the legislative act took effect.").

The United States is the only proper defendant before the Court of Federal Claims. See United States v. Sherwood, 312 U.S. 584, 588 (1941) (explaining that "if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court"); May, 80 Fed. Cl. at 447. Accordingly, to assert a successful takings claim, Plaintiff's claim must be premised upon action attributable to the United States. See

Erosion Victims of Lake Superior Regulation v. United States, 833 F.2d 297, 301 (Fed. Cir. 1987) (affirming Claims Court's dismissal of landholders' complaint for failure to demonstrate "direct and substantial involvement sufficient for United States liability under the just compensation clause of the Fifth Amendment"); Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1361-62 (Fed. Cir. 2002) (explaining that the United States' involvement must be "direct and substantial" before liability can attach); Fallini, 56 F.3d at 1383 (explaining that "[w]hat [a plaintiff] may challenge under the Fifth Amendment is what the government has done, not what [third parties] have done"). For the same reasons discussed above in regard to Plaintiff's breach of trust claim, Plaintiff's takings claim accrued no later than 1980, when Congress codified the existing administrative policy. Accordingly, the statute of limitations bars Plaintiff's claim.

Based on Plaintiff's discovery response, Plaintiff intends to argue that its takings claim accrued in December 2006, when the District Court lifted the Bennett Freeze. See Def.'s Ex 25. In support of this accrual date, Plaintiff relies on Creppel v. United States, 41 F.3d 627, 632 (Fed. Cir. 1994), and Reed Island-MLC, Inc. v. United States, 67 Fed. Cl. 27 (2005) (citing Creppel), presumably for the proposition "that the statute of limitations begins to run on a temporary takings claim when the temporary takings period ends." Reed Island, 67 Fed. Cl. at 29. Plaintiff's argument, however, misapprehends the ruling in Creppel, fails to account for controlling Federal Circuit caselaw decided after Creppel, and does not address important distinctions between the case at the bar and the cases on which Plaintiff relies. Equally important, Plaintiff overlooks the requirement that its takings allegations must be premised on action in which the United States, and not third parties engaged.

Plaintiff's reliance on Creppel is misplaced because, although the "cessation of regulation may be sufficient for finding a temporary taking," the Federal Circuit has cautioned, in cases subsequent to Creppel, that "nothing . . . supports the proposition that the end of regulation is necessary" for a temporary takings claim to accrue. Bass Enters. Prod. Co. v. United States, 133 F.3d 893, 896 (Fed. Cir. 1998). In Bass Enterprises, the Federal Circuit emphasized that "[t]he Supreme Court has actually suggested to the contrary: 'It would require a considerable extension of [takings jurisprudence] to say that no compensable regulatory taking may occur until a challenged ordinance has ultimately been held invalid.'" Id. (quoting First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 320 (1987)). Contrary to the conclusion that Plaintiff asserts, the Federal Circuit in Bass Enterprises stated clearly that "[t]emporary reversible takings should be analyzed in the same constitutional framework applied to permanent irreversible takings." 133 F.3d at 896 (quoting Yuba Natural Res., Inc. v. United States, 821 F.2d 638, 641 (Fed. Cir. 1987)). The Federal Circuit acknowledged that "[t]he fact that regulation has not ceased may complicate a determination of just compensation," but asserted that this complication "does not justify a bright-line rule against liability." Bass Enters., 133 F.3d at 896.

Moreover, in a footnote in Bass Enterprises, the Federal Circuit dispelled Plaintiff's notion that Creppel may call for a different result. See id. at 896 n.3. The Federal Circuit noted that the plaintiff in Bass Enterprises, like Plaintiff in this case, filed suit before the regulation to which it objected had been repealed. In Bass Enterprises, the Federal Circuit stated that Creppel "is inapposite because there the government regulation had already ceased, leaving only the issue of when the statute of limitations began to run." Id. Plaintiff's takings claim in this case is

equally distinguishable to the plaintiffs' claim in Bass Enterprises. In addition, it is inconsistent for Plaintiff to assert that its claim, which it filed in 1988, did not begin to accrue until 2006. Although the 1974 Settlement Act empowering Plaintiff to litigate its dispute with the Hopi Tribe combined with the 1980 amendment applying the Freeze to "lands in litigation" demonstrated clearly that the Freeze was a temporary condition, Plaintiff did not wait for the Freeze to be lifted before asserting its takings claim. Presumably, Plaintiff believed that it had a ripe takings claim, i.e., that its claim had accrued, at the time it filed its Complaint in this Court.

Plaintiff's assertion that its cause of action accrued in December 2006 also fails to account for Federal Circuit law in which the court held that a takings claim premised on a legislation accrues at the time the legislation is enacted. In Fallini, for example, the Federal Circuit dismissed a complaint that plaintiffs filed in 1991, in which they argued that the Wild Free-Roaming Horses and Burros Act ("WHBA"), enacted in 1971, effected a taking of their property, because it denied the plaintiffs the right to remove wild horses and burros from their land and thereby required them "to provide water to wild horses whenever plaintiffs provided water to their domestic livestock." 56 F.3d at 1380. In finding that the statute of limitations barred the plaintiffs' takings claim in Fallini, the Federal Circuit addressed and rejected two theories especially relevant to Plaintiff's claims in this case.

First, the plaintiffs in Fallini asserted that they had experienced a continuous taking from the date of the WHBA's enactment until 1986, when, pursuant to a settlement in a previously-filed lawsuit, the Bureau of Land Management agreed to remove excess wild horses from the plaintiffs' land annually. The Federal Circuit rejected the plaintiffs' assertion of a continuing claim noting that the plaintiffs' interpretation of the law "would mean that in a case such as this

one, where the damages continue to increase over time, the plaintiffs' cause of action would never accrue and the statute of limitations would never run." Fallini, 56 F.3d at 1381. The Federal Circuit explained that the only changes between 1971 and 1986 "were changes in the number of protected horses [on plaintiff's property], and thus the amount of water taken," but emphasized that "[n]othing that happened in those later years had the legal effect of triggering, for the first time, the [plaintiffs'] obligation to sue for the alleged takings that had occurred since the enactment of the [WHBA]." Id. at 1382.

Similarly, with respect to Plaintiff's case, the only meaningful change between Congress' codification of the Freeze in 1980, or even the administrative implementation of the Bennett Freeze in 1966, and the District Court's lifting of the Freeze in 2006 is the number of development proposals that were submitted and denied. While Plaintiff might contend that these denials altered the quantum of damages, they do not have the legal effect of imposing a new restriction on the subject property. See Fallini, 56 F.3d at 1381-82. Plaintiff was aware of the Freeze immediately upon its imposition, and all parties were well-aware of the effects the Freeze imposed on Plaintiff's lands more than six years before Plaintiff filed this lawsuit. Plaintiff's argument that its taking claim based on the imposition of the Freeze accrued in 2006 is incorrect as a matter of law.

The second theory that plaintiffs advanced in Fallini was based on the assertion that every drink of water that a wild horse consumed constituted a new taking; under this theory, plaintiffs conceded that they could not recover for water wild horses had consumed more than six years before the lawsuit was filed, but sought recovery for water taken within six years of the plaintiffs' filing date. See 56 F.3d at 1382. The Federal Circuit rejected this theory as well

noting that, "[f]or purposes of claim accrual, such a taking occurs on the date of enactment of the legislation." Id. at 1382-83. See also Entines, 39 Fed. Cl. at 679 ("When the government action at issue occurs pursuant to legislation, a resulting takings claim accrues on the date the legislative act took effect."). The Federal Circuit analogized the plaintiffs' argument in Fallini to a situation in which the government enacts legislation requiring owners of beachfront property to allow others to walk along the shore, see Fallini, 56 F.3d at 1382 (citing Nollan v. Cal. Coastal Comm'n, 483 U.S. 825 (1987)), and explained that, in the latter situation, "[e]very instance of a beachcomber using the public easement does not constitute a separate taking, even though each use may inflict psychic or economic injury on the landowner." Fallini, 56 F.3d at 1383. This is because, "[f]or purposes of determining when the [plaintiffs'] claim accrued, it is necessary . . . to look to the nature and timing of the governmental action that constituted the alleged taking." Id.

> What the Fallinis may challenge under the Fifth Amendment is what the government has done, not what the horses have done. The only governmental action that could constitute a compensable taking in this case is the government's directive forbidding the Fallinis from shooing the horses away from the water that the Fallinis have produced at their developed water sources. That governmental action cannot be regarded as recurring with every new drink taken by every wild horse, even though the consumption of water by the wild horses imposes a continuing economic burden on the Fallinis. See Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (proper focus, for statute of limitations purposes, "is upon the time of the [defendant's] acts, not upon the time at which the consequences of the acts became most painful"). Because the Fallinis identify the enactment of the Wild Free-Roaming Horses and Burros Act as the governmental action that prevented them from fencing the horses away from their water sources, and because they admit that they suffered injury from the date of enactment, their claim must be regarded as accruing long before they filed their present suit.

Id. In the case at the bar, Plaintiff identifies the Bennett Freeze as the governmental action that prevented it from exercising its development rights fully, and contend that they suffered injury

from the date of the Freeze's enactment.[9] See Def.'s Ex 25 (Plaintiff's Response to Interrogatories at DOJ188) (acknowledging that "the economic effect of the regulations that severely and completely deprived the Navajo Nation of both the economic and beneficial use of the land occurred much earlier"). Accordingly, as in Fallini, the statute of limitations bars Plaintiff's claim and should be dismissed pursuant to RCFC 12(b)(1).

### B. The Court Should Reject Plaintiff's Breach of Trust Claim

#### 1. The Court Lacks Jurisdiction Over a Non-Constitutional Breach of Trust Claim Premised on Congressional Actions

In its second cause of action, Plaintiff alleges that the United States has a fiduciary responsibility to "regulate, develop and protect the property rights in the frozen area which defendant holds in trust for [Plaintiff]." First Am. Compl. ¶ 29. Plaintiff contends that the United States breached that fiduciary responsibility by either instituting or enforcing the Bennett Freeze. As discussed above, the six year statute of limitations bars Plaintiff's claims. Even if

[9] In Fallini, the Federal Circuit acknowledged that, "[i]f the horses were agents or instrumentalities of the United States government, the analysis of what governmental action constituted the alleged taking might well be different." 56 F.3d at 1383. The United States anticipates that Plaintiff will argue the Hopi Tribe was an agent or instrumentality of the United States in order to distinguish this case from Fallini. Such an argument is inapplicable "Agency is the fiduciary relationship that arises when one person . . . manifests assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. Here, the United States assigned a mutual consent requirement to both the Hopi and the Navajo, not to act on the United States' behalf, but for each of the tribes to protect their own interests in the 1934 Act Reservation lands. Neither tribes' decisions to approve or deny individual development proposals was subject to the United States' control. Indeed, on a number of occasions, modifications were made to the terms of the Freeze so that the Commissioner could review and potentially overturn the tribes' decisions on proposals that one tribe or the other denied or disregarded. Nor did the Hopi Tribe manifest assent or consent to Act on the United States' behalf; as stated above, modifications to the terms of the Freeze were implemented to account for the Hopi's frequent lack of response when presented with a development proposal.

Plaintiff's breach of trust claim was not time-barred, however, the Court should dismiss the claim for lack of jurisdiction.

In Menominee Tribe of Indians v. United States, 221 Ct. Cl. 506, 607 F.2d 1335 (1979) ("Menominee Basic"), the Court of Claims concluded it lacked jurisdiction over a non-constitutional breach of trust claim premised not on a claim that a federal official contravened a governing statute or treaty, but on a claim that Congress violated a trust obligation. See 607 F.2d at 1343. The holding in Menominee Basic makes clear that not only does the court lack jurisdiction over a claim that Congress' enactment of a statute breached the United States' trust obligation, but the court also lacks jurisdiction over a claim that an agency's implementation of that statute constituted a breach. See 607 F.2d at 1345 ("Unless the Department violated the Constitution or some outstanding directive of Congress, the United States cannot be held liable for Interior's affirmative actions or passive omissions with respect to the passage and implementation of the [relevant statutory enactment]."); see also Menominee Indian Tribe of Wis. v. United States, 39 Fed. Cl. 441, 460 (1997) ("The court cannot ignore the fact that Congress has absolute and plenary power to change or abrogate, by statute, a prior treaty with an Indian tribe, as long as the statute does not violate the Constitution.").

The holding in Menominee Basic is a logical extension of the underlying principle that legitimate Congressional action cannot breach the same trust Congress itself defined. "[T]he fiduciary relationship springs from the statutes and regulations which 'define the contours of the United States' fiduciary responsibilities.'" Pawnee v. United States, 830 F.2d 187, 192 (Fed. Cir. 1987), cert. denied, 486 U.S. 1032 (1988) (quoting United States v. Mitchell, 463 U.S. 206, 224 (1983) ("Mitchell II")). Where Congress has legislated specifically concerning an agency's

duties to Indians in a particular sphere, Congress must be understood to have established the contours of the government's trust duties, and compliance with the statute equates to compliance with the trust duty. See N. Slope Borough v. Andrus, 642 F.2d 589, 593, 611-13 (D.C. Cir. 1980) (the Secretary of the Interior's responsibility must be "carried out according to the guidelines and principles established by Congress"); California v. Watt, 668 F.2d 1290, 1325 (D.C. Cir. 1981) (same). Thus, if Congress has defined the trust obligations, and the executive branch has fully complied with those obligations, there can be no judicially enforceable claim that trust obligations are impacted. See Pawnee, 830 F.2d at 192; Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1482 (D.C. Cir. 1995) ("[A]n Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty.").

Plaintiff will likely respond, as it did in earlier briefing, that Menominee Basic is inapplicable, because Plaintiff also raises a Fifth Amendment claim for just compensation. See Pl.'s Resp. to Def.'s Mot. for Case Management Plan at 11, dated Jan. 31, 2008 (Doc. No. 101). However, Plaintiff's Fifth Amendment claim seeks only to recover monetary relief, not to invalidate Congress' codification of the Bennett Freeze as unconstitutional. No court has ever determined the Bennett Freeze is unconstitutional, and this Court lacks jurisdiction to do so. In fact, rather than invalidating the Bennett Freeze, the District Court and the Ninth Circuit demanded that the Navajos comply with the consent requirement. See Def.'s Ex. 20 ¶ 3, at DOJ71 (requiring the Navajo Nation to make "written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze"); Masayesva, 65 F.3d at 1460 (vacating the District Court's lifting of the Bennett

Freeze).

Under Plaintiff's theory, the United States could have avoided liability for a breach of trust only if the Department of the Interior intentionally violated an act of Congress, a statute with which both the Ninth Circuit and a federal district court had expressly required compliance. To avoid such a result, the Court should conclude that the principles discussed in Menominee Basic apply, and dismiss Plaintiff's breach of trust claim for lack of jurisdiction pursuant to Rule 12(b)(1).

**2. Plaintiff Cannot Identify Specific Fiduciary Obligations That Can Fairly Be Interpreted as Mandating Compensation for Damages Sustained**

Even if Menonimnee Basic does not bar Plaintiff's breach of trust claim, the claim fails because Plaintiff cannot show the existence of a specific money-mandating fiduciary obligation that the government allegedly failed to fulfill. In order to assert a breach of trust claim, Plaintiff must satisfy two distinct requirements. First, Plaintiff must show a waiver of sovereign immunity based on a violation of "the Constitution, or any Act of Congress or any [federal] regulation. . . ." Mitchell II, 463 U.S. at 216 (quoting 28 U.S.C. § 1491(a)). A waiver of sovereign immunity must be "unequivocally expressed in statutory text," and the scope of any waiver must be "strictly construed . . . in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996). This "threshold" requirement demands that Plaintiff identify "specific rights-creating or duty-imposing statutory or regulatory prescriptions" that establish the "specific fiduciary or other duties" that the government allegedly failed to fulfill. United States v. Navajo Nation, 537 U.S. 488, 490 (2003).

Second, if the "threshold is passed," Plaintiff must show that "the relevant source of substantive law" whose violation forms the basis of the claim "can fairly be interpreted as

mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes." Id. (internal quotation and citation omitted); United States v. White Mountain Apache Tribe, 537 U.S. 465, 472-73 (2003) (stating that the other source of law must be "reasonably amenable to the reading that it mandates a right of recovery in damages"). If the tribe is unable to identify a money-mandating source, dismissal is proper pursuant to Rule 12(b)(1) for lack of jurisdiction. See Grosdidier v. United States, 77 Fed. Cl. 106, 108-09 (2007).

In the instant case, Plaintiff's First Amended Complaint alleges three "source[s] of defendant's fiduciary responsibilities:" (1) "implied contracts" between the United States and the Navajo Nation, Pl.'s First Am. Compl. ¶¶ 25-26; (2) the 1934 Act, see id. ¶ 28; and (3) several federal statutes and regulations, see id. ¶¶ 27, 29. These three "sources," however, do not specify any rights or create any specific duty that the United States allegedly failed to fulfill in this case. Certainly none of the "sources" suggest that the United States had a fiduciary obligation to manage the Bennett Freeze Area for the sole benefit of the Navajo Nation.

For example, although Plaintiff alleges that trust obligations arose under certain "implied contracts," Plaintiff offers no evidence of the content of those contracts or proof that the contracts imposed a specific fiduciary responsibility on the United States. Similarly, the 1934 Act, which outlined the exterior boundaries of the 1934 Reservation Area, did not establish any specific fiduciary obligations. The 1934 Act does not describe any specific duties or ongoing federal obligations, does not articulate any future federal supervision of this property, and does not suggest that the United States had a duty to allow Plaintiff the unilateral right to develop the lands. Compare White Mountain Apache Tribe, 537 U.S. at 474-75 (finding trust obligations

where the trust property was made "subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose" and the government "exercised daily supervision [and] occupation") with United States v. Mitchell, 445 U.S. 535, 542-43 (1980) ("Mitchell I") (holding General Allotment Act of 1887, which authorized the allotment of certain lands to tribal members, "created only a limited trust relationship between the United States and the allottee" and did "not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands."). Indeed, rather than supporting Plaintiff's position, the 1934 Act's withdrawal of land for the benefit of the Navajo Nation and "such other Indians as may already be located thereon" suggests that the Department of the Interior would have been remiss if it had not instituted a mutual consent requirement applicable to both the Navajos and the Hopis.

For this reason, the Federal Circuit rejected the Navajo Nation's argument in Navajo Nation v. United States, 501 F.3d 1327 (Fed. Cir. 2007), that the 1934 Act (and the 1868 Treaty and the 1974 Settlement Act) imposed a money-mandating trust responsibility with respect to coal mining operations on the Navajo Reservation. Although the Federal Circuit noted that these "substantive sources of law . . . contain explicit trust language," the court cautioned that such language "is necessary but not sufficient for an Indian Tucker Act breach of trust claim," and therefore proceeded to evaluate whether the network of other statutes upon which the Navajo Nation relied established "specific fiduciary or other duties that can fairly be interpreted as

mandating compensation for damages sustained."[10] Id.

Nor do the federal statutes and regulations that Plaintiff cites in its First Amended Complaint constitute a network that can fairly be interpreted as mandating compensation. First, many of the statutes and regulations are simply irrelevant to the questions this case presents. See, e.g., Federal Aid Highway Act, 23 U.S.C. §§ 101, et seq.; 23 U.S.C. §§ 201, et seq. (providing generally for the expenditure of federal funds on various classes of highways, including, inter alia, Indian Reservation Roads); 25 U.S.C. §§ 391-416 (governing lease, sales, or surrender of allotted or unallotted lands). Second, and more important, with respect to all the remaining statutory authority upon which Plaintiff relies, federal courts have ruled expressly that these statutes and their corresponding regulations do not provide Plaintiff a substantive basis for a breach of trust claim against the United States in federal court. See Navajo Nation, 501 F.3d at 1339 ("[T]he Indian Lands Rights-of-Way Act of 1948[, 25 U.S.C. §§ 311-28,] and its implementing regulations do not provide a relevant substantive source of law."); White Mountain Apache Tribe v. United States, 249 F.3d 1364, 1372 (Fed. Cir. 2001) (holding the Snyder Act, 25 U.S.C. §§ 2, 13, "fails 'to provide a basis for a money-mandating claim as laid

[10] The Federal Circuit reached a similar conclusion with respect to the Navajo-Hopi Rehabilitation Act of 1950, 25 U.S.C. §§ 631, et seq. ("NHRA"), another statute which Plaintiff cites in this case. At least in the limited context of coal development, the Federal Circuit stated that the NHRA "authorized and directed the government to embark on 'a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians, . . . and the supplying of means to be used in their rehabilitation." Navajo Nation, 501 F.3d at 1341 (quoting 25 U.S.C. § 631). Accordingly, the Federal Circuit held that "the Act may contribute to the Nation's asserted network." Navajo Nation, 501 F.3d at 1341 n.3. The Federal Circuit did not state, however, that the NHRA established any money-mandating duties on its own, and instead found it necessary to supplement its discussion of the NHRA with a careful evaluation of the extensive array of comprehensive coal-mining laws and regulations upon which the Navajo Nation relied. In the instant case, Plaintiff fails to identify any equivalent provisions.

out in Mitchell II'"); Edwards v. District of Columbia, 821 F.2d 651, 659 (D.C. Cir. 1987) (holding United States Housing Act, 42 U.S.C. §§ 1437, et seq., does not provide an implied right of action in federal court); Latinos Unidos de Chelsea en Accion v. Sec'y of Hous. & Urban Dev., 799 F.2d 774, 794 (1st Cir. 1986) (holding the Housing and Community Development Act, 42 U.S.C. §§ 5301, et seq., does not provide an implied right of action in federal court); Allred v. United States, 33 Fed. Cl. 349, 355 (1995) (holding neither the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601-1683, nor the Indian Health Services Act, 42 U.S.C. §§ 2001-2004b, are money-mandating statutes and dismissing for lack of jurisdiction).

The authorities listed in Plaintiff's First Amended Complaint do not provide a basis for a money-mandating claim and are insufficient to establish an actionable fiduciary duty. Moreover, Plaintiff cannot establish that the Bennett Freeze violated any of the cited references (much less some implied duty created therefrom). These "sources," considered separately or together, do not approximate the pervasive "network" of statutes and regulations required to infer a specific fiduciary responsibility. Rather than establishing a specific fiduciary duty requiring the Department of the Interior to manage the Bennett Freeze Area for Plaintiff's sole benefit, Congress codified the Bennett Freeze, and explicitly prevented Plaintiff from engaging in unilateral development in the disputed land over the Hopi Tribe's objection. See 25 U.S.C. § 640d-9(f). The Department of the Interior's statutory responsibility, then, was to implement the consent requirement, not to manage the Bennett Freeze Area for the sole benefit of the Navajo Nation. Plaintiff, therefore, cannot show that Congress created specific fiduciary duties or that the "Government has failed faithfully to perform those duties." Navajo Nation, 537 U.S. at 506. Consequently, these statutes and regulations do not establish the existence of any

money-mandating "specific fiduciary or other duties" relevant to this case.

### C. The Court Should Limit Plaintiff's Claims to an Examination of those Written Proposals that Plaintiff Actually Proposed and Was Not Allowed to Undertake

For the reasons discussed above, the Court should dismiss Plaintiff's claims for lack of jurisdiction pursuant to Rule 12(b)(1). The Court need only reach the argument presented in this section, and the remainder of this memorandum, if it concludes it has jurisdiction to hear Plaintiff's claims.

As both an administrative policy and a statute, the Bennett Freeze did not prevent all development; rather, the Freeze temporarily established a mutual consent requirement, which was designed to prevent the Hopi Tribe and the Navajo Nation from unilaterally developing certain areas while they litigated the merits of their respective rights to the disputed property. The Court should evaluate the impact of the Bennett Freeze in reference to those specific projects that Plaintiff actually proposed and was not allowed to undertake due to the Bennett Freeze. Any other approach would incorrectly treat the consent requirement as an absolute bar to all development and therefore misapprehend the nature of the Bennett Freeze.[11/]

While the Bennett Freeze was in place, Plaintiff submitted several projects for approval, and the Hopi Tribe (or the Department of the Interior) allowed Plaintiff to undertake many of the proposals. See Def.'s Exs. 22-24, 26.[12/] Since 1988 and continuing until the Bennett Freeze was

---

[11/] In addition, the alleged economic impact must be limited to those projects proposed on disputed property, and over which the Hopi Tribe acquired no rights during the District Court Litigation. The Court need not compile a definitive list of projects in order to grant this motion.

[12/] Defendant's Exhibit 22 is a list that Plaintiff generated in response to the United States' discovery request, identifying projects Plaintiff proposed between 1966 and 1992. Defendant's Exhibit 23 is a similar list Plaintiff submitted in connection with the earlier summary judgment (continued...)

lifted, Plaintiff has been under court order to submit written project proposals. See Def.'s Ex. 20. These project proposals fall generally into one of two categories:

1. **Individual Projects**, generally involving replacement, repair, or improvement of individual tribal members' homes that were located in the Bennett Freeze Area. According to Plaintiff's documents, Plaintiff proposed approximately 218 Individual Projects between 1966 and 2006, approximately 141 of which were approved in whole or part (sixty-four percent approval).

2. **Public Work Projects**, such as paving a public road; repairing or improving some public utility (such as water lines or sewage facilities); or extending an electrical powerline. According to Plaintiff's documents, Plaintiff proposed approximately 90 Public Work Projects between 1966 and 2006, approximately 56 of which were approved (sixty-two percent approval).

The Court need not determine the exact number of projects Plaintiff proposed and the Hopi Tribe rejected at this point of the litigation.[13/] Regardless of the precise number of proposals, the Court should conclude that Plaintiff's claims are limited to an examination of those written development proposals that Plaintiff actually proposed, but were unable to undertake because of the Bennett Freeze. Moreover, as discussed below, even if Plaintiff's entire list of rejected proposals is considered, Plaintiff cannot establish a valid takings claim.

---

[12/](...continued)
briefing. Defendant's Exhibit 23 contains additional information about some of these proposals. See Def.'s Ex. 23. Counsel for the United States summarized these documents as well as additional proposals Plaintiff made after 1992, in Defendant's Exhibit 24. See also Def.'s Ex. 26 (declaration describing the preparation and limitations of Defendant's Exhibit 24).

[13/] The United States does not waive its ability to challenge the accuracy of Plaintiff's lists in future proceedings.

**D. Plaintiff Lacks Standing to Seek Compensation for Individual Tribal Members' Claims**

The economic impacts, if any, resulting from denial of the Individual Projects were experienced by individual tribal members, not the Navajo Nation itself. Therefore, the Navajo Nation lacks standing to pursue claims related to the Hopi Tribe's denial of these Individual Projects.

In order to establish standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 815 (2003). An organization lacks standing when the "remedy sought is monetary damages as compensation for wrongs done to the members of an organization rather than the organization itself; the organization must have an entitlement to recovery in its own right." N. Paiute Nation v. United States, 10 Cl. Ct. 401, 406 (1986). Consequently, an Indian Tribe cannot maintain suit when the claim "is not a tribal claim but concerns the rights of and obligations to individual Indians, members of the . . . Tribe." Sioux Tribe of Indians v. United States, 89 Ct. Cl. 31, 38 (1939) (citing Price v. United States, 174 U.S. 373, 375 (1899)).

The Individual Project requests typically involved the replacement or improvement of individual tribal members' homes. Denial of these projects affected individual tribal members, not the tribe itself. Consequently, Plaintiff lacks standing to pursue claims related to any of the Individual Projects, and the Court should rule that Plaintiff's claims are limited to the rejected Public Works Projects.

**E. The Court Should Reject Plaintiff's Agins-Based Takings Arguments as a Matter of Law**

In the earlier summary judgment briefing, Plaintiff argued that the United States was liable for a regulatory taking under the so-called Agins test, because the Bennett Freeze did not "substantially advance legitimate state interests." Agins v. Tiburon, 447 U.S. 255, 260 (1980); see Pl.'s Resp. to Def.'s Mot. for Summ. J. at 21, filed Jan. 31, 1995 (Doc. No. 20) (arguing that the Bennett Freeze "was vastly disproportionate to any legitimate government purpose").[14/] The Court should reject Plaintiff's Agins-based allegations and arguments as a matter of law. In 2005, the Supreme Court clarified that the "substantially advances" formula articulated in Agins is "not a valid takings test." Lingle v. Chevron, 544 U.S. 528, 545 (2005). Accordingly, Plaintiff's temporary takings claim must be evaluated under the test articulated in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978), not the "substantially advanced" or "proportional" formulae discussed in Agins.

**F. The Court Should Reject Plaintiff's Penn Central-Based Takings Arguments**

For the reasons discussed above, the Court should conclude that Plaintiff's takings claim is limited to the written Public Work Projects Plaintiff submitted and was unable to undertake because of the Bennett Freeze. In addition, the Court should conclude that the undisputed facts demonstrate that the United States is entitled to judgment as a matter of law, and enter summary judgment in favor of the United States pursuant to Rule 56.

Plaintiff's temporary regulatory takings claim must be evaluated under the three Penn

---

[14/] Plaintiff's First Amended Complaint contains similar allegations. See Pl.'s First Am. Compl. ¶¶ 17-18, at 6 (alleging that the Bennett Freeze effected a taking because it "does not substantially advance any legitimate governmental interest" and that the Bennett Freeze "is unreasonably and unnecessarily broad in scope").

Central factors: (1) "[t]he economic impact of the [action] on the claimant"; (2) "the extent to which the [action] has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." Penn Central, 438 U.S. at 124; Bair v. United States, 515 F.3d 1323, 1326 (Fed. Cir. 2008). In evaluating these factors, the over-arching question is whether the burdens imposed by the government's actions "are functionally comparable to government appropriation or invasion of private property." Lingle, 544 U.S. at 529. The Penn Central inquiry "turns in large part, albeit not exclusively" on the economic impact factor, and the degree of interference with property interests. Lingle, 544 U.S. at 540; Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004) ("[T]he existence of economic injury is indispensable to demonstrating a regulatory taking."); Hendler v. United States, 175 F.3d 1374, 1385 (Fed. Cir. 1999) ("A pivotal criterion governing whether a regulatory taking has occurred is the impact the regulatory imposition has had on the economic use, and hence value, of the property[;] if the regulatory action is not shown to have had a negative economic impact on the property, there is no regulatory taking.").

**1. The Bennett Freeze Did Not Cause Significant Economic Impact**

The Supreme Court has never specified an exact threshold percentage of value loss, but it is clear that a taking lies only where the economic impact is very substantial. See, e.g., Lingle, 544 U.S. at 539 (asking whether the restriction is the functional equivalent of a physical occupation or appropriation of land); Riverside Bayview Homes, Inc., 474 U.S. 121, 126 (1985) (a taking may occur in "extreme circumstances"); Concrete Pipe & Prods. of Cal., Inc. v. Const. Laborers Pension Trust, 508 U.S. 602, 645 (1993) (diminution in value of seventy-five percent did not effect taking); Brace v. United States, 72 Fed. Cl. 337, 357 n.33 (2006) (collecting cases

showing losses of up to sixty percent did not support a taking). Moreover, the Supreme Court has observed that neither diminution in property value, Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 332 (2002), nor "even substantial reduction of the attractiveness of the property to potential purchasers," Kirby Forest Indus. v. United States, 467 U.S. 1, 15 (1984), will suffice to establish that a taking has occurred. The economic impact prong establishes an objective, not a subjective, standard. See Chancellor Manor v. United States, 331 F.3d 891, 904 (Fed. Cir. 2003) ("The subjective expectations of the [landowners] are irrelevant.").

A determination of economic impact must focus on the appropriate relevant parcel, a concept that includes spatial, functional, and temporal dimensions. See Tahoe-Sierra, 535 U.S. at 331. In this case, the "parcel as a whole" is Plaintiff's interest in the entire 1934 Reservation. The Bennett Freeze impacted a relatively small portion of that area for a limited, though not insignificant, amount of time. Even assuming, *arguendo*, that Plaintiff was delayed in undertaking the identified projects, the economic impact caused by the delay would have caused no more than a *de minimus* economic impact on the subject property as a whole.

**2. The Bennett Freeze Did Not Interfere with Plaintiff's Reasonable Investment Backed Expectation**

The second factor in the Penn Central test "looks to whether or not the regulation of plaintiff's property interfered with plaintiff's 'distinct investment-backed expectations.'" Florida Rock Indus. v. United States, 45 Fed. Cl. 21, 38 (1999) (quoting Penn Central, 438 U.S. at 124). "Plaintiff must show that the regulation of its property frustrated reasonable expectations . . . if it is to show a taking." Id. In addition, a "'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" Id. (citing

Ruckelshaus v. Monsanto, 467 U.S. 968, 1004-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980))). A party's "subjective expectation is irrelevant to whether that expectation is reasonable." Cienega Gardens v. United States, 331 F.3d 1319, 1346 n.42 (Fed. Cir. 2003). The lack of reasonable investment-backed expectations may be dispositive of a takings claim. See Monsanto, 467 U.S. at 1005 ("[T]he force of the [reasonable expectations factor] is so overwhelming . . . that it disposes of the takings question."); Golden Pac. Bankcorp. v. United States, 15 F.3d 1066, 1074 (Fed. Cir. 1994) (absence of reasonable investment-backed expectations due to the highly regulated nature of the banking industry was dispositive).

The Federal Circuit has identified "three factors relevant to the determination of a party's reasonable expectations:"

> (1) whether the plaintiff operated in a "highly regulated industry;" (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have "reasonably anticipated" the possibility of such regulation in light of the "regulatory environment" at the time of purchase.

Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1348 (Fed. Cir. 2001)). Each of these factors counsels against a finding of reasonable expectations in this case.

First, there is generally no frustration of reasonable investment-backed expectations where an industry has been highly regulated for some time. Rith Energy v. United States, 270 F.3d 1347, 1351 (Fed. Cir. 2001) (concluding that coal mining is a highly regulated industry and observing that coal mining company was subject to the "widely understood risk" that it would not be permitted to mine all the coal it wished). To the extent this factor has any relevance to the

claim raised here, the factor clearly favors the United States' position. Although there is no money-mandating trust responsibility here, it is undisputed that the federal government assumes a unique role with respect to tribal property, including the lands covered by the Bennett Freeze. Given the genesis of the long-standing dispute between the Navajos and Hopis, Plaintiff had no reasonable expectation that it would be allowed to conduct unilateral development in this area since at least the passage of the 1934 Act.

Second, the "problem that spawned the regulation," Appolo Fuels, 381 F.3d at 1349, can be traced back at least to the 1934 Act itself, which established the boundary lines of a reservation for the Navajo people and "'such other Indians as may already be located thereon.'" 1934 Act, 48 Stat. at 961. Based on this language, Plaintiff knew, or should have known, that unilateral development might be restricted if the "other Indians" opposed the proposed development.

Third, in light of the language of the 1934 Act, and the extensive litigation between the Hopi Tribe and the Navajo Nation involving somewhat similar arguments about their respective rights to the 1882 Reservation Area, Plaintiff had no right or reasonable expectation that it would be allowed to unilaterally develop the disputed land over the Hopi Tribe's objection. Certainly after the Department of the Interior issued the administrative policy in 1966, Plaintiff's subjective expectation that it could engage in unilateral development over the objection of the Hopi Tribe was unreasonable. See Golden Pac. Bancorp, 15 F.3d at 1067 (dismissing takings claim because banking plaintiff could not have reasonably expected that the government would simply fail to enforce the applicable statutes and regulations).

### 3. The Character of the Government Action Favors a Finding of No Liability

The last factor identified in Penn Central is the character of the government action. The Supreme Court has stated that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Central, 438 U.S. at 124. See also Lingle, 544 U.S. at 538-39 (noting that economic impact and interference with reasonable investment-backed expectations are "primary" and the character prong "may be relevant").

In this case, the alleged interference with the property was a regulatory imposition, not a physical invasion. The Bennett Freeze did not result in a physical intrusion upon any part of Plaintiff's property, it did not result in a seizure of Plaintiff's property, and it did not result in the complete elimination of Plaintiff's ability to use the land. Cf. Hodel v. Irving, 481 U.S. 704, 717 (1987) (holding that "complete abolition of both the descent and devise of a particular class of property may be a taking"). The "extraordinary" government regulation at issue in Hodel offers an instructive contrast to the government action Plaintiff challenges here. Id. at 716. In Hodel, the challenged government action eliminated tribal members' rights "to pass on a certain type of property – the small undivided interest – to one's heirs." Id. at 716. The offending statute was so unusual that "[e]ven the United States concede[d] that total abrogation of the right to pass property is unprecedented and likely unconstitutional." Id. at 716. Since the federal act "completely abolished" Plaintiffs' rights to "both descent and devise" their properties, the Supreme Court invalidated the statute, stating that "a total abrogation of these rights cannot be upheld." Id. at 717.

The government action at issue here is manifestly different. The Department of the Interior (and later, Congress) recognized the long history of dispute between the two tribes, as well as the tribes' legitimate arguments to the disputed property. The United States took the reasonable approach of allowing the tribes to decide for themselves when development should occur. The United States did not forcibly take property from one tribe and give it to the other, and it is undisputed that Plaintiff was able to undertake many of the projects that it proposed. Moreover, unlike the statute at issue in Hodel, the consent requirement was temporary, and lasted only as long as the two tribes continued to litigate their respective positions. The fact that the District Court litigation lasted 32 years demonstrates that the tribes had legitimate arguments to the disputed property, and supports the reasonableness of the government's approach. The character of the government action prong, therefore, favors a finding of no liability.

## V. CONCLUSION

For the reasons discussed above, the Court should dismiss Plaintiff's claims for lack of jurisdiction pursuant to RCFC 12(b)(1), because Plaintiff's claims are barred by the six-year statute of limitations. In addition, the Court should dismiss Plaintiff's breach of trust claim pursuant to RCFC 12(b)(1), because the Court lacks jurisdiction over a non-constitutional breach of trust claim premised on a congressional action, and because Plaintiff cannot show the existence of a money-mandating fiduciary duty.

If the Court determines that it has jurisdiction to hear Plaintiff's claims, the Court should grant partially summary judgment in favor of the United States pursuant to RCFC 56, and order that Plaintiff's claims are limited to an examination of those written Public Work Proposals that Plaintiff actually proposed and was not allowed to undertake. Finally, the Court should grant

summary judgment in favor of the United States on Plaintiff's takings claim because the undisputed facts show that the United States is entitled to judgment as a matter of law.

Dated: June 2, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

_s/ William J. Shapiro_________________
WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, California 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

MARK S. BARRON
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, DC 20530
(202) 305-0490 (phone)
(202)305-0506 (fax)






Exhibit 1 to
United States' Motion
DOJ1

the southeast quarter of section thirty-four, township sixteen and one-half north, range thirteen west of the Gila and Salt River meridian, be, and the same is hereby, reserved from settlement, entry, sale, or other disposition for use of the Walapai Indians, subject to any valid, existing right, legal or equitable, of any person thereto.

WM. H. TAFT.

## MOQUI (OR HOPI) RESERVATION.

EXECUTIVE MANSION, *December 16, 1882.*

It is hereby ordered that the tract of country in the Territory of Arizona lying and being within the following-described boundaries, viz, beginning on the one hundred and tenth degree of longitude west of Greenwich, at a point 36° 30′ north; thence due west to the one hundred and eleventh degree of longitude west; thence due south to a point of longitude 35° 30′ north; thence due east to the one hundred and tenth degree of longitude west; thence due north to place of beginning, be, and the same is hereby, withdrawn from settlement and sale, and set apart for the use and occupancy of the Moqui and such other Indians as the Secretary of the Interior may see fit to settle thereon.

CHESTER A. ARTHUR.

## NAVAJO RESERVATION.

[Partly in Utah and New Mexico.]

EXECUTIVE MANSION, *October 29, 1878.*

It is hereby ordered that the tract of country in the Territory of Arizona lying within the following-described boundaries, viz, commencing at the northwest corner of the Navajo Indian Reservation, on the boundary line between the Territories of Arizona and Utah; thence west along said boundary line to the one hundred and tenth degree of longitude west; thence south along said degree to the thirty-sixth parallel of latitude north; thence east along said parallel to the west boundary of the Navajo Reservation; thence north along said west boundary to the place of beginning, be, and the same hereby is, withdrawn from sale and settlement and set apart as an addition to the present reservation for the Navajo Indians.

R. B. HAYES.

---

EXECUTIVE MANSION, *January 6, 1880.*

It is hereby ordered that the following-described country lying within the boundaries of the Territories of New Mexico and Arizona, viz, commencing in the middle of the channel of the San Juan River where the east line of the Navajo Reservation in the Territory of New Mexico, as established by the treaty of June 1, 1868 (15 Stat., 667), crosses said river; thence up and along the middle channel of said river to a point 15 miles due east of the eastern boundary line of said reservation; thence due south to a point due east of the present southeast corner of said reservation; thence due south 6 miles; thence

Exhibit 2 to
United States' Motion
EXHIBIT 1 DOJ2

EXECUTIVE MANSION, *April 24, 1886.*

It is hereby ordered that the following-described tract of country in the Territory of New Mexico, viz, all those portions of townships 29 north, ranges 14, 15, and 16 west of the New Mexico principal meridian, south of the San Juan River, be, and the same is hereby, withdrawn from sale and settlement and set apart as an addition to the Navajo Indian Reservation.

GROVER CLEVELAND.

---

EXECUTIVE MANSION,
*Washington, D. C., November 19, 1892.*

It is hereby ordered that the Executive order of May 17, 1884, by President Chester A. Arthur, withdrawing from sale and settlement and setting apart as a reservation for Indian purposes certain lands in the Territories of Utah and Arizona, be, and the same hereby is, modified so that all the lands described in said order which lie west of the 110th degree of west longitude and within the Territory of Utah be, and the same hereby are, restored to the public domain, freed from the reservation made by said order.

BENJ. HARRISON.

---

EXECUTIVE MANSION, *January 8, 1900.*

It is hereby ordered that the tract of country lying west of the Navajo and Moqui reservations in the Territory of Arizona, embraced within the following-described boundaries, viz, beginning at the southeast corner of the Moqui Reservation and running due west to the Little Colorado River; thence down that stream to the Grand Canyon Forest Reserve; thence north on the line of that reserve to the northeast corner thereof; thence west to the Colorado River; thence up that stream to the Navajo Indian Reservation, be, and the same is hereby, withdrawn from sale and settlement until further ordered.

WILLIAM MCKINLEY.

---

WHITE HOUSE, *November 14, 1901.*

It is hereby ordered that the following-described tract of country in Arizona, viz, commencing at a point where the south line of the Navajo Indian Reservation (addition of January 8, 1900) intersects the Little Colorado River; thence due south to the fifth standard parallel north; thence east on said standard to the middle of the south line of township 21 north, range 15 east; thence north on the line bisecting townships 21, 22, 23, 24, said range 15 east, to the south line of the Moqui Reservation; thence due west to the place of beginning, be, and the same is hereby, withdrawn from sale and settlement until such time as the Indians residing thereon shall have been settled permanently under the provisions of the homestead laws or the general allotment act approved February 8, 1887 (24 Stats., 388), and the act amendatory thereof, approved February 28, 1891 (26 Stats., 794).

THEODORE ROOSEVELT.

---

*Pueblo Industrial School Reserve.*

EXECUTIVE MANSION, *October 3, 1884.*

It is hereby ordered that the following-described tract of land in the county of Bernalillo and Territory of New Mexico, viz, all that certain piece, parcel, or tract of land situate, lying, and being in the

Exhibit 3 to
United States' Motion
DOJ3

93D CONGRESS : : : : 2D SESSION

JANUARY 21–DECEMBER 20, 1974

# SENATE REPORTS

## VOL. 1-8

MISCELLANEOUS REPORTS ON
PUBLIC BILLS, VIII

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

Exhibit 4 to
United States' Motion
DOJ4

Calendar No. 1121

93D CONGRESS 2d Session } SENATE { REPORT No. 93-1177

# RESOLUTION OF NAVAJO-HOPI LAND DISPUTES

SEPTEMBER 25, 1974—Ordered to be printed

Mr. FANNIN, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 10337]

The Committee on Interior and Insular Affairs, to which was referred the Act (H.R. 10337) to authorize the partition of the surface rights in the joint use area of the 1882 Executive Order Hopi Reservation and the surface and subsurface rights in the 1934 Navajo Reservation between the Hopi and Navajo Tribes, to provide for allotments to certain Paiute Indians, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the Act as amended do pass.

The amendments are as follows:

1. Strike out all after the enacting clause and insert in lieu thereof the following:

**That, (a) within thirty days after enactment of this Act, the Director of the Federal Mediation and Conciliation Service shall appoint a Mediator (hereinafter referred to as the "Mediator") who shall assist in the negotiations for the settlement and partition of the relative rights and interests, as determined by the decision in the case of *Healing* v. *Jones* (210 F. Supp. 125, D. Ariz., 1962, aff'd 3 U.S. 758, 1963) (hereinafter referred to as the "*Healing* case"), of the Hopi and Navajo Tribes (hereinafter referred to as the "tribes") to and in lands within the reservation established by the Executive order of December 16, 1882, except land management district no. 6 (such lands hereinafter referred to as the "joint use area"). The Mediator shall not have any interest, direct or indirect, in the settlement of the interests and rights set out in this subsection. The duties of the Mediator shall cease upon the entering of a full agreement into the records of the supplemental proceedings pursuant to section 3 or the submission of a report to the District Court after a default in negotiations or a partial agreement pursuant to section 4.**

thence southwesterly 1,200 feet (in a straight line) following the 6,900 feet contour;

thence south 46 degrees east, 600 feet;

thence north 38 degrees east, 1,300 feet to the point of beginning, 23.8 acres more or less: *Provided*, That, if and when such spring is fenced, the Hopi Tribe shall pipe the water therefrom to the edge of the boundary as hereinabove described for the use of residents of the area. The natural stand of fir trees within such 2-mile radius shall be conserved for such religious purposes.

SEC. 21. Notwithstanding anything contained in this Act to the contrary, the Secretary shall make reasonable provision for the use of and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes.

SEC. 22. The availability of financial assistance or funds paid pursuant to this Act may not be considered as income or resources or otherwise utilized as the basis (1) for denying a household or member thereof participation in any federally assisted housing program or (2) for denying or reducing the financial assistance or other benefits to which such household or member would otherwise be entitled to under the Social Security Act or any other Federal or federally assisted program. None of the funds provided under this Act shall be subject to Federal or State income taxes.

SEC. 23. The Navajo and Hopi Tribes are hereby authorized to exchange lands which are part of their respective reservations.

SEC. 24. If any provision of this Act, or the application of any provision to any person, entity or circumstance, is held invalid, the remainder of this Act shall not be affected thereby.

SEC. 25. (a)(1) For the purpose of carrying out the provisions of section 15, there is hereby authorized to be appropriated not to exceed $31,500,000.

(2) For the purpose of carrying out the provisions of subsection (a) of section 19, there is hereby authorized to be appropriated not to exceed $10,000,000.

(3) For the purpose of carrying out the provisions of subsection (b) of section 19, there is hereby authorized to be appropriated not to exceed $500,000.

(4) For the purpose of carrying out the provisions of subsection (b) of section 14, there is hereby authorized to be appropriated not to exceed $5,500,000.

(5) There is hereby authorized to be appropriated annually not to exceed $500,000 for the expenses of the Commission.

(6) There is hereby authorized to be appropriated not to exceed $500,000 for the services and expenses of the Mediator and the assistants and consultants retained by him: *Provided*, That, any contrary provision of law notwithstanding, until such time as funds are appropriated and made available pursuant to this authorization, the Director of the Federal Mediation and Conciliation Service is authorized to provide for the services and expenses of the Mediator from any other appropriated funds available to him and to reimburse such appropriations when funds are appropriated pursuant to this authorization, such reimbursement to be credited to appropriations currently available at the time of receipt thereof.

(b) The funds appropriated pursuant to the authorizations provided in this Act shall remain available until expended.

2. Amend the title so as to read:

An Act to provide for final settlement of the conflicting rights and interests of the Hopi and Navajo Tribes to and in lands lying within the joint use area of the reservation established by the Executive order of December 16, 1882, and lands lying within the reservation created by the Act of June 14, 1934, and for other purposes.

## I. INTRODUCTION

The purpose of H.R. 10337, as amended, is to provide for the settlement of the conflicting rights and interests of the Hopi and Navajo Tribes in two areas of northeastern Arizona: the joint use area of the reservation established by the Executive Order of September 16, 1882, and lands lying within the reservation established by the Act of June 14, 1934.



These lands have been the subject of disputes between the two tribes even prior to the 1882 Executive Order and the 1934 Act. In recent years these disputes were brought before the Federal courts and the Indian Claims Commission and an impressive array of legal arguments and historical, archaeological, and anthropological data has been presented by both tribes in support of their respective positions. The court has stated and, now, the tribes themselves are agreed that no final resolution can occur absent the enactment of legislation. The tribes, however, are not in agreement as to the substance of that legislation.

Against this background the Committee held extensive hearings over two Congresses. In the mark-up sessions which began on August 6, 1974, the Committee did not hew to the position of either of the tribes, but rather agreed to certain guiding principles which would have to be met in any equitable legislative resolution of the disputes. The Committee then proceeded to mark-up a clean proposal to reflect those principles. This proposal was ordered reported as an amendment in the nature of a substitute to H.R. 10337 on September 11, 1974.

This report begins with a cursory discussion of the background of the disputes. (Much fuller descriptions may be found in the printed Committee hearings and in the 118-page opinion of the District Court for the District of Arizona in *Healing* v. *Jones* (210 F. Supp. 125, 1962; aff'd 363 U.S. 758, 1963).) Following this discussion are a description of the alternative bills pending before the Committee, statements of the need for a legislative resolution, and a listing of the principles which the Committee employed in drafting H.R. 10337, as ordered reported. Among the other sections of this report are a brief summary of the provisions of the bill and a more detailed section-by-section analysis.

## II. BACKGROUND

Both the Hopi and Navajo have occupied the American southwest for centuries. As the District Court noted in *Healing* v. *Jones* (see below): "No Indians in this county have a longer authenticated history than the Hopi" (210 F. Supp. 125, 134, D. Ariz. 1963, aff'd 363 U.S. 758, 1963). Archaeological evidence shows that groups ancestral to the Hopi were settled in Arizona and New Mexico before 1300 A.D. and perhaps as early as 600 A.D. In 1541 a detachment of the Spanish explorer, Coronado, visiting northeastern Arizona, encountered the Hopi living in mesa-top villages.

The Hopi still live in several villages in the same general area and pursue a life style not entirely dissimilar to that viewed by the Spanish explorers. The Hopi are a sedentary, village-based people, with an economy based on dry farming and grazing. Their crop fields are located near the villages in which they live. Besides raising crops, they also engage in livestock herding in areas near the mesas and travel to more distant points for ceremonial purposes, wood gathering, and hunting.

The Hopi tribe is a federally-recognized tribe, with a tribal government organized pursuant to the Indian Reorganization Act of 1934. The membership of the tribe is approximately 6,000 persons.

The time of the entry of the Navajo people into the Southwest is in question, but clearly the "recorded history of the Navajos does not extend as far back as that of the Hopi" (210 F. Supp. 125, 134). Available evidence suggests the Navajo were settled in northwestern New Mexico as early as 1500. They are mentioned in preserved journals for the first time in 1629; and it appears that they first entered what is now Arizona in the last half of the eighteenth century. Eventually, the Navajo spread into parts of what are now Arizona, New Mexico, and Utah. As a result of this process of migration and settlement, the Navajo came to surround the Hopi who had continued to reside in the same general area in northeastern Arizona.

Although some Navajos established farms which held them to fixed locations, in the main they were a semi-nomadic, grazing and hunting people who seldom gathered in cohesive communities. Families and kinship groups roamed rather extensive areas in search of forage and game. This required them to live in rude shelters known as "hogans" to which they returned whenever it was practicable. It is this migrating lifestyle which led to their occupation of large parts of northern New Mexico and Arizona and the particular lands presently under dispute.

The Navajo tribe is federally-recognized with a tribal government organized under governing documents adopted by the tribal council and approved by the Secretary of the Interior. The current membership is approximately 130,000.

### THE JOINT USE AREA

On December 16, 1882, President Chester A. Arthur signed an Executive order establishing a reservation of approximately 2,472,095 acres in the Territory of Arizona for the use and occupation of the Hopi (then called the "Moqui") and "such other Indians as the Secretary of the Interior may see fit to settle thereon". Principal among the reasons for establishing the reservation cited by the local Hopi Indian Agent, the Indian Inspector, the Commissioner of Indian Affairs, and the Secretary was the necessity to create a reservation for the Hopi in order to provide the Federal Government with jurisdiction to protect the Hopi from the pressures of Navajo migration, Mormon settlers, and white "intermeddlers". As early as this date, approximately 300 Navajo lived on the 1882 reservation.

In 1868, the United States entered into a treaty with the Navajo which granted to them a reservation to the east of what became the 1882 reservation. The western boundary of the Navajo reservation was defined with greater particularity in an Executive order issued on October 29, 1878. This line became the eastern boundary of the 1882 reservation. Additional land was added to the southwest of the Navajo reservation by another Executive order issued on January 6, 1880. With this addition the Navajo reservation contained about 11,875 square miles or 8,000,000 acres. However, as noted by the Court in the *Healing* case:

> Despite the vast size of the Navajo reservation at that time, this semi-arid land was considered incapable of providing support for all of the Navajos. Moreover, except for one or two places, the boundaries of the Navajo reservation were not distinctly marked. It is therefore not surprising that great numbers of the Navajos wandered far beyond the paper boundaries of the Navajo reservation as it existed in 1880. By 1882, Navajos comprising hundreds of bands and amounting to about half of the Navajo population had camps and farms outside the Navajo reservation, some as far away from it as one hundred and fifty miles. (210 F. Supp. 125, 134).



Part of this expansion occurred in the 1882 reservation and became a source of continued complaints by the Hopi to the Federal government. As relations between the Navajo and Hopi became increasingly hostile, several Administrations contemplated removal of all Navajo from the 1882 reservation and, in some instances, even initiated efforts to do so, including the sending of troops into the area. However, no removal ever occurred, and today, approximately 10,000 Navajo occupy and use the lands within the area.

By the Act of July 22, 1958 (72 Stat. 403), Congress authorized each tribe to institute or defend an action against the other in a three-judge court of the District Court of the District of Arizona "for the purpose of determining the rights and interests of such parties in and to said lands and quieting title in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity . . ." The result of this authorization was the September 28, 1962, decision in *Healing* v. *Jones* (210 F. Supp. 125, D. Ariz. 1962, aff'd 373 U.S. 758, 1963) in which the court held *inter alia* that:

> (1) Neither tribe obtained any vested rights in the land under the 1882 Executive order. The rights were vested in the tribes by the 1958 Act and, thereupon, became protected by the 5th Amendment to the Constitution.
>
> (2) By a 1943 administrative action establishing a grazing district for the exclusive use of the Hopi surrounding the Hopi villages, the Hopi obtained the exclusive right, subject to the trust title of the United States, to that area known as Land Management District No. 6.
>
> (3) Because of administrative action taken between 1937 and 1943, the Secretary impliedly settled the Navajo Tribe within the 1882 reservation under the authority of the Executive order.
>
> (4) The Hopi Tribe and the Navajo Tribe, subject to the trust title of the United States, have joint, undivided, and equal interests in the entire 1882 Executive order reservation except the Land Management District No. 6. This area is known as the "joint use area".
>
> (5) The 1958 Act did not confer authority on the Court to partition joint interests between the two tribes.

Despite the determination of equal and undivided interests in the joint use area in the *Healing* case, for all practical purposes, the Navajo Tribe has exercised exclusive control of the joint use area, including surface leasing and granting of rights-of-way since the 1962 decision. During the past ten years, the two tribes have attempted to negotiate a joint-use agreement, but negotiations have failed.

On March 13 1970, the Hopi Tribe petitioned the District Court to issue a writ of assistance enforcing the Hopi rights to the joint use

Exhibit 4 to
United States' Motion
DOJ7

area in accordance with the *Healing* decision. The Court dismissed this petition in August 1970 on the ground that it lacked jurisdiction to issue process to enforce the judgment. On December 3, 1971, the Court of Appeals for the Ninth Circuit reversed this decision, holding that the District Court has authority to issue a writ of assistance and remanded the matter for further proceedings (*Hamilton* v. *Nakai*, 453 F. 2d 152). On May 22, 1972, the U.S. Supreme Court denied the Navajos' petition for a writ of certiorari.

On October 14, 1972, the District Court issued an order of compliance directing the Navajo Tribe, *inter alia*, to: afford the Hopi Tribe its proper possession and use of a joint, undivided, and equal share in the disputed area; reduce its livestock in the joint use area to the point where the Navajo Tribe is using no more than one-half the carrying capacity of the area; and administer the area jointly with the Hopi Tribe. The United States was ordered, *inter alia*, to submit plans for effectuating this order. On the same day the court issued a writ of assistance commanding the United States Marshal to serve a copy of the foregoing order upon the Navajo Tribe. The Navajo Tribe appealed from the court's order and then, at the court's request, submitted an alternative plan to implement that order. On April 23, 1973, the court rejected the Navajo plan and adopted the United States' plan for achieving true joint use of the disputed area. Among other things, the plan adopted provides for removal of all livestock from the joint use area save that essential for daily livelihood, for restricting further Navajo building in the area, and for platting of new management units for use in future land recovery programs. It is important to note, however, that this plan does not effect a partition of the joint use area, and the District Court's holding that it lacks the power to partition still controls its disposition of the case.

Finally, on September 12, 1974, the U.S. Court of Appeals for the Ninth Circuit firmly rejected appeals by the Navajo from the October 14, 1972, order of compliance and the plan incorporated in the April 23, 1972, order (*Hamilton* v. *MacDonald*. —F. 2d —. 1974).

The Navajo are in complete possession of the disputed area. Partition of the joint use area could result in the necessity of moving as many as 6,000 Navajo (estimates vary widely). The Navajo oppose this alternative on the grounds of the disruption which relocation would cause, particularly in light of the unfortunate, early history of official Indian relocation efforts, and the lack of any lieu lands for Navajo required to relocate. Among other things, they propose that the Navajo purchase the Hopi interest in the joint use area.

The Hopi position is that they are entitled to the one-half use of the land under the law. They feel that the only way to secure their legal right and to avoid the inequity and hardship which would be imposed on Hopi tribal members were they denied lands to which they are legally entitled is to have the surface partitioned equally to the two tribes.

THE 1934 RESERVATION LANDS

In order to confirm Navajo interests in the Navajo Reservation which was continually enlarged by the 1878, 1880, and other Executive orders and Congressional enactments since the original



reservation was established by treaty in 1868, Congress enacted a statute defining the boundaries of the Navajo Reservation in Arizona (Act of June 14, 1934, 48 Stat. 960). After describing the lands to be included in the Navajo Reservation, the Act states that:

> All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive Order of December 16, 1882. (48 Stat. 960, 961.)

It is this language which has created the controversy and engendered a dispute between the Navajo and Hopi Tribes over the nature and extent of the latter's interest in the lands described in this 1934 Navajo Reservation Boundary Act.

In several respects, the dispute over the 1934 reservation lands differs from the dispute over the joint use area. The disputes arise from different actions of the Federal Government: the former being related to the 1934 Navajo Reservation Boundary Act and the latter to the 1882 Executive order. Furthermore, the 1934 reservation lands dispute was not addressed in the *Healing* decision.

The problems involved in the 1934 reservation lands and in the joint use area disputes are, however, substantially similar. The tribes are unable to agree on their relative rights and interests and have been unable to use the lands jointly in harmony. Both sides have marshalled an impressive array of arguments; legal, anthropological, and equitable, in defense of their positions. In brief (too brief to adequately describe the position of either side), both sides recognize that at the time of the enactment of the 1934 Navajo Reservation Boundary Act, the Hopi were residing in the village of Moencopi which is located immediately west of the 1882 reservation and wholly within the lands set aside in the 1934 Act. The Hopi argue that this fact and the "such other Indians as are already settled thereon" language of the 1934 Act, together with other historical data and governmental statements and papers, give them an undivided interest in the entire Navajo Reservation as established in the 1934 Act. They hold that the transfer of 243,000 acres, as proposed by H.R. 10337, as passed by the House of Representatives, is quid pro quo for a quit claim to any other interest they may have in the approximately 8.2 million acres of the 1934 reservation outside of the 1882 reservation. The Navajo position, based on differing interpretations and data, is that the Hopi are only entitled to that acreage they were occupying on the date of the Act (June 14, 1934), which the Navajo estimate to be 35,000 acres. Counsel for the Navajo have proposed language providing for the immediate partition of the 35,000 acres, but have communicated Navajo support for a judicial settlement of the 1934 reservation lands dispute proposed in a bill introduced by Senator Montoya (see section III below).

## III. Recent Legislative History

As it became apparent that the *Healing* decision, standing alone, could not resolve the Navajo-Hopi land disputes, Congress realized that its responsibilities to assist in the resolution of the conflicting claims to land were not terminated by the enactment of the 1958 Act authorizing the *Healing* suit. Furthermore, the District Court in the *Healing* case clearly stated that it was at a loss to separate the rights and interests in the disputed lands without additional legislation by Congress authorizing partition of those lands.

In the 92d Congress the House of Representatives approved H.R. 11128 which is similar in several major respects to H.R. 10337. H.R. 11128, in part, authorized the following:

1. Partition of the joint use land area by the Secretary of the Interior, with each tribe receiving approximately one-half of the land;
2. Relocation of the affected Navajo tribal members over a five-year period;
3. Compensation to the Navajo to the extent that they would be able to purchase a safe, sanitary replacement dwelling and;
4. Partition of the surface and subsurface of the 1934 reservation lands with a grant of 208,000 acres to the Hopi Tribe.

Following hearings on H.R. 11128 by the Senate Committee on Interior and Insular Affairs, the full Committee, in executive markup session, deferred action on the measure and, as an alternative, authorized the establishment of a three-member ad hoc committee drawn from the Committee's membership. The ad hoc committee's charge was to undertake a thorough and exhaustive review of the historical and legal background leading up to the land disputes and, further, to present proposed recommendations to the Committee for resolution of the disputes within 90 days of the convening of the 93rd Congress.

However, due to several unforeseen developments at the outset of the 93rd Congress, the Committee abandoned the ad hoc committee approach to the land disputes and referred the issue back to the Subcommittee on Indian Affairs to be handled within the Subcommittee's normal jurisdiction.

The Committee held two hearings on the Navajo-Hopi land disputes; first, at Winslow, Arizona, March 7 and 8, 1973, at which time the Subcommittee considered H.R. 1193 (introduced by Representative Steiger and identical to H.R. 11128); and second, at Washington, D.C., July 24, 1974, at which time the full Committee considered H.R. 10337, S. 2424, S. 3230 and S. 3724. A summary of these measures follows:

### *H.R. 10337—House Passed Bill*

H.R. 10337, as passed by the House of Representatives on May 29, 1974, would grant to the District Court, in supplemental proceedings to *Healing* v. *Jones*, the jurisdiction to partition the surface of the joint use area between the Hopi and Navajo Tribes. To aid the Court in its determination, the bill establishes certain criteria for partition which include equal acreage and quality of land, insofar as practicable and, contiguity of lands partitioned and inclusion of the high Navajo population density areas in the portion partitioned to the Navajo so as to avoid as much disruption as possible.



H.R. 10337 would transfer to the Hopi, to be held in trust by the United States, approximately 243,000 acres of the 1934 reservation lands.

The House-passed bill provides that those Indians who reside on land that will be partitioned shall be relocated from such lands over a five-year period and authorizes $28,800,000 for this purpose.

H.R. 10337 directs the Secretary of the Interior to immediately commence reduction of the number of livestock in the joint use area to the usual range capacity as determined by standards established by the Secretary. To accomplish this the bill authorizes $10 million.

### *S. 2424 (Senator Fannin)*

S. 2424 is similar in scope to H.R. 10337 except that, rather than the Federal District Court for the District of Arizona supervising the partition of the joint use area, the Secretary of the Interior is directed to perform that task. In addition there is no provision for compensation of those Hopi and Navajo who will be forced to relocate as a result of the partition, which means that no money is authorized for purchase, relocation and repurchase of homesites. (As the first action of the Committee's mark-up sessions on Navajo-Hopi legislation, Senator Fannin withdrew his bill in favor of H.R. 10337.)

### *S. 3230 (Senator Montoya)*

S. 3230 would utilize a commission approach to resolve the issues in disputes. Briefly stated, this commission, composed equally of Navajo and Hopi, would undertake a study of the lands involved in the joint use area and determine which lands were used exclusively by the respective tribes and which lands were used by the Navajo for residential purposes and were also used by the Hopi for wood and coal gathering, religious ceremonies and hunting. The commission would report to the Secretary of the Interior the appraised value of the respective interests as determined by the study. Thereupon the Secretary, by order, would partition the interests to the disputed lands granting the Hopi easements for timber and coal gathering, ceremonial shrines and hunting, and compensating the Hopi Tribe for any interest it finally receives which is less than one-half of the total value of the joint use area. The bill provides for resolution of the 1934 lands dispute by mandating the District Court for the District of Arizona to partition the lands involved according to general principles of equity.

### *S. 3724 (Senator Abourezk)*

S. 3724 would authorize the establishment of the Navajo-Hopi Development Commission. The Commission, in cooperation with federal departments and agencies, would plan, organize and implement social and economic development efforts designed to improve the life style of tribal members residing on the Navajo and Hopi Reservations.

The proposed measure would authorize a judicial partition of the joint use area through provisions similar to those included in H.R. 10337, as it passed the House of Representatives. S. 3724 also provides for the transfer of approximately 35,000 acres from the 1934 reservation lands to the Hopi Tribe.

Following the judicial partition of the joint use area, the Secretary of the Interior would be required to conduct a mandated census to determine the number of adult Navajo residing on the land partitioned to the Hopi Tribe, and the number of adult Hopi residing on the land partitioned to the Navajo Tribe.

Any person (Navajo or Hopi), enumerated through the census, who has resided since his birth in the joint use area and any surviving spouse of such person would be afforded a life estate on the residential site used by him on the date of enactment of S. 3724.

Those adult individuals who moved into the joint use area following their birth and prior to enactment of S. 3724 would be authorized to reside in the area for an equal period of time following the date of enactment S. 3724.

Any head of a household displaced as a result of S. 3724 would be guaranteed:

1. That his property would be purchased at fair market value;
2. That he would be provided reasonable moving expenses in accordance with section 202 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (84 Stat. 1894); and
3. That his total reimbursement would equal the cost of a suitable replacement dwelling.

Each tribe woud be guaranteed fair rental payments for use by the other tribe's members of land partitioned to it.

The proposed bill authorizes the appropriation of such funds necessary to carry out its provisions.

The Department of the Interior expressed its support for H.R. 10337, if amended as indicated in their report to the Committee. In final testimony before the Committee, the Hopi Tribe recommended enactment of H.R. 10337 and the Navajo Tribe recommended enactment of S. 3230.

## IV. Need for Legislative Action

The prolonged dispute between the Navajo and Hopi Tribes over the joint use area has resulted in a heavy drain on the energies and financial resources of both tribes. Because of the tribal leaderships' preoccupation with this complex issue, social and economic development efforts which are so vital to the well-being of the Navajo and Hopi people have been unnecessarily delayed and frustrated.

Moreover, any attempt to launch an intensive range rehabilitation program to restore the badly overgrazed (estimated to be 400 percent overgrazed) joint use area appears to be stymied until such time as the broader issue is resolved.

Although the dispute over the 1934 reservation lands derives from a legal basis different from that concerning the joint use area, the fundamental issues and problems are similar and warrant resolution at this time.

The Federal Government has an opportunity to address solutions to these major issues which are products of its own actions and subsequent inaction. An unfortunate outgrowth of Federal inaction in resolving the joint use area and 1934 reservation lands disputes is that the Navajo and Hopi Tribes have been placed in adversary roles. This



is grossly unfair to both tribes who by necessity must maintain a harmonious relationship for their mutual well-being.

There are overriding moral, ethical and legal considerations which justify prompt Congressional approval of legislation designed to bring about a lasting resolution of the joint use area and 1934 reservation lands disputes.

## V. Committee Consideration of Legislative Alternatives

During its deliberations on the several proposals pending before the Committee, the members followed certain guiding principles. These principles were:

1. That justice and equity for the Hopi and Navajo people dictate an early resolution of the joint use area and the 1934 reservation lands disputes and swift Congressional approval of the necessary enabling legislation;
2. That the decision of the three-judge Court in the *Healing* case that the Navajo and Hopi Tribes have joint, undivided and equal rights and interests in the joint use area should in no way be disturbed or overridden by the provisions of any bill ordered reported by the Committee;
3. That no matter how successful a court might be in devising a fair and equitable judicial resolution of the joint use area dispute it would still be a dictated, rather than a voluntary, solution; and, therefore, that a voluntary settlement between the two tribes is distinctly preferable and that a final negotiation process should be provided and so structured to afford the tribes the opportunity to willingly negotiate such a settlement;
4. That, in the event the two tribes fail to reach a voluntary settlement of the joint use area dispute through the negotiating process, the dispute should be referred to the U.S. District Court for the District of Arizona for a compulsory judicial resolution;
5. That, despite the failure of past negotiation attempts, the two tribes, when faced with enacted legislation calling for a compulsory judicial resolution if a final, voluntary negotiation effort fails, may enter the negotiation discussions with a renewed desire to arrive at their own solution to the controversy;
6. That the environment most conductive to successful negotiations would be one that provides the two tribes with the maximum freedom to concur in any settlement or settlement provision which is not contrary to law or to the *Healing* decision;
7. That, if the negotiating process fails, the District Court should have the flexibility to tailor a final adjudication, including partition of the joint use area, consistent with its decision in the *Healing* case;
8. That any compulsory judicial settlement will, in all likelihood, include a division of the lands of the joint use area, rather than any arrangement which would call for continued joint use of, or the purchase by one tribe of the other tribe's interests and rights in, the entire joint use area;
9. That any such division of the lands of the joint use area must be undertaken in conjunction with a thorough and generous relocation program to minimize the adverse social, economic, and cultural im-

pacts of relocation on affected tribal members and to avoid any repetition of the unfortunate results of a number of early, official Indian relocation efforts;

10. That an immediate legislative resolution of the 1934 reservation lands dispute is preferable to beginning now for that dispute a duplication of the lengthy process initiated by the 1958 Act authorizing suit over the joint use area dispute; but that any immediate legislative resolution relating to the 1934 reservation lands must be accompanied by a relocation program identical to and for the same reasons as that suggested above for the joint use area; and

11. That because of the Federal Government's repeated failure to resolve the land disputes, the major costs of resolution should be properly borne by the United States.

The Committee, therefore, rejected the four pending measures, and ordered reported an amendment in the nature of a substitute to H.R. 10337 which contains provisions reflecting the foregoing principles.

## VI. Major Provisions of H.R. 10337 as Ordered Reported

The Navajo and Hopi Tribes, pursuant to sections 1, 2, and 3 of H.R. 10337, as ordered reported, are authorized to enter into a final negotiating process for resolution of the dispute concerning the joint use area. A Mediator, to be appointed by the Director of the Federal Mediation and Conciliation Service, would assist negotiating teams, appointed by the tribal councils of the Hopi and Navajo Tribes, in their negotiating endeavors.

These first three sections set forth procedures and schedules to govern the negotiating process and direct the Secretary of the Interior and departments and agencies of the Federal Government to render appropriate cooperation and assistance.

In the event the tribes should reach full agreement on the issues, the Mediator would cause such agreement to be entered into the records of the U.S. District Court as supplemental proceedings in the *Healing* case. A similar procedure is to be followed by the Mediator concerning any partial agreement reached between the tribes.

Although sections 1, 2 and 3 contemplate a net six-month negotiating period by the tribes, the period of time may exceed ten months due to various time elements established in these sections.

If the tribes fail to reach full agreement within the negotiating period or if either tribe is in default, the Mediator under section 4 is directed to prepare a report containing his recommendations for a plan of settlement of the joint use area dispute for submission to the U.S. District Court. The District Court is required to review the report and recommendations for conformity to the *Healing* case and H.R. 10337. Following the review of the report and the recommendations (which are not binding on the Court), the District Court is authorized to make a final adjudication, including partition of the joint use area, and enter the judgment in the supplemental proceedings of the *Healing* case.



Section 5 establishes guidelines to facilitate a negotiated agreement by the tribes pursuant to section 3 or to assist the Mediator in preparing his report pursuant to section 4.

Section 6 establishes guidelines to be followed by the Court in the event it is required to assume responsibility for resolution of the joint use area dispute.

These two sets of guidelines reflect the guiding principles discussed above in section V of this report, including the preferability of a negotiated settlement, the freedom of the tribes in the negotiations to concur in any settlement provisions they wish, the likelihood of a division of the land in the event judicial resolution is required, and the need to minimize adverse social, economic, and cultural impacts should such division occur.

Section 7 preserves the joint ownership by both tribes of coal, oil, gas and other minerals within and underlying the joint use area.

Section 8 partitions approximately 243,000 acres surrounding Moencopi from the reservation established by the 1934 Navajo Reservation Boundary Act and directs that the tract be held in trust for the Hopi Tribe. This provides an immediate legislative resolution to the 1934 reservation lands dispute.

Section 9 authorizes the Secretary to make allotments to Paiute Indians who are not members of the Navajo Tribe, who are located on the 1934 reservation lands, and who were either located there, or are descendants of Paiutes who were located there, on the date of enactment of the 1934 Act.

Section 10 states that lands partitioned to the two tribes pursuant to H.R. 10337 will be held in trust for the respective tribes.

Section 11 authorizes the Secretary of the Interior to transfer, upon the payment of fair market value, up to 250,000 acres of Bureau of Land Management lands in Arizona or New Mexico to the Navajo Tribe so as to restore a portion of the Navajo land base lost during partition.

Section 12 establishes a three-member independent Navajo and Hopi Indian Relocation Commission to administer any relocation of tribal members required by the resolution of the land disputes. It is hoped that the independent nature and focussed responsibilities of the Commission will insure that the settlement implementing authority will be sufficiently expert and possess all the requisite authority to develop a relocation program which will minimize the inevitable adverse social, economic, and cultural impacts.

Section 13 establishes the first task of the Commission as that of reporting to Congress within two years of a final order by the District Court resolving the joint use area dispute a relocation plan for lands partitioned in the joint use area and the area partitioned to the Hopi from the 1934 reservation lands. The plan is to take effect 30 days after its submission.

Section 14 directs the Commission to assume responsibility for effecting the relocation plan and to complete the relocation process within five years of its initiation. It also directs the Commission to make

relocation incentive payments of decreasing values each year after the plan is in effect to households which voluntarily enter into relocation contracts with the Commission. These payments are incentive payments only, payments and programs to make restitution of dwelling, improvements, etc. to the households subject to relocation are set forth in section 15.

Section 15 provides that the Commission will purchase for fair market value the habitation and improvements of each household required to relocate. Furthermore, the Commission is to make relocation payments to the households to cover their moving costs. Finally, the Commission is required to make up the difference to each household to insure that it will have the financial wherewithal to obtain "a decent, safe, and sanitary replacement dwelling adequate to accommodate such households." Alternative means for the Commission to carry out its responsibility to insure the availability of such replacement dwellings include construction or purchase of housing by the Commission.

Section 16 provides for the payment of fair rental value to the tribe to which lands are partitioned by the other tribe prior to completion of the relocation program.

Section 17 provides protection from relocation to members of either tribes who own allotments or who are Federal employees.

Section 18 authorizes suit for license fees and other revenues collected in, and the value of agricultural and grazing use of, the joint use area after the date of determination of joint interests in the area if such issues are not resolved in the settlement of the joint use area dispute. It also authorizes any further original, ancilliary, or supplementary actions to insure full settlement of the land use disputes.

In section 19 the Secretary is directed to undertake two programs: a program of stock reduction and range restoration in the joint use area (as noted earlier it may be as much as 400 percent overgrazed) to be commenced immediately and a program, to be conducted upon resolution of the land disputes, of surveying and fencing the partitioned lands.

Section 20 provides for Hopi use of a certain 23.8 acre tract in the joint use area for religious ceremonial purposes even if the tract is partitioned to the Navajo.

Section 21 directs the Secretary to make provision for the use of and right of access to identified religious shrines of either tribe in lands partitioned to the other tribe.

Section 22 insures that no financial assistance or funds paid under H.R. 10337 can be used as the basis for denying the recipient's participation in federally assisted housing programs or for denying or reducing social security benefits or benefits from other Federal or federally assisted programs. It also directs that the funds will not be subject to Federal or State income taxes.

Section 23 would allow exchange of reservation lands by the two tribes.

Section 24 provides that the remainder of H.R. 10337 shall remain in effect even if any part of it is declared invalid.

Section 25 provides the funding authorization (see section VII below for a discussion of authorization levels).

## VII. Cost of H.R. 10337, as Ordered Reported

During the July 24, 1974, hearing before the Interior Committee on H.R. 10337, the Interior Department was asked to furnish to the Committee current information as to the estimated costs of implementing this legislation. The Department estimated the costs for authorization purposes over the life of the bill to be $47,200,000 and the Committee included that amount in the sum to be authorized. The text of the response from the Department to the Chairman of the Committee concerning the costs is set forth in full in section XI of this report entitled "Executive Communications".

Subsequent to the final mark-up of H.R. 10337 on September 11, 1974, a representative of the Department suggested that the surveying and fencing program would cost an additional $200,000 because of the Committee decision to provide a legislative resolution for the 1934 reservation lands dispute. This conforming change, authorized at the final mark-up, was made in the reported bill.

Furthermore, when the Committee decided upon a six-month negotiation period and the appointment of a Mediator to assist the negotiations, it added a $500,000 authorization for the Mediator.

Finally, the Committee authorized an annual sum of $500,000 to support the activities of the Navajo and Hopi Indian Relocation Commission. Although the life span of the Commission cannot be determined with absolute certainty, the Commission is expected to have an eight year existence. Thus, the total authorization for the Commission would be $4,000,000.

The dollar total of funds which H.R. 10337, as ordered reported, would authorize to be appropriated is approximately $52,000,000. The subtotals are as follows:

| | |
|---|---|
| Relocation incentive payments (sec. 14(b)) | $5,500,000 |
| Purchase of dwellings and improvements, relocation expenses, and replacement dwellings (sec. 15) | 31,500,000 |
| Stock reduction and range restoration program (sec. 19(a)) | 10,000,000 |
| Survey and fencing program (sec. 19(b)) | 500,000 |
| Mediator expenses | 500,000 |
| Commission expenses (at $500,000 per year) | 4,000,000 |
| Total authorization | $52,000,000 |

All funds appropriated under these authorizations are to remain available until expended.

## VIII. Tabulation of Votes Cast in Committee

The votes on amendments to H.R. 10337 were taken by the full Committee in open mark-up sessions. As those votes were previously announced by the Committee, in accordance with the provisions of section 133(b) of the Legislative Reorganization Act of 1946, as amended, tabulation of the votes in this Committee Report is unnecessary. The unanimous vote to report H.R. 10337, as amended, was by voice vote.

## IX. Committee Recommendation

The Committee on Interior and Insular Affairs in open mark-up session on August 21, 1974, by voice vote unanimously recommended that H.R. 10337, as amended, be enacted.

motion that the gentleman from Maryland spoke about.

Mr. QUILLEN. Mr. Speaker, I yield 2 minutes to the gentleman from Texas (Mr. LOEFFLER).

Mr. LOEFFLER. Mr. Speaker, I thank the gentleman from Tennessee (Mr. QUILLEN) for yielding this time to me.

I wish to echo the remarks of many of the Members who have spoken already in an effort to delay consideration of the rule.

We have a caveat to all Members who have not had a chance to review the pending railroad deregulation bill. I happen to be one of the Members—there are three of us—who represent the city of San Antonio and who clearly know that this is not deregulatory in its own sense but is, rather, the perpetuation of a monopoly, the way we are currently viewing section 202. This is important to the consumers, for instance, of San Antonio.

I will, therefore, support the Bauman motion which will delay consideration of the rule until July 22. I urge my colleagues to do likewise, and I hope that in the interim period of time we might reach some accommodation where deregulation might be achieved without inordinate burden being placed upon the consumers who are captive shippers.

Again, Mr. Speaker, I urge my colleagues to adopt the Bauman proposal and join with the gentleman from Texas (Mr. ECKHARDT) and the gentleman from Texas (Mr. GONZALEZ) in their approach.

Mr. BEILENSON. Mr. Speaker, I yield 5 minutes to the distinguished chairman of the Committee on Rules, the gentleman from Missouri (Mr. BOLLING).

Mr. BOLLING. Mr. Speaker, I realized that this was being brought as I watched the television upstairs, and I frankly think that it was brought up too precipitously. That does not mean that it will not be brought up again before the Congress goes in recess.

But I am going to ask the gentleman from California (Mr. BEILENSON) as a favor to me, and with an understanding of the confusion that exists, to withdraw the rule.

Mr. Speaker, he can do that now, and if he chooses so to do, that is what will happen.

Mr. BEILENSON. Mr. Speaker, I withdraw House Resolution 716.

The SPEAKER pro tempore. The resolution is withdrawn.

## CONFERENCE REPORT ON S. 751, NAVAJO AND HOPI INDIAN RELOCATION AMENDMENTS ACT OF 1980

Mr. UDALL. Mr. Speaker, I call up the conference report on the Senate bill (S. 751) relating to the relocation of the Navajo Indians and the Hopi Indians, and for other purposes.

The Clerk read the title of the Senate bill.

The SPEAKER pro tempore. Pursuant to the rule, the conference report is considered as having been read.

(For conference report and statement, see proceedings of the House of June 17, 1980.)

The gentleman from Arizona (Mr. UDALL) will be recognized for 30 minutes, and the gentleman from California (Mr. CLAUSEN) will be recognized for 30 minutes.

The Chair now recognizes the gentleman from Arizona (Mr. UDALL).

GENERAL LEAVE

Mr. UDALL. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks on the conference report under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arizona?

There was no objection.

Mr. UDALL. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I am pleased to bring to the House the report of the conference committee resolving the differences of the two Houses on the bill, S. 751, amending the Navajo-Hopi Land Dispute Settlement Act.

In 1974, we enacted legislation providing for the settlement of a long-standing dispute between the two tribes to approximately 2,000,000 acres of land. The 1974 act provides for the partition of the land between the two tribes and will result in the eventual relocation of over 800 families of Navajo.

This relocation process is and will continue to be an extremely traumatic event for the Navajo people. This is probably the largest forced relocation effort required by the Federal Government since the Indian removal policies of the 1800's.

Mr. Speaker, since the passage of the 1974 act, numerous defects and oversights have been identified in its implementation. S. 751, in the two versions passed by the Senate and House, sought to remedy those defects and oversights.

After extensive negotiations, the conferees on S. 751 have arrived at a reasonable compromise of the issues in disagreement.

The major points of disagreement relate to the provisions for added lands for the relocation of Navajo families and the provision for life estates for Navajo families living on lands partitioned to the Hopi tribe.

On both of these critical issues the conferees have achieved agreement and have worked out compromises which I think will go a long way toward easing the burdens and trauma of relocation for these Navajo families.

Mr. Speaker, I urge the House to adopt the conference report.

Mr. CLAUSEN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of the conference report on S. 751, the Navajo and Hopi Amendments Act of 1979.

Although the initial Senate and House versions of these amendments could be fairly described as pro-Navajo and pro-Hopi, respectively, the distinguished chairman of the Interior Committee, Mr. UDALL, and the majority and minority conferees of both bodies should be congratulated for producing a fair and well-balanced compromise between the two bills.

I share the hope and expectation of the conferees that these amendments will permit the necessary relocation of some 800 Indian families to go forward without further delay or undue hardship.

The history of the Navajo and Hopi dispute, the 1974 settlement and the current amendments is well-explained in the committee and conference reports, and I will not attempt to summarize it now.

I would note for the record, however, the statement of the managers regarding the provision in the conference report that authorizes continued payments in lieu of taxes on those public lands which may be transferred to the Navajo Tribe.

As a Member who was deeply involved in the origination of the Payments in Lieu of Taxes Act of 1976, I want to emphasize the position of the conferees that this provision results from very unique circumstances and should in no way be considered a precedent for treatment of other, existing Indian trust lands.

Mr. Speaker, I fully support the work of the conferees and I am pleased that reasonable solutions to the problems of implementing the 1974 settlement act have been worked out.

My appreciation of this accomplishment is tempered, however, by my regret at what caused it to be needed. It should not be forgotten that the principal cause of the long and often bitter dispute between two of America's ancient Indian tribes was the consistent failure of the Federal Government to pay appropriate attention to the administration of its responsibilities in Indian affairs. The accumulated cost of repairing the damage done by such inattention, in dollars alone in this case, as in others, is staggering.

The total dollar cost of the Navajo and Hopi settlement and relocation will no doubt eventually exceed $60 million. But the larger cost—to those 5,000 Indians who are legally compelled to move to provide a just solution to a problem not really of their making—is immeasurable.

This is especially so when one considers that these people are noted for their particular love for their land, and that many of them have lived on their land for generations. The lesson of all this seems clear—the Federal Government must exercise its responsibilities over Indians with great care.

Mr. LUJAN. Mr. Speaker, will the gentleman yield?

Mr. CLAUSEN. I yield to the gentleman from New Mexico.

Mr. LUJAN. Mr. Speaker, I want to thank my friend, the gentleman from California (Mr. CLAUSEN) for yielding. I will be very brief.

Mr. Speaker, this solution to the Hopi-Navajo problem is really one that should never have come about in the first place.

☐ 1800

I think the solution is bad. I was on the conference for this particular piece of legislation, and I must say that I did sign the conference report because we have to do something to implement the provisions of the act of 1974. Nevertheless, I still believe that the solution imposed upon us by the legislation in 1974 is a bad solution. When people have to be moved from places where they were born and raised, it is not an equitable

Exhibit 5 to
United States' Motion
DOJ13

HeinOnline -- 126 Cong. Rec. 16822 1980

solution, so far as I am concerned. Not having any other alternative, Mr. Speaker, I therefore bow to the will of the majority as expressed in 1974 and at least support this as the only way that we can implement the carrying out of that policy. This legislation does that, and reluctantly I must support the legislation.

Mr. CLAUSEN. Mr. Speaker, I yield 2 minutes to the distinguished minority leader, the gentleman from Arizona (Mr. RHODES).

Mr. RHODES. Mr. Speaker, I hope that this conference report will be adopted. The subject, of course, is one which is well known to every resident of Arizona, New Mexico, Utah, and Colorado. We have had the problems between the Navajo and Hopi for many, many years, and I suspect that they may perhaps even antedate the advent of the white man on this continent.

If it is possible to do anything at all to actually assuage the feelings of these people against each other which they have had for so many years, then certainly we want to do it. I am satisfied that this bill is not a perfect bill. If it were it probably would not have gotten this far. But the facts are that it is the best bill which we can get, and it is a bill which I think will have a very good chance of building a solid foundation of good feeling between these two tribes who have not had those feelings about each other in the past, and I sincerely hope and I believe that we are taking the right step in the right direction.

Mr. Speaker, I urge adoption of the report.

Mr. CLAUSEN. I thank the minority leader for his advice and counsel.

Mr. Chairman, I yield 2 minutes to the gentleman from Utah (Mr. MARRIOTT), who played a key role.

Mr. MARRIOTT. Mr. Speaker, I rise in support of the conference report on S. 751, the Navajo and Hopi Indian Relocation Amendments Act of 1979.

These amendments modify the 1974 Navajo-Hopi Settlement Act, an act which Congress hoped would finally resolve the 100-year-old dispute between the two tribes over the use and occupancy of some 1.8 million acres of land in northeastern Arizona. The settlement provided for a Federal court to partition the disputed area, and for the relocation of each tribe's members residing on lands partitioned to the other.

Today, although the disputed land has been partitioned, nearly 700 Navajo families and a few Hopi families are still awaiting relocation. Problems in acquiring resettlement lands, in setting criteria for life estates for aged and disabled Indians for whom relocation would be an undue hardship, and insufficient authority for the Federal Relocation Commission to fulfill its responsibilities in moving 5,000 people, have combined to stall the relocation process.

The conference report on S. 751 contains a series of compromises between House and Senate bills with the common goals of facilitating the relocation of Indians from the partitioned areas and lessening the human costs of such a large-scale resettlement. As one of the conferees, I am pleased to state my belief that the product of the conference is fair to both tribes, balanced and workable. As is true of many good compromises, no party will receive all it sought in negotiations, nor will any party fail to benefit from the outcome. The compromises in S. 751 are not loved by either of the tribes, but they are nonetheless acceptable to both as perhaps the best that could be achieved under current political and fiscal realities.

I believe this legislation to be among the most important to be considered by this Congress. By enacting the original Navajo-Hopi settlement in 1974, Congress made a commitment to return to the Hopi Tribe much of their lands wrongfully lost through encroachment by Navajos. By the same token, Congress made a commitment to the Navajo Tribe to see that additional lands and basic amenities were provided for the people who would have to be relocated. For Congress to fail to enact S. 751 would be to renege on those commitments and to leave several thousand people in a legal and psychological limbo.

The ultimate cost of such an occurrence, in dollars and in human anguish, would certainly be far beyond any costs now contemplated. Thus, it is extremely important to the integrity of the Congress and the United States, as well as the interests of the Navajo and Hopi Indian Tribes, that the conference report on S. 751 be approved. I urge its speedy adoption.

REMARKS OF CONGRESSMAN DAN MARRIOTT

In 1974, after several years of great effort, the 93rd Congress passed P.L. 93–531, which has come to be known as the Navajo-Hopi Settlement Act. The 1974 Act was designed to bring an end to the century-old land dispute between the Hopi and Navajo Tribes involving millions of acres of reservation lands in Northeastern Arizona.

All of the land in question was aboriginally Hopi. Not until the mid-to-late 1700's did the Navajos enter the Hopi Area. Conflicts between the two tribes persisted over the years with the federal government only adding to the problems rather than assisting in a resolution.

In 1958 Congress adopted P.L. 85–547, which was designed to permit the tribes to quiet title to some of the lands in question. That litigation culminated in 1962 with the decision of *Healing* v. *Jones*, 210 F. Supp. 125 (D. Ariz. 1962). The *Healing* decision involved approximately 2.5 million acres and held that of the total amount, 600,000 acres were exclusively Hopi, but the balance was to be a joint-use area on a share and share-alike basis. That decision was affirmed by the U.S. Supreme Court on direct appeal. (373 U.S. 758 (1963)).

Following the *Healing* case, the Navajos refused to permit the Hopis to use or occupy any of the so-called Joint Use Area. As a result, the Hopis sought and obtained a court order in 1972. The Navajos refused to comply with that order, continuing to prevent the Hopis from any use of the 1.8 million acres of jointly owned lands. Eventually, the Navajos were held in contempt of court.

At approximately the same time, Congress saw the wisdom of passing the Settlement Act, which contained many features designed to end the protracted dispute. Some of those features included (1) a mandatory negotiating period, requiring the two tribes to seek resolution with the aid of a federal mediator; (2) authorization for the court to partition the lands between the two tribes should the negotiations fail to provide a resolution; (3) the creation of a Relocation Commission which is charged with the responsibility of developing a plan to facilitate the resettlement of Navajos from lands partitioned to the Hopis; (4) benefits for relocatees which will help to ease the inevitable hardships which accompany such a move; (5) permission for the Navajos to acquire an additional 250,000 acres to facilitate resettlement; and (6) other provisions which were aimed at resolving other aspects of the land dispute and related claims.

Following the passage of the Settlement Act on December 22, 1974, the tribes met with the federal mediator during a period exceeding six months. Unable to bring the parties to agreement, the mediator submitted his lengthy recommendations to the Arizona Federal District Court in December of 1975, calling for the equal partition of the surface lands of the Joint Use Area. The court held further hearings and finally, in February of 1977, entered its partition order, adopting many of the mediator's recommendations. After two appeals to the Ninth Circuit Court, it now appears that the district court's partition order has been upheld.

As contemplated under the Settlement Act and as required by the mediator's recommendations and the court's partition order, the land division will result in the mandatory relocation of approximately 700 Navajo families and a few Hopi families.

The relocation process was to have commenced no later than two years from the final partition order and is to take no more than five years from the starting date. The two-year lapse was designed to give the Commission an opportunity to prepare a report and plan. It is sad to note that already more than three years have passed since the final partition order and still no report has been produced by the Commission. This delay has in part been due to appeals by the Navajo Tribe. Currently, the Relocation Commission's report is not expected to be submitted to Congress until March 1981, a full six years after enactment of the initial settlement legislation. The amendments in S. 751 do not grant any additional time to the Commission, and we certainly do not condone the delays added to this already over-ripe problem.

In the face of the impending relocation, the Navajo Tribe has asked Congress to take one last look at the Settlement Act in an effort to minimize the inevitable burdens of the relocation. In the process of evolving these final amendments to the original act, the Hopis, too, have offered suggestions. Both tribes have been very helpful in working out these new amendments. Although neither tribe is completely satisfied with the end product, many of their concerns are addressed and accommodated.

It is especially significant to note that these amendments are intended to constitute a "last bite at the apple." In other words, the Congressmen and their staffs which have worked directly on this matter now expect the parties and the Relocation Commission to proceed with dispatch to conclude the partition and relocation. Further delay and further legislative tampering can only result in increasing the overall difficulties associated with this problem. The equities have been weighed and reweighed by the courts and by Congress. The balances have been struck on the basis of countless pages of documentary evidence and arguments and on the basis of scores of witnesses. These new amendments are designed with one primary aim: conclude the legislation and get on with the resettlement.

In this regard, the new amendments contain the following features:

Section 2(c) authorizes both tribes to

Exhibit 5 to
United States' Motion
DOJ14

HeinOnline -- 126 Cong. Rec. 16823 1980

bring an action for damages to some of the disputed lands. This section actually confirms authority granted in the 1974 Settlement Act, but because of confusion raised during litigation, the amendments were added by way of clarification. Actions for such damages have already been commenced. It is intended that these amendments will hasten the resolution of those claims. The 1974 Act gave maximum flexibility to the *Healing* supplemental proceedings to decide these issues or to defer to another judge if that proved desirable.

Section 3 provides very important language regarding tribal jurisdiction over the partition lands. Much of the frustration experienced by the Hopis has involved this issue. Outright interference by the Bureau of Indian Affairs over Hopi use and control of their partitioned lands has required these specific provisions which establish deadlines for assumption of full jurisdiction by the Hopi Tribe. The Secretary is charged with the responsibility to safeguard relocatees and life-estate tenants. But that responsibility is only meant to correct any cases of Hopi harassment (which have never yet occurred). It is ironic that this provision was included because history has shown that all the harassment has come from the Navajos with virtually no action by the Secretary to protect Hopis.

Nonetheless, this provision resolves some of the hitherto unfounded Navajo fears and may, indeed, also work for the protection of Hopis. The provision is not designed to give the Secretary of the Interior any powers to prevent the Hopis from obtaining the full and complete peaceful enjoyment of their restored lands. If the Secretary and/or Commission is unable to carry out its assignments, then it is essential that the Tribes have this full jurisdiction to make certain themselves that the relocation is accomplished within the statutory deadline.

Section 3(f) is designed to restore the status quo in the 1934 Reservation Area west of the 1882 Executive Order Area. By requiring both tribes to approve development in that area (except for limited exclusive areas where no joint consent is needed), neither tribe will be able to attain an unfair advantage over the other. Litigation regarding the title to these lands is presently ongoing and it is expected that the Hopis will also be partitioned a large tract of land in this area as well—larger by far than what was initially contemplated by H.R. 11128 in the ninety-third Congress. Such partition may result in additional relocations, which these amendments contemplate. The extent of such partition and relocation is not presently known, but the Navajos' position in the 1974 legislation has caused this uncertainty.

In 1974, rather than face the immediate partition of approximately 250,000 acres to the Hopis in this area by Congressional mandate, the Navajos opted for the present course of litigation, which will probably result in a much larger area being partitioned to the Hopis. The benefits and additional lands provided for the Navajos under the 1974 Act and these amendments are designed to resolve any Navajo hardships in the 1934 Reservation Area as well.

Section 4 provides for the addition of the original 250,000 acres to the Navajo Reservation plus another 150,000 acres, or a total of 400,000 acres of new reservation lands. While it is debatable whether any additional lands are really needed to accomplish relocation, the Navajos have claimed that these new lands are needed to relocate those who reside on lands partitioned to the Hopis.

Certainly, on the 16 million acre Navajo Reservation there is ample room for residences for the Joint Use Area Relocatee families and several hundred more from the 1934 Area. There is admittedly not enough room for those families to graze livestock, however. Because of the badly overgrazed nature of the entire area it is abundantly clear that no longer can the Navajo people expect to earn any significant part of their overall tribal income through ranching. These amendments recognize this fact of life. It is incumbent now upon tribal leaders to seek new sources of livelihood for their members. If this is not done, in the future the problem will be at their doors, not that of Congress.

Section 5 grants additional tools to the Relocation Commission and underscores Congress' intent that this Commission be, and be treated as a truly independent body, not subject to the indirect control of Interior as has occurred in the past.

Section 6 allows Congress ninety days (instead of 30 days as set forth in the 1974 Act) to review the relocation plan. It is expected that the Commission's plan will be reasonably complete, but it is recognized that many of the practical problems associated with the relocation cannot be fully anticipated until the resettlement process is actually underway. Consequently, the purpose of the Congressional review is not simply to criticize the details of the plan, but instead to make certain that relocation is actually moving forward without delay and without any major oversights.

Section 7 grants benefits to a limited group of Navajo trespassors who were evicted from executive Hopi lands in 1972.

Section 8 establishes final deadlines for the Secretary to accomplish surveying, monumenting, fencing and livestock reduction before the respective tribes take over these tasks. The Secretary's past failures in these areas are not condoned in any way by the amendments but it was felt that specific Congressional deadlines would encourage compliance with existing court orders in these areas and set dates on which the Tribes may take over these jobs.

Sections 9, 10 and 11 add further tools to the Commission to facilitate and expedite relocation. Section 11 specifically creates an annual fund which the Commission can divide between the two tribes for the purpose of helping both overcome problems created by the partition.

In addition, Section 11 provides authorization for a much needed Hopi High School and a Hopi Medical Center which is also desperately required to meet the increased activity and population in the area.

Exemptions from NEPA and FLPMA are included in section 11 to avoid any possibility that those two acts would be raised to obstruct relocation or the reclamation of the lands in question.

Section 11 also expands the government's willingness to absorb the expected litigation expenses which occur as a result of the legislation. This provision (as did Section 8 in the 1974 Act) recognizes the casual role played by the United States in these problems and also acknowledges the inherent conflict of interest that the United States has in attempting to represent either of these tribes in an action against the other.

The final provision in the amendments deals with life-estates to be granted to a limited number of physically disabled or aged residents of the lands partitioned to the other tribe. The Relocation Commission is responsible for the initial selection of these individuals. The original restrictions concerning life-estates as recommended by the mediator and adopted by the court are expanded considerably by the amendments and will clearly benefit individual Navajos. I am pleased to note that the conferees provided for up to ten life estates for those few Hopis living in the Navajo partitioned area who choose not to move.

It is possible that not all the problems relating to the life-estates will be resolved during the life of the Commission. While the conferees expect the Secretary to assume administration of life estates after the Relocation Commission expires, the courts will, of course, provide the ultimate back-up for the resolution of any problems. These amendments are intended to change only minimally with the prior pronouncements of the court on life-estates. It is intended that the other aspects of the court's orders will remain in full effect to the extent they are not contradicted by these statutory amendments.

In short, this "final tune-up" of the Settlement Act has been accomplished after much careful debate and study. All of the conferees, I believe, recognize that this relocation project will not be easy or pleasant. But we all recognize that in the interest of justice, it must be done. While the short-term costs of this task are considerable, in the long term, getting this job done now will save much in terms of human suffering and actual dollar outlay.

For all these reasons, I support S. 751 as reported by the Conference Committee and urge you to vote with me for passage.

Mr. CLAUSEN. Mr. Speaker, I have no further requests for time.

Mr. UDALL. Mr. Speaker, I yield myself 2 minutes, and I have no requests beyond that.

Mr. Speaker, I just want to thank the gentleman from Arizona, the distinguished minority leader, for his support. This has been a bipartisan project from the beginning. Our senior Senator, Senator GOLDWATER, worked closely with me in putting this thing together over the years, and our junior Senator was a member of the conference committee and signed the report.

So this is a good solution to a very ancient and complex subject. I strongly urge its approval by the House.

Mr. Speaker, if there are no further requests for time, I move the previous question on the conference report.

The previous question was ordered.

The SPEAKER pro tempore. The question is on the conference report.

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. ROUSSELOT. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 396, nays 15, not voting 22, as follows:

[Roll No. 369]

YEAS—396

| | | |
|---|---|---|
| Abdnor | Atkinson | Bingham |
| Addabbo | AuCoin | Blanchard |
| Akaka | Badham | Boggs |
| Albosta | Bafalis | Boland |
| Alexander | Bailey | Bolling |
| Ambro | Baldus | Boner |
| Anderson, Calif. | Barnard | Bonior |
| Andrews, N.C. | Barnes | Bonker |
| Andrews, N. Dak. | Beard, R.I. | Bouquard |
| Annunzio | Beard, Tenn. | Bowen |
| Anthony | Bedell | Brademas |
| Applegate | Beilenson | Breaux |
| Archer | Benjamin | Brinkley |
| Ashbrook | Bennett | Brodhead |
| Ashley | Bereuter | Brooks |
| Aspin | Bethune | Broomfield |
| | Bevill | Brown, Calif. |
| | Biaggi | Brown, Ohio |

Exhibit 5 to United States' Motion DOJ15

HeinOnline -- 126 Cong. Rec. 16824 1980

SALT LAKE CITY 11, UTAH

JOHN S. BOYDEN
ALLEN H. TIBBALS
EARL P. STATEN
BRYANT H. CROFT

May 29, 1963

COPY

Commissioner of Indian Affairs
Washington, D. C.

Dear Sir:

My client, the Hopi Indian Tribe, has drawn to my attention that the Navaho Indian Tribe contemplates development in Pasture Canyon in the western extension of the Navaho Reservation. I have been permitted to examine a preliminary engineering report on this project prepared by Chambers and Campbell Incorporated, 3500 Indian School Road, Northeast, Albuquerque, New Mexico.

The Navaho Tribe included the item in their budget, and last October conditional approval was granted to the tribe, for including the item in the budget pending a study to determine whether the development would interfere with the present use of water from the same source by the Hopi Tribe of the Moencopi area.

Our study indicates that such development would definitely interfere not only with future development of the Hopi interests, but with present useage and we, therefore, request that the Hopi rights in the area be given proper consideration.

I call to your attention that the Hopi Indians of the Moencopi area have a long history in this area, a history which was recognized in the Act of Congress of June 14, 1934, 48 Stat 960. The boundaries of the Navaho Reservation were then extended but the rights of the Moencopi people in the area were preserved and protected. At page 961 of 48 Stat, the law provides:

> "All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however. . . . . . ." (Emphasis ours)

We do not regard the development of this area as a matter within the exclusive province of the Navaho Indian Tribe. This is the area of the Navaho Reservation which caused Congress to set the reservation aside, not only for the Navaho but Hopi Indians also. Any development of the area should take into consideration these established rights. We are hopeful that when the present

Exhibit 6 to
United States' Motion
DOJ16

COPY



controversy between the Hopi Indians and Navaho Indians now in the Supreme Court of the United States, Healing v. Jones, has been determined, we may make some definite provision for a fair treatment of the Moencopi Hopi.

It is our intention to then call this matter to your attention and to the attention of the Secrerery of the Interior. In the meantime, we trust that no steps will be taken that are detrimental to the rights of these Hopi people.

Very truly yours,

JOHN S. BOYDEN

JSB:bg
CC: W. Wade Head, Area Director, Phoenix Area Office
F. M. Haverland, Area Director, Gallup, N.M.
Superintendent H. E. O'Harra, Hopi Indian Agency
Abbott Sekaquaptewa, Tribal Chairman, Hopi Indian Tribe

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
HOPI INDIAN AGENCY
KEAMS CANYON, ARIZONA

N O T I C E

April 4, 1966

TO: JACK FRANK, a Navajo Indian.

The Hopi Tribal Council has by Resolution No. 30 of December 29, 1965, determined that the presence of you and your family on the Hopi Indian Reservation is in violation of the Council's Ordinance No. 13 and has given you proper and timely notice that unless you voluntarily moved from the Reservation by April 1, 1966, you would be removed and excluded therefrom. The Secretary of the Interior has determined that the Ordinance, Resolution and Notice were proper and within the authority of the Hopi Tribal Council and that it is his duty to assist the Tribe in the enforcement thereof. Therefore, by direction of the Secretary of the Interior you are hereby ordered forthwith to remove and exclude yourself and all members of your family from the Hopi Indian Reservation. Should you fail to do so immediately, the matter of your expulsion will be referred to the Attorney General for appropriate legal action against you.

Served By Richard H Mc Intire
Hopi Agency Special officer
at Echo Canyon
Have Joe Kaalunto
John Yellow back
at 10:25 AM
Witness - Eric [illegible]

Clyde W. Pensoneau

CLYDE W. PENSONEAU, Superintendent
Hopi Agency
Keams Canyon, Arizona

XERO COPY XERO COPY XERO COPY XERO COPY

COPY

Exhibit 7 to
United States' Motion
DOJ18

NNDSC27209

NAVAJO AREA OFFICE
WINDOW ROCK, ARIZONA
RECEIVED
APR 11 1966
MAIL & FILES

April 8, 1966

Mr. W. Wade Head

Area Director, Phoenix, Arizona

Dear Mr. Head:

Reference is made to the telegram of April 1, 1966, from Assistant Secretary of the Interior, Harry R. Anderson, directing me to serve notice of removal and exclusion to each Navajo person who was earlier served with Hopi Tribal Notice of Determination of Harmful Presence on the Hopi Reservation and Order of Expulsion and Exclusion, and who has not yet moved from the Hopi Reservation.

This will advise that on April 5 and April 6, 1966, the Navajo people still residing within the Hopi Reservation were served with removal and exclusion notices. The Navajo people served were as follows:

2 Joe and Wanda Kabinto, his wife
(Each served separately)
1 Harry Bahe
2 John Yellowhair and Mary Etta Yellowhair, his wife
(Each served separately)
1 Mary Kabinto Yesslith
1 Inez Kabinto Nelson
1 Katie Nelson
1 Vinton Nelson
2 Jack Frank and Leta Frank, his wife
(Each served separately)
2 David George and Elizabeth Redhorse George, his wife
(Each served separately)
2 Dan Joe Grayhair and Agnes George Grayhair, his wife
(Each served separately)
1 Rose George Baker

The following Navajo people who were served with Notices of Removal last January were either not residing on the Hopi Reservation and thus available for Service, or had already removed themselves from the Hopi Reservation. Should these people return to the Hopi Reservation and take up residence, they will be served with Notice of Removal:

cc rec'd ref Mr Talgne

XERO COPY

COPY

Exhibit 8 to
United States' Motion
DOJ19
NNDSC27218

Alice Bahe
James Baker
Dandy George
May Lillie George (wife of Dandy George)
Kee Nelson

A copy of each Notice and Return of Service are submitted herewith. In accordance with the instructions contained in the telegram cited above, like copies of these Notices and Returns of Service are being sent to the Commissioner of Indian Affairs.

Sincerely yours,

Clyde W. Pensoneau
Superintendent

cc: Commissioner, BIA
Washington, D.C. (20242)
Graham Holmes, Area Director
Navajo Agency
Window Rock, Arizona

XERO COPY XERO COPY XERO COPY

COPY

June 11, 1966

Commissioner of Indian Affairs
Washington 25, D. C.

Dear Commissioner:

On June 9, 1963, while you were out of the city, I personally delivered to James Officer, for you, a copy of my communication to William A. Simson of Arizona Public Service Company at Phoenix under date of June 6, 1963.

The application of Arizona Public Service to the Hopi Tribal Council for a right of way over the joint use area of the Hopi lands presents no real problem but the insistence of Navajo legal counsel that their resolution contain a provision in fact denying any Hopi interest in the lands is in defiance to judicial decree and invites unnecessary trouble.

At our recent conferences held in Washington, D. C. the representatives of Arizona Public Service Company seemed to assume that since the Navajo legal counsel will not retreat from his arbitrary position the Hopi Indians are the obstructionists in failing to pamper the whim. We sincerely trust a fair analysis of the situation will reveal our reason and justify our position. The Hopi Tribal Council will take no action upon the requested right of way until we have had an opportunity to inspect the executed Navajo resolution and we are confident our action will add no succor to the untenable Navajo legal posture.

We have as yet received no request for Hopi consent to a right of way over the reservation confirmed by Act of Congress on June 14, 1934 ( 48 Stat. 960). It is not the duty of the owner of an interest in land to volunteer assistance to the power company in obtaining its right of way. The burden is upon the applicant to make the title search. If there has been no confluence of fact and statute in the minds of others, at least the Hopi Indians know they were the other Indians located on the reservation to which the 1934 statute made reference. On May 20, 1964, I personally delivered to Commissioner Philleo Nash a letter dated May 19, 1964, wherein we protested the granting of coal prospecting permits and sought the aid of the guardian of the property of both tribes in protecting Hopi interests. Ten days later a supplementary letter was sent to the Commissioner citing precedent and authority for the Hopi

contention and calling to official attention the inequalities imposed upon the weaker Hopi Tribe by the Navajo and the government. With obvious intent to delay and subtle design to abort, on June 2, 1964, we were informed that the views of the two area officers upon the point raised had been requested. July 21, 1964, we had learned that both area offices had responded and the Commissioner was so advised by us. July 31, 1964, we were assured the matter was under consideration in the Solicitor's office. After waiting until March 29, 1965, we again asked for a reply and informed the Commissioner that insult had been added to injury when a key business corner within the customary Mooncopi Hopi use area had been graded and graveled for the construction of a business investment, without even consulting the Hopi people. The Commissioner remained mute while the Navajo proceeded with the completion of the enterprise which now flourishes in irritating disrespect for Hopi rights. The Commissioner was reminded that a bill to resolve the conflicting tribal claims, HR 9529, 88th Congress, had died because we were unable to obtain any report from the Department of Interior. Finally we learned that problem had been withdrawn from the Solicitor's office and the Solicitor had no question before him on the subject. To say we are dissatisfied is a mild understatement.

The Hopi Tribal Council by unanimous resolution has authorized and directed me to take such action as in my opinion may be lawful and helpful in definitely defining, protecting and effectively administering the rights of the Hopi Indians in the 1934 reservation.

Succinctly stated, this is now the situation:

(1) If anyone proceeds with the proposed right of way or transmission lines over the 1934 reservation without Hopi consent, appropriate legal action will be instituted forthwith.

(2) Hopi consent will be withheld until a plan for the impounding of disputed revenues from the reservation is devised and some assurance of intention to proceed in good faith toward the permanent solution of the conflicting tribal claims is manifest.

Yours very truly,

John S. Boyden
Hopi Tribal Attorney

/s/ S...

THE HOPI TRIBE

Real Property

Res .. No. H-4-66
Hopi Tribal Council

WHEREAS, the Hopi Tribal Council sees the need to re-activate the Hopi Negotiating Committee to meet with the Navajo Negotiating Committee, and for such other purposes prescribed by the Hopi Tribal Council from time to time in accordance with the Constitution and By-Laws of the Hopi Tribe,

NOW THEREFORE BE IT RESOLVED THAT the Negotiatimg Committee, be, and it is hereby re-activated, to consist of the following members and alternate, subject to the provisions of Article VI, Section 1 (L) and provided that any recommendations of the Committee shall be subject to review and final approval of the Hopi Tribal Council; provided further, that no firm commitments shall be made by this committee without the prior approval of the Hopi Tribal Council:

| | |
|---|---|
| Dewey Healing | Homer Cooyouma |
| Abbott Sekaquaptewa, Chairman | Stanley Honahni |
| Emory Sekaquaptewa, Jr. | Thomas Balenquah |
| Logan Koopee | ________________(vacant) |
| | Robert Adams, Alternate |

BE IT FURTHER RESOLVED, that this shall be a standing Committee, and that any vacancies occurring for any reason, shall be filled by the Hopi Tribal Council.

## C E R T I F I C A T I O N

I hereby certify that the foregoing Resolution was regularly adopted by the Hopi Tribal Council on the 15th day of February, 1966, by a vote of 10 in favor and 0 opposed, the Chairman not voting, after full and free discussion on the merits.

Dewey Healing
Dewey Healing, Chairman
Hopi Tribal Council

ATTEST:

Kedric Outah, Acting Secretary
Hopi Tribal Council

APPROVED:

February 14, 1966

Clyde W. Pensoneau
Clyde W. Pensoneau, Supt.
Hopi Indian Agency

RECEIVED
REAL PROP. MGMT.
MAR 3 1966

WRO135

Exhibit 9 to
United States' Motion
DOJ23

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

D-66-1003.9a

July 1, 1966

Memorandum

To: Commissioner of Indian Affairs
Attn: E. R. Fryer, Assistant Commissioner

From: Associate Solicitor, Indian Affairs

Subject: Interest of Hopi Indians in area defined by Act of June 14, 1934, 48 Stat. 960

By memorandum dated June 16, 1966, you referred to this office a letter dated June 11, 1966, to the Commissioner from Mr. John S. Boyden, Hopi Tribal Attorney. Your memorandum asks whether the Hopi Indians have an interest in the area defined by the Act of June 14, 1934, 48 Stat. 960, and, if so, the nature and extent of that interest.

The Act of June 14, 1934, in part provides:

> "That the exterior boundaries of the Navajo Indian Reservation, in Arizona, be, and they are hereby defined as follows:
>
> * * * * * *
>
> All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882."

It is beyond question that Hopi Indians resided in the area defined by the Act at the time of its passage. The history of the Act discloses beyond quibble that Congress recognized this fact and included the "other Indians" provision for the express purpose of protecting Hopi rights.

WRO125

Exhibit 10 to
United States' Motion
DOJ24

While it is clear that the Hopi have an interest in the area described in the 1934 Act, it is not possible for us to define the nature or extent of that interest.

Although we were not supplied with copies of Mr. Boyden's earlier letters to the Commissioner which are referred to in his letter of June 11, 1966, it appears that they expressed Hopi protests to recognition by this Department of certain grants of rights in lands in the area, particularly in the vicinity of Moencopi, made unilaterally by the Navajos. Apparently the Hopis have also protested certain encroachments by the Navajos on lands in the area traditionally used or occupied by the Hopis.

We are mindful of the serious problems faced by the Bureau in attempting to administer lands in which more than one group of Indians have real but undefined interests and wish we could be more helpful in delineat- ing the respective rights of the tribes. It may well be that only the Congress has the power to definitively deal with the issue. But, pend- ing authoritative resolution of the respective interests of the two tribes, it would seem essential that the area be administered in a way which takes account of the Hopi interest.

Richmond F. Allan
Associate Solicitor
Indian Affairs

Please make ... Realty ... DGM

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C. 20242

IN REPLY REFER TO:

BUREAU OF INDIAN AFFAIRS
RECEIVED
JUL 12 1966
PHOENIX

JUL 8 - 1966

Mr. Graham E. Holmes

Area Director, Navajo, Window Rock, Arizona 86515

Dear Mr. Holmes:

The conflict between the Navajo and Hopi Tribes over their respective rights in the Executive Order Reservation of 1882 was resolved by Healing v. Jones. The decision in that case unequivocally and finally gave joint and common ownership of the surface and subsurface of the 1882 Executive Order Reservation lying outside of District 6 to the two tribes.

Thus, the ownership and rights in that particular area are forever settled insofar as this Bureau is presently concerned. All actions whatsoever taken by officials of the Bureau (rights-of-way, traders licenses, leases, etc.) which hypothecate in any way the resources of the jointly owned area of the 1882 Executive Order Reservation must be guided by the reality of common ownership.

Another problem which has perplexed the Bureau for years is the administration of that area in Arizona encompassed by the Act of June 14, 1934 (48 Stat. 960), popularly known as the "Boundary Bill of 1934." That Act confirmed to the Navajos, and other Indians residing therein, ownership to certain Executive Order additions made to the Navajo Treaty Reservation of 1868. The Hopi Tribe has long claimed rights in the area encompassed by the "Boundary Bill." These have largely been ignored by the Bureau, and wholly by the Navajo Tribe. Historically, these claims have been confined to the general region of Moencopi and Tuba City and to the country lying between them and the Hopi Villages.

In recent years, the Attorney for the Hopi Indians, acting on their behalf, has asserted the claims of the Hopi and protested actions taken unilaterally by the Navajo Tribe and/or the Bureau

Area Director, Phoenix

RECEIVED
REAL PROP. MGMT.
JUL 13 1966
WRO121

Exhibit 11 to
United States' Motion
DOJ26

in the area referenced without consent of, or for that matter, consultation with, the Hopi Tribe. Leases and permits have been granted throughout the area without regard for any Hopi interest. Only recently, a lease was given to a restaurant operator for a site almost on the doorstep of Moencopi without Hopi consent. Moneys collected from leases, rights-of-way, traders licenses, and other sources have been credited throughout the years solely to the Navajo Tribe.

Now comes an urgent request for a right-of-way, submitted by the Arizona Public Service Corporation, to construct a transmission line across the 1934 "Boundary Bill" area. The application for a right-of-way has been approved by the Navajo Tribe but the Hopi Tribe was not originally made a party. As a consequence, the Hopi Tribe has directed its counsel to take appropriate legal action should a crossing be attempted without the consent of the Hopi Tribe, and to take such other action as needed effectively to administer the rights of the Hopi Indians in the 1934 reservation.

That action stimulated a request to the Solicitor for an opinion as to the extent and nature of Hopi rights in the 1934 "Boundary Bill" area as a guide for proper administration of the area to which the Hopis have historically made their claim. That opinion is attached hereto. It affirms the presence of Hopi interests in the area but leaves unanswered questions about the nature and extent of such rights. It appears likely the answer to that multiple question can be supplied only by the Congress and/or the Federal Courts.

It is evident the Government can no longer continue to administer the area as though it were owned solely by the Navajo Tribe. Without attempting to prejudge, prejudice, or anticipate any future action that might be taken by the tribes in friendly negotiation, or by the Congress finally to adjudicate the respective interests of the tribes, it does not appear reasonable to administer the total of the reservation area in Arizona, confirmed by the Act of June 14, 1934, as though it were jointly owned by the Hopi and Navajo Tribes. Effective administration requires of me a prudent judgment.

Therefore, the following instructions shall apply only to that portion of the Navajo Reservation lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extensions, to the reservation line, of the northern and southern boundaries of the said Executive Order Reservation.

Effective July 1, 1966, an undetermined Hopi interest in the area so delimited shall officially be recognized by placing in a special deposit account all moneys derived from the use and management of the surface and subsurface resources therein. No action shall be taken by an official of the Bureau that does not take full cognizance of the undetermined rights and interests of the Hopi Indians in the said area. This will necessitate formal action by the Hopi as well as by the Navajo Tribe on all those cases which hypothecate the surface or subsurface resources for exploration, mining, rights-of-way, traders, or other use or occupancy authorized by permit, lease, or license.

The same rule will apply to any action which might be taken by the Government for which the law, policies, or regulations require prior tribal consent. By the same token, neither tribe should be permitted unilaterally to take actions within the said area that trespass on the rights of the other.

The administration of the area delimited above will, if long continued, place a financial hardship on both tribes and will magnify the costs and difficulties of administration.

The period of hardships and administrative difficulties would be shortened materially by a friendly confrontation of the tribes, to the end that in face-to-face talks they might agreeably negotiate out what they consider to be their respective interests and thus form the basis for an early and amicable legislative presentation to the Congress of a bill to end confusion of ownership.

In anticipation of Hopi demands for cash reimbursement from the Navajo for whatever their share may prove to be in revenues collected from at least the area described herein, all of which revenues have heretofore been deposited to the credit of the Navajo Tribe, the Area Director for the Navajo should commence a

search for the records of collections and deposits of funds derived from the resources within the area since the date of the enactment of the so-called "Boundary Bill" of June 14, 1934.

Sincerely yours,

(SGD.) ROBERT L. BENNETT
Commissioner

Enclosure

IN REPLY REFER TO:

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C. 20242

OCT 31 1967

RECEIVED NOV 1967 HOPI INDIAN AGENCY KEAMS CANYON, ARIZ.

Memorandum

To: Graham E. Holmes, Navajo Area Director
W. Wade Head, Phoenix Area Director

From: Commissioner of Indian Affairs

Subject: October 17 meeting of Navajo-Hopi Negotiating Committees

This will confirm the conclusions and agreements reached at the October 17, 1967, meeting at Flagstaff, Arizona, with the Navajo and Hopi Negotiating Committees. This memorandum will also serve to revise my letter of July 8, 1966, as it pertains to the administration of that portion of the area lying west of the Executive Order Reservation of 1882, as delineated in my letter of July 8, 1966.

Since my letter of July 8, 1966, public works type projects as distinguished from commercial and other type developments involving a third party, have been discussed with Tribal and Council members of both the Navajo and Hopi Tribes. Accordingly, my letter of July 8, 1966, is revised as follows:

1. The approval or disapproval of public works type projects, will be determined by the Commissioner of Indian Affairs in that portion of the area lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extensions, to the reservation line, of the northern and southern boundaries of the said Executive Order Reservation.

2. Although approval or disapproval of public works type projects is reserved to the Commissioner of Indian Affairs, and will not henceforth require joint tribal approval, all proposed developments as outlined in my July 8, 1966, letter will be submitted to the Commissioner for determination as to whether they fall within the public works category, and otherwise for his information and consideration.

Under the above policy revision, I find it necessary to approve the Two Grey Hill School and the Tuba City Hospital since these public works type projects are so vitally needed to serve the best interests of the members of both tribes. When the site planning is completed and a final site is selected, each tribe will be advised of the exact site for these two facilities.

It is understood that my approval of the above facilities will include approval for any necessary roads and power lines to serve the facilities. The construction of these facilities will in no way prejudice the rights of either tribe in any determination of their land use rights or land ownership.

It is understood from the Flagstaff meeting that local committees (Navajo and Hopi members living in the vicinity of Moencopi and Tuba City) will be formed to assist in making an on-the-ground survey of land use areas, including present use and by whom, by the following categories of use: (1) Grazing (2) farming, and (3) community use. These use areas are to be translated on a map for presentation and discussion purposes at our next meeting. Technical assistance by the Bureau staff will be available to assist in this effort. It does seem that there should be agreement as to <u>some</u> land use areas and that it should be possible for joint recommendations as to these property lines. Use areas suggested by each committee that cannot be agreed upon by both committees will provide the basis for further study and negotiation.

In addition to the committees for an on-the-ground survey of land use areas, I am requesting that the Navajo and Hopi tribes form a joint local education committee of local residents to work with the Bureau in the development and administration of the education program in the Moencopi-Tuba City area.

Dr. Rabeau concurs in this approach for a joint health committee to work with Indian Health in the development and administration of the proposed hospital.

It is sincerely hoped that each committee will come to the next working conference prepared to propose and support, with a map or maps, what they consider to be their respective interests; that the two committees can agree on <u>some</u> area of use and that through negotiation the area of disagreement can be narrowed and thus form the basis for an early and amicable legislative presentation to the Congress of a bill to end confusion of ownership.

I am looking forward to our next working conference which is scheduled for November 27, 28 and 29 at Francisco Grande, Casa Grande, Arizona. I shall look to Area Director Head to make the necessary arrangements for this conference.

Robert L. Bennett
Robert L. Bennett
Commissioner

cc: John Boyden, 11-8-67



WRO048

Exhibit 12 to
United States' Motion
DOJ32

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C. 20242

IN REPLY REFER TO:
1 Prop. Mgmt.
inistration
0 10232

DEC 28 1970

Memorandum

To: Area Director, Navajo Area
Area Director, Phoenix Area

From: Commissioner of Indian Affairs

Subject: Administrative Procedures for Real Estate Transactions within the Hopi-Navajo 1934 Disputed Area

This is in response to recent requests by the Navajo Area Director for authority to approve several transactions within the 1934 area. Proposals submitted for review include Van's Trading Post lease, Simpson and Thompson commercial lease modification at Cameron, Arizona, and a homesite lease. This extends to the other leases and permits the Navajo Area Office requested telegraphic delegation of approval authority.

On October 15, 1970, the Associate Solicitor, Indian Affairs, advised the Assistant Secretary, Public Land Management, that legal approval cannot be given to a transaction in which the Navajo interest would be recognized unilaterally and the Hopi interest ignored in view of the undefined interest of the Hopi Tribe determined to exist in the 1934 Boundary Bill Area. This was also clearly set forth in the Solicitor's memorandum of July 1, 1966.

Accordingly, the incoming copies of these transactions are returned for appropriate action by the Hopi Tribe. This action is consistent with instructions and amendments given by former Commissioner Bennett on July 8, 1966.

The Assistant Secretary, Public Land Management, in a letter to Senator Barry Goldwater dated May 14, 1970, stated that there is no way of solving the dispute administratively and that its solution will require either judicial decision, Congressional action or both.

BUREAU OF INDIAN AFFAIRS
RECEIVED

WRO193

Exhibit 13 to
United States' Motion
DOJ33

Until such time as the Assistant Secretary has determined a final course of action or legislation is enacted, the following administrative guidelines will be followed:

An area known as the Moencopi-Hopi area was delineated for administrative purposes by Assistant Secretary Loesch in identical letters dated February 26, 1970, to the respective Chairmen of the Navajo and Hopi Tribes.

This area within the 1934 disputed area set aside for exclusive use of the Hopi Tribe is to be administered through the Superintendent of the Hopi Agency and the Phoenix Area Director. Leases, exchanges, permits, rights-of-way, and other transactions affecting the real property interests in this area will require execution or consent by both tribes. The remainder of the 1934 Boundary Bill Area outside the Moencopi-Hopi exclusive use area but within the original Bennett line (or the western extension of the 1882 Executive Order Reservation) will be administered by the Area Director of the Navajo Area Office for the exclusive use of the Navajo Tribe. Again execution or consent by both tribes is required in each transaction. No exceptions will be made, including public works projects. The appropriate approving official is not delegated authority to approve separate leases, counterpart leases, or other instruments of conveyance or those authorizing tenure until all parts have been received and the approval or grant can be made of both tribal interest simultaneously. No transaction executed on behalf of only one tribe's interest will be considered a valid transaction.

All of the lands within the 1934 Boundary Bill Area outside of the original line delineated by Commissioner Bennett (or the western extension of the 1882 Executive Order Reservation) shall be administered for the exclusive use of the Navajo Tribe through the Office of the Navajo Area Director.

Transactions within this area will not be required to be executed by the Hopi Tribe.

All income collected on lands in the 1934 disputed area inside the original Bennett line (or western extension of the 1882 Executive Order Reservation) will be placed in escrow in a special deposit account pending final definition of the undetermined interest of the Hopi Tribe. Income derived from

the remainder of the 1934 area (outside the original Bennett line) will not require deposit in a special account, but the Area Directors should take note that an accounting may be required by eventual judicial or legislative action.

There should be no question or confusion in administration of the common ownership interest in the 1882 Hopi Executive Orde Reservation outside District 6 in conformance with the United States District Court decision under Healing v. Jones. Each tribe must join in each new transaction, and each tribe is entitled to receive their proportionate share in the income derived from these authorized uses.

Furthermore, the Hopi Tribe is entitled to receive their one-half individual share from all leases, permits or other authorized uses which were in existence after September 28, 1962, the date of the District Court decision. The Area Directors are hereby directed to immediately make a proper distribution to each tribe of all income previously collected and to provide for such distribution of income received in the future. We can no longer assume a unilateral position in favor of either tribe. Also, inasmuch as this entire area has been eliminated from the applicability of 25 CFR 152, Navajo Grazing Regulations, all existing annually renewable grazing permits within the area issued under Part 152 should be declared terminated upon the expiration of their current annual term; no new permits may be issued under Part 152 within the area.

Acting Commissioner

Enclosures

INDIAN
Real Estate Svcs.
Administration

AUG - 4 1972

Dear Mr. MacDonald:

In my letter of June 5, I described two areas in the immediate vicinity of Tuba City and Moencopi communities and proposed that developmental opportunities initiated by local residents and the respective tribal councils might proceed without the approval of both tribes.

At our meeting last July 7, 1972, the proposal was discussed with both tribal chairmen. As an interim arrangement to facilitate local development of public and private facilities of benefit to local residents, the administrative procedures issued by the Acting Commissioner of Indian Affairs December 28, 1970, are modified as follows for the Tuba City and Moencopi areas.

Leases, permits, rights-of-way and other transactions affecting real property interests will only require execution by or consent of the Navajo Tribe within the Tuba City area and the Hopi Tribe within the Moencopi area. This modification does not extend to or include contracts or authorizations to drill water wells. Administrative approvals or grants of rights-of-way will be by the authorized representatives of the Secretary who has jurisdictional responsibility.

This modification is limited to the areas described in the enclosures hereto and does not otherwise change the procedures contained in the December 28, 1970, memorandum. Also, nothing contained herein is intended to be prejudicial to the interests of

either tribe in the resolution of their respective rights in and to the 1934 Boundary Bill Area.

Sincerely yours,

(sgd) Harrison Loesch

Assistant Secretary of the Interior

Mr. Peter MacDonald
Chairman
Navajo Tribal Council
Window Rock, Arizona 86515

Enclosures

IDENTICAL LETTER SENT TO CHAIRMAN OF THE HOPI TRIBE

cc: Area Directors, Phoenix and Navajo Offices with copy of incoming.

Secretary's Surname
Secretary's Reading File (2)
LM
BIA Surname
300
350
Chrony
Mailroom
350: DEMaynard/lsm/7-12-72

United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

RECEIVED JUN 9 1972 THE HOPI TRIBE ORAIBI, ARIZONA

JUN - 5 1972

Dear Mr. Hamilton:

In conversation in recent weeks the suggestion has been put forth that it would be to the mutual advantage of the Hopi and Navajo Tribes if it was no longer a requirement for both tribes to agree to any surface leases or rights-of-way in the immediate vicinity of Tuba City or Moencopi. This would permit certain types of needed developments to proceed, both in the Tuba City area and the Moencopi area.

I am enclosing a map delineating two areas. If both tribes are agreeable, I would be willing to modify the existing instructions so that leases or rights-of-way could be entered by either tribe without the agreement of the other in their respective areas outlined on the attached map. These areas would be designated simply for this purpose and as an interim arrangement and would in no way be prejudicial to the interests of either tribe in resolving their respective rights in the 1934 Boundary Bill area.

Sincerely yours,

Harrison Loesch

Harrison Loesch
Assistant Secretary --
Public Land Management

Mr. Clarence C. Hamilton
Chairman
Hopi Tribal Council
P. O. Box 123
Oraibi, Arizona 86039

Enclosure

Exclusive Hopi administered area in and around the Village of Moencopi, Arizona. Administration to be by the Hopi Tribal Council and Hopi Agency, Keams Canyon, Arizona. "Tribal land in the N/2 N/2 section 4, T. 31 N., R. 11 E., G&SRBM; that part of the S/2 section 28, SE/4SE/4 section 29, and the E/2 E/2 section 32 all lying South and East of the centerline of U. S. Highway 164; and all of section 33, T. 32 N., R. 11 E., G&SRBM."

Exclusive Navajo administered area in and around the Tuba City, Arizona, area. Administration to be by the Navajo Tribal Council and Navajo ARea Office, Window Rock, Arizona. "Tribal lands in the SE/4, S/2 SW/4 section 17, W/2 section 21, all of section 20, E/2 E/2 section 19, E/2 section 30, and that part of the W/2 section 28, section 29 and the E/2 E/2 section 31 all lying North and West of the centerline of the U. S. Highway 164, all in T. 32 N. R. 11 E., G&SRBM."




WRO477

Exhibit 14 to United States' Motion

DOJ40

R.P.M.
1934

United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
WASHINGTON, D.C. 20242

ATTN:

Jackson
Hernandez
Lee

FILE

IN REPLY REFER TO:

Real Estate Svcs.
Administration
BCCO 3392

AUG 15 1972

Memorandum:

To: Area Directors, Phoenix and Navajo Areas

From: Commissioner of Indian Affairs

Subject: Modification of December 28, 1970, Memorandum Which Established Procedures for Real Estate Transactions within the Hopi-Navajo 1934 Disputed Area

The Assistant Secretary has issued a modification of the December 28, 1970, procedures adopted for administration of the 1934 Boundary Bill Area. Copies of the Assistant Secretary's letter to the chairmen of the respective tribal councils are enclosed for your guidance in future administrative action affecting real property in the vicinity of Tuba City and Moencopi.

As you will note, the modification only extends to these two delineated areas and does not change the procedural instruction otherwise. Leases, permits, rights-of-way or other transactions affecting real property interest within each of the described areas can be approved or rights-of-way granted by the authorized representative if executed or consented to by the Navajo Tribe within the Tuba City area and by the Hopi Tribe within Moencopi. No water well-drilling contracts or authorizations are to be approved without the participation by both tribes.

RECEIVED
REAL PROP. MGMT.
AUG 18 1972

cc: Supt. Hopi

WRO791

Exhibit 15 to
United States' Motion
DOJ41

The implementation of the modified procedures will permit completion of certain developmental programs within the respective communities.

John O Crow
Deputy Commissioner

Enclosure

# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

~~1. Area Director~~
2. Work ... [illegible]
~~3. [illegible]~~
does this exclude Pasture Canyon (in the [illegible] description)
cc - RPM

[illegible] LO

Jackson
Hernandez
Lee

FILE

AUG - 4 1972

Dear Mr. MacDonald:

In my letter of June 5, I described two areas in the immediate vicinity of Tuba City and Moencopi communities and proposed that developmental opportunities initiated by local residents and the respective tribal councils might proceed without the approval of both tribes.

At our meeting last July 7, 1972, the proposal was discussed with both tribal chairmen. As an interim arrangement to facilitate local development of public and private facilities of benefit to local residents, the administrative procedures issued by the Acting Commissioner of Indian Affairs December 28, 1970, are modified as follows for the Tuba City and Moencopi areas.

Leases, permits, rights-of-way and other transactions affecting real property interests will only require execution by or consent of the Navajo Tribe within the Tuba City area and the Hopi Tribe within the Moencopi area. This modification does not extend to or include contracts or authorizations to drill water wells. Administrative approvals or grants of rights-of-way will be by the authorized representatives of the Secretary [illegible] jurisdictional responsibility.

This modification is limited to the areas described in the enclosures hereto and does not otherwise change the procedures contained in the December 28, 1970, memorandum. Also, nothing contained herein is intended to be prejudicial to the interests of

BUREAU OF INDIAN AFFAIRS
RECEIVED
AUG [illegible] 1972
PHOENIX

REAL PROP. [illegible]
AUG [illegible]

WRO793

Exhibit 15 to
United States' Motion
DOJ43

either tribe in the resolution of their respective rights in and to the 1934 Boundary Bill Area.

Sincerely yours,

(Sgd) Harrison Loesch

Secretary of the Interior

Mr. Peter MacDonald
Chairman
Navajo Tribal Council
Window Rock, Arizona 86515

Enclosures

IDENTICAL LETTER SENT TO CHAIRMAN OF THE HOPI TRIBE

cc: Area Directors, Phoenix and Navajo Offices with copy of incoming.

# HOPI TRIBE

P. O. BOX 123

ORAIBI, ARIZONA 86039

September 9, 1975

Mr. Lynn R. Montgomery
Acting Project Officer
Bureau of Indian Affairs
Joint Use Administrative Office
125 E. Birch Avenue
Flagstaff, Arizona 86001

Dear Mr. Montgomery:

At its Special meeting held on August 14, 1975, the Hopi Tribal Council disapproved the following requests to survey roads within the 1934 Boundary Bill area and the 1882 Executive Order Reservation. This letter would be in reply to all your previous correspondence in regards to these requests.

1. BIA Route 41 - Pinon northwesterly via Forest Lake ✓
2. BIA Routes [redacted] and N6130 - Cedar Ridge to Highway 90 near Gap Trading Post).
3. N21 - Tonalea (Red Lake) northerly toward Kaibeto. ✓
4. N16 - U. S. Highway 160 toward Navajo Mountain. ✓
5. N62 - Highway 264 to Rocky Ridge School
6. N6110 - Cedar Ridge to the Shinom Alter (1934 B.B.)
7. N21 - The Gap northerly toward Coppermine (Bodaway Mesa

A20 ?

The Council feels that they cannot approve such requests at this time until the land problem between the Navajo and Hopi Tribes has been resolved.

BF0016945

Sincerely,

Leona J. Natsewayt

Leona J. Natseway
Tribal Secretary
Hopi Tribal Council

LJN:dt

RECEIVED
OCT 20 1975
BIA
NAVAJO AREA ROADS

RECEIVED
SEP 1975
JUA OFFICE

013730

Exhibit 16 to
United States' Motion
DOJ45 NNDSC10699

United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
WASHINGTON, D. C. 20245

John A. Rw

IN REPLY REFER TO:
Tribal Planning Services

JUL 16 1976

Mr. Peter MacDonald
Chairman
Navajo Nation
Window Rock, Arizona 86515

Dear Chairman MacDonald:

This is in response to Navajo Tribal Council Resolution CJN-36-75 of June 18, 1975 which requests that the freeze on Navajo construction and development in the Western Navajo Agency be lifted.

Since passage of the Resolution, a list of 58 proposed projects and a brief and supplemental memorandum on the legality of the freeze have been submitted on the Navajo Nation's behalf. Although the views of the Hopi Tribe have been sought on several occassions, we have not received a substantive response to date.

Initially, let me say that I am very much aware of the effect of the freeze upon Navajo people who reside in the affected area. For many, their hopes and aspirations for a better standard of living have suffered through no fault of their own. I also recognize the interest the Navajo Nation has in bettering its members' lives and fully appreciate its desire to remove the onerous impact of the freeze.

It is my belief that the decision which I have reached may be better understood by tracing its evolution. As a result of the Associate Solicitor for Indian Affairs' opinion of July 1, 1966, Commissioner Bennett issued a memorandum dated July 8, 1966, which imposed a requirement that Hopi consent be received for all actions which "hypothecate the surface or subsurface resources for exploration, mining, rights-of-way, traders, or other use or occupancy authorized by permit, lease or license" in areas encompassing lands situated in the westerly extension of the 1882 Executive Order area. All money derived from the use or management of the lands was to be deposited in a special account. The funds in the account were to be disbursed when the relative interests of each tribe had been determined. The area affected was modified several times to allow

CONSERVE AMERICA'S ENERGY

*Save Energy and You Serve America!*

RECEIVED
Bureau of Indian Affairs
JUL 22 1976
WRO399
PHOENIX, AZ. 85011

Exhibit 17 to
United States' Motion
DOJ46

improvements to be made by each tribe in delineated areas without the other's approval. An exception for "public work type projects" was also established for a time which allowed the Commissioner unilaterally to approve proposed projects. However, all exceptions or modifications were eliminated in a memorandum of the Acting Commissioner dated December 28, 1970, and an absolute requirement for the other tribe's approval was reimposed. This requirement stood for more than two years when the Assistant Secretary, in a letter to you dated August 4, 1972, offered an exception allowing Navajo development in an area immediately surrounding Tuba City to proceed without Hopi approval and also permitting Hopi development in the Moencopi vicinity without Navajo approval. Each of the two areas is several square miles in size. Thus, today a Navajo project within the Tuba City area that requires a lease, permit, or right-of-way need only have Navajo tribal approval, with the exception of water wells which still require each tribe's approval. The corollary is the case for a Hopi project in the Moencopi area. But for all projects outside these two areas, the approval of both tribes is required.

With this background in mind I turn to the Nation's request that the freeze be vacated.

The Nation's principal argument in support of vacating the freeze in its entirety, is that it lacks a legal basis because the Hopi Tribe has no interest in the affected area. That, I believe, is a close legal question and one which is now before the Federal District Court in Arizona. The issue of what affect the 1934 Boundary Bill, 48 Stat. 960, had upon the freeze area is, in my view, a matter better left to the District Court for resolution. Furthermore, section 5 of the Navajo-Hopi Settlement Act expressly conferred jurisdiction on the District Court to determine the relative interests of the two tribes in the area affected by the Boundary Bill. If the Court should rule that any portion of the disputed lands belong exclusively to one or the other of the tribes, they will be partitioned accordingly. Thus, any development by the Navajo Nation now, could in retrospect prove unnecessary and wasteful, if the particular lands are eventually partitioned to the Hopi Tribe. The alternative argument presented in the Nation's supplemental memorandum of law dated December 12, 1975, is that even if it be assumed that the Hopi Tribe has some undefined ownership interest in the lands, the Navajos should not be precluded from making improvements because it is an established principle of law that a cotenant out of possession can not thwart a cotenant in possession from making improvements and it is the Navajos who hold possession to all but a small portion of the

disputed area. The Nation's memorandum persuasively argues this point. However, the most recent rights-of-way statute for Indian lands, 25 U.S.C. §§323-328, in some respects modifies this principle when, as here, two tribes are involved, each ostenably having ownership interests in the land. It calls for the consent of tribes organized under the Indian Reorganization Act, 25 U.S.C. §§461-479, in order for the Secretary to grant a right-of-way. The rights-of-way regulations, 25 CFR §161.3(a), require the consent of the tribe for a right-of-way across tribal lands irrespective of whether it is organized under the Reorganization Act.

Although I am unable to go as far as the Nation wishes in lifting the freeze, in order to alleviate its harsh impact during the pendancy of the litigation and unless ordered otherwise, I intend to modify the freeze in the following manner. For any Navajo project proposed in any part of the area in which the Hopi Tribe presently asserts a claim which is within the area presently affected by the freeze, */ I will entertain a request for unilateral approval, on an ad hoc basis, for each project for which the Hopi Tribe has specifically refused to grant its consent or that failed to consider granting its consent within 30 days after being requested to do so.

If the Navajo Tribe is of the opinion that a project is necessary now, it may present the proposal to the Hopi Tribe. If either the Hopi Tribal Council or its authorized executive officers fail to grant their consent or fail to act within 30 days, the proposal may be sent to me directly. I will have my staff here review it and I will endeavor to approve it if there is a substantial necessity demonstrated.

In order to adequately consider a project, I would like to have it presented in as much detail as possible. If a permit, lease or right-of-way is involved, a legal description of the affected lands along with maps, tracings and plans must be submitted. Beyond this, it will be necessary to know the precise need for and impact of the completed project. This is essential because of our obligation to comply with the National Environmental Policy Act, 42 U.S.C. §§4321-4374, in granting approval. Because the basis for this modification is to alleviate deprivations, I would like to have a justification of the project presented. The list of proposed projects already submitted generally falls into several categories: water and sewer lines; electric power supply; housing improvement; upgrading

---

*/ The Hopi Tribe does not assert any claim to lands in a checkerboard area to the southwest. These lands were purchased for the Navajo Tribe. Thus, no Hopi consent is necessary for any development on these particular lands.

roads, almost exclusively those for school bus routes; and flood control earthen dams. In addition, three new schools are proposed. I might add that I see no need for Hopi consent for some of the 50 projects proposed in the December 16, 1975 letter; such projects as nos. 13, 14 and 20, in my view, would require no approval of the United States because no easement appears to be required, nor are permits or leases involved.

However, in all instances involving leases, permits, or rights-of-way, I would expect a justification of each project, not in technical or engineering, or even cost, terms, but one describing the present conditions of the people concerned and how the completion of the project will, in any measure, change existing conditions.

If a right-of-way is required, the procedure under the regulations, 25 CFR Pt. 161, should be followed. In other words, permission to survey should first be requested from the Navajo Area Director under §161.4. However, the consent of the Hopi Tribe need not be obtained first for surveying as required under §161.3. Once the survey is completed, at the time the proposed project is submitted to the Hopi Tribe for its consent, a copy of the same should be submitted to the Navajo Area Office so that office may assess the environmental effects and the merits of the project and make a recommendation to me.

Any proceeds from leases, permits or compensation for rights-of-ways granted under this measure shall be deposited in the same escrow account into which all other funds have been deposited. The funds will remain there until the respective interests of both tribes have been finally judicially resolved. In a letter dated October 7, 1975, Mr. George Vlassis, on behalf of the Nation, agreed that, subject to council approval, the Nation would stipulate that any projects approved as a result of a modification of the freeze, would not be used as evidence in the present Court proceeding. I will require that such a stipulation be made.

I believe that this procedure provides the pragmatic means for reducing the arbitrarily imposed obstacle to meeting Navajo needs. At the same time, I can take into consideration the Hopi Tribe's interest that may eventually be recognized in the courts. I am hopeful that this measure will be both workable and of direct benefit to Navajo people. Upon receipt of the first proposal, we will make every effort to treat it expeditiously.

Sincerely yours,

(SGD) Morris Thompson

Commissioner of Indian Affairs

cc: Mr. Richard Schifter
Fried, Frank, Harris, Shriver & Kampelman
600 New Hampshire Avenue, N.W.
Washington, D. C. 20008

Mr. George P. Vlassis
Vlassis, Ruzow & Linzer
1545 W. Thomas Road
Phoenix, Arizona 85015

Mr. Jay Edwards, Esq.
507 2nd Street, N.E.
Washington, D. C. 20007

Mr. Samuel Pete
Director
Navajo-Hopi Land Dispute Commission
The Navajo Nation
Window Rock, Arizona 86515

Mr. Abbott Sekequaptewa
Chairman
Hopi Tribal Council
New Oraibi, Arizona 86039

Mr. John Boyden
Boyden, Kennedy, Romney & Howard
Ten East South Temple
Salt Lake City, Utah 84111

BIA, Navajo Area Director
BIA, Phoenix Area Director
BIA, Director, Office of Trust Responsibilities
BIA, Joint-Use Office
BIA, Western Navajo Agency
BIA, Hopi Agency
Solicitor-Indian Affairs, D. Jones

THE NAVAJO NATION
WINDOW ROCK, NAVAJO NATION (ARIZONA) 86515

PETER MACDONALD
CHAIRMAN, NAVAJO TRIBAL COUNCIL

WILSON C. SKEET
VICE CHAIRMAN, NAVAJO TRIBAL COUNCIL

November 22, 1978

Roy Dan, Executive Director
Agency Housing Project
Bureau of Indian Affairs
Navajo Western Agency
Tuba City, Arizona 86045

Dear Mr. Dan:

On behalf of the Navajo-Hopi Land Dispute Commission, we like to Thank You and all members of the Western Navajo Agency Housing Development Advisory Committee for inviting us and allowing us to participate in your orientation.

The problems are immense and the living conditions in the former Joint Use Area have greatly deteriorated due to the freeze imposed on September 28, 1962, by the Federal District Court then located in Prescott, Arizona. This ruling even became more stringent on October 14, 1972, by an order of the Tucson Federal District Court.

This freeze imposed a prohibition on all construction and improvements to existing structures, private and public. The freeze included not only private hogans but schools, health facilities, bridges, roads, wells and other water supplies and all community improvements. Basically, the land dispute has meant nothing but deprevation of the basic necessities for nearly 20 years.

On February 10, 1977, the date of the partition order, the freeze on construction was lifted in the area partitioned to the Navajos but not in the area partitioned to the Hopi Tribe. This partition judgement was again reaffirmed August 30, 1978, pending final adjudication of the Southern and Western boundary of the 1882 Executive Order Area.

On behalf of the Navajo residents of the 1882 Executive Order Area, we appreciate your continuing efforts to address

the innumerable problems confronting them. If you should need at anytime our assistance, please do not hesitate to call us at 871-4941, ext. 1359 or 1360.

Freddie Howard, Assistant Director
Navajo-Hopi Land Dispute Commission

FH/br

cc: A. Begay, Agency Director
Tuba City
Tulley Man, O.M.P.A.
Tuba City

OCT 1972
RECEIVED
U. S. ATTORNEY
PHOENIX

FILED
COPY
OCT 1 1972
CLERK, U. S. DISTRICT COURT
DISTRICT OF ARIZONA
BY: DEPU

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CLARENCE HAMILTON, CHAIRMAN OF THE HOPI TRIBAL COUNCIL OF THE HOPI INDIAN TRIBE, FOR AND ON BEHALF OF THE HOPI INDIAN TRIBE, INCLUDING ALL VILLAGES AND CLANS THEREOF, AND ON BEHALF OF ANY AND ALL HOPI INDIANS CLAIMING ANY INTEREST IN THE LANDS DESCRIBED IN THE EXECUTIVE ORDER DATED DECEMBER 16, 1882,

Plaintiff,

vs.

PETER MacDONALD, CHAIRMAN OF THE NAVAJO TRIBAL COUNCIL OF THE NAVAJO INDIAN TRIBE FOR AND ON BEHALF OF THE NAVAJO INDIAN TRIBE, INCLUDING ALL VILLAGES AND CLANS THEREOF, AND ON BEHALF OF ANY AND ALL NAVAJO INDIANS CLAIMING ANY INTEREST IN THE LANDS DESCRIBED IN THE EXECUTIVE ORDER DATED DECEMBER 16, 1882; RICHARD G. KLEINDIENST, ATTORNEY GENERAL OF THE UNITED STATES, ON BEHALF OF THE UNITED STATES;

Defendants.

No. Civil 579

PRESCOTT

ORDER OF COMPLIANCE

The Plaintiff in the above-entitled action having filed his Petition for an Order and Writ of Assistance on March 13, 1970; and following an appeal and decision by the United States Court of Appeals for the Ninth Circuit and denial of a Petition for Writ of Certiorari by the Supreme Court of the United States on May 22, 1972, this Court heard and received evidence adduced by the parties hereto, and having adopted its Findings of Facts and Conclusions of Law herein on September 7, 1972, and having heard the arguments of the parties as to the proposed relief on September 30, 1972; and good cause appearing therefor,

IT IS ORDERED, ADJUDGED, AND DECREED:

That the Defendants be and they are hereby ordered and directed to grant and permit the joint use and possession of the surface, including all resources, in and to all of the Executive

A-6

Exhibit 19 to
United States' Motion
DOJ53

NNDSC27680

COPY

Order Reservation of December 16, 1882, lying outside of the boundaries of Land Management District 6 as defined on April 24, 1943, to the Hopi Indian Tribe and the Navajo Indian Tribe, share and share alike.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:

1. Defendants shall forthwith commence reduction of livestock in the Joint-Use Area of the 1882 Executive Order Reservation, and within one (1) year from the date of this Order complete reduction of Navajo livestock to one-half (1/2) of the carrying capacity as determined by the Soil and Range Inventory of the 1882 Executive Order Reservation (exclusive of District 6) dated 1964.

2. Within one (1) year from the date of this Order a new Range Reconnaissance to determine the present carrying capacity of said area shall be completed by the United States, and immediately thereafter a further reduction of livestock to the actual carrying capacity shall be commenced by Defendants and be completed within six (6) months from such commencement.

3. Commencing one (1) year from the date of this Order, livestock may be grazed upon the Joint-Use Area of the 1882 Executive Order Reservation, only after new permits therefor have been issued by the Bureau of Indian Affairs, and all prior existing permits shall be deemed cancelled as of that date. Thereafter, permits may be issued to either or both tribes or individual tribal members of said tribes as the respective tribal councils of said tribes shall direct.

4. Commencing one (1) year from the date of this Order, permits covering not more than one-half (1/2) of the carrying capacity shall be issued to the Navajo Tribe or members thereof, and permits covering not more than one-half of such carrying capacity shall be issued to the Hopi Tribe or members thereof. Neither tribe, including the members thereof, shall at any one time hold permits which in total cover more than one-half (1/2) of the carrying

COPY

capacity.

5. From the date of this Order all income from said Joint-Use Area to the Navajo and Hopi Tribes, including but not limited to income from mineral production and sales, leases, trader license fees, rights-of-way grants, and licenses shall be divided equally between said tribes. However, profits and gains from livestock use permitted as hereinbefore provided shall be the sole property of the permittee. Grazing fees may be assessed and collected in the future by either tribe from individual permittees of the assessing tribe and shall inure to the benefit of said tribe without accounting to the other tribe.

6. The tribes shall exchange copies of all existing leases, easements, contracts, or other documents togehter with written descriptions of all oral agreements, which relate to the Joint-Use Area or businesses or improvements located thereon.

7. No new construction shall be permitted on the Joint-Use Area without a permit issued jointly by the two tribes, except that the Hopi Tribe shall be permitted to construct that number of dwellings or other improvements equal to those Navajo dwellings and other improvements which are presently existing or are now under construction in the Joint-Use Area.

8. Within sixty (60) days from the date of this Order the United States of America shall present to this Court for its approval a plan to facilitate and implement this Order with relation to prevention of damage to, and misuse of, the rangeland as specified in Paragraphs 1 and 2, above.

9. Within ninety (90) days from the date of this Order the United States of America shall present to this Court for its approval a plan to facilitate and implement this Order, except with relation to prevention of damage to, and misuse of, the rangeland.

10. The plans required by this Order shall take effect sOn approval of such plans by this Court.

11. Should Congressional legislation be enacted expressly

COPY

conflicting with any of the specific provisions of this Order, this Court retains jurisdiction to make such changes and further orders as may be required to correlate this Order with any conflicting statutory provisions. All other provisions of this Order not in conflict with statutory provisions shall remain in full force and effect.

12. The Clerk of this Court shall issue a Writ of Assistance directing the Defendants herein to comply with the foregoing Order.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED:

That matters and issues concerning accounting and restitution and as to liability of the United States in respect thereto, if any, to the extent this Court has jurisdiction, are expressly reserved for later consideration and hearing.

DATED this 10 day of October, 1972.

James A. Walsh

JAMES A. WALSH
United States District Judge

COPY
OF
ORIGINAL FILED ON THIS DATE
SEP 26 1988
RICHARD H. WEARE, CLERK
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| IVAN L. SIDNEY, et al., Plaintiffs | ) | No. CIV 58-579 PCT-EHC |
| v. | ) | |
| PETER MACDONALD, et al., Defendants. | ) | ORDER GRANTING PRELIMINARY INJUNCTION |

NATURE OF PROCEEDING

The United States filed a Motion for a Preliminary Injunction on September 14, 1988, seeking to enjoin the Navajo Tribe from implementing programs recently announced by Navajo Tribal Chairman Peter MacDonald having to do with Navajo Tribal activities on Hopi partitioned lands (HPL) and 1934 Act lands (Bennett Freeze).

The Government's concern was first prompted by Chairman MacDonald's letter to the Navajo-Hopi Indian Relocation Commission (Relocation Commission), dated August 15, 1988, in which after a series of statements critical of the Navajo-Hopi relocation process and his perceptions of conditions on these areas, he stated:

////////

> I am compelled by this reality to tell you that if I do not receive by August 25, 1988 the clearest possible commitment from the federal government to conduct the needed repairs and related construction, I will personally undertake to provide more suitable housing from [sic] those on the HPL, including resistors, and for those most in need on the Bennett Freeze, and especially to find housing, on the HPL itself if need be, for the refugee families who left the HPL but have no place else to go. I will spare no effort in this regard.

A copy of this letter was noted as going to Ross Swimmer, Assistant Secretary of Interior. It is unclear why this letter was not directed to the Department of Interior, in view of responsibilities imposed on the Secretary by the 1974 Navajo-Hopi Indian Relocation Act, 25 U.S.C. § 640d, et seq, and subsequent orders of this Court.

An attachment to MacDonald's letter listed 34 "Housing Assistance Requests" for Navajo Tribal members residing on either the HPL or the so-called Bennett Freeze area. The list identified the nature of the "problem", but did not provide any information regarding proposed remedial actions.

The Commission responded under date of August 19, 1988 that it would follow its policy of giving priority to relocation assistance for "relocatees from the HPL and those in emergency situations". The response went on to state:

////////



Exhibit 20 to
United States' Motion
DOJ58

> . . . With your assistance and intervention, we feel this process can be quickened even beyond our normally expeditious fashion. Particularly in the case of Tribal approval of pending homesite leases, your personal assistance will be helpful. Since almost all of these families are in the Teesto and Hardrock areas, it would be helpful if staff persons from the Navajo-Hopi Development Office could accompany our staff on these visits. We will notify the Development Office of the schedule.(*)

MacDonald replied on August 23, 1988, stating that he was "not interested in forcing my people to leave their homelands", i.e., compliance with federal legislation and court opinions, and that "[he] may have to personally undertake to provide decent housing for those of my people on the HPL, including resistors, and for those most in need on the Bennett Freeze. I shall do what I can for those refugee families who left the HPL and are aithout homes and promised benefits."

On August 30, 1988, the Navajo-Hopi Development office wrote Hopi Tribal Chairman Ivan Sidney as follows:

> The Navajo-Hopi Development Office, on behalf of the Navajo Tribe, hereby gives notice to the

(*) It takes from 3 to 6 years for the Navajo Tribe to process and issue a lease for a tribal member to relocate from the HPL to an adjacent area which is included in the Navajo Reservation.

Exhibit 20 to United States' Motion
DOJ59

> Hopi Tribe of intended construction in the HPL and 1934 Statutory Freeze Area. The Navajo Tribe intends to repair, renovate, replace or add to dilapidated or inadequate structures belonging to the families on the enclosed list.
>
> Based on existing court guidelines, we have concluded that Hopi Tribal consent is not necessary for the types of construction we intend to do.

The list sent to the Hopi Tribe included 50 "Housing Assistance Requests", and a general location of the house. It did not specify what was proposed to be constructed at any location. The list included properties on the HPL and Bennett Freeze area.

The list mailed to the Hopi Tribal Chairman did not include the names and locations for Billy Attaki and Irene Yazzie which were on the list mailed to the Relocation Commission.

After having done nothing for a number of years to repair or replace any burned or dilapidated building, or build an addition to an existing building, for any Tribal member living on the HPL, the Tribe, under the putative direction of Chairman MacDonald, commenced an extensive and frenetic construction program on the HPL and the Bennett Freeze area in late August, 1988. One example: within a two week period, eight Navajo Tribal members employed by the tribe at minimum hourly wage rates, using $11,484 in materials provided by the Tribe and using tribal equipment and vehicles,

Exhibit 20 to
United States' Motion
DOJ60

constructed a two room block house (768 sq. ft.) for Billy Attakai and his mother to replace a house that they had lived in for many years.

This construction program was commenced at or near the time that Chairman MacDonald in a four page "Paid Advertising Supplement to Navajo Times" announced his personal plan to improve the living conditions of Navajos residing on the HPL. MacDonald's statement includes his assertions of what he intends to do on the HPL:

> [W]e will keep renovating and rebuilding houses;
>
> We will start digging wells and running powerlines and stringing phone lines and building roads. We will set up a health clinic;
>
> And we may initiate a Resettlement Program. Right here in the HPL. If there are any Navajos out there who desire to return to their ancestral homelands, we will begin to resettle them.

The Government's request for a temporary restraining order was heard on Friday, September 16 and Saturday, September 17. The Navajo Tribe received notice of the hearing, and fully participated in the hearing by way of arguments and presentation of evidence. The hearing was an adversarial proceeding in every sense of the word.

Given the nature of the hearings on September 16 and 17, any order issued by the Court granting injunctive relief will be treated as a preliminary injunction. Levas and Levas v. Village of Antioch, Ill., 684 F.2d 446 (7th Cir. 1982); Walker v. Hannon,

Exhibit 20 to
United States' Motion
DOJ61

487 F.Supp. 1151, (D.C. Pa. 1980), affirmed 624 F.2d 1092 (3rd Cir. 1980); MLZ, Inc., v. Fourco Glass Co., 470 F.Supp. 273 (D.C. Tenn., 1978). See also: Wright & Miller Federal Practice and Procedure, § 2951.

STANDARDS FOR GRANTING PRELIMINARY INJUNCTION

The criteria in this Circuit for granting a preliminary injunction require a moving party to establish:

(1) a strong likelihood of success on the merits;

(2) the possibility of irreparable injury to the moving party if the preliminary relief is not granted;

(3) a balance of hardships favoring the moving party; and

(4) in appropriate instances, advancement of the public interest.

The moving party may meet its burden of proof by demonstrating

(1) a combination of probable success on the merits and the possibility of irreparable injury, or

(2) that serious questions are raised and the balance of hardship tips sharply in its favor.

As noted in U-Haul Intern. Inc., v. Jartran, Inc., 522 F.Supp. 1238, 1242 (D. Ariz. 1981), affirmed 681 F.2d 1159 (9th Cir. 1982):

> The difference between these two tests is insignificant and a finding with respect to either establishes the basis for injunctive relief.

Exhibit 20 to
United States' Motion
DOJ62

THE TWO AREAS AT ISSUE

1934 Act(*). In 1934 Congress enacted legislation describing the exterior boundaries of the Navajo Reservation in northeastern Arizona. (Act of June 14, 1934, 48 Stat. 960). The Act conveyed an equitable interest in certain of those lands to the Navajo and "such other Indians as may already be located thereon." The lands involved in the 1934 Act are separate and apart from areas involved in Healing v. Jones. For a discussion of the 1934 Act, see: Sekaquaptewa v. MacDonald, 448 F.Supp. 1183 (D. Ariz. 1978), affirmed in part and reversed in part, and remanded, 619 F.2d 801 (9th Cir. 1980), cert. denied 449 U.S. 1010 (1980).

An action is pending in this Court, filed by the Hopi Tribe pursuant to 28 U.S.C. § 640d-7, to determine Hopi tribal rights and interests in the 1934 area. Sidney v. MacDonald, CIV 74-842-PCT-EHC. This case has been set for trial in Prescott, on September 6, 1989.

Section 640d-9(f), enacted July 8, 1980, 94 Stat. 929 provides as follows with respect to development of lands in litigation under the 1934 Act:

> Any development of lands in litigation pursuant to section 640d-7 of this title and further defined as that 'portion of the Navajo Reservation lying west of the Executive Order Reservation of 1882 and bounded on the north and south by westerly extensions, to the reservation line, of the northern and southern boundaries of said Executive Order Reservation' shall be carried out only upon the written consent of each tribe except for the limited

(*) This area in dispute under the 1934 Act is referred to as the "Bennett Freeze."

Exhibit 20 to
United States' Motion
DOJ63

> areas around the village of Moenkopi and around Tuba City. Each such area has been heretofore designated by the Secretary. 'Development' as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

Insofar as the record in this proceeding reflects, there have been no controversies or disputes regarding construction or development in this area prior to the current program instituted by Chairman MacDonald.

Ten construction projects identified in MacDonald's letter of August 30, 1988 to the Hopi Tribal Chairman are located in this area. As referenced earlier, this letter did not give any information regarding what was proposed to be constructed at any location; neither did it request consent for such undertakings.

MacDonald's letter to the Commission, dated August 15, 1988, stated (p.1):

> 2) Those on the Bennett Freeze - as many as 15 families are considered to be in the greatest need of housing repairs or replacements of whom we have specifically identified two at this time. There are many more.

Two of the projects listed in this letter, Nos. 9 (Wilson Zahne) 10 (Isabelle Mann) are located in the 1934 area. The record does not establish whether one or both of these locations are in the area around Tuba City excepted in section 640d-9(f).

MacDonald's purpose for including these two projects in the

Exhibit 20 to
United States' Motion
DOJ64

letter to the Commission is unclear, inasmuch as the Commission has no present responsibilities over activities in this area.

The Navajo Tribe has completed, or is in the process of completing other construction projects in the 1934 area without notice to, or consent of the Hopi Tribe. Exhibit 4 in this proceeding discloses the following projects in this category:

| NAME | PROJECT | STATUS | DATE |
| --- | --- | --- | --- |
| Pete Smiley | Replacement House | 100% | 9/9 |
| James Jones | " " | " | " |

The scope and extent of the current activities in this area undertaken by Chairman MacDonald strongly suggest the need for an order of this Court which will implement the statute and provide procedures for the interested parties to follow if there is a dispute regarding a proposed project of either tribe.

HOPI PARTITIONED LANDS (HPL)

The HPL are those areas which were awarded to the Hopi Tribe in the Judgment of Partition in CIV 58-579 - PCT (originally Healing v. Jones):

> . . . [to] be held in trust by the United States exclusively for the Hopi Tribe and as a part of the Hopi Reservation and that the United States hold the same in trust for the Hopi Tribe severally and absolutely free from any and all claims of the Navajo Tribe and members thereof, except as hereinafter specifically set out.

Exhibit 20 to
United States' Motion
DOJ65

Navajo Tribal members residing on the HPL do not have the right to decide whether they will remain on the HPL indefinitely. In all instances other than those persons qualifying for a life estate lease (eilgibility, timely application and lease), whether to eventually relocate - move from - the HPL is not a voluntary choice for these individuals.(*)

The original Partition Judgment in this matter, entered February 10, 1977, (paragraph 7(b) and (c), ordered:

> (b) No new construction in the area hereby partitioned to the Hopi Tribe shall hereafter be commenced or continued by the Navajo Tribe, or any member thereof, without the written authorization of the Hopi Tribe.
>
> (c) The prior orders of this Court concerning new construction are hereby prospectively modified as herein provided.

The final Judgment of Partition, entered April 18, 1979, following the Order of Remand by the Court of Appeals, reaffirmed paragraph 7b. Judge Walsh further ruled:

> This judgment shall be a final adjudication of the partition issue notwithstanding

---

(*)Statements by Navajo Tribal Counsel, Richard Stolbach, to this Court "that the relocation process is a voluntary one and that Congress has not determined that anyone has to move" is a disservice to the Navajo Tribe and those tribal members still residing on the HPL. It is also a misstatement of the law. (see p.91, Tr. of Prel. Inj. hearing, September 16, 1988). Initial legislation provided that Navajos residing on the HPL would be removed over a five year period (approximately 1984) at a total cost of $28,800,000.

Exhibit 20 to United States' Motion

DOJ126

the fact that the Court may enter subsequent orders regarding jurisdiction over livestock reduction, range restoration, or other matters related to the partition process, to effectuate the final separation of tribal interests in the Joint Use area.

There has been a ban on "new construction" going on back as early as October 14, 1972. In an Order citing Chairman MacDonald for contempt on May 29, 1974, for new construction in violation of an earlier order, the Court found:

> . . . Representatives of the Comptroller General examined 37 of these cases prior to November 26, 1973, and reported that nine of the cases were new construction, i.e., construction that did not replace a burned or dilapidated building or construction that added to existing buildings. The report stated further, that Federal funds had been used in four of the nine cases.

A subsequent order arguably utilized this definition for new construction, without rescripting it in that instance. See: Judge Walsh's Order of September 11, 1980, requiring removal of a number of buildings on the HPL.

This Court's Order of March 29, 1982, finding Chairman MacDonald in contempt for "new construction" on the HPL, recognized the 1974 definition, i.e., that "new construction" did not include

Exhibit 20 to
United States' Motion
DOJ67

"construction that merely replaces a burned or dilapidated building or construction that adds to an existing building." Sidney v. MacDonald, 536 F.Supp. 420, 426 (D.Ariz. 1982), aff. 718 F.Supp. 314 (9th Cir. 1983) told both tribal chairman:

> 4. Each tribe shall have jurisdiction and authority over any lands partitioned to it and all persons located thereon subject to the responsibility of the Secretary to protect the rights and property of life tenants and persons awaiting relocation.

This order was entered consistent with the 1980 amendment to the Relocation Act, section 640d-9(g). I would observe parenthetically that should the Secretary fail in these obligations, a Tribal Chairman does not succeed ipse dixit to the Secretary's rights and he cannot proceed unilaterally to do what he believes is required on the reservation of the other tribe. Rather, he is obliged to bring an appropriate proceeding in this Court, accelerated if necessary, to seek that relief on behalf of the disaffected tribal member or members.

The March 29, 1982 order, Id, 563 F.Supp. at 429 ordered Defendants "Peter MacDonald and the Navajo Tribe" to:

> Cease and desist from providing construction assistance in any form, i.e., labor or materials, to Navajos residing on Hopi partitioned lands without ascertaining whether the requesting individual has obtained the necessary prior written Hopi consent.

Exhibit 20 to
United States' Motion
DOJ68

Substantial evidence presented during this injunction proceeding supports a finding that the construction activities at issue were either:

(1) undertaken without the consent of either the Hopi Tribe or interested agencies of the United States, or

(2) "new construction" under prior orders of this Court.

Substantial evidence of record supports a finding that Chairman MacDonald, acting on behalf of the Navajo Tribe, stated that the tribe would undertake development projects on the 1934 lands and HPL lands, which developments would be contrary to provisions of the Navajo-Hopi Relocation Act and/or Orders of this Court.

Substantial evidence of record supports a finding that Chairman MacDonald, acting on behalf of the Navajo Tribe, has stated "We may initiate a Resettlement Program. Right here in the HPL. If there are any Navajos out there who desire to return to their ancestral homelands, <u>we will begin to resettle them</u>." (Emphasis supplied). This practice would violate provisions of the Navajo-Hopi Relocation Act and/or prior Orders of this Court.

This Court has been given authority by Congress to enforce the judgment of partition, as well as provisions of the Relocation Act. This Court has been afforded reasonable discretion how to proceed in exercising that authority.

The Court of Appeals has recognized that there is a need

Exhibit 20 to
United States' Motion
DOJ69

to resolve issues in the relocation process "as speedily as possible." Sekaquaptewa v. MacDonald, 575 F.2d 239, 248 (9th Cir. 1978).

Congress has repeatedly legislated towards that goal. This proposition was recently emphasized by the Court of Appeals in Sidney v. Zah, 718 F.2d 1453, 1456 (9th Cir. 1983)(*):

> . . . This case concerns the Navajo Tribe's responsibility to effectuate Congress' express intent to resolve the land dispute between the Hopi and Navajo Tribes expeditiously through judicial proceedings enforcing partition . . .

The relocation process, including the well-being of those eligible for and awaiting relocation are matters affected with the public interest. Actions intended to, or resulting in the frustation of these purposes are harmful to all concerned. Damages, both in a monetary sense and through emotional trauma caused by the creation of false hopes and expectations are inestimable. These injuries are real and irreparable; their effects can be measured only by speculation and conjecture.

The United States has shown a combination of probable success on the merits and the strong possibility of irreparable injury. The government has also shown that the equities in this

---

(*) Peterson Zah, then Chairman of the Navajo Tribe, had been substituted in the action for Peter MacDonald, pursuant to Fed.R.App. P.43(c).

proceeding tip sharply in its favor with respect to advancement of the public interest.

With the issuance of this Preliminary Injunction, I would remind the parties that cooperation, consultation and the exercise of reasoned judgment do not violate any order of this Court or their obligations under the law. Neither are they a sign of weakness by anyone exercising leadership responsibility.

Accordingly,

IT IS ORDERED, pendente lite,

(1) The Navajo Tribe shall not undertake any construction or development activities on the 1934 Act lands (Bennett Freeze) and the Hopi Partitioned Lands (HPL) except in compliance with this Order;

(2) Construction or development activities include providing materials for these purposes, as well as labor and equipment;

(3) The Navajo Tribe shall make written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze or HPL.

(a) A construction application shall include the name of person, or persons regularly residing at the dwelling, a description of the location sufficient to identify the site, a description of the proposed construction and why it is considered necessary (together with plans and specifications, if any), the materials and cost, number of employees of the Tribe to be involved in



Exhibit 20 to
United States' Motion
DOJ71

the construction, and the estimated time to complete the project;

(b) The Hopi Tribe and the Bureau of Indian Affairs shall each notify the Navajo Tribe in writing of approval or disapproval of each application within ten (10) days after it is filed, together with reasons if an application is disapproved.

(i) The Navajo Tribe may petition this Court for review of any disapproved application within ten (10) days after receiving such disapproval. The petition may be telefaxed to the Court; it will be noticed for expedited hearing after telephone conference with counsel.

(ii) Any construction required by an act of nature (fire, storm, etc.) or because of a sudden change in health conditions, may be handled by telephone calls between Tribal representatives. An appeal to this Court will be handled in accordance with the preceding paragraph

(iii) A development application (such as a road, utility line, well, wind-mill, stock tank, reservoir) shall include specifics regarding the development, including location, estimated cost, and justification for the proposal. A development application shall be

Exhibit 20 to United States' Motion DOJ72

processed in the same manner as a construction application.

(4) The Navajo Tribe shall not settle or resettle any Navajo Tribal members on the HPL without the written consent of the Hopi Tribe.

Dated this 26th day of September, 1988.

[signature]

United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Todd Honyoama, Vice-Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe,<br><br>Plaintiffs,<br><br>v.<br><br>Joe Shirley, Jr., President of the Navajo Nation, for and on behalf of the Navajo Nation,<br><br>Defendants.<br><br>Evelyn James, President of the San Juan Southern Paiute Tribe, for and on behalf of the San Juan Southern Paiute Tribe,<br><br>Intervenor. | No. CIV 74-842-PHX-EHC<br><br>**ORDER AND FINAL JUDGMENT** |

This action came on regularly for trial between October 17, 1989, and February 8, 1990, and again between July 7 and July 21, 1992. Thereafter, the Court fully considered all the evidence, made findings of fact and conclusions of law, and on December 21, 1992, the Court entered "Final Judgment (as amended December 18, 1992)" [Dkt 915], a copy of which is attached hereto as Exhibit 1 (hereinafter referred to as "the 1992 Judgment"). The Navajo Nation, the Hopi Tribe, and the San

Juan Southern Paiute Tribe appealed and cross-appealed from various aspects of the 1992 Judgment, with appeals relating to Hopi claims and appeals relating to Paiute claims having been separately filed and briefed.

On December 5, 1995, the Court of Appeals decided the appeals and cross-appeals relating to Hopi claims in *Masayesva v. Zah*, 65 F.3d 1445-1461 (9th Cir. 1995), wherein the 1992 Judgment was affirmed in part, reversed in part, and remanded. In 2002, the Navajo Nation, the Hopi Tribe, and the San Juan Southern Paiute Tribe began a mediation process that has resulted in a bipartite Intergovernmental Compact between the Navajo Nation and the Hopi Tribe dated November 3, 2006, a copy of which is attached hereto as Exhibit 2 (hereinafter referred to as "the Intergovernmental Compact"). The San Juan Southern Paiute Tribe is not a party to the Intergovernmental Compact, and the Court has been advised by the parties that the Navajo Nation and the Hopi Tribe understand and agree that nothing in the Intergovernmental Compact shall adversely affect the interests of the San Juan Southern Paiute Tribe.

In 1993, the Navajo Nation and the San Juan Southern Paiute Tribe began a separate mediation process in which the Hopi Tribe was not involved. On February 10, 1995, the appeal filed by the San Juan Southern Paiute Tribe, No. 93-15216, in the United States Court of Appeals for the Ninth Circuit (hereinafter referred to as "the Paiute Appeal"), was dismissed while the Navajo Nation and the San Juan Southern Paiute Tribe continued to discuss possible settlement. The order dismissing the Paiute Appeal stated that "either party may effect reinstatement [of the Paiute Appeal] by filing a notice of reinstatement." No notice of reinstatement of the Paiute Appeal has been filed by either party, but the time for filing such a notice of reinstatement has not yet expired. On March 18, 2000, the Navajo Nation and the San Juan Southern Paiute Tribe entered into a Treaty to effectuate a comprehensive



Exhibit 21 to
United States' Motion
DOJ75

settlement of all issues between them, including the creation of a separate San Juan Southern Paiute Reservation, but said Treaty has not yet been approved by Congress or the Secretary of the Interior.

The parties, by their counsel of record, have stipulated to the entry of this Order and Final Judgment, the Hopi Tribe being represented by its counsel of record, Arnold & Porter LLP, the Navajo Nation being represented by its counsel of record, Perkins Coie Brown & Bain PA, and the San Juan Southern Paiute Tribe being represented by its counsel of record, the Native American Rights Fund. The Court having been fully informed, and having reviewed the Intergovernmental Compact, has determined that the parties are entitled to orders and judgment as set forth herein. Accordingly, it is hereby

ORDERED, ADJUDGED, AND DECREED as follows:

(1) The Court has jurisdiction under the 1934 Act (Pub. L. No. 73-352, 48 Stat. 960) and the 1974 Act (25 U.S.C. § 640d *et seq.)* over the parties and the subject matter of the Intergovernmental Compact.

(2) The 1992 Judgment is hereby confirmed and incorporated herein as if again set forth in full, except as expressly modified by this Order and Final Judgment or as it may be modified as a result of the Paiute Appeal.

(3) The terms and provisions of the Intergovernmental Compact are approved and made a part of this Order and Final Judgment as if again set forth in full.

(4) Title to the property interests established in the Intergovernmental Compact is hereby quieted in accordance with the terms of the Intergovernmental Compact.

(5) The Court retains jurisdiction over the parties and the subject matter for the purpose of proceedings to vacate, modify, or enforce any arbitration decision and award made under Section 8.4 of the Intergovernmental Compact, or original

enforcement proceedings under Sections 8.7 or 8.8 thereof.

(6) Any and all claims asserted by the Navajo Nation or the Hopi Tribe against the other in this action are fully and finally adjudicated by this Order and Final Judgment and are hereby dismissed with prejudice. Each party shall bear its own attorneys' fees and costs.

(7) The Court hereby finds that no lands are any longer "in litigation" for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the "Bennett Freeze," are of no further force or effect.

(8) The Court hereby directs the Clerk of the Court that Exhibits A, B, C, and D attached to the Intergovernmental Compact shall be filed under seal.

(9) Notwithstanding anything to the contrary in the Intergovernmental Compact or in this Order and Final Judgment, nothing therein shall adversely affect any interest of the San Juan Southern Paiute Tribe.

(a) Nothing in the Intergovernmental Compact or in this Order and Final Judgment is intended to, or does, resolve the legal issue whether, in the absence of a separate reservation for San Juan Southern Paiute Tribe, the Navajo Nation has, or does not have, the power to encumber, by the creation of the easements and other interests granted to the Hopi Tribe by the Intergovernmental Compact, any of the land in which the San Juan Southern Paiute Tribe was determined to have a property interest as set forth in this Court's opinion of July 10, 1992, the "Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims" (docketed by the Court on July 14, 1992 [Dkt 876]), or as such land area may be modified as a result of any appeal.

(b) As to any lands within the boundaries of the 1934 Reservation that are set aside as part or all of a separate reservation for the San Juan Southern Paiute

Tribe, whenever and however that may be accomplished, the parties agree that the easements and other interests granted under the Intergovernmental Compact shall not encumber such lands, and no obligation under the Intergovernmental Compact shall be binding upon the San Juan Southern Paiute Tribe.

IT IS FURTHER ORDERED that, the Court having disposed of all claims between the Navajo Nation and the Hopi Tribe, this judgment is final as to the Navajo Nation and the Hopi Tribe.

Dated this 4th day of December, 2006.

Earl H. Carroll
United States District Judge

# EXHIBIT 1

FILED RECEIVED LODGED COPY
DEC 21 1992
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| VERNON MASAYESVA, Chairman of the Hopi Tribal Council of the Hopi Indian Tribe, for and on behalf of the Hopi Indian Tribe, | CIV 74 - 842 PCT EHC |
| Plaintiff, | |
| v. | FINAL JUDGMENT (as amended December 18, 1992) |
| PETERSON ZAH, Chairman of the Navajo Tribal Council of the Navajo Indian Tribe, for and on behalf of the Navajo Indian Tribe, | |
| Defendant, | |
| v. | |
| EVELYN JAMES, et al., | |
| Intervenors. | |

This action having come on regularly for trial between October 17, 1989 and February 8, 1990 and again between July 7 and July 21, 1992; plaintiff having appeared by and through his attorneys, Arnold & Porter, defendant having appeared by and through his attorneys, Brown & Bain, P.A., and intervenors having appeared by and through their attorneys, the Native American Rights Fund; the Court having fully considered all the evidence and the entire record herein; and the Court having made its findings of fact and conclusions of law and orders as set forth in its opinions dated April 27, 1992 (Findings of Fact and Conclusions of Law re: Hopi Claims), March 13, 1992 (regarding limitations on the Court's jurisdiction to partition land



AO 72 Rev. 8/82

to the San Juan Southern Paiute Tribe), June 18, 1992 (Order Amending Findings of Fact re: Hopi Claims), July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), September 25, 1992 (Findings of Fact and Conclusions of Law and Judgment re: Partition of the 1934 Reservation), and the other orders referenced therein; and the Court having determined that the parties are entitled to judgment (amended) as set forth herein, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

A. Defining the Lands in Issue.

For purposes of this Final Judgment, the term "The 1934 Reservation" shall mean all the lands within the boundaries described in Attachment A, being the legal description appearing in the Act of June 14, 1934, 48 Stat. 960.

B. Quieting Title to that Portion of The 1934 Reservation Partitioned to The Hopi Tribe.

1. Subject only to the trust title of the United States of America, title to the lands described in Attachment B (hereinafter "the Hopi Partitioned Lands") is hereby quieted forever in favor of the Hopi Tribe and against the Navajo Nation and all Navajo villages, clans and individuals and it is hereby declared that neither the Navajo Nation nor any Navajo village, clan or individual has or shall have any estate, right, title, lien, or interest whatever in or to the Hopi Partitioned Lands or any part thereof, and that the Hopi Tribe owns, and is entitled to possession of, the Hopi Partitioned Lands, both surface and subsurface interests, subject to the trust title of the United States, and the Navajo Nation and all persons claiming under it and its villages, clans, and individual members are



AO 72
Rev. 8/82

hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to the Hopi Partitioned Lands.

2. Subject only to the trust title of the United States of America, title to the Hopi Partitioned Lands is hereby quieted forever in favor of the Hopi Tribe and against the San Juan Southern Paiute Tribe and its individual members and it is hereby declared that neither the San Juan Southern Paiute Tribe nor its individual members have or shall have any estate, right, title, lien, or interest whatever in or to the Hopi Partitioned Lands or any part thereof, and that the Hopi Tribe owns, and is entitled to possession of, the Hopi Partitioned Lands both surface and subsurface interests, subject to the trust title of the United States, and the San Juan Southern Paiute Tribe and all persons claiming under it and its individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to the Hopi Partitioned Lands.

3. The Hopi Partitioned Lands shall henceforth be subject to the jurisdiction of the Hopi Tribe to the same extent as is applicable to other portions of its reservation.

C. <u>Declaration of the Interests of the San Juan Southern Paiute Tribe in a Portion of The 1934 Reservation</u>.

1. For the reasons stated in this Court's order of March 13, 1992 (regarding this Court's jurisdiction over claims brought by the San Juan Southern Paiute Tribe), as supplemented by this Court's opinion dated July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), the San Juan Southern Paiute Tribe is not entitled to a partitioning of any lands in this action

and the jurisdiction and authority of this Court are limited to declaring the lands in which the San Juan Southern Paiute Tribe has an interest.

2. The San Juan Southern Paiute Tribe has a property interest in that portion of The 1934 Reservation described and set forth in this Court's opinion of July 10, 1992 (Findings of Fact and Conclusions of Law re: San Juan Southern Paiute Claims), the location of which is generally shown on the maps attached to this judgment as Attachment C. Said lands shall hereinafter be referred to as "the Paiute Lands," although the Navajo Nation also has a property interest in a part of the Paiute Lands, as set forth in the said prior opinion.

3. The Hopi Tribe does not have any interest in any portion of the Paiute Lands.

4. Because this Court lacks jurisdiction to partition land to the San Juan Southern Paiute Tribe, this Court's declaration of the San Juan Southern Paiute Tribe's property interest in the Paiute Lands does not confer any jurisdiction to that tribe over any part of those lands.

D. Quieting Title to the Portion of The 1934 Reservation in Which Neither the Hopi Tribe nor the San Juan Southern Paiute Tribe Has Any Interest.

1. Subject only to the trust title of the United States of America, title to all of The 1934 Reservation, excepting only the Hopi Partitioned Lands and the Paiute Lands, is hereby quieted forever in favor of the Navajo Nation and against the Hopi Tribe and all Hopi villages, clans and individuals and it is hereby declared

that neither the Hopi Tribe nor any Hopi village, clan or individual has or shall have any estate, right, title, lien, or interest whatever in or to such lands or any part thereof, and that the Navajo Nation owns, and is entitled to possession of, such lands, both surface and subsurface interests, subject to the trust title of the United States, and the Hopi Tribe and all persons claiming under it and its villages, clans, and individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to such lands.

2. Subject only to the trust title of the United States of America, title to all of The 1934 Reservation, excepting only the Hopi Partitioned Lands and the Paiute Lands, is hereby quieted forever in favor of the Navajo Nation and against the San Juan Southern Paiute Tribe and its individual members and it is hereby declared that neither the San Juan Southern Paiute Tribe nor any of its individual members have or shall have any estate, right, title, lien, or interest whatever in or to such lands or any part thereof, and that the Navajo Nation owns, and is entitled to possession of, such lands, both surface and subsurface interests, subject to the trust title of the United States, and the San Juan Southern Paiute Tribe and all persons claiming under it and its individual members are hereby permanently enjoined from asserting any estate, right, title, lien, or interest in or to such lands.

3. All of The 1934 Reservation, excepting only the Hopi Partitioned Lands, is and shall be subject to the jurisdiction of the Navajo Nation to the same extent as is applicable to other portions



AO 72
Rev. 8/82

Exhibit 21 to
United States' Motion
DOJ84

of its reservation.

E. Allotments Not Affected.

This Judgment does not affect the title, possession, and enjoyment of lands heretofore allotted to Hopi and Navajo individuals for which patents have been issued. All Hopi allotments are located on land partitioned to the Hopi Tribe, and those allotments shall be subject to the jurisdiction of the Hopi Tribe. All Navajo allotments are located on land partitioned to the Navajo Nation, and those allotments shall be subject to the jurisdiction of the Navajo Nation.

F. Implementing the Partitioning.

1. 25 U.S.C. § 640d-18(b) and 18(c) requires the Secretary of the Interior to provide for the survey, location of monuments, and fencing of boundaries of the Hopi Partitioned Lands and to do so within twelve months of the final order of partition herein. For purposes of that requirement and all other provisions in this judgment that refer to the "final order of partition" or the like, entry of this judgment shall be deemed to be the final order of partition; Provided, however, that if any party files a notice of appeal, then the date of the final order of partition shall be deemed to be the date a mandate is issued by the Court of Appeals. The Court hereby retains jurisdiction of this action to resolve any issue that may arise relating to such survey; Provided, however, that the parties shall first attempt to resolve any such issue by agreement and if agreement cannot be reached and the Court is required to resolve such issue, the Court shall assess attorneys' fees, court costs and incremental surveyors' expenses against the non-prevailing

party. Upon completion of such survey, the parties shall cause to be expeditiously filed with the Court a certified copy of the survey findings and determination.

2. Within 90 days of the final order of partition, the Hopi Tribe shall install a trough outside the Hopi Partitioned Lands and a pipe from the Little Hollow Place Windmill, which shall deliver and contain sufficient water to provide for the livestock belonging to Navajo stockmen in the area, up to a maximum of one half of the water produced by Little Hollow Place Windmill. The pipe and trough shall thereafter be maintained by the Navajo Nation.

3. Within 90 days of the final order of partition, the Navajo Nation shall install a trough inside the Hopi Partitioned Lands and a pipe from the Rock Pile Windmill, which shall deliver and contain sufficient water to provide for the livestock belonging to Hopi stockmen in the area, up to a maximum of one half of the water produced by Rock Pile Windmill. The pipe and trough shall thereafter be maintained by the Hopi Tribe.

4. The public is granted a license and easement to utilize the portion of the Hopi Partitioned Lands lying south of Pasture Canyon Reservoir dam for recreational purposes. If this area ceases to be used as a park, the Hopi Tribe may petition this Court for termination of this license and easement after public notice and hearing and this Court retains jurisdiction to hear any such petition.

5. The Hopi Tribe is granted a license and easement to improve or maintain the ditches running across the Navajo farms in the

northern part of Pasture Canyon, which access shall occur only after 10 days' advance written notice to the Navajo Nation and to the individual Navajos farming in Pasture Canyon. This license and easement does not allow the Hopi Tribe to interfere with Navajo use of the springs in Pasture Canyon.

6. The Navajos farming in Pasture Canyon shall prevent their stock from destroying or damaging the irrigation ditches running through the upper part of Pasture Canyon and this Court retains jurisdiction to consider any injunctive relief and/or damage claims against the Navajo Nation respecting disturbance or damage to the irrigation ditches by Navajo individuals or their livestock.

7. Those Navajo families presently using Pasture Canyon Reservoir are granted a license and easement to water their livestock. This license and easement does not authorize grazing of Navajo livestock within the section of Pasture Canyon partitioned to the Hopis, including at the sides of the Reservoir, excepting for that grazing impossible to prevent while watering such animals. If the Hopi Tribe chooses to build a pipeline from the Reservoir to troughs on the eastern and western sides of the Reservoir (outside of the boundary of the Hopi Partitioned Lands), or some other measure which will ensure a continuous water supply for such Navajo livestock, then the Hopi Tribe may petition this Court for termination of this license and easement and this Court retains jurisdiction to hear any such petition.

G. <u>Declaring Certain Restrictions on Development to be Ended</u>.

The restrictions on development on a portion of the 1934

Reservation, as codified by 25 U.S.C. § 640d-9, are deemed ended, except as provided in this Court's order granting, in part, the Hopi Tribe's motion for partial stay of the judgment.

IT IS FURTHER ORDERED that each party shall bear its own costs and attorneys' fees incurred to date in connection with this action.

IT IS FURTHER ORDERED the Court having disposed of all claims asserted herein against or by all parties, this Judgment is final.

DATED this 18th day of December, 1992.

Earl H. Carroll

The Honorable Earl H. Carroll
United States District Judge

ATTACHMENT A

Beginning at a point common to the States of Arizona, New Mexico, Colorado, and Utah, thence west along the boundary line between the States of Arizona and Utah to a point where said boundary line intersects the Colorado River; thence down the south bank of that stream to its confluence with the Little Colorado River; thence following the north bank of the Little Colorado River to a point opposite the east boundary of the Grand Canyon National Park; thence south along said east boundary to the southeast corner of section 5, township 30 north, range 6 east, Gila and Salt River base and meridian, Arizona; thence east to the southeast corner of section 4; thence south to the southwest corner of section 10; thence east to the southeast corner of section 10; thence south to the southwest corner of section 14; thence east to the northwest corner of the northeast quarter section 23; thence south two miles to the southeast corner of the southwest quarter section 26; thence west one half mile to the southeast corner of section 27, township 30 north, range 6 east, Gila and Salt River base and meridian, Arizona; thence south seven miles to the southwest corner of section 35, township 29 north, range 6 east; thence east one mile; thence south one and one half miles to the southwest corner of the northwest quarter section 12, township 28 north, range 6 east; thence east through the center of section 12 to the range line between ranges 6 and 7 east; thence south along said range line five and one half miles to the southeast corner of section 1, township 27 north, range 6 east; thence west three miles to the southwest corner of section 3, township 27 north, range 6 east; thence south five miles to the southeast corner of section 33, township 27 north, range 6 east; thence east along township line between townships 26 and 27, six and one half miles, to the northeast corner of the northwest quarter section 8, township 26 north, range 7 east; thence south two miles to the southeast corner of the southwest quarter section 10, township 26 north, range 7 east; thence east four and one half miles to the southeast corner of section 8, township 26 north, range 8 east; thence north four miles to the northwest corner of section 28, township 27 north, range 8 east, Gila and Salt River base and meridian; thence east one mile to the southeast corner of section 21; thence north four miles to the northeast corner of section 4, township 27 north, range 8 east, thence east along township line between townships 27 and 28 north to its intersection with the Little Colorado River; thence up the middle of that stream to the intersection of the present west boundary of the Leupp Extension Reservation created by Executive order of November 14, 1901; thence south along the present western boundary of said extension to where it intersects the fifth standard parallel north; thence east along said standard parallel to the southwest corner of township 21 north, range 26 east, Gila and Salt River base and meridian; thence north six miles to the northwest corner of township 21 north, range 26 east; thence east twelve miles to the northeast corner of township 21 north, range 27 east; thence south two miles; thence east twelve miles; thence south four miles; thence east along the township line between townships 20 and 21 north to the boundary line between the States of New Mexico and Arizona; thence north along said boundary line to the point of beginning.

however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive order of December 16, 1882.

## ATTACHMENT B

## Hopi Partitioned Lands

The Hopi Partitioned Lands are situated in Township 30 North, Range 11 East; Township 30 North, Range 12 East; Township 31 North, Range 10 East; Township 31 North, Range 11 East; Township 31 North, Range 12 East; Township 32 North, Range 11 East; Township 32 North, Range 12 East, of the Gila & Salt River Base & Meridian, Coconino County, Arizona, within the boundary described as follows:

(a) Starting at a point of beginning at the middle of the streambed of the Moenkopi Wash at the sharp bend in that streambed (where it changes its direction of flow from southeasterly to westerly) situated in Section 1 of Township 31 North, Range 10 East, approximately 1,500 feet east of the western boundary of said Section 1, then proceeding due south to the top of the northern rim of the Moenkopi Plateau at approximately 4,800 feet of elevation;

(b) then proceeding in a generally west-southwesterly direction along the rim of Moenkopi Plateau at 4800 feet of elevation to a point due north of the point on the USGS 7.5-minute topographic map, Moenave SE quadrangle (1969) which is marked 'x4955' (said point being approximately 4950 feet south of the southwest corner of the Sewer Lagoon in Kerley Valley); then proceeding due south approximately 200 feet to a point on the rim of Moenkopi Plateau which is at 4900 feet of elevation; then proceeding in a generally southerly direction along the rim of Moenkopi Plateau along the rim of Moenkopi Plateau along the 4900-foot contour line, passing to the

west of the developed springs at Toh Nee Di Kishi, Tohnali, and Seller Springs, to a point on the rim of the plateau which is approximately 500 feet west and immediately north of View Point Well;

(c) then proceeding due east to a point directly south of the Hopi stone house in the Little Hollow Place (said house being approximately 1,500 feet east of the Little Hollow Place Windmill);

(d) then continuing due east a distance of another 100 feet;

(e) then proceeding from that point due north, passing 100 feet to the east of the Hopi stone house in Little Hollow Place, to the center of the right-of-way of Arizona Highway 264 (provided, however, that the partitioning fence to be built by the United States shall terminate where it meets the fence now existing along the southern edge of said right-of-way);

(f) then proceeding in an east-southeasterly direction along the centerline of Arizona Highway 264 until it intersects a north-south line which passes through a point 100 feet west of the westernmost structure now present at Navajo Site 57 (the location of which is identified on Navajo Exhibit 5001);

(g) then proceeding due north along said north-south line approximately 1900 feet to a point which is due west of the westernmost structure now present at Navajo Site 57; then proceeding due north an additional 100 feet;

(h) then proceeding in a generally northeasterly direction to a point immediately west of Rock Pile Windmill;

(i) then proceeding due north to the middle of the stream bed of the Moenkopi Wash;

(j) then proceeding down the middle of the stream bed of the Moenkopi Wash in a generally westerly direction to the eastern boundary of Township 32 North, Range 11 East;

(k) then proceeding due north along the eastern boundary of Township 32 North, Range 11 East approximately 5,700 feet to a point on a line running directly east from the intersection of the southern edge of the right-of-way of Arizona Highway 160 and the eastern edge of an unimproved road leading south to the eastern side of Reservoir Canyon, as shown on Nav. Ex. 4176A;

(l) then proceeding due west along said line to the aforementioned intersection;

(m) then proceeding in a generally northerly direction along the unimproved road leading north into Pasture Canyon, until that road reaches the intersection of a second unimproved dirt road (just north of the label "A" on Ex. 4176A); then proceeding north (where the first unimproved road turns slightly northwest), parallel to, and 200 feet from the first unimproved road, until it reaches a point 200 feet east of the southern tip of Pasture Canyon Reservoir; then following a line which is parallel to, and 200 feet to the east of, the eastern high-water mark of the Reservoir to a point due east of the northernmost high-water mark of the Reservoir; then proceeding in a generally northerly direction along the eastern edge of Pasture Canyon, against the eastern wall of Pasture Canyon, until it reaches a fence demarcating the southern boundary of the former "Government Pasture," said fence being located approximately 100 feet south of the southern boundary of Section 10 of Township 32 N, Range 11 E;

(n) then in a generally westerly direction along the aforementioned fence to the western edge of the floor of Pasture Canyon;

(o) then proceeding in a southerly direction along the western edge of the Canyon floor, against the west wall of the Canyon, to the southern edge of the cultivated Hopi fields; then proceeding south-southwest approximately 600 feet to a point which is 200 feet due west of the northernmost highwater mark of Pasture Canyon Reservoir; then proceeding in southerly direction along a line which is parallel to, and 200 feet to the west of, the western high-water mark of Pasture Canyon Reservoir, to a point 200 feet due west of the southern tip of the Pasture Canyon Reservoir;

(p) then proceeding in a generally southerly and southeasterly direction along the western edge of the tree-line on the western edge of Pasture Canyon, passing east of Navajo Sites 100 and 108 (as shown on Nav. Ex. 4176A), until it reaches the middle of the right-of-way of Arizona Highway 160 at a point where an unimproved road on the western side of Pasture Canyon intersects with Arizona Highway 160;

(q) then following the middle of the right-of-way of Arizona Highway 160 in a generally westerly, then generally southerly direction to the northern boundary of Navajo allotment Tract No. 37 (as shown on the Dependent Resurvey of Tracts in Section 32 T-32 North, R-11 East of the Gila & Salt River Base & Meridian, Coconino County, Arizona, Officially Filed March 18, 1991, Utilizing Map 1 of 7 (1283-B), Map 6 of 7 (1283-G) & Map 7 of 7 (1283-H));

(r) then east along the northern boundary of Tract No. 37 to



AO 72
Rev. 8/82)

the tract's northeastern corner, then south along the eastern boundary of Tract No. 37 to the tract's southeastern corner, then west along the southern boundary of Tract No. 37 until it reaches the tract's southwestern corner, then south along the eastern boundary of Navajo allotment Tract Nos. 39 and 42 (as shown on the Dependent Resurvey of Tracts in Section 32 T-32 North, R-11 East of the Gila & Salt River Base & Meridian, Coconino County, Arizona, Officially Filed March 18, 1991, Utilizing Map 1 of 7 (1283-B), Map 6 of 7 (1283-G) & Map 7 of 7 (1283-H)) until it reaches the southeastern corner of Tract No. 42;

(s) then proceeding in a westerly direction along the 4700-foot elevation near or at the top of the Moenkopi Plateau, until it is at a point on the Plateau immediately above a point adjacent to an unimproved dirt road which passes between the base of the Moenkopi Plateau and a bluff or hill lying to the north, in the vicinity of Navajo Site 24 (the location of which is shown on Exhibit 5002);

(t) the proceeding in a northerly direction across the hill or bluff until it intersects an unimproved direct road just south of Moenkopi Wash; then proceeding along the midpoint of said unimproved dirt road, until the road reaches the middle of the stream bed of the Moenkopi Wash;

(u) then proceeding in a generally westerly direction along the middle of the stream bed of the Moenkopi Wash to the point of beginning.




Exhibit 21 to
United States' Motion
DOJ95




Attachment C

Exhibit 21 to
United States' Motion
DOJ96

# EXHIBIT 2

# Intergovernmental Compact

**This Intergovernmental Compact** is made as of the 3rd day of November, 2006, by and between the Navajo Nation and the Hopi Tribe.

**RECITALS:**

The Navajo Nation and the Hopi Tribe are federally recognized, sovereign nations, empowered to control and regulate their affairs in the manner set forth in this Compact.

The Navajo and Hopi peoples are and shall remain neighbors, and desire to live in harmony and with mutual respect for each other for all future generations. One important aspect of such mutual respect is consideration for the religious beliefs and practices of the other.

Access to and use of certain places and natural resources are essential to the traditional religious practices of the Navajo and Hopi peoples. Some such places and resources are on land controlled by the other party, and some of those places are on land that has been involved in litigation since 1974, pending in the United States District Court for the District of Arizona (No. 74-842-PCT-EHC) (the "Litigation").

The parties desire to resolve both the disputes involved in the Litigation and others, and further to establish and protect the rights of their members to engage in traditional religious practices where those practices involve access to and use of the other party's lands. The parties also wish to provide for the maintenance and protection of religious sites on their lands for the use and benefit of their members now and in the future. To that end, the parties have agreed to certain grants, covenants, undertakings, and waivers as set forth herein.

**AGREEMENTS:**

**Now, therefore**, in consideration of the grants, covenants, undertakings, and waivers set forth below, the parties agree and are bound as follows:

**Article 1: Definitions**

1.1 "The parties" means the Navajo Nation and the Hopi Tribe, while "party" means either the Navajo Nation or the Hopi Tribe individually.

1.2 "The Navajo Lands" means all lands held in trust by the United States for the benefit of the Navajo Nation or the Navajo people as a whole, including such lands partitioned and awarded in the Litigation pursuant to the District Court's orders and judgments reported at 816 F. Supp. 1387 (1992).

1.3 "The Hopi Lands" means all lands in Arizona held in trust by the United States for the benefit of the Hopi Tribe or the Hopi people as a whole, including such lands partitioned and awarded in the Litigation pursuant to the District Court's orders and judgments reported at 816 F. Supp. 1387 (1992).



Exhibit 21 to
United States' Motion
DOJ98

1.4 "Hopi Religious Practices" means: (a) the gathering or collection of certain minerals and plant materials, and the gathering of young Golden Eagles and hawks, for religious purposes; (b) the visitation of certain sites, including places where hawks and eagles nest, shrines, and sacred springs, for religious purposes; (c) rituals conducted at such sites; (d) pilgrimages to and from and between shrines, including those on the Hopi Salt Trail from the Hopi villages to the Grand Canyon; and (e) other traditional Hopi ceremonies or rituals.

1.5 "Navajo Religious Practices" means: (a) conducting healing ceremonies, blessing ceremonies, and other traditional Navajo ceremonies or rituals at various places; (b) constructing shelters and other structures as a part of such ceremonies and rituals; (c) gathering or collecting various minerals, plant materials and animal parts for religious purposes; (d) visiting sacred sites, including but not limited to sacred springs, for placing offerings, conducting blessings, and reciting prayers; and (e) travel to and from and between sacred places.

1.6 "Landowner Tribe" means the Navajo Nation with respect to the Navajo Lands and the Hopi Tribe with respect to the Hopi Lands.

1.7 "Effective Date" means the date on which the United States District Court for the District of Arizona enters the Order described in Section 7.4.

1.8 "Extended family" means persons who are related to an enrolled member of the Navajo Nation or the Hopi Tribe by blood or marriage.

**Article 2: Rights of Access and Use; Easements and Other Interests**

2.1 The Hopi Tribe grants to the Navajo Nation, for the use and benefit of all current and future enrolled members of the Navajo Nation and members of their extended families, a permanent, irrevocable, prepaid, non-exclusive easement and permit to come upon and to use the Hopi Lands for Navajo Religious Practices.

2.2 The Navajo Nation grants to the Hopi Tribe, for the use and benefit of all current and future enrolled members of the Hopi Tribe and members of their extended families, a permanent, irrevocable, prepaid, non-exclusive easement, profit, license, and permit to come upon and to use the Navajo Lands for Hopi Religious Practices, including, without limitation, an easement to travel along, and visit shrines associated with, the Hopi Salt Trail as defined and depicted on Exhibit A, subject, however, to the limitations set forth in Section 2.4 as to the places where certain gathering may be done.

2.3 The Hopi Tribe grants to the Navajo Nation, for the use and benefit of all current and future enrolled members of the Navajo Nation, a permanent, irrevocable, prepaid, non-exclusive easement, profit, license, and permit to come upon the Hopi Lands and to gather and remove plants, herbs, green boughs, feathers, rocks, and minerals for religious and medicinal purposes from the Hopi Lands

generally; provided, however, that such materials and things shall not be gathered for sale or other commercial purposes.

2.4 The Navajo Nation grants to the Hopi Tribe, for the use and benefit of all current and future enrolled members of the Hopi Tribe, a permanent, irrevocable, prepaid, non-exclusive easement, profit, license, and permit to come upon the Navajo Lands, and to gather and remove fledgling Golden Eagles and hawks within the areas depicted on Exhibit B, and to gather and remove minerals and plant materials for religious and medicinal purposes from the Navajo Lands generally; provided, however, that such materials and things shall not be gathered for sale or other commercial purposes. This Compact does not grant to the Hopi Tribe or its members any easement, profit, license, permit, or right to gather or remove any Golden Eagle or hawk from any part of the Navajo Lands outside the areas depicted on Exhibit B, and this Compact does not prevent, limit or restrict the Navajo Nation from enforcing any law governing trespass, hunting or interference with wildlife against any person who comes upon any part of the Navajo Lands outside the areas depicted on Exhibit B for the purpose of gathering or removing any Golden Eagle or hawk. This Compact does not waive, limit or restrict any right the Hopi Tribe or its members may have under the United States Constitution or federal law to come upon any part of the Navajo Lands outside the areas depicted on Exhibit B for the purpose of gathering or removing any Golden Eagle or hawk.

2.5 The rights of both parties described in Sections 2.1 and 2.2 shall be subject to the following conditions:

A. If any Navajo Religious Practice or Hopi Religious Practice is anticipated to involve more than 20 individuals at any one place and time, or if habitable structures are to be constructed for use in any such religious practice, or if non-habitable structures will be erected which are required to be left to degrade naturally, the member of the Navajo Nation or the Hopi Tribe responsible for such religious practice shall give advance notice to the Landowner Tribe in the manner set forth in Article 9 not later than 5 calendar days before commencement of such religious practice, stating the expected dates of commencement and completion of the ceremony or ritual, its location, the approximate number of expected attendees if the number is greater than 20, and the location and type of any structures to be constructed; and

B. The member of the Navajo Nation or the Hopi Tribe responsible for the Navajo Religious Practice or Hopi Religious Practice will dismantle any habitable structures erected in connection with such religious practice within 5 days of its completion, and, if he fails to do so, the Landowner Tribe may dismantle such structures without liability, but the Landowner Tribe shall not dismantle any structure as to which notice was given pursuant to subsection A above to the effect that the structure would be a non-habitable structure that is required to be allowed to degrade naturally, regardless of the Landowner Tribe's opinion as to whether the structure is non-habitable.

2.6 No permit shall be required to exercise any of the rights granted in Sections 2.1, 2.2, 2.3, or 2.4, and no advance notice shall be required before exercising any such rights, except as required by Section 2.5 and Article 5.

2.7 When traveling on the lands of the other party to exercise any of the rights granted in Sections 2.1, 2.2, 2.3, or 2.4, members of the Navajo Nation and the Hopi Tribe and members of their extended families are authorized to travel upon any route across any lands that a member of the Landowner Tribe could lawfully travel upon under the laws of the Landowner Tribe.

2.8 While on the land of the other party, members of the Navajo Nation and the Hopi Tribe and members of their extended families shall be subject to laws generally applicable to the Landowner Tribe's members; provided, however, that no such law shall (a) prohibit a Hopi Religious Practice or a Navajo Religious Practice altogether, or deem any such religious practice in and of itself to be a trespass or other violation of law, or (b) prevent or materially limit the exercise by any member of the other party of rights granted by this Compact.

2.9 Any person traveling to or from any place for a religious purpose may request an escort by the Landowner Tribe and, if such an escort is requested a reasonable time in advance, the law enforcement agency of the Landowner Tribe shall provide such an escort at no cost. If any member of the Navajo Nation or the Hopi Tribe or member of the extended family of such tribal member experiences difficulty obtaining access to a religious site on the land of the other party, and, if the Landowner Tribe is requested to do so, the Landowner Tribe shall take such reasonable steps as are necessary to facilitate access.

2.10 Nothing herein shall be deemed to extend rights to anyone who is not a member of the Navajo Nation or the Hopi Tribe or a member of the extended family of such member or to authorize the conduct of any practices other than Navajo Religious Practices and Hopi Religious Practices. Nothing in this Compact authorizes anyone to conduct practices that are traditionally conducted by Indian tribes other than the parties but are not traditionally conducted by members of one of the parties.

2.11 No easement, profit, license, or permit granted by this Article shall give the grantee party any civil or criminal jurisdiction or taxing authority over the land that is subject to the easement, profit, license or permit. No easement, profit, license or permit granted by this Article shall be subject to taxation by the Landowner Tribe. No easement, profit, license, or permit granted by this Article shall give the grantee party any interest in the mineral rights to any area subject to such easement, profit, license, or permit.

**Article 3: Secrecy and Privacy**

3.1 Each party desires to maintain the secrecy of the exact location of the sacred places of its members to the greatest extent possible. Accordingly, the parties are not required to notify each other at the present time or in the future of the location of any sacred site.

3.2 The Landowner Tribe shall respect the privacy of persons engaging in religious practices, and shall not observe or intrude upon religious activities or impede, search, inspect, or interfere with any person traveling to or from such activities. If a participant requests an escort pursuant to Section 2.9, the escort shall respect the privacy of the participants except as necessary to provide the requested escort services.

3.3 The parties shall make reasonable efforts to advise their members of the terms of this Compact, to encourage their members to respect the privacy of the religious activities of others on their land, and to urge their members to deal courteously and respectfully with area residents when they enter upon the other party's land for religious purposes; provided, however, that the Exhibits A, B, C, and D to this Compact may not be shown to members of the parties other than elected leaders and those employees of the party having responsibility for performance and/or enforcement of this Compact, or to any other person.

**Article 4: Protection of Religious Sites**

4.1 Except as the parties may otherwise agree in writing with respect to a particular site, the Navajo Nation shall prohibit any new man-made improvement, structure, installation, or apparatus, whether placed on, under, or above the ground, including the temporary or permanent placement of moveable structures capable of human habitation, to be placed or constructed within any of the areas listed in Exhibit C. The reference numbers used in Exhibit C are for reference purposes only, and no significance should be attributed to the choice of numbers, the sequence of the numbers, or any gaps in the numbers.

4.2 The Navajo Nation grants to the Hopi Tribe a permanent, irrevocable, non-exclusive, prepaid conservation easement and servitude consistent with the terms and provisions of Section 4.1 to the areas listed on Exhibit C.

4.3 Whenever the Navajo Nation receives an application or request for construction on the Navajo Lands, and where the application or request, if approved, would result in any activity specified in Section 4.1 within 800 meters of any area listed on Exhibit C, the Navajo Nation shall give notice in writing and provide a copy of the application or request to the Hopi Tribe before approving or authorizing the proposed activity.

4.4 Except as the parties may otherwise agree in writing with respect to a particular site, the Hopi Tribe shall prohibit any new man-made improvement, structure, installation, or apparatus, whether placed on, under, or above the ground, including the temporary or permanent placement of moveable structures capable of human habitation, to be placed or constructed within 800 meters of any active Golden Eagle nest on the Hopi Lands; provided, however, that this prohibition shall not apply to any land located within 800 meters of any Hopi village existing as of the time of the proposed construction.

4.5 The Hopi Tribe grants to the Navajo Nation a permanent, irrevocable, non-exclusive, prepaid conservation easement and servitude consistent with the terms and provisions of Section 4.4 to the areas described in Section 4.4.

4.6 Whenever the Hopi Tribe receives an application or request for construction on the Hopi Lands, and where the application or request, if approved, would result in any activity specified in Section 4.4 within 1600 meters of any active Golden Eagle nest on the Hopi Lands, the Hopi Tribe shall give notice in writing and provide a copy of the application or request to the Navajo Nation before approving or authorizing the proposed activity; provided, however, that this Section shall not apply to any construction on land located within 800 meters of any Hopi village existing as of the time of the proposed construction.

4.7 Except as may be otherwise agreed to in writing by the parties, the restrictions on placement and construction described in Sections 4.1 and 4.4 shall not limit or affect the right of any person to enter or use any such area for any purpose other than such placement and construction including, without limitation, entry and use for religious observances, livestock grazing, and use and maintenance of existing roads, fences, corrals, fields, wells, springs, and livestock watering tanks.

4.8 The Landowner Tribe shall make reasonable efforts to prevent any person from violating the provisions of Section 4.1 or Section 4.4. If any person nevertheless violates the provisions of Sections 4.1 or 4.4, the Landowner Tribe shall cause the prohibited placement or construction to be removed within 90 days of the date on which it receives notice of the violation.

4.9 Where the Landowner Tribe has actual notice that damage or destruction is likely to occur, the Landowner Tribe shall make reasonable efforts to prevent any individual from damaging or destroying any Golden Eagle nest or cultural artifact within any of the areas listed in Exhibit C or Section 4.4, or any shrine known by the Landowner Tribe to be sacred to members of the other Party. If such damage or destruction nevertheless occurs, the Landowner Tribe shall investigate and prosecute the perpetrators consistent with the laws of the Landowner Tribe.

4.10 If the Landowner Tribe desires to undertake any substantial new improvement or development of any spring identified in Exhibit D, it shall first consult with the other party and, insofar as practicable, carry out such improvement or development in such a fashion that access to the spring for religious purposes will be maintained and that a portion of the flow of the spring will remain in its natural condition. Nothing in this Compact prohibits, regulates or affects maintenance or repair of improvements installed at any spring as of the Effective Date, nor does anything in this Compact require removal or alteration of any improvement installed at any spring as of the Effective Date.

4.11 Additional religious sites may be designated as being subject to the provisions of this Article 4 only by further written agreement of the parties.

4.12 No easement or servitude granted by this Article shall give the grantee party any civil or criminal jurisdiction or taxing authority over the land that is subject to the easement or servitude. No easement or servitude granted by this Article shall be subject to taxation by the Landowner Tribe.

**Article 5: Studying and Enhancing Golden Eagle Population; Collection of Golden Eagles and Hawks by Hopis**

5.1 As soon as practicable after the Effective Date, the parties shall establish a Joint Golden Eagle Advisory Board. The purpose of the Board shall be to collect data concerning the Golden Eagle population in and around the Hopi and Navajo Lands and to make recommendations to tribal authorities concerning specific measures to be taken to preserve and enhance the Golden Eagle population through habitat protection and otherwise. Each party shall appoint 2 people to serve on the Board, both of whom shall be knowledgeable in the field of wildlife biology. The Board shall consider and make appropriate recommendations regarding all environmental and other factors affecting the Golden Eagle population, including measures to improve productivity, protect habitat suitable for nesting, prevent disturbances during nesting season, enhance the prey base, prevent accidental deaths and otherwise decrease infant and juvenile mortality and similar matters. The parties shall submit the Board's recommendations to their respective governmental authorities responsible for wildlife management, land-use planning and environmental protection with directions that such recommendations should be taken into consideration in decision-making to the extent each party shall deem appropriate in dealing with its sovereign lands, but no recommendation of the Board shall be binding on the parties.

5.2 The parties hereby jointly request the United States Fish and Wildlife Service or its successor agency to conduct a study of the Golden Eagle population within the Navajo Lands and the Hopi Lands ("Study"). The Study shall be conducted according to the study design set out in Exhibit E, subject to the Service's determination as to the best available science to apply and subject to available funding, with the objective of providing a scientific basis for the United States Fish and Wildlife Service or its successor agency to issue permits conforming to the requirements of Section 5.5.

5.3 During the first four years of the Study ("Initial Phase"), in each year when the United States Fish and Wildlife Service or a successor agency issues a permit for the collection of Golden Eagles by Hopi tribal members in northeastern Arizona, the permit application shall not seek the take of more than 18 Golden Eagles from within the areas depicted on Exhibit B. During the Initial Phase, the Navajo Nation shall not require the Hopi Tribe or its members to apply for or obtain a permit from the Navajo Nation to take Golden Eagles from the areas depicted on Exhibit B in each year when the United States Fish and Wildlife Service, or a successor agency, issues a permit that authorizes Hopi tribal members to take not more than 18 Golden Eagles from within the areas depicted on Exhibit B. This Section does not constrain the United States Fish and Wildlife Service or successor agency from specifying in any permit the number of Golden Eagles

that may be taken from any part of northeastern Arizona other than the areas depicted on Exhibit B, nor does it otherwise constrain the Service or successor agency in the performance of its permitting function.

5.4 During the Initial Phase of the Study, in any year when the Hopi Tribe or its members file a timely application with the United States Fish and Wildlife Service or a successor agency for a permit to take no more than 18 Golden Eagles from the areas depicted on Exhibit B, in the event the United States Fish and Wildlife Service or a successor agency fails to issue a permit before the gathering season commences conforming to the requirements of Section 5.3, Hopi tribal members shall take from the areas depicted on Exhibit B no more than 18 Golden Eagles, and the Navajo Nation shall issue permits to the Hopi Tribe or its members authorizing the taking of 18 Golden Eagles from the areas depicted on Exhibit B. For purposes of this Section, a timely decision by the United States Fish and Wildlife Service that no eagles may be taken, or the issuance of a permit allowing an unlimited number of eagles to be taken, does not constitute a failure to issue a permit or a failure to specify the number of eagles which may be taken. Neither this Section, nor the Secretary's signature on this Compact, shall be interpreted as an authorization by the Secretary to take Golden Eagles without a valid permit issued by the United States Fish and Wildlife Service pursuant to the Bald and Golden Eagle Protection Act.

5.5 The parties hereby jointly request that, after the Initial Phase of the Study, any permit issued by the United States Fish and Wildlife Service or a successor agency for the Hopi Tribe or its members to take Golden Eagles from northeastern Arizona shall separately specify (a) the number of Golden Eagles that may be taken from northeastern Arizona, and (b) the number of Golden Eagles that may be taken from that portion of northeastern Arizona depicted on Exhibit B, and hereby jointly further request that both such numbers shall be based on the results of the Study as of the time of issuance of the permit, with the objective of maintaining the stability of the Golden Eagle population on Navajo and Hopi lands as a whole.

5.6 After the Initial Phase of the Study, including the issuance of findings regarding the specific matters set out in Exhibit E, the Navajo Nation shall not require the Hopi Tribe or any individual member of the Hopi Tribe to apply for or obtain a permit from the Navajo Nation to take Golden Eagles from the areas depicted on Exhibit B if the Hopi Tribe or its member holds a valid permit issued by the United States Fish and Wildlife Service or its successor agency conforming to the requirements of Section 5.5.

5.7 After the Initial Phase of the Study, in any year when the Hopi Tribe or its members file a timely application with the United States Fish and Wildlife Service or a successor agency for a permit to take Golden Eagles from the Navajo Lands and the Hopi Lands, in the event the United States Fish and Wildlife Service or a successor agency fails to issue a permit before the gathering season commences conforming to the requirements of Section 5.5, Hopi tribal members shall take from the areas depicted on Exhibit B no more than the number of

Golden Eagles permitted to have been taken from that area pursuant to the then most recent federal permit, and the Navajo Nation shall issue permits to the Hopi Tribe or its members authorizing the taking of such numbers of Golden Eagles from the areas depicted on Exhibit B. For purposes of this Section, a timely decision by the United States Fish and Wildlife Service that no eagles may be taken, or the issuance of a permit allowing an unlimited number of eagles to be taken, does not constitute a failure to issue a permit or a failure to specify the number of eagles which may be taken. Neither this Section, nor the Secretary's signature on this Compact, shall be interpreted as an authorization by the Secretary to take Golden Eagles without a valid permit issued by the United States Fish and Wildlife Service pursuant to the Bald and Golden Eagle Protection Act.

5.8 As soon as practical after the United States Fish and Wildlife Service or its successor agency shall have issued any permit to the Hopi Tribe or its members to take Golden Eagles from northeastern Arizona, the Hopi Tribe shall provide a copy of any such permit to the Navajo Nation.

5.9 Members of the Hopi Tribe may collect no more than 12 hawks each year from within the areas described in Section 2.4 and shown on Exhibit B, without applying for or obtaining a permit from the Navajo Nation.

5.10 Not later than September 30 of each year, the Hopi Tribe shall report to the Navajo Nation regarding the number of Golden Eagles and hawks taken by Hopis from the Navajo Lands, including the general location where taken and the condition of each Golden Eagle and hawk when taken.

5.11 No party shall be obligated by this Article to disclose the exact location of Golden Eagle nests or other information considered confidential or sensitive. The parties agree to use their best efforts to maintain the confidentiality of any information disclosed which is considered secret or sensitive by the disclosing party.

5.12 Nothing in this Compact shall be construed as a waiver of the Hopi Tribe's or its members' claim that their right to gather Golden Eagles and hawks for religious purposes is protected by the First Amendment to the United States Constitution and is not subject to regulation or limitation by any governmental agency.

5.13 Nothing in this Compact shall be construed as a waiver of any claim by the Navajo Nation or its members against the United States Fish and Wildlife Service for failure to perform its duties pursuant to the Bald and Golden Eagle Protection Act, 16 U.S.C. § 668a or regulations thereunder.

**Article 6: Star Mountain**

6.1 Within 90 days after the Effective Date the Hopi Tribe shall remove the sections of fence indicated on Exhibit F, and no fence shall be constructed or reconstructed on or around Star Mountain except in the locations shown on Exhibit F.

## Article 7: Claims Released and Litigation Dismissed

7.1 As of the Effective Date, without any further instrument or action by either party, each party shall be deemed to have irrevocably and absolutely waived and released: (a) each and every claim of title or beneficial title in law or in equity to any land to which title or beneficial title is held by the other party as of the Effective Date within the areas covered by the Act of June 14, 1934, 48 Stat. 960; (b) any claim, whether or not such claim is now known, against the other party for an accounting, fair value of grazing, damages, or for other relief under 25 U.S.C. § 640d-7(c); and (c) any claim, whether or not such claim is now known, against the other party for fair rental value under 25 U.S.C. § 640d-15 as to lands within the areas covered by the Act of June 14, 1934, 48 Stat. 960. Nothing in this Compact shall be deemed to be a waiver or release by either party of any present or future claim or right against the Navajo Nation, the Hopi Tribe, the United States, or any other person or entity based upon an easement or way of necessity or similar doctrine, and excepting the easements expressly described in Sections 2.1, 2.2, 2.3, 2.4, 4.2 and 4.5 of this Compact, nothing in this Compact shall be deemed to create any easement or way of necessity or interest under any similar doctrine nor shall anything in this Compact be deemed an admission by either party or by the United States of the existence of any such easement or way of necessity or interest under any similar doctrine.

7.2 The parties agree that all funds received, collected, or held by the Department of Interior and/or the Bureau of Indian Affairs as payment by third parties for easements, rights-of-way, or other interests within the area known as the "Bennett Freeze," for the period from July 8, 1966 to the Effective Date, are to be distributed in equal shares to the Navajo Nation and the Hopi Tribe.

7.3 As soon as practicable after this Compact shall have been executed by the parties, the parties shall jointly present it to the United States Secretary of the Interior for approval of the agreements and creation of the beneficial interests and use and access rights upon and to certain trust lands set forth in this Compact. Neither this Compact nor the Secretary's approval of it shall be construed to mean that the Secretary or the United States has authorized either party or its members to violate any federal or state law, including without limitation the Bald and Golden Eagle Protection Act, or to violate or abrogate the legally protected property rights of any individual. The parties hereby agree and represent to the Secretary of the Interior that an appraisal of the fair market value of the property rights conveyed under this Compact is not necessary or appropriate in light of the special relationship between the parties and the special circumstances recited in this Compact, that nothing in this Compact describes any "major federal action" for any regulatory purpose, and that no further investigations or approvals are necessary or appropriate. Approval of this Compact by the Secretary does not create any new claim against the United States for monetary damages.

7.4 As soon as practicable after this Compact shall have been fully executed by the parties and the Secretary of the Interior or his or her duly authorized

representative, the parties shall stipulate to and obtain an order and judgment in the Litigation (a) confirming and incorporating the orders and judgments entered by the District Court in 1992 following the partition phase of the trial (all as reported at 816 F. Supp. 1387 (1992)); (b) adopting the terms and provisions of this Compact as an order and judgment of the Court; (c) declaring that the Court has jurisdiction under the 1934 Act (Pub. L. No. 73-352, 48 Stat. 960) and the 1974 Act (25 U.S.C. § 640d *et seq.)* over the parties and the subject matter of this Compact; (d) quieting title to the property interests established herein; (e) continuing the Court's jurisdiction over the parties and the subject matter for the purpose of proceedings to vacate, modify, or enforce any Decision and Award made under Section 8.4, or original enforcement proceedings under Sections 8.7 and 8.8; (f) dismissing any and all claims asserted against each other in the Litigation, with prejudice, with each party to bear its own attorneys' fees and costs; (g) declaring that no lands are any longer "in litigation" for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the "Bennett Freeze," are of no further force or effect; and (h) directing that Exhibits A, C, and D attached to this Compact shall be filed under seal.

7.5 On the Effective Date, each party shall be deemed to have consented, for purposes of 25 U.S.C. §640d-9(f), to any and all future "development" as that term is used in 25 U.S.C. § 640d-9(f) within the lands of the other party covered by that statute, including but not limited to development planned as of that date, and upon request of the other party shall execute any and all consents that might be requested as to any such development; provided, however, that neither party shall be deemed under this Section to have consented or waived any objection to any such development under any provision of law other than 25 U.S.C. § 640d-9(f); and provided further that this Section shall not apply to any development which is prohibited under Article 4 of this Compact.

7.6 After the Effective Date, the Hopi Tribe agrees to endorse and publicly support any bill the Navajo Nation may submit to Congress insofar as it requests the repeal of 25 U.S.C. § 640d-9(f); provided, however, that the Hopi Tribe does not agree to endorse or support any other provision of any legislation which may be proposed or requested.

**Article 8: Enforcement and Dispute Resolution**

8.1 As soon as practicable after the Effective Date, there shall be established by the parties a Joint Commission to administer and facilitate this Compact. Each party shall appoint 2 persons to serve on the Joint Commission, at least one of whom should be familiar with the religious practices of members of that party. The fifth member of the Joint Commission shall be a neutral person, skilled in the resolution of disputes, who has previously served as a judge of a tribal, state, or federal court and is not a member of either party. The neutral fifth member of the Joint Commission shall be appointed either by agreement of the parties or, failing such agreement, by the Chief Judge of the United States Court of Appeals for the Ninth Circuit or the Chief Judge's designee. Any compensation to the neutral

fifth member shall be paid equally by the parties. The neutral fifth member shall serve an indefinite term, unless and until he or she shall resign or the parties shall agree to appoint a replacement.

8.2 The parties shall attempt in good faith to negotiate and resolve any dispute arising under this Compact, beginning at the lowest practical operational level and escalating to the highest officials of each party if necessary, before initiating any proceedings under Section 8.3. This Section shall not, however, require either party to forbear for any particular period of time before initiating such proceedings.

8.3 Any dispute arising under this Compact that is not resolved by negotiation may be submitted to the Joint Commission for arbitration, which shall be commenced by mailing a written demand for arbitration setting forth in detail the dispute and the relief requested to each member of the Joint Commission and the other party, by registered or certified mail, postage prepaid. Arbitration before the Joint Commission shall be the only procedure and the only forum for resolution of such disputes unless and until the Joint Commission shall fail to make a decision within the period specified in Section 8.4.

8.4 The Joint Commission shall establish its own rules and procedures not inconsistent with the terms of this Compact for the resolution of any dispute which is the subject of a demand for arbitration, hearing such evidence and argument as it may, in its discretion, choose to accept. When any dispute is so submitted, the Joint Commission shall decide and resolve the dispute by issuing a written Decision and Award signed by a majority of the 5 members within 180 days after the date on which the demand for arbitration shall have been mailed to the last of the members of the Joint Commission and the other party.

8.5 The Joint Commission in its Decision and Award shall have the authority to issue restraining orders, injunctions, declaratory judgments, and orders of specific performance enforcing the terms of this Compact, but shall not have the authority to award damages, attorneys' fees, or the costs of arbitration.

8.6 A Decision and Award of the Joint Commission shall be subject to judicial review and enforcement only in the United States District Court for the District of Arizona, and may be vacated or modified only on the grounds permitted under the Federal Arbitration Act (9 U.S.C § 1 *et seq.)* as it exists on the Effective Date, except that no Decision and Award shall be vacated or modified on the ground of partiality of either or both of the two members appointed by each of the parties.

8.7 In the event a neutral fifth member shall not be serving on the Joint Commission at the time the demand for arbitration is mailed to the party-appointed members and such neutral fifth member shall not have been appointed within 30 days thereafter, either party may then commence litigation in the United States District Court for the District of Arizona for appointment of a neutral fifth member to the Joint Commission.

8.8 In the event the Joint Commission shall fail to issue a Decision and Award within the period set forth in Section 8.4, either party may then commence litigation in the United States District Court for the District of Arizona for any relief that the Joint Commission could have awarded.

8.9 Each party hereby consents to arbitration and/or suit in the circumstances and for the relief described in Sections 8.3 through 8.8, and hereby waives its sovereign immunity for the limited purpose of such arbitration and/or suit, but the limited waiver of sovereign immunity expressed herein does not extend to any claim for any other remedy.

8.10 The Joint Commission shall meet at least once annually or, at the request of either party, more frequently, to discuss, counsel, interpret, or mediate the provisions of this Compact and seek to establish informal agreements between the parties regarding the implementation of the provisions of this Compact. When meeting for the purposes described in this Section, the neutral fifth member of the Joint Commission need not attend unless one of the parties so requests, and, if one of the parties does so request, the meeting shall be deferred until the neutral fifth member is in attendance. No action of the Joint Commission shall be binding on the parties other than a Decision and Award issued pursuant to Sections 8.3 through 8.5.

8.11 Nothing in this Compact prevents either party or its members from exercising any rights under, or invoking the authority of the United States Secretary of the Interior to implement and enforce, the provisions of 25 U.S.C. § 640d-20.

8.12 Except as provided herein, the parties shall not be liable for any acts taken by any of their individual members not acting in an official capacity.

**Article 9: Notices**

9.1 Any notice required or permitted under this Compact shall be in writing and shall be placed in the United States mail, first-class postage prepaid, addressed as specified below or to such other addresses as any party may hereafter specify. Any notice so provided shall be deemed effective as of the date it is mailed.

9.2 Notices to the parties shall be addressed as follows:

A. To the Navajo Nation:

Navajo Nation
Attention: Director of Historic Preservation Department
P.O. Box 4950
Window Rock, Arizona 86515

and a copy to:

Navajo Nation
Attention: Attorney General
P.O. Drawer 2010
Window Rock, Arizona 86515

B. To the Hopi Tribe:

The Hopi Tribe
Attention: Director of Cultural Preservation
P.O. Box 123
Kykotsmovi, Arizona 86039

and a copy to:

The Hopi Tribe
Attention: General Counsel
P.O. Box 123
Kykotsmovi, Arizona 86039

9.3 Either party may, by written notice to the other, change the designated persons to whom notice should be addressed and/or the address to which such notice shall be sent.

9.4 Nothing contained in this Compact shall prohibit informal communications in addition to the formal written notices otherwise required by this Compact. In order to expedite informal attempts to resolve disputes each party is encouraged to, and at its election may, provide the other party from time to time with the names, telephone numbers, and other information necessary to transmit information electronically as to any officials or employees of the party designated to attempt to resolve issues informally.

**Article 10: Modification**

10.1 This Compact may not be changed, waived, discharged, or terminated orally, but only by an instrument in a writing signed by the parties.

**Article 11: Delegation and Assignment**

11.1 Each party may, in its own discretion, designate one or more of its officials, employees, agencies, committees, or other political subdivisions to perform any obligation of the party under this Compact and delegate authority to such person or entity to perform such obligations. Such designation and delegation shall not, however, relieve either party of its own obligations to the other party under this Compact. No party may assign any right or interest under this Compact and, except as provided in this Section, no party may delegate any duty or obligation under this Compact, and any attempted or purported assignment or delegation in violation of this Section shall be void.

**Article 12: Binding Effect**

12.1 Each party has warranted and represented to the other party that the officer whose signature appears on this Compact has been duly and fully authorized, empowered and instructed to execute this Compact on behalf of the party, with the intent that each party be immediately and irrevocably bound by, and entitled to the benefits of, this Compact.

12.2 Nothing in this Compact shall affect, modify, or supersede any Accommodation Agreement or other agreement between the Hopi Tribe and any member of the Navajo Nation.

12.3 Nothing in this Compact shall affect, modify, or supersede: (a) any requirement imposed by Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, or the regulations implementing that Section, 36 C.F.R. Part 800, regarding the comment and consultation process concerning identification of historic properties, assessment of potential adverse effects and avoidance, and minimization and/or mitigation of any adverse effects on historic properties on the Hopi Lands or the Navajo Lands or elsewhere; or (b) the rights or obligations of either party under the Native American Graves Protection and Repatriation Act, 25 U.S.C. §3001 *et seq.*

12.4 Nothing in this Compact shall be construed as a waiver of (a) any claim made by the Navajo Nation in the pending litigation known as *Navajo Nation v. United States* (No. 508-88L in the United States Court of Federal Claims), (b) any claim made by the Navajo Nation in the pending litigation known as *Navajo Nation v. United States* (No. 93-763L in the United States Court of Federal Claims), or (c) any claim made by the Hopi Tribe in the pending litigation known as Hopi Tribe v. United States (No. 00-217L in the United States Court of Federal Claims). Neither this Compact nor the approval of this Compact by the United States Secretary of the Interior may be used in the litigation identified in subpart (a) above as proof that the Navajo Nation had title to the so-called "Bennett Freeze" area as of the time of imposition of the "Bennett Freeze," but the Navajo Nation does not waive its right to introduce any other evidence as to such issues.

12.5 The rights and interests granted in this Compact are effective on the Effective Date and do not require execution of any other instrument or recordation of this Compact or any other instrument.

12.6 All current and future enrolled members of the Navajo Nation and the Hopi Tribe are third-party beneficiaries of this Compact, but no such member shall have the right as an individual to institute or participate in any legal proceeding involving this Compact, including any arbitration or lawsuit authorized by Article 8. This Section shall not be interpreted to imply that this Compact authorizes any form of legal proceeding other than those specifically provided for herein.

**Article 13: Applicable Law**

13.1 Unless otherwise expressly provided herein, this Compact shall be interpreted according to Arizona law, except that the property rights and interests described in this Compact are to be interpreted in accordance with the Restatement (Third) of Property as it exists on the Effective Date.

**Article 14: Severability of Provisions**

14.1 If any provision of this Compact is held to be void or unenforceable, all other provisions shall nonetheless continue in full force and effect.

**Article 15: Entire Agreement**

15.1 This Compact constitutes the entire understanding and agreement between the parties with respect to the subject matters of this Compact, and there are no agreements, undertakings, restrictions, representations or warranties as between the parties other than those set forth in this Compact.

**IN WITNESS WHEREOF**, the parties have caused this Compact to be executed as of the day and year first above written.

**NAVAJO NATION**

By: ______________________
Joe Shirley, Jr.
President

**THE HOPI TRIBE**

By ______________________
Todd Honyaoma, Sr.
Vice-Chairman

APPROVED:

By: ______________________
Dirk Kempthorne
United States Secretary of the Interior

# EXHIBIT A
to the Intergovernmental Compact
Filed Under Seal As
Confidential Pursuant to Protective Order
Entered by the Court on July 23, 1998

## Exhibit A

Exhibit A is an oversized map showing the location of the Hopi Salt Trail, as mentioned in Section 2.2 of this Intergovernmental Compact.

Pursuant to Section 3.3 of this Intergovernmental Compact, Exhibit A will remain confidential, and may not be shown to "members of the [the Navajo Nation and the Hopi Tribe] other than elected leaders and those employees of the [the Navajo Nation and the Hopi Tribe] having responsibility for performance and/or enforcement of this Compact."

# EXHIBIT B
# to the Intergovernmental Compact
# Filed Under Seal As
# Confidential Pursuant to Protective Order
# Entered by the Court on July 23, 1998

**Exhibit B**

Exhibit B is an oversized map showing Hopi eagle gathering areas, as mentioned in Section 2.4 of this Intergovernmental Compact.

Pursuant to Section 3.3 of this Intergovernmental Compact, Exhibit B will remain confidential, and may not be shown to "members of the [the Navajo Nation and the Hopi Tribe] other than elected leaders and those employees of the [the Navajo Nation and the Hopi Tribe] having responsibility for performance and/or enforcement of this Compact."

# EXHIBIT C
to the Intergovernmental Compact
Filed Under Seal As
Confidential Pursuant to Protective Order
Entered by the Court on July 23, 1998

## Exhibit C

Exhibit C, as mentioned in Section 4.1 of this Intergovernmental Compact, is a five-page list of certain existing eagle nests on Navajo Lands. Exhibit C begins with the statement, "Circular areas, each having a radius of eight hundred (800) meters and a center point at the following UTM coordinates, are subject to the restrictions set forth in Section 4.1," followed by a list of reference numbers and UTM coordinates for each reference number.

Pursuant to Section 3.3 of this Intergovernmental Compact, Exhibit C will remain confidential, and may not be shown to "members of the [the Navajo Nation and the Hopi Tribe] other than elected leaders and those employees of the [the Navajo Nation and the Hopi Tribe] having responsibility for performance and/or enforcement of this Compact."

# EXHIBIT D
to the Intergovernmental Compact
Filed Under Seal As
Confidential Pursuant to Protective Order
Entered by the Court on July 23, 1998

**Exhibit D**

Exhibit D, as mentioned in Section 4.10 of this Intergovernmental Compact, is a two-page list of springs, some of which are on Navajo Lands and some of which are on Hopi Lands. Exhibit D begins with the statement, "The spring located at each of the following UTM coordinates is subject to the restrictions set forth in Section 4.10," followed by a list of reference numbers and UTM coordinates for each reference number.

Pursuant to Section 3.3 of this Intergovernmental Compact, Exhibit D will remain confidential, and may not be shown to "members of the [the Navajo Nation and the Hopi Tribe] other than elected leaders and those employees of the [the Navajo Nation and the Hopi Tribe] having responsibility for performance and/or enforcement of this Compact."

# Exhibit E

## RESEARCH PLAN

## A TERRITORY OCCUPANCY MONITORING SYSTEM TO GUIDE THE HARVEST OF GOLDEN EAGLES ON HOPI AND NAVAJO LANDS

The following study design for evaluating the effects of harvest on the golden eagle population on Navajo and Hopi lands is directly tied to the management goal of maintaining a viable population of golden eagles. This plan is based on population monitoring and indicates management and research activities that should take place if the monitored population falls below threshold levels.

The Coordinated Bird Monitoring Working Group of the International Association of Fish and Wildlife Agencies (2004) recently developed a detailed report on the role of population monitoring in bird conservation. They concluded that monitoring can provide the information needed to inform conservation decisions and evaluate their effectiveness. However, for this to be the case, monitoring and evaluation programs should be science based, and there needs to be explicit agreement about the goals of management actions. The Working Group termed such a system "management-based monitoring" and explicitly noted that management in such a system is directly supported by monitoring, the results of which guide the decision-making process and provide feedback about the population's responses to management decisions. Quoting from the report (page 5), management-based monitoring involves:

> "1) specification of explicit objectives, 2) use of existing information to develop management strategies, 3) implementation of actions in accordance with these strategies, 4) assessment of the effect of actions taken, and 5) periodic adjustment of management strategies, when necessary. Monitoring plays a critical role in science-based management by providing information for management decisions ..., evaluating those decisions through a comparison of results against prior beliefs ..., and increasing understanding of the dynamics of managed systems."

For the purposes of golden-eagle management, biologists annually will monitor territory occupancy within a selected sample of about 60 territories on, or to the extent possible, in close vicinity to, Navajo and Hopi lands. The specific management goal would be to maintain the eagle population at current levels. The number of eagle territories occupied each year would be used to reflect population status. The average level observed in the first three years of monitoring would provide a baseline population level that would be used as a benchmark to assess population status in future years. If environmental conditions during the first three years of monitoring are found to be outside the range of normal conditions with respect to factors affecting breeding eagles, then the period of time for developing a baseline will be extended until the population is monitored for three years within the range of normal conditions.

It should be recognized that the scope of research is constrained by the costs and difficulties of collecting information on golden eagle demography over large areas of

roadless and rugged terrain. However, this plan represents an attempt to implement such a strategy at reasonable cost and in a logistically feasible manner. Further, both the Hopi Tribe and the Navajo Nation have expressed concern regarding public disclosure of the locations of nesting eagles. Under this plan, the territory locations would need only to be known by those biologists monitoring them; and different groups of biologists would monitor different subsets such that only an independent, supervising biologist would know where all the territories were.

The U.S. Fish & Wildlife Service seeks harvest levels that can be sustained by the eagle population. Monitoring trends in territory occupancy will provide an empirical assessment of the net effect of all demographic forces associated with the population, including harvest. Developing a baseline (standard) for territory occupancy will require an assessment of data collected during the first three years of monitoring. Thereafter, the annual surveys will be used to assess trends in occupancy and the corresponding likelihood of population sustainability, given environmental conditions and harvest levels. Based on ongoing assessment of annual occupancy levels, management actions may be adjusted and additional research may be called for.

Consistent with the principles of management-based monitoring, if occupancy were to drop by a designated amount, then new management actions would be taken. Specifically, (a) harvest levels would be reduced by an amount or rate (e.g., proportional to drop) until the occupancy level returned to baseline levels, and (b) systematic, site-by-site examinations of conditions within each vacant territory would be conducted. If the latter could not rule out a recruitment deficit (insufficient adult eagles of both sexes to fill breeding vacancies), then (c) a region-wide study of mortality factors killing free-ranging eagles would be indicated and considered as a separate study.

The first action (a) would reduce the mortality in the population due to harvest. The third action (c) might show a path of management intervention that could stabilize or improve the trend of occupancy through increased survival. For example, if electrocution or poisoning were identified as important, then management efforts would be taken to reduce mortality due to these factors. If those efforts were successful, and occupancy rates went back to baseline levels, harvest would be re-instated at previous levels. If efforts were not successful or only partially successful, then harvest levels would be adjusted based on current understanding of their importance relative to the importance of other mortality factors.

The basic plan is to develop a management-based monitoring system that will help biologists make management decisions in the face of uncertainty about the dynamics of the eagle population. The system is adaptive (it regularly updates management actions based on new information), and it is tied to the management objective. This iterative and ongoing process will provide a way of detecting any large decline in the eagle population and offer humans some insight into ways of aiding its recovery.

## RATIONALE FOR MONITORING TRENDS IN TERRITORY OCCUPANCY

Golden eagles are naturally long-lived and faithful to their breeding areas, and populations are known for their high degree of stability. On Navajo and Hopi lands, eagle pairs almost always build their nests on cliff ledges, and these, by their nature, are permanent. If one were to imagine a vast, cliffy, landscape newly discovered by eagles, then, as the population grew, pairs of adult eagles would eventually lay claim to every serviceable cliff in the region. For a breeding pair of eagles in northern Arizona, a serviceable cliff is one containing at least one ledge suitable for nest placement and where foraging habitat adequate to eagle survival and reproduction is within reasonable commuting distance (the closer the better). Eagles, like other organisms, behave so as to maximize their number of surviving young and to minimize the risk to their own survival and future fecundity. Evolutionarily speaking, the components of a serviceable breeding location must together offer a promise of lifetime reproductive success that outweighs the costs and risks of staying there to the exclusion of other areas. We would expect that eagles are good at recognizing the trade-offs and tend not to settle for substandard locations, i.e., those whose features lies below a quality threshold. We would suppose that locations most coveted by eagle pairs would be those offering updrafts for easy soaring and travel, abundant food (hares, rabbits, squirrels), defensibility (high perches with a view), and isolation from nest predators.

Territorial eagle pairs tend to exclude all other adult eagles from as far as can be seen from perches in their territories. Pairs are usually at least 3-4 miles apart. In the case of long, continuous cliffs, pairs separate themselves to the extent they can, usually by several miles or more. As with other raptors, distance between pairs often depends upon the quality of foraging habitat: high prey densities promote high densities of pairs over the long term.

Populations of eagles tend to grow within a region until all serviceable breeding locations are occupied by pairs. As additional eagles mature, they must wait until a territory vacancy arises before they can enter the breeding population. These nonbreeding adults, called floaters, buffer the breeding population against loss by filling vacancies as they occur. When the population size levels out, the overall number of floaters depends upon overall rates of reproduction and survival in the population, and it is not unreasonable to imagine an equal number of floaters and breeders. In Switzerland, competition and strife between floaters and breeders over ownership of territories may interfere with reproduction (Haller 1996). Even so, a good supply of floaters is a sign of population stability, because when they are present, every serviceable breeding location will contain a pair of adults.[1] In 2005, Hunt and Hunt (in preparation) re-surveyed 58 golden eagle breeding territories in west-central California that had been occupied by pairs in 2000; every territory contained a pair in 2005.

In summary, we see that, in a healthy golden eagle population, there are more adults than places to nest, a condition that ensures a high degree of stability in the number of territories annually occupied by pairs. This, in turn, suggests that monitoring the annual

[1] If there are few floaters, then subadult eagles will tend to fill breeding vacancies.

rate of territory occupancy can be used to detect a decline in the demographic balance, i.e., an insufficiency in the number of floaters to fill vacancies. A principal cause of such a condition (recruitment deficit) is excessive mortality.

**MONITORING STRATEGY**

A periodic survey of golden eagle territories and territorial occupancy by eagle pairs will be developed and maintained for a sample of golden eagle territories that is of sufficient size to reveal population declines that might occur in the future. An independent biologist (either an employee of the United States Fish and Wildlife Service or a contractor of the United States Fish and Wildlife Service, who in either event shall not previously have been employed by or under contract with the Hopi Tribe or the Navajo Nation) will oversee the monitoring program. That independent biologist shall supervise and work with a biologist for the Hopi Tribe and a biologist for the Navajo Nation, each of whom shall have had previous experience studying the eagle populations on their respective areas.

The basic assumption of the monitoring program is that, in the absence of changes in habitat quality, territories occupied in one year will tend to be reoccupied in the next. However, when survey results show vacant territories, it is essential to differentiate those deriving from (a) a recruitment deficit from (b) those territories that have become un-inhabitable during years of low prey availability (drought effect) or in response to habitat changes.[2] Normally, eagle pairs tend to respond to years of low prey availability by remaining on or near their territories and not breeding, but local habitat changes affecting vacancy must be examined on a site -by-site basis. In any case, these possibilities should be recognizable over the long term and can be placed in perspective relative to the issue of general population decline.

Another pitfall in interpretation arises when pairs are overlooked. Pairs of golden eagles may build several nests within their territories and may alternate among them from year to year. Alternate nests may be up to a mile or more apart, a factor that sometimes makes it difficult to determine whether territories have been abandoned or have simply shifted in core location. The risk of false judgment means that thorough examination is essential. Another source of error is the occasional establishment of ephemeral territories by transient pairings; such territories must be recognized and avoided in survey samples.

**TASKS (2006)**

Task 1. Assemble records of known territories. In December 2005, or as soon as possible thereafter, the biologists will meet to discuss options for study area boundaries and to agree on the boundaries of the study area. After meeting separately with the Hopi biologist concerning nesting territories on Hopi lands and with the Navajo biologist concerning nesting territories on Navajo lands, the independent biologist will map and compile knowledge of nesting territories believed to be occupied. Records of non-tribal land management agencies (e.g., U.S. Bureau of Land Management, National Park

[2] If there are few floaters, then subadult eagles will tend to fill breeding vacancies.

Service, Arizona Game and Fish Department) and other sources will also be located, examined, and mapped by the independent biologist. Maps and records will be compiled by the independent biologist to maintain tribal, state, and federal privacy of nest locations. For logistical and socio-political reasons, it is desirable that the monitored territories be, to the extent possible, located on, or at least near, the tribal lands where both harvest and strong concerns for local populations exist. However, it is possible that logistical constraints may necessitate that some territories be placed off tribal lands. From the perspective of monitoring the broad population of golden eagles in the regions, it is not critical that the territories be on the tribal lands, so long as they can be regarded as occurring within the effective population (the pool of recruitment to nests on Navajo and Hopi lands).

Task 2. Conduct aerial survey. In early January 2006 (weather permitting) the independent biologist will travel by fixed-wing aircraft to selected known or suspected territories within the study area. GPS locations of nests, observation points, and routes of ground access will be mapped. The independent biologist will be accompanied by the Hopi biologist to inspect nesting territories on Hopi lands and by the Navajo biologist to inspect nesting territories on Navajo lands.

Task 3. Select initial survey sample. With information from tasks 1 and 2, the independent biologist will select an initial sample of about 70-80 territories to be surveyed. Territories chosen should have known histories of occupancy (where available), reasonable accessibility (ideally by road vehicle), and good visibility from observation points so that alternate nests can be readily surveyed. As discussed above, it is not necessary to survey all territories within the reservations, nor is it necessary that all territories be on reservation lands, so long as they can be regarded as occurring within the effective population (the pool of recruitment to nesting territories on Hopi and Navajo lands). A pool of ten additional territories will be selected as possible replacements for any territories that prove to be either (a) unsuitable for ground survey (Task 4), or (b) unoccupied during the initial occupancy survey (Task 4).

Task 4. Conduct initial occupancy survey. The independent biologist (accompanied by the Hopi biologist on Hopi lands and by the Navajo biologist on Navajo lands) will attempt to observe each selected territory from ground observation points. Evidence of pair occupancy will require the observation of a pair of eagles, or of a single adult incubating, brooding, feeding young, or repairing a nest (Postupalsky 1974). The best time to do this will be during the month before egg-laying (January and early February): golden eagles are usually conspicuous during that period, engaging in "undulation" flights high above their territories. Incubating eagles are more secretive; most begin their 45-day incubation period in February. Successful pairs are again conspicuous when young are over 5-weeks of age (half-grown). However, after the initial few years of establishing baselines, occupancy surveys should not be conducted during the nestling phase due to bias associated with the difficulty in locating pairs that do not lay eggs or fail in the egg stage (Steenhof 1987). Some territories may require a day or more of observation during the initial occupancy survey; others may be more readily assessed, depending on weather-related visibility, and other factors. All things considered, weather

may be the biggest obstacle to getting the job done. After consultation with Hopi and Navajo biologists and, if desired by the independent biologist, with others familiar with territorial behavior of golden eagles and/or geographical and habitat conditions in the selected territories, the independent biologist shall develop guidelines to ensure that consistent study methods are used across all territories during a given study year, with the understanding that such guidelines may be refined or modified from year to year based on experience as the study unfolds. Without limitation, such guidelines may include such details as the number of visits to be made to a territory, the duration of visits, and timing of visits with respect to date and weather. The independent biologist will record the presence/absence of pairs at all surveyed territories and classify all sites as to the ease (efficiency) with which they are surveyed.

<u>Task 5. Refine baseline sample</u>. On the basis of the results of the initial survey(s), the independent biologist, after consultation with Hopi and Navajo biologists, will select 50-60 occupied territories for continued surveying. The 2006 survey may indicate that a proportion of territories are more economically surveyed with helicopter support, i.e., ferrying ground observers to and from observation points. This contingency may or may not affect the future annual budget, depending on the efficiency with which it can be conducted. Pairs incidentally observed from the helicopter need not be surveyed from the ground.

**TASKS (ANNUAL)**

<u>Task 6. Conduct annual survey</u>. Biologists will repeat the field survey as outlined in Task 4 in January and February of each year and will continue for the first three to five years to refine the sample of surveyed territories to maximize appropriate representation and cost efficiency. The survey will extend into the incubation and nestling periods as necessary to determine occupancy or vacancy of all selected territories.

<u>Task 7. Resurvey apparent vacancies</u>. Consistent with guidelines as described in Task 4, repeat visits will be made to verify vacancies or the presence of single adults. Nothing herein shall preclude the biologists from revisiting in a subsequent year any territory found to have been unoccupied in an earlier year.

<u>Task 8. Examine conditions at vacant territories and search for newly established territories in the vicinity of vacant territories</u>. As explained above, failure to locate an eagle pair in a previously occupied territory can have several explanations, including (a) insufficient eagles of breeding age in the population to fill all serviceable sites, (b) landscape changes that render the area no longer serviceable, and (c) relocation of the pair to an inaccessible area within their territory. The biologists will make every effort to distinguish between these explanations on a site-by-site basis. In addition, because it is possible that a nest site within a territory simply might change its position, whenever a territory appears unoccupied, biologists will search for newly established territories in the vicinity of vacant territories to attempt to rule out the possibility that the territory boundaries, nest location, or both have been moved but are still occupied.

Task 9. Estimate the trend of territory reoccupancy. Using territory occupancy data collected during the first several years of study as a baseline, the trend of territory reoccupancy in succeeding years will be estimated by the independent biologist using standard statistical methods for estimating trends in wildlife count data and for detecting population declines. The occupancy level and 95% confidence intervals for occupancy rate and trend in occupancy rate will be estimated from the monitored territories each year. One-sided statistical tests will be used for estimating trends (we are interested in the alternative statistical hypothesis that the slope for trend is less than zero; Thompson et al. [1998]).

Task 10. Test hypothesis of stable occupancy. The proposed monitoring is designed to test the following hypothesis:

> *That sufficient floaters exist to buffer the breeding population on Navajo lands and Hopi lands as a whole against loss, i.e., that the net demographic regime (including immigration) continues to fill all serviceable breeding locations with territorial pairs.*

Outcome 1. Annual occupancy surveys show that eagle pairs are present in all or virtually all surveyed territories. Hypothesis is strengthened.

Outcome 2. Eagles are absent in some territories and analyses indicate a statistically significant negative trend. Hypothesis is questioned.

Response to Outcome 2. Systematically examine and report the landscape conditions of unoccupied territories to assess the effects, if any, of drought and/or habitat changes (the amount of work depends upon on the number of such sites).

Outcome 2.1. Eagle absences in territories are explainable by drought effects on territory habitability or habitat changes. Hypothesis is neither strengthened nor weakened.

Outcome 2.2. Eagle absences in territories are not explainable by habitat changes. Hypothesis is weakened.

Response to Outcome 2.2.

2.2.1 The permitted harvest of golden eagles is reduced to reflect vacancies that cannot be explained by changes in habitat conditions.

2.2.2 If more than 10% of occupied territories go unoccupied and cannot be shown to have resumed activity within three years of going unoccupied, then additional and more intensive monitoring would be implemented. Specifically, this result would also trigger the implementation of a general (telemetry-based) study of golden

eagle mortality in the region with the aim of identifying and mitigating currently unknown mortality agents. Such mitigation might compensate for the harvest. If so, the standard U.S. Fish and Wildlife Service harvest quota could be restored when pair occupancy returns to baseline levels.

## DISCUSSION OF BUDGET

The expenses associated with this project will be highest in the initial two or three years when the array of territories to be monitored and their observation points must be identified and mapped. Once the baseline is established, the annual costs should be far lower than those of the earlier years.

## REFERENCES

Haller, H. 1996. The golden eagle in the Grisons. Long-term studies on the population ecology of Aquila chrysaetos in the center of the Alps. Der Ornithologische Beobachter. Beiheft 9: 167pp.

Postupalsky, S. 1974. Raptor reproductive success: some problems with methods, criteria and terminology. Raptor Research Report No. 2:21-31

Steenhof, K. 1987. Assessing raptor reproductive success and productivity. Pages 157-170 in Raptor management techniques manual. Scientific and technical series number 10. National Wildlife Federation, Washington, D.C.

The Coordinated Bird Monitoring Working Group of the International Association of Fish and Wildlife Agencies. 2004. Monitoring Avian Conservation: Rationale, Design, and Coordination. Unpublished Report (30 pages). Available at: http://www.iafwa.org/Attachments/bird_conservation/Final_Avian_Monitoring_Report.pdf

Thompson, W.F., G.C. White, and C. Gowan. 1998. Monitoring vertebrate populations. Academic Press, New York, 365 pp.


Exhibit F
to Intergovernmental Compact
between Navajo Nation and Hopi Tribe, dated November 3, 2006
Existing fencing that may remain
Existing fencing that must be removed
New fencing that may be constructed
HOPI BUTTES
Ha-uhn-yalin
Wash
Cemetery
Check Dams

# EXHIBIT B

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Tuba City Hospital/High School Complex | Tuba City | 06/00/1967 | Construction of Greyhills High School and additional housing for Indian Health Service personnel | Denied | 06/00/1967 |
| Tuba City Mutual Help Housing | Tuba City | 12/00/1971 | Extend utility right-of-way to Tuba City housing project | Approved | 12/29/1971 |
| Cameron Water and Sewer Extensions | Cameron | 7/24/1972, 8/4/1972, 6/28/1976 | Extend water and sewer to Cameron residents | No response on record | 7/21/1976 |
| Tso, Emmett | Tuba City | 00/00/1973 | Replacement of burned out home, in existence long before the Bennett Freeze | Denied | |
| Rare Metals Housing | Rare Metals | 00/00/1974 | Repair of water and sewer system at former Rare Metals Uranium Processing Site | Approved | 2/9/1979 |
| Pasture Canyon Irrigation | Pasture Canyon | 3/5/1974 | Proposal to improve Pasture Canyon irrigation system to benefit both Navajo and Hopi farmers | Denied | 6/23/1982 |
| Gap/Cedar Ridge Water and Sewer Systems | Gap/Cedar Ridge | 3/18/1975, 4/4/1975, 2/23/1977 | Indian Health Service proposal to provide water system to benefit 30 homes in Gap area | Ignored | |
| N 20 Right-of-way | Gap/Coppermine | 4/23/1975 | Survey road (N 20) running from Gap north to Coppermine | Denied | 9/9/1975 |
| N 21 Right-of-way | Red Lake | 4/23/1975 | Request to approve right-of-way for paving existing road (N 21) to serve Red Lake and Kaibeto communities, including BIA schools | Denied | 9/9/1975 |
| N 6120 Right-of-way | Cedar Ridge | 8/14/1975 | Survey unpaved road (N 6120) from Cedar Ridge | Denied | 9/9/1975 |
| N 6130 Right-of-way | Cedar Ridge | 8/14/1975 | Survey road (N 6130) from Cedar Ridge to Gap | Denied | 9/9/1975 |
| N 6110 Right-of-way | Cedar Ridge | 8/14/1975 | Survey unpaved road (N 6110) west of Highway 89, at Cedar Ridge | Denied | 9/9/1975 |
| Sewage Lagoon, Tuba City | Tuba City | 12/30/1975 | Request to repair leaking sewage lagoon adjacent to Moencopi Wash | Unknown | 1/19/1976 |
| Allen Construction Co. | Tuba City | 00/00/1976 | Request permit to remove 700 cubic yards of gravel from gravel pit located east of Moencopi Village | Approved | 4/13/1976 |
| Van Zee Water and Waste Lines | Van Zee | 6/28/1976, 11/22/1976 | Indian Health Service proposal to provide adequate domestic water and waste disposal facilities for 14 families residing near Van Zee | Denied | 9/15/1976 |
| Red Lake Power Line | Red Lake | 8/7/1976 | Request to provide electrical service to Red Lake Community Housing Project, school and medical facility | Denied | Oct-76 |
| Cameron Sewage Lagoon | Cameron | 8/11/1976 | Request for sewer line and sewage lagoon | No response on record | |
| Kerley Valley Water Distribution | Kerley Valley | 8/11/1976 | Request to provide a domestic water distribution system to serve families living in Kerley Valley | Denied | 9/15/1976 |
| Gap/Cedar Ridge Powerline | Gap | 8/11/1976 | Request to provide electricity to homes in the Cedar Ridge Community | Ignored by the Hopi Tribe | |
| Nez, Renie | Unknown | 9/8/1976 | Application for new construction | No response on record | |

Exhibit 22 to United States' Motion DOJ131

EXHIBIT B

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Tuba City High School and Indian Health Service Hospital | Tuba City | 00/00/1977 | Construction of new Tuba City high school and Indian Health Service hospital | Approved | 00/00/1977 |
| Tappan Springs Water Line | Tappan Springs (Cameron) | 2/23/1977 | Indian Health Service proposal to develop a water system to serve 11 Navajo families that reside in Tappan Springs area | Ignored | 6/29/1977 |
| Moenave Water Distribution | Moenave Water Distribution | 2/23/1977 | Develop domestic water and sewer system to serve 12 Navajo families | Ignored | |
| Cedar Ridge Water Distribution | | 2/23/1977 | Develop water distribution system to provide water service to 30 families | Ignored by Hopi Tribe | |
| Cedar Ridge Water Distribution | Cedar Ridge | 1/27/1978 | Community Water System to provide water and sewage services to 50 families which have never had a domestic water supply | Denied | 2/14/1978 |
| Zahaney, Rose | | 8/22/1978 | Provide electrical service to residence | Denied | 2/2/1979 |
| Indian Health Service Water System | Tuba City | 8/4/1978 | Indian Health Service proposal to develop a domestic water supply and sewer system to serve 23 families living near the Old Tuba City airport | No response on record | |
| Rare Metals Powerline | Rare Metals | 2/8/1979 | Extension of powerline to Rare Metals | Denied | 2/9/1979 |
| West Tuba City Water Distribution | Tuba City | 3/26/1979 | Indian Health Service proposal to develop a community water system to provide domestic water to 31 Navajo families | Denied | 4/23/1979 |
| Preston Mesa Powerline | Preston Mesa | 8/30/1979 | Right-of-way for power line extension to serve families without electric service | Ignored | |
| Bennett, Bobby James | Tuba City | 1/7/1980 | Hook up to electrical service | Denied | 2/14/1980 |
| N 21 Right-of-Way | Red Lake | 2/7/1980 | Request to approve right-of-way for paving existing road (N 21) to Red Lake and Kaibeto communities, including BIA schools | Denied | 2/24/1981 |
| N 21 Red Lake - Kaibeto Road | Red Lake | 4/2/1980 | Request for right-of-way for road construction/improvement of existing road which serves communities and schools | Denied | 9/11/1981 |
| Kerley Valley Sewer Extension | Kerley Valley | 4/11/1980 | Extension of existing water distribution system of approx. 3,500 feet | Approved | 7/14/1980 |
| Tuba City landfill | Tuba City | 7/8/1980 | Request for public landfill in accordance with Public Health Code | Record not clear | 10/23/1980 |
| Tappan Springs | Tappan Springs (Cameron) | 8/13/1980 | Request to extend electrical service to 3 families in Freeze area | No response on record | |
| N 21 Right-of-Way | Red Lake | 10/22/1980 | Request for right-of-way for road construction/improvement of existing road which serves communities and schools | Denied | 6/23/1981 |
| Lane, Keith & Dorothy | Wildcat Peak | 4/16/1981 | Request for approval of a homesite lease for family that has resided at location for years | Denied | 6/4/1981 |
| NTUA Water Well/Forest Lake Powerline | Tuba City/Forest Lake | 6/18/1981 | Two part request to drill another NTUA Water Well to serve the residents of the Tuba City area, and to extend the existing power line from Black Mesa to Forest Lake community | Approved, conditioned on Navajo approval of Hopi request | 7/2/1981 |

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Haskey, Mike | Tuba City | 00/00/1982 | Replacement of burned out trailer | Denied | 3/10/1982 |
| Tuba City water irrigation project | Tuba city | 00/00/1982 | | Initially tabled - subsequently approved Area A, but not Area B | 6/23/1982, 8/13/1982 |
| Saganitso, Victor Sr. | Tuba City | 3/22/1982 | Replacement of existing home | No response on record | |
| Cedar Ridge Pre-school | Cedar Ridge | 5/13/1982 | Proposal to build preschool facility for unserved area | No response on record | |
| Keebahe, Norman | Cameron | 6/28/1982 | Replacement of inadequate housing (old 16'x 24' frame structure with no utilities) for paraplegic and family | First request ignored.\|Second request denied | 8/26/1982 |
| Bilagody, Stella | Tuba City | 7/6/1982 | Replacement of 1-room shack ("without proper covering") for elderly Navajo woman with severe degenerative disc disease | Denied | 8/26/1982 |
| Mott, Billy | Bodaway/Gap | 7/6/1982 | Replacement of existing "two-room shack, with an incomplete structure in the back" | No response on record | |
| Tacheeni, Jack and Mae | Bodaway/Gap | 7/6/1982 | Replacement of dilapidated one-room shack with plastic tarp outside | Denied | 8/26/1982 |
| Yellowhair, Kahn | Coalmine Mesa | 7/6/1982 | Room addition to existing residence | No response on record | |
| Watson, Stella | Rare Metals | 7/6/1982 | Replacement of dilapidated hogan for grandmother and grandchildren | No response on record | |
| Nez, Chee | Coalmine Mesa | 7/6/1982 | Replacement of stone hogan | No response on record | |
| Tisi, Charley | Bodaway/Gap | 7/6/1982 | Bathroom addition to existing residence | No response on record | |
| Tacheenie, Jennie | Bodaway/Gap | 7/6/1982 | Replacement for deteriorated residence | No response on record | |
| Keebahe, Norman | Cameron | 7/28/1982 | Request for approval of homesite lease | No response on record | |
| Neztsosie, David | 89/264 Junction | 9/29/1982 | Request to build replacement house because his current home is "literally falling apart" | No response on record | |
| Kelly, Andrew, Sr. | Tuba City/Moencopi | 1/20/1983 | Requesting waiver of homesite lease. | No response on record | |
| Gap/Bitter Springs Powerline | Gap/Bitter Springs | 4/14/1983 | Extend existing NTUA powerline from Gap north to Bitter Springs Housing Project (located outside Freeze) | Denied | 11/30/1983 |
| Rare Metals Uranium Mine Reclamation | Rare Metals | 5/3/1983 | Cleanup of uranium processing facility under federal program | Approved | |
| APS | Various | 6/23/1983 | Hopi letter to Arizona Public Service Company containing Hopi's view that by providing electrical hookups APS would be violating law | | |
| Kelly, Andrew, Sr. | Tuba City/Moencopi | 1/20/1984 | Requesting waiver of homesite lease. | No response on record | |
| Bilagody, Stella | | 7/13/1984 | Request for 12 x 20 replacement house | No response on record | |
| Mott, Anna | Bodaway/Gap | 7/13/1984 | Widow with five children requests replacement of severely dilapidated shack with a house | No response on record | |
| Tacheeni, Jack and Mae | Bodaway/Gap | 7/13/1984 | Replacement of dilapidated one room shack | No response on record | |
| Manygoats, Margaret | Tonalea | 7/13/1984 | Replacement of dilapidated hogan with two bedroom house | No response on record | |
| Yellowhair, Kahn | Coalmine Mesa | 7/13/1984 | 10'x 12' addition to existing housing; renovation | No response on record | |
| Means, Kee John | Cameron | 10/16/1984 | Connection to electric line for quadriplegic Navajo | Approved | 6/20/1985 |

Exhibit 22 to United States' Motion DOJ133

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Anderson, Bob | Tuba City | 11/19/1984 | Use of Pasture Canyon water for HUD housing construction by building contractor | Hopis contend that the use of the Pasture Canyon water is development, and consent is required. Subsequent Navajo request denied | |
| APS | | 3/21/1985 | Request for easment for 12kv electric line | No response on record | |
| Black, Emma | Bodaway/Gap | 10/21/1985 | Replace 16'x 16' hogan, which collapsed due to age and structural deterioration | No response on record | |
| Maize, Henry | Tonalea | 8/5/1986 | Replacement of severely dilapidated hogan (20' diameter) | No response on record | |
| George, Kenneth | Coalmine Mesa | 10/22/1986 | Replacement for collapsed hogan | Denied | 11/21/1986 |
| Bodaway/Gap Water Extension | Bodaway/Gap | 10/19/1987 | Extend existing water service to additional families | No response on record | |
| Nez, Willie and family | Bodaway/Gap | 10/26/1987 | Replacement of small (16'x 16') dilapidated hogan | Denied | 4/19/1988 |
| Arizona, Hotachellie | Bodaway/Gap | 00/00/1988 | Replacement of hogan | Approved "under protest" with condition that replacement be of original dimensions | 10/21/1988 |
| Dodson, Raymond and Christine | Tonalea | 4/19/1988 | Construction of electric line; hook up | No response on record | |
| Cameron School | Cameron | 8/16/1988 | Request by superintendent of school district for Hopi Tribal approval of Cameron school. At present only K-3 attend school locally. Other students must commute 40-50 miles daily | No response on record | |
| Black, Helen | Bodaway/Gap | 9/7/1988 | Housing repairs | Denied | 9/9/1988 |
| Johnson, Dorothy | Bodaway/Gap | 9/7/1988 | Repairs to 20-year old house; electricity and running water | Denied | 9/9/1988 |
| Secody, Mary | Bodaway/Gap | 9/7/1988 | Woman and 2 young children request renovation to provide adequate winter shelter; electricity hook-up | Denied | 9/9/1988 |
| Secody, Marie | Bodaway/Gap | 9/7/1988 | Family with 5 young children living in 12' x 16' house request repairs; electricity hook-up | Denied | 9/9/1988 |
| Blackhat, Alfred | Bodaway/Gap | 9/7/1988 | Insulation for hogan; water and electricity | Denied | 9/9/1988 |
| Blackhat, John | Bodaway/Gap | 9/7/1988 | 71 year old man requesting renovation of 25-year old dilapidated house; electricity | Denied | 9/9/1988 |
| Yazzie, Victoria | Tonalea | 9/7/1988 | Mother and child living 100 feet from electrical line request hook up to electricity | Denied | 9/9/1988 |
| Maze, Henry and Rena | Bodaway/Gap | 9/7/1988 | Request hook up to electricity | Denied | 9/9/1988 |
| Hoschaine, Edward and Darlene | Bodaway/Gap | 9/7/1988 | Request hook up to electricity | Denied | 9/9/1988 |
| Redhouse, Lee | Bodaway/Gap | 10/12/1988 | Renovation and addition to existing housing | No response on record | |
| Secody, Marie | Bodaway/Gap | 10/12/1988 | Renovation and addition to existing housing | Approved renovations but not addition | 10/26/1988 |
| Western Navajo Fair | Tuba City | 10/13/1988 | Request to build temporary structures for the annual Western Navajo Fair | Approved | 10/19/1988 |
| Stevens, Flora | Red Lake | 10/28/1988 | Renovation of deteriorated home, roofing, walls and floor | No response on record | |
| Goodman, Theresa | | 11/7/1988 | Repair and addition to existing housing | No response on record | 11/17/1988 |

Exhibit 22 to
United States' Motion
DOJ134

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Stevens, Flora | Red Lake | 12/20/1988 | Request for reconsideration | No response on record | |
| Whitesinger, Paul | Tuba City | 12/22/1988 | Request of Navajo suffering from progressive kidney disease to connect his trailer to nearby community utilities | Denied | 1/12/1989 |
| Coalmine Mesa Chapter House | Coalmine Mesa | 00/00/1989 | Request for construction and renovation of projects within Chapter | Denied | 12/6/1989 |
| Cameron Vendor Village | Cameron | 1/3/1989 | Development of site for use by local arts and crafts vendors | Unresolved | |
| Homer, Marie | Bodaway/Gap | 3/10/1989 | Replacement of existing home (14'x 22' wood shed with dirt floor; no insulation; entire roof leaks) with a 16' x 32' one-bedroom house for a family of 5 | Denied | 11/15/1990 |
| Shorty, Billy | Tonalea | 3/10/1989 | Replacement of small 13'x 14' hogan (used by family of 6) with one-bedroom house with water line, plumbing, sewer, and electrical hook-up | Denied | 6/7/1989 |
| Dougi, Delfred | Cameron | 3/10/1989 | Replacement of severely dilapidated 1950 trailer (9'x 18') with 16' wood addition (residence for 2 adults and 6 children);\|Request replacement with 2-bedroom home with plumbing, sewer system, water line, and electrical hook-up | Initial application ignored.\|Resubmitted application denied | 8/26/1989 |
| Williams, Lester | Tonalea | 3/10/1989 | Replacement of cardboard and aluminum one-room shack (for family of 5 with a quadriplegic child) with a two-bedroom house with utilities | Denied | 6/7/1989 |
| Dodson, Harry | Tonalea | 3/10/1989 | Replacement of 18'x 23' shack with two bedroom house for family of 7 persons: addition of plumbing, sewer system, water line, and electrical hookup | Denied | 6/7/1989 |
| Bilagody, Stella | Tuba City | 8/22/1989 | Replacement of 18' x 16' wooden shack with 16' x 32' one -bedroom house with plumbing, sewer system, water line, and electrical hook up. (Resident is a Navajo widow who suffers from degenerative disc disease, which severely restricts ability to walk to and from outhouse) | Replacement denied; approval limited to renovation and small addition to existing structure and utilities | 9/26/1989 |
| Blackhat, John | Bodaway/Gap | 8/28/1989 | Repair of collapsed/damaged roof and ceiling | Approved | 9/12/1989 |
| Begay, Glenmore | Coalmine Mesa | 9/13/1989 | Replacement of hogan illegally torn down by Hopi Tribe on July 15, 1989 | Denied | 11/9/1989 |
| Dougi, Delfred | Cameron | 10/5/1989 | Replacement of severely dilapidated 1950 trailer (9'x 18') with 16' wood addition (residence for 2 adults and 6 children);\|Request replacement with another trailer (previous request for replacement with 2-bedroom home with utilities was denied) | Approved, conditioned on moving trailer to another site | 11/9/1989 |
| Begay, Glenmore | Coalmine Mesa | 1/2/1990 | Replacement of hogan illegally torn down by Hopi Tribe on July 15, 1989 | Approved on certain conditions | 1/12/1990 |
| State Highway 64 | | 1/10/1990 | Request for right-of-way easement | No response on record | |

Exhibit 22 to
United States' Motion
DOJ135

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Hidden Springs Water Rehabilitation Project | Hidden Springs (Bodaway) | 1/26/1990 | Develop artesian spring to conserve run off and eliminate seasonal water shortages. For family and livestock use | Denied | 2/26/1990 |
| Begay, John and Sarah | Bodaway/Gap | 2/13/1990 | Replacement of home completely destroyed by fire | Approved with condition that replacement be of same size and materials as original structure | 2/26/1990 |
| Gap Sewer Lagoon | Gap | 2/16/1990 | Proposal to expand and renovate existing sewage lagoon to prevent further leaking and contamination | Denied expansion. Approved renovation. | |
| Williams, Lester | Tonalea | 2/21/1990 | Request to hook-up to community water line | No response on record | |
| Gap/Bodaway School Expansion | Gap | 2/28/1990 | Proposal to replace the existing "primary school" (three dilapidated trailers located adjacent to the community sewage lagoon) with a new school building and playground | Denied | 3/23/1990 |
| Bodaway Chapter House | Bodaway | 4/9/1990 | Request to renovate Bodaway chapter house, which can no longer be used as community facility because of safety concerns | Approved | 5/15/1990 |
| Manygoats, Bessie | Tonalea | 5/4/1990 | Replacement of substandard residence with larger residence; connection to electric lines, cistern and pump, septic system | Denied | 6/6/1990 |
| Yellowhair, Joe | Bodaway/Gap | 5/4/1990 (request for reconsideratio n 10/22/1990) | Replacement of a 20' dilapated mud and log ceremonial hogan on existing homesite with a 20' wood frame ceremonial hogan; hook up to adjacent electrical line | Denied. | 6/6/1990 (request for reconsideratio n denied 12/3/1990 |
| John, Loretta | Bodaway/Gap | 5/7/1990 | Request to replace three residential structures destroyed by fire in 1987 and 1989 with one two-bedroom house (for family of 5); connections to electricity, water, and septic tank | Denied. | 6/6/1990 |
| Blackhat, Joe | Bodaway/Gap | 5/8/1990 | Replacement of dismantled mud and log hogan with permanent replacement housing (a one-bedroom house for a family of 4) (hogan dismantled when main beam cracked and hogan became uninhabitable) | Denied | 6/8/1990 |
| Billboards | Tuba City | 5/15/1990 | Erect billboards | Denied. | 6/14/1990 |
| Keebahe, Margaret | Shadow Mountain | 6/12/1990 | Replacement of collapsed hogan;\|Construction of temporary ceremonial hogan | Denied | 6/20/1990 |
| Badonie, Susan | | 8/10/1990 | Construction of a home | No response on record | |
| Coalmine Mesa waterline extension | Coalmine Mesa | 8/13/1990 | Request to put in waterline extension to benefit District 3 permit holders grazing livestock south of well 3K-312 and U.S. Highway 264 and to prevent traffic accidents and resulting injuries due to livestock crossover | No response on record | |
| Dandy, Cora | Tonalea | 8/28/1990 | Renovation/repairs to existing housing | Approved | 9/27/1990 |

Exhibit 22 to
United States' Motion
DOJ136

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Farrell, James | Tuba City | 8/31/1990 | Renovation and repair of existing home | Approved certain repairs but not complete renovation | 10/9/1990 |
| Farrell, Betty | Tuba City | 8/31/1990 | Renovation of existing home and bathroom addition for insulin dependent diabetic; repair of existing ceremonial hogan | Denied repair of ceremonial hogan; approved home renovation and addition | 10/9/1990 |
| Begay, LaVonne | Coalmine Mesa | 9/17/1990 | Replacement of burned-out home | Approved | 9/26/1990 |
| Adams, Bill | Cameron | 9/18/1990 | Replace unsafe hogan with hogan of identical size; addition of plumbing, electrical wiring, cistern, septic tank, and drainage field | Denied all utilities; approval limited to same-size replacement of existing structure | 10/18/1990 |
| Begay, Jessie Lee | Moenave | 9/18/1990 | Replacement of burned out residence; connection of residence to community power and water lines | Denied request to connect to community utilities;\|Approved replacement conditioned on limitation to same size and location, even though family has 9 members | 9/24/1990 |
| Yazzie, Gene and Lucinda | Tuba City | 9/20/1990 | Replacement of burned-out trailer with frame addition with 24' x 32' two-bedroom frame house for a family of 5 | Approved | 9/26/1990 |
| Cameron Sewage Lagoon Repairs | Cameron | 9/24/1990 | Proposal to remedy seepage from community Sewage Lagoon, which poses health hazards to humans and livestock | Approved | 10/26/1990 |
| Coalmine Mine Fire | Coalmine Mesa | 9/26/1990, 10/14/1991 | Proposal to remedy health and safety concerns caused by underground mine fire burning in Coalmine Mesa | Ultimately approved following negotiation | 12/17/1991 |
| Western Navajo Fair | Tuba City | 9/26/1990 | Request to build temporary structures for the Western Navajo Fair | Approved | 10/9/1990 |
| Yazzie, Larry | Gap/Bodaway | 10/2/1990 | Replacement of 26' diameter hogan (676 sq. ft.; inhabited by two adults and six children) with two bedroom home | Denied | 11/1/1990 |
| Homer, Rose | Bodaway/Gap | 10/2/1990 | Addition of bedroom and bathroom to existing residence (744 sq. ft.) to accommodate 8 full-time residents;\|Repairs to existing structure | Denied additions, plumbing, electrical wiring, cistern and pump, and septic tank; approved only repairs | 11/1/1990 |
| Hoschaine, Darlene | Tonalea | 10/9/1990 | Replacement of 25'x 16' shack (used by family of 6 persons) with 42' diameter hogan; plumbing, electrical wiring/hook-up, cistern with pump, septic tank, and drainage field | Denied | 11/15/1990 |
| Homer, Marie | Bodaway/Gap | 10/16/1990 | Replacement of existing shack | Denied | 11/15/1990 |
| Gap Sewer Lagoon | Cameron | 10/22/1990 | Relocation and expansion of sewer lagoon based on adverse health and safety considerations; raw sewage currently discharged into wash | Ignored | |
| Tuba City/Moenkopi Sewage Treatment Plant | Tuba City | | Request for modifications | Approved | 3/26/1991 |

Exhibit 22 to United States' Motion DOJ137

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Secody, Grace | Tuba City | 2/12/1991 | Replacement of elderly woman's burned out hogan; only structure remaining at homesite is a brush ramada | Denied | 3/15/1991 |
| Sewage Lagoon, Tuba City | Tuba City | 2/20/1991, 4/22/1991 | Modifications to current lagoon to meet health and safety needs | No response on record | |
| Bridge Surveys | Tuba City | 2/20/1991 | Request by BIA to survey 6 bridge locations | Denied | 4/22/1991 |
| Tuba City School | Tuba City | 5/2/1991 | Request to drill for water | No response on record | |
| Mott, Anna | Bodaway/Gap | 5/7/1991 | Emergency replacement of roof and internal electric wiring destroyed by fire | Approved, on condition that family not connect house to community electric power lines | 5/17/1991 |
| Dugi, Sherman and Louise | Cameron | 5/8/1991 | Repairs to existing structure caused by fire | Approved | 10/2/1991 |
| Cameron Abandoned Mines Reclamation Project #1 | Cameron | 5/15/1991 | Department of Interior proposed clean-up of contaminated abandoned uranium mines in Cameron area | Approved (following negotiation) | 11/5/1991 |
| Keebahe, Tom | Cameron | 6/19/1991 | Repair/renovation of existing home (roof, windows, etc) | Approved | 7/19/1991 |
| DAHC | Tuba City | 7/1/1991 | Non-profit residential and treatment center for severely handicapped Native American children | Denied | 11/25/1991 |
| Western Navajo Fair | Tuba City | 7/8/1991 | Request to build temporary structures for the Western Navajo Fair | No response on record | |
| Bedonie, Susan | Tonalea | 8/10/1991 | Renovation and repair of existing house | Approved on condition that floor area of existing structure will not be increased | 9/17/1990 |
| Smith, Stanley | Tuba City | 10/1/1991 | Replacement of burned out wood frame house | Approved | 10/15/1991 |
| Manygoats, Marie | Tonalea | 10/21/1991 | Replacement of seriously deteriorated home | Approved | 12/13/1991 |
| Whiterock, Jerry | Tonalea | 11/3/1991 | Replacement of residence dangerous to health and safety of occupants | Approved | 12/13/1991 |
| John, Lorraine | Gap | 11/13/1991 | Replacement of home destroyed by fire (same size, same location) | Approved | 2/11/1992 |
| Smith, Sadie | Kaibeto | 11/13/1991 | Replacement of 21'x 13' shack, deteriorated beyond repair with two-bedroom home for family of 6; internal plumbing, cistern and drainage | Denied | 1/16/1992 |
| Widehat, Phyllis | Tuba City | 11/14/1991 | Replacement of home destroyed by fire | Approved | 2/11/1992 |
| Martin, Mary | Bodaway/Gap | 11/15/1991 | Replacement of home destroyed by fire (full/part-time residence for 6 adults and 7 children, all in same extended family); replacement house would have been smaller than original house | Denied | 1/16/1992 |
| Johnson, Ernest | Cameron | 12/2/1991 | Replacement of existing home with similar structure | Approved | 1/16/1992 |
| Homer, Gary | Bodaway/Gap | 12/4/1991 | Replacement of dilapidated home | Approved | 1/16/1992 |
| Curley, Lucinda and Neal | Tonalea | 12/5/1991 | Replacement of existing hogan with substantially larger home. Note: Applicant is a member of the Hopi Tribe married to a Navajo | Approved | 1/16/1992 |

Exhibit 22 to
United States' Motion
DOJ138

Exhibit 22 to
United States' Motion
DOJ139

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Black, Towlie | Bodaway/Gap | 12/13/1991 | Replacement of existing hogan for elderly woman with medical needs (on kidney dialysis); addition of plumbing and electricity | Denied request to hook up to community water and electric lines; approved simple replacement | 1/16/1992 |
| Yellowhair, Loren | Tuba City | 12/16/1991 | Replacement of burned-out mobile home (12' x 60' ) with a small (24' x 32') house | Denied | 12/30/1991 |
| Bilagody, Elizabeth and Harry | Tuba City | 1/2/1992 | Renovation/repairs to existing home | Approved | 2/11/1992 |
| Tohonnie, Elsie | Black Falls | 1/15/1992 | Replacement of small shack (deteriorated beyond repair) with small one-bedroom home with electricity, cistern, septic tank, and drainage field | Denied requested replacement which was larger than current residence; approved septic tank | 2/27/1992 |
| Homer, Joe | Bodaway/Gap | 1/16/1992 | Replacement of deteriorated hogan with same-size structure; connection to sanitation facilities and utilities | Denied | 2/27/1992 |
| Haskey, Mike | Tuba City | 1/17/1992 | Replacement of mobile home destroyed by fire with permanent house | Denied | 3/10/1992 |
| Sloan, Leonard and Family | Bodaway/Gap | 1/22/1992 | Replacement of small mud hogan (330 sq. feet; on verge of collapse) with two bedroom home for family of six with medical problems | Denied replacement, but approved utility hook-ups | 2/27/1992 |
| Rock, Mabel | Tonalea | 1/23/1992 | Replacement of existing hogan (deteriorated beyond repair) with smaller hogan/utilities at same location; diabetic Navajo in poor health | Approved | 2/27/1992 |
| Benally, Shirley | Tuba City | 2/6/1992 | Addition to current residence; repair | Request for addition denied; repairs approved | 3/10/1992 |
| Littlefoot, Bahe | Tonalea | 2/11/1992 | Replacement of severely deteriorated frame house | Approved | 3/10/1992 |
| Cameron Abandoned Mines Reclamation Project #2 | Cameron | 2/25/1992 | Department of Interior proposal to clean-up remaining contaminated abandoned uranium mining sites in Cameron | No response on record | |
| Jean, Harry | Tuba City | 2/28/1992 | Replacement of existing hogan (deteriorated beyond repair) with small one-bedroom home; connection to utilities (500 ft. away) | Denied; revised application for same size replacement approved | 4/9/1992 |
| Littleman, Huskie | Coalmine Mesa | 3/2/1992 | Replacement of hogan (deteriorated beyond repair) with hogan of same size for elderly couple with multiple health problems | Denied | 4/9/1992 |
| Bennett, Esther | Bodaway/Gap | 3/12/1992 | Replacement of existing home (deteriorated beyond repair) with small one-bedroom house | Approved | 9/15/1992 |
| Navajo Arts and Crafts | Cameron | 3/12/1992 | Improvements to existing tribal arts and crafts enterprise | No response on record | |
| Tsosie, Harry | Bodaway/Gap | 3/16/1992 | Addition to existing home to relieve overcrowding (512 sq. ft.; 8 full-time residents);\|Repair to exterior walls (rotting fiberboard, intended for use in insulation) | Approved | 4/22/1992 |
| Cody, Rosemary | Cameron | 3/17/1992 | Replacement of home | Approved | 4/22/1992 |

| NAME OF NAVAJO/PROJECT | LOCATION | DATE OF REQUEST | TYPE OF REQUEST | HOPI RESPONSE | DATE OF RESPONSE |
|---|---|---|---|---|---|
| Johnson, Lee | Cameron | 3/19/1992 | Replacement of severely dilapidated and unstable residence (piece-meal assemblage of trailer parts and scrap wood) for 2 adults and 7 children); addition of cistern, drainage field, and septic tank | Approved | 4/22/1992 |
| Yazzie, Sally | Coalmine Mesa | 3/19/1992 | Bathroom addition/electrical wiring to meet medical needs | Approved | 4/22/1992 |
| Mann, Alfred | Tonalea | 3/19/1992 | Replacement of unsound hogan with one-bedroom house for family of 4; addition of electrical wiring and internal plumbing | Denied | 4/22/1992 |
| Yazzie, Zella | Tuba City | 3/30/1992 | Addition to mobile home to accommodate 9-person family; home repairs | Approved | 5/22/1992 |
| Edgewater, Zella | Tuba City | 4/14/1992 | Replacement of dilapidated hogan and waterline hook-up for elderly woman | Approved | 5/22/1992 |
| Junction Enterprises | Cameron | 4/28/1992 | Business site renewal and request for improvements | Ignored | |
| Yazzie, Sandra | Cameron | 5/5/1992 | Utility hook-ups for elderly, insulin dependent woman | Approved | 5/22/1992 |
| Scott, Leonard | Tonalea | 7/23/1992 | Addition of one bedroom to daughter's existing home; utility hook-ups for elderly, handicapped person | Approved | 9/8/1992 |
| Manychildren, Mary Lou | Gray Mountain | 7/31/1992 | Replacement of trailer destroyed by tornado with two-bedroom house for family of 4 | Approved | 8/11/1992 |
| Boone, Allen | Cameron | 8/6/1992 | Replacement of home damaged by tornado | Approved | 9/8/1992 |
| Benally, Millie | Tonalea | 8/12/1992 | Replacement of collapsed hogan | Approved | 9/8/1992 |
| Keams, Madge | Cameron | 8/19/1992 | Replacement of home damaged by tornado | Approved | 9/8/1992 |
| Colorado, Wilson | Cameron | 9/1/1992 | Replacement of home damaged by tornado | Approved | 9/8/1992 |
| Bennett, Bobby James | Tuba City | 9/9/1992 | Replacement of existing home (roof and walls caved-in) | Approved | 9/15/1992 |

Exhibit 22 to
United States' Motion
DOJ140

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Tuba City Hospital/High School Complex | Tuba City | 06/00/67 | Construction of Greyhills High School and additional housing for Indian Health Service personnel | Denied ("Final decision by unanimous vote to disapprove project") | | 06/00/67 |
| Tuba City Mutual Help Housing | Tuba City | 12/00/71 | Extend utility right-of-way to Tuba City housing project | Approved | Hopi Tribe conditioned its approval on Navajo willingness to approve a Hopi request to build 16 homes | 12/29/71 |
| Cameron Water and Sewer Extensions | Cameron | 07/24/72<br>06/28/76<br>08/04/78 | Extend water and sewer to Cameron residents | No response on record | Approved by BIA | 07/21/76 |
| Tso, Emmett | Tuba City | 00/00/73 | Replacement of burned out home, in existence long before the Bennett Freeze | Denied. When Mr. Tso attempted to rebuild, the Chairman of the Hopi Tribe threatened to burn down his house, causing him to move elsewhere | Government refused to intervene | |
| Rare Metals Housing | Rare Metals | 00/00/74 | Repair or removal of existing housing at former Rare Metals Uranium Processing Site | Approved | Housing no longer in existence | 12/12/74 |
| Pasture Canyon Irrigation | Pasture Canyon | 03/05/74 | Proposal to improve Pasture Canyon irrigation system to benefit both Navajo and Hopi farmers | Denied ("The area is currently in litigation and the village board feels that there should be no improvement of any kind...until after the decision is made through the court") | | 06/23/82 |
| Gap/Cedar Ridge Water and Sewer Systems | Gap/Cedar Ridge | 03/18/75<br>04/04/75<br>02/23/77 | Indian Health Service proposal to provide water system to benefit 80 homes in Gap area | Ignored | Approved by BIA | |

Exhibit 23 to United States' Motion
DOJ141

I23

## Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| N 20 Right-of-way | Gap/Coppermine | 04/23/75 | Survey road (N 20) running from Gap north to Coppermine | Denied | Additional denial on 06/30/77 | 09/09/75 |
| N 21 Right-of-way | Red Lake | 04/23/75 | Request to approve right-of-way for paving existing road (N 21) to serve Red Lake and Kaibeto communities, including BIA schools | Denied | | 09/09/75 |
| N 6120 Right-of-way | Cedar Ridge | 08/14/75 | Survey unpaved road (N 6120) from Cedar Ridge | Denied | | 09/09/75 |
| N 6130 Right-of-way | Cedar Ridge | 08/14/75 | Survey road (N 6130) from Cedar Ridge to Gap | Denied | | 09/09/75 |
| N 6110 Right-of-way | Cedar Ridge | 08/14/75 | Survey unpaved road (N 6110) west of Highway 89, at Cedar Ridge | Denied | Additional denial on 06/30/77 | 09/09/75 |
| Sewage Lagoon, Tuba City | Tuba City | 12/30/75 | Request to repair leaking sewage lagoon adjacent to Moencopi Wash | Unknown | | 01/19/76 |
| Van Zee Water and Waste Lines | Van Zee | 06/28/76<br>11/22/76 | Indian Health Service proposal to provide adequate domestic water and waste disposal facilities for 14 families residing near Van Zee | Denied | Approved by BIA | 09/15/76 |
| Red Lake Power Line | Red Lake | 08/07/76 | Request to provide electrical service to Red Lake Community Housing Project, school and medical facility | Denied | Reversed by BIA | 10/76 |
| Cameron Sewage Lagoon | Cameron | 08/11/76 | Request for sewer line and sewage lagoon | No response on record | Approved by BIA 02/03/77 | |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests



| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Kerley Valley Water Distribution | Kerley Valley | 08/11/76 | Request to provide a domestic water distribution system to serve families living in Kerley Valley | Denied | Approved by BIA | 09/15/76 |
| Gap/Cedar Ridge Powerline | Gap | 08/11/76 | Request to provide electricity to homes in the Cedar Ridge Community | Ignored by the Hopi Tribe | Approved by BIA | |
| [redacted] | Unknown | 09/08/76 | Application for new construction | No response on record | | |
| Tuba City High School and Indian Health Service Hospital | Tuba City | 00/00/77 | Construction of new Tuba City high school and Indian Health Service hospital | Approved | Hopi Tribe conditioned its approval on Navajo approval of various Hopi projects | 00/00/77 |
| Tappan Springs Water Line | Tappan Springs (Cameron) | 02/23/77 | Indian Health Service proposal to develop a water system to serve 11 Navajo families that reside in Tappan Springs area | Ignored | Approved by BIA | 06/29/77 |
| Moenave Water Distribution | Moenave | 02/23/77 | Develop domestic water and sewer system to serve 12 Navajo families | Ignored | Approved by BIA | |
| Cedar Ridge Water Distribution | | 02/23/77 | Develop water distribution system to provide water service to 30 families | Ignored by Hopi Tribe | Approved by BIA | |
| Cedar Ridge Water Distribution | Cedar Ridge | 01/27/78 | Community Water System to provide water and sewage services to 50 families which have never had a domestic water supply | Denied ("Rights and interests . . . are in litigation at the present time") | Approved by BIA on appeal | 02/14/78 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests



| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Indian Health Service Water System | Tuba City | 08/04/78 | Indian Health Service proposal to develop a domestic water supply and sewer system to serve 23 families living near the Old Tuba City airport | No response on record | Approved by BIA | |
| Rare Metals Powerline | Rare Metals | 02/08/79 | Extension of powerline to Rare Metals | Denied | | 02/09/79 |
| West Tuba City Water Distribution | Tuba City | 03/26/79 | Indian Health Service proposal to develop a community water system to provide domestic water to 31 Navajo families | Denied | Approved by BIA | 04/23/79 |
| Preston Mesa Powerline | Preston Mesa | 08/30/79 | Right-of-way for power line extension to serve families without electric service | Ignored | Approved by BIA | |
| [redacted] | Tuba City | 01/07/80 | Hook up to electrical service | Denied ("based on the reason that the location of the dwelling is situated within the 'Bennett Freeze Area' and is under litigation") | | 02/14/80 |
| N 21 Right-of-Way | Red Lake | 02/07/80 | Request to approve right-of-way for paving existing road (N 21) to Red Lake and Kaibeto communities, including BIA schools | Denied | "Cannot approve such requests until the land problem . . . has been resolved"; "Area currently under litigation and is therefore rejected" | 02/24/81 |
| N 21 Red Lake - Kaibeto Road | Red Lake | 04/02/80 | Request for right-of-way for road construction/improvement of existing road which serves communities and schools | Denied | | 09/11/81 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Tuba City Hospital/High School Complex | Tuba City | 06/00/67 | Construction of Greyhills High School and additional housing for Indian Health Service personnel | Denied ("Final decision by unanimous vote to disapprove project") | | 06/00/67 |
| Tuba City Mutual Help Housing | Tuba City | 12/00/71 | Extend utility right-of-way to Tuba City housing project | Approved | Hopi Tribe conditioned its approval on Navajo willingness to approve a Hopi request to build 16 homes | 12/29/71 |
| Cameron Water and Sewer Extensions | Cameron | 07/24/72<br>06/28/76<br>08/04/78 | Extend water and sewer to Cameron residents | No response on record | Approved by BIA | 07/21/76 |
| [redacted] | Tuba City | 00/00/73 | Replacement of burned out home, in existence long before the Bennett Freeze | Denied. When Mr. Tso attempted to rebuild, the Chairman of the Hopi Tribe threatened to burn down his house, causing him to move elsewhere | Government refused to intervene | |
| Rare Metals Housing | Rare Metals | 00/00/74 | Repair or removal of existing housing at former Rare Metals Uranium Processing Site | Approved | Housing no longer in existence | 12/12/74 |
| Pasture Canyon Irrigation | Pasture Canyon | 03/05/74 | Proposal to improve Pasture Canyon irrigation system to benefit both Navajo and Hopi farmers | Denied ("The area is currently in litigation and the village board feels that there should be no improvement of any kind...until after the decision is made through the court") | | 06/23/82 |
| Gap/Cedar Ridge Water and Sewer Systems | Gap/Cedar Ridge | 03/18/75<br>04/04/75<br>02/23/77 | Indian Health Service proposal to provide water system to benefit 80 homes in Gap area | Ignored | Approved by BIA | |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| N 21 Right-of-Way | Red Lake | 10/22/80 | Request for right-of-way for road construction/improvement of existing road which serves communities and schools | No response on record | | |
| Lane, Keith & Dorothy | Wildcat Peak | 04/16/81 | Request for approval of a homesite lease for family that has resided at location for years | Denied | | 06/04/81 |
| NTUA Water Well/Forest Lake Powerline | Tuba City/Forest Lake | 06/18/81 | Two part request to drill another NTUA Water Well to serve the residents of the Tuba City area, and to extend the existing power line from Black Mesa to Forest Lake community | Approved, conditioned on Navajo approval of Hopi request | | 07/02/81 |
| Saganitso, Victor Sr. | Tuba City | 03/22/82 | Replacement of existing home | No response on record | | |
| Cedar Ridge Pre-school | Cedar Ridge | 05/13/82 | Proposal to build preschool facility for unserved area | No response on record | | |
| Keebahe, Norman | Cameron | 06/28/82 | Replacement of inadequate housing (old 16'x 24' frame structure with no utilities) for paraplegic and family | First request ignored. Second request sent 08/12/82, emphasizing that request was "a matter of life and death"; denied because of Hopi "moratorium" | "The Hopi Negotiating Committee during its regular meeting on Aug. 23, 1982, unanimously voted to place a moratorium on any and all construction activities, more specifically within the Bennett Freeze Order Area (BFOA) . . . . The Committee has postponed the processing of all construction applications for the BFOA for an indefinite period . . . " | 08/26/82 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests



| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Bilagody, Stella | Tuba City | 07/06/82 | Replacement of 1-room shack ("without proper covering") for elderly Navajo woman with severe degenerative disc disease | Denied | "The Hopi Negotiating Committee during its regular meeting on Aug. 23, 1982, unanimously voted to place a moratorium on any and all construction activities, more specifically within the Bennett Freeze Order Area (BFOA) . . . . The Committee has postponed the processing of all construction applications for the BFOA for an indefinite period . . . " | 08/26/82 |
| Mott, Billy | Bodaway/Gap | 07/06/82 | Replacement of existing "two-room shack, with an incomplete structure in the back" | No response on record | | |
| Tacheeni, Jack and Mae | Bodaway/Gap | 07/06/82 | Replacement of dilapidated one-room shack with plastic tarp outside | Denied | | 08/26/82 |
| Yellowhair, Kahn | Coalmine Mesa | 07/06/82 | Room addition to existing residence | No response on record | | |
| Watson, Stella | Rare Metals | 07/06/82 | Replacement of dilapidated hogan for grandmother and grandchildren | No response on record | | |
| [illegible]ez, Chee | Coalmine Mesa | 07/06/82 | Replacement of stone hogan | No response on record | | |
| [illegible], Charley | Bodaway/Gap | 07/06/82 | Bathroom addition to existing residence | No response on record | | |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Tacheenie, Jennie | Bodaway/Gap | 07/06/82 | Replacement for deteriorated residence | No response on record | | |
| Neztsosie, David | 89/264 Junction | 09/29/82 | Request to build replacement house because his current home is "literally falling apart" | No response on record | | |
| Gap/Bitter Springs Powerline | Gap/Bitter Springs | 04/14/83 | Extend existing NTUA powerline from Gap north to Bitter Springs Housing Project (located outside Freeze) | Denied | | 11/30/83 |
| Rare Metals Uranium Mine Reclamation | Rare Metals | 05/03/83 | Cleanup of uranium processing facility under federal program | Approved | | |
| APS | Various | 06/23/83 | Hopi letter to Arizona Public Service Company containing Hopi's view that by providing electrical hookups APS would be violating law | | Hopi letter to APS "Please be advised you will be held accountable if you fail to comply with this law . . ." | |
| Mott, Anna | Bodaway/Gap | 07/13/84 | Widow with five children requests replacement of severely dilapidated shack with a house | No response on record | | |
| Tacheeni, Jack and Mae | Bodaway/Gap | 07/13/84 | Replacement of dilapidated one room shack | No response on record | As of 01/25/89, the Hopi Tribe still had not responded to request | |
| Manygoats, Margaret | Tonalea | 07/13/84 | Replacement of dilapidated hogan with two bedroom house | No response on record | | |
| Yellowhair, Kahn | Coalmine Mesa | 07/13/84 | 10'x 12' addition to existing housing; renovation | No response on record | | |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Anderson, Bob | Tuba City | 11/19/84 | Use of Pasture Canyon water for HUD housing construction by building contractor | Hopis contend that the use of the Pasture Canyon water is development, and consent is required. Subsequent Navajo request denied | | |
| Means, Kee John | Cameron | 00/00/85 | Connection to electric line for quadriplegic Navajo | Approved | | 06/20/85 |
| Black, Emma | Bodaway/Gap | 10/21/85 | Replace 16'x 16' hogan, which collapsed due to age and structural deterioration | No response on record | | |
| Maize, Henry | Tonalea | 08/05/86 | Replacement of severely dilapidated hogan (20' diameter) | No response on record | | |
| George, Kenneth | Coalmine Mesa | 10/22/86 | Replacement for collapsed hogan | Denied | | 11/21/86 |
| Bodaway/Gap Water Extension | Bodaway/Gap | 10/19/87 | Extend existing water service to additional families | No response on record | | |
| Nez, Willie and family | Bodaway/Gap | 10/26/87 | Replacement of small (16'x 16') dilapidated hogan | Denied | | 04/19/88 |
| Arizona, Hotachellie | Bodaway/Gap | 00/00/88 | Replacement of hogan | Approved "under protest" with condition that replacement be of original dimensions | | 10/21/88 |
| Dodson, Raymond and Christine | Tonalea | 04/19/88 | Construction of electric line; hook up | No response on record | | |
| Cameron School | Cameron | 08/16/88 | Request by superintendent of school district for Hopi Tribal approval of Cameron school. At present only K-3 attend school locally. Other students must commute 40-50 miles daily | No response on record | 05/02/91 request to test drill the site for water was approved on 09/09/91 | |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Black, Helen | Bodaway/Gap | 09/07/88 | Housing repairs | Denied | | 09/09/88 |
| Johnson, Dorothy | Bodaway/Gap | 09/07/88 | Repairs to 20-year old house; electricity and running water | Denied | | 09/09/88 |
| Secody, Mary | Bodaway/Gap | 09/07/88 | Women and 2 young children request renovation to provide adequate winter shelter; electricity hook-up | Denied | | 09/09/88 |
| Secody, Marie | Bodaway/Gap | 09/07/88 | Family with 5 young children living in 12' x 16' house request repairs; electricity hook-up | Denied | | 09/09/88 |
| Blackhat, Alfred | Bodaway/Gap | 09/07/88 | Insulation for hogan; water and electricity | Denied | | 09/09/88 |
| Blackhat, John | Bodaway/Gap | 09/07/88 | 71 year old man requesting renovation of 25-year old dilapidated house; electricity | Denied | | 09/09/88 |
| Yazzie, Victoria | Tonalea | 09/07/88 | Mother and child living 100 feet from electrical line request hook up to electricity | Denied | | 09/09/88 |
| Naze, Henry and Rena | Bodaway/Gap | 09/07/88 | Request hook up to electricity | Denied | | 09/09/88 |
| Hoschaine, Edward and Darlene | Bodaway/Gap | 09/07/88 | Request hook up to electricity | Denied | | 09/09/88 |
| Redhouse, Lee | Bodaway/Gap | 10/12/88 | Renovation and addition to existing housing | No response on record | | |
| Western Navajo Fair | Tuba City | 10/13/88 | Request to build temporary structures for the annual Western Navajo Fair | Approved | | 10/19/88 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Stevens, Flora | Red Lake | 10/28/88 | Renovation of deteriorated home, roofing, walls and floor | No response on record | 11/10/88 BIA approved shingles only | |
| Whitesinger, Paul | Tuba City | 12/22/88 | Request of Navajo suffering from progressive kidney disease to connect his trailer to nearby community utilities | Denied | | 01/12/89 |
| Cameron Vendor Village | Cameron | 01/03/89 | Development of site for use by local arts and crafts vendors | Unresolved | Multi-year negotiations | |
| Homer, Marie | Bodaway/Gap | 03/10/89 | Replacement of existing home (14'x 22' wood shed with dirt floor; no insulation; entire roof leaks) with a 16' x 32' one-bedroom house for a family of 5 | Denied | Reversed on appeal | 11/15/90 |
| Shorty, Billy | Tonalea | 03/10/89 | Replacement of small 13'x 14' hogan (used by family of 6) with one-bedroom house with water line, plumbing, sewer, and electrical hook-up | Denied ("While our investigations indicate that the present structures are in such poor condition that replacement may be necessary, the proposed replacement structures go far beyond what is necessary to address the immediate safety and health concerns of the residents until ownership of the land is determined") | On overcrowding: "Your applications also claim that overcrowded conditions represent a health risk to the occupants. Although in very extreme cases this may be true, the Hopi Tribe does not consider that overcrowded conditions alone . . . are sufficient threat to the health of residents to justify replacement housing"; Smaller residence and utilities approved on appeal | 06/07/89 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Dougi, Delfred | Cameron | 03/10/89 | Replacement of severely dilapidated 1950 trailer (9'x 18') with 16' wood addition (residence for 2 adults and 6 children);<br>Request replacement with 2-bedroom home with plumbing, sewer system, water line, and electrical hook-up | Initial application ignored. Resubmitted application denied | Located on "checkerboard lands" excluded from 1934 Act litigation | 08/26/89 |
| Williams, Lester | Tonalea | 03/10/89 | Replacement of cardboard and aluminum one-room shack (for family of 5 with a quadriplegic child) with a two-bedroom house with utilities | Denied ("While our investigations indicate that the present structures are in such poor condition that replacement may be necessary, the proposed replacement structures go far beyond what is necessary to address the immediate safety and health concerns of the residents until ownership of the land is determined") | On standards/ overcrowding: "Your applications refer to federal housing standards as justification for the proposed replacement structures. In the Hopi Tribe's view, federal housing standards are not applicable to the present construction requests. The issue in new construction on the statutory freeze area is what construction or improvement is necessary to remove threats to the health or safety of residents while litigation over the status of the land proceeds. Your applications also claim that overcrowded conditions represent a health risk to the occupants. Although in very extreme cases this may be true, the Hopi Tribe does not consider that overcrowded conditions alone . . . are sufficient threat to the health of residents to justify replacement | 06/07/89 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| | | | | | housing"; Smaller residence and utilities approved on appeal. On request for reconsideration, a larger two-bedroom house was approved | |
| Dodson, Harry | Tonalea | 03/10/89 | Replacement of 18'x 23' shack with two bedroom house for family of 7 persons: addition of plumbing, sewer system, water line, and electrical hookup | Denied ("While our investigations indicate that the present structures are in such poor condition that replacement may be necessary, the proposed replacement structures go far beyond what is necessary to address the immediate safety and health concerns of the residents until ownership of the land is determined") | See above. Larger residence and limited utilities approved on appeal | 06/07/89 |
| Bilagody, Stella | Tuba City | 08/22/89 | Replacement of 18' x 16' wooden shack with 16' x 32' one -bedroom house with plumbing, sewer system, water line, and electrical hook up. (Resident is a Navajo widow who suffers from degenerative disc disease, which severely restricts ability to walk to and from outhouse) | Replacement denied; approval limited to renovation and small addition to existing structure and utilities | | 09/26/89 |
| Blackhat, John | Bodaway/Gap | 08/28/89 | Repair of collapsed/damaged roof and ceiling | Approved | | 09/12/89 |
| Begay, Glenmore | Coalmine Mesa | 09/13/89 | Replacement of hogan illegally torn down by Hopi Tribe on July 15, 1989 | Denied | | 11/09/89 |

## Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Dougi, Delfred | Cameron | 10/05/89 | Replacement of severely dilapidated 1950 trailer (9'x 18') with 16' wood addition (residence for 2 adults and 6 children); Request replacement with another trailer (previous request for replacement with 2-bedroom home with utilities was denied) | Approved, conditioned on moving trailer to another site | | 11/09/89 |
| Begay, Glenmore | Coalmine Mesa | 01/02/90 | Replacement of hogan illegally torn down by Hopi Tribe on July 15, 1989 | Approved on conditions that: floor space not exceed 500 sq. ft.; no utility connections for water, sewer, or electric lines; and dwelling to be occupied only by applicant and immediate family | Previous request denied by Chairman Sidney on 11/09/89 | 01/12/90 |
| Hidden Springs Water Rehabilitation Project | Hidden Springs (Bodaway) | 01/26/90 | Develop artesian spring to conserve run off and eliminate seasonal water shortages. For family and livestock use | Denied ("no immediate health and safety problems") | | 02/26/90 |
| Begay, John and Sarah | Bodaway/Gap | 02/13/90 | Replacement of home completely destroyed by fire | Approved with condition that replacement be of same size and materials as original structure | | 02/26/90 |
| Gap Sewer Lagoon | Gap | 02/16/90 | Proposal to expand and renovate existing sewage lagoon to prevent further leaking and contamination | Denied expansion because the land is still under litigation. Approved renovation | | |
| Gap/Bodaway School Expansion | Gap | 02/28/90 | Proposal to replace the existing "primary school" (three dilapidated trailers located adjacent to the community sewage lagoon) with a new school building and playground | Denied | | 03/23/90 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Bodaway Chapter House | Bodaway | 04/09/90 | Request to renovate Bodaway chapter house, which can no longer be used as community facility because of safety concerns | Approved | | 05/15/90 |
| Manygoats, Bessie | Tonalea | 05/04/90 | Replacement of substandard residence with larger residence; connection to electric lines, cistern and pump, septic system | All denied, even though it is agreed that "the structure currently used . . . is inadequate to provide safe and healthy shelter." Re utilities: "Ms. Manygoats has lived at the site for many years without these conveniences, and nothing . . . suggests they are necessary to address her specific health or safety requirements" | Suggests approval may be granted, upon application, of a smaller structure (without utilities). Modification requested by Ms. Manygoats on 08/09/90 and approved 08/20/90 | 06/06/90 |
| Yellowhair, Joe | Bodaway/Gap | 05/04/90 (request for reconsider-ation 10/22/90) | Replacement of a 20' dilapidated mud and log ceremonial hogan on existing homesite with a 20' wood frame ceremonial hogan; hook up to adjacent electrical line | Denied: "there is no compelling health or safety reason to approve construction of a ceremonial structure" | | 06/06/90 (request for reconsider-ation denied 12/03/90) |
| John, Loretta | Bodaway/Gap | 05/07/90 | Request to replace three residential structures destroyed by fire in 1987 and 1989 with one two-bedroom house (for family of 5); connections to electricity, water, and septic tank | Denied: "We agree that the structure currently serving as a residence is inadequate, but believe the former residence can be renovated rather than replaced" | Chairman Masayesva: "Until ownership of the disputed area can be determined, the Hopi Tribe will approve construction requests only on a specific and demonstrated health or safety need for particular improvements by particular residents. General requests based on the proposition that bigger and better houses are desirable do not satisfy that standard" | 06/06/90 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Blackhat, Joe | Bodaway/Gap | 05/08/90 | Replacement of dismantled mud and log hogan with permanent replacement housing (a one-bedroom house for a family of 4) (hogan dismantled when main beam cracked and hogan became uninhabitable) | Denied | | 06/08/90 |
| Keebahe, Margaret | Shadow Mountain | 06/12/90 | Replacement of collapsed hogan; Construction of temporary ceremonial hogan | Denied ("As I and my predecessor have repeatedly stated, requests for approval of construction must precede the construction itself to be approved") | | 06/20/90 |
| Dandy, Cora | Tonalea | 08/28/90 | Renovation/repairs to existing housing | Approved | | 09/27/90 |
| Farrell, Betty | Tuba City | 08/31/90 | Renovation of existing home and bathroom addition for insulin dependent diabetic; repair of existing ceremonial hogan | Denied repair of ceremonial hogan ("no showing that completion of the hogan is necessary to protect the health or safety of the residents"); Approved home renovation and addition ("the present condition of the house is so poor that complete renovation . . . is justified") | | 10/09/90 |
| Begay, LaVonne | Coalmine Mesa | 09/17/90 | Replacement of burned-out home | Approved | | 09/26/90 |
| Adams, Bill | Cameron | 09/18/90 | Replace unsafe hogan with hogan of identical size; addition of plumbing, electrical wiring, cistern, septic tank, and drainage field | Denied all utilities (applicant's chronic asthma and osteoarthritis did not constitute a "direct medical necessity"); Approval limited to same-size replacement of existing structure (admittedly "structurally unsound and may represent a threat to the safety of the Adams family") | Re Hopi position on utilities: "We also note that the nearest community power lines are more than a half a mile from the residence. There are a number of other residences in the vicinity of the Adams site, and these residents in turn would | 10/18/90 |

331
Exhibit 23 to
United States' Motion
DOJ156

## Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| | | | | | likely want to enjoy the improvement offered by permanent electric power. Most households undoubtedly contain one or more individuals whose daily lives would arguably be made better or healthier by the extension of utility services of all kinds. Until the legal status of the lands is resolved, however, the Hopi Tribe will approve new utilities only in cases of direct medical necessity" | |
| Begay, Jessie Lee | Moenave | 09/18/90 | Replacement of burned out residence; connection of residence to community power and water lines | Denied request to connect to community utilities; Approved replacement conditioned on limitation to same size and location, even though family has 9 members | Re "health and safety" policy: "The policy of the Hopi Tribe is to allow construction to replace residences destroyed by fire or other natural causes, but to approve only the reconstruction of the former structure rather than substantial improvements. No special health or safety considerations were presented in your application which would justify an exception to that policy in this case" | 09/24/90 |
| Yazzie, Gene and Lucinda | Tuba City | 09/20/90 | Replacement of burned-out trailer with frame addition with 24' x 32' two-bedroom frame house for a family of 5 | Approved | | 09/26/90 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Cameron Sewage Lagoon Repairs | Cameron | 09/24/90 | Proposal to remedy seepage from community Sewage Lagoon, which poses health hazards to humans and livestock | Approved | | 10/26/90 |
| Coalmine Mine Fire | Coalmine Mesa | 09/26/90<br>10/14/91 | Proposal to remedy health and safety concerns caused by underground mine fire burning in CoalMine Mesa | Ultimately approved following negotiation | | 12/17/91 |
| Western Navajo Fair | Tuba City | 09/26/90 | Request to build temporary structures for the Western Navajo Fair | Approved | | 10/09/90 |
| Yazzie, Larry | Gap/Bodaway | 10/02/90 | Replacement of 26′ diameter hogan (676 sq. ft.; inhabited by two adults and six children) with two bedroom home | "The Hopi Tribe disapproves the construction of a replacement structure for the hogan, hook-up to electrical lines and water lines. . . . The Hopi Tribe does not consider that overcrowded conditions justify the need for a replacement structure" | Denial overruled on health and safety grounds. Electrical hookups not permitted | 11/01/90 |
| Homer, Rose | Bodaway/Gap | 10/02/90 | Addition of bedroom and bathroom to existing residence (744 sq. ft.) to accommodate 8 full-time residents;<br>Repairs to existing structure | Denied additions, plumbing, electrical wiring, cistern and pump, and septic tank;<br>Approved only repairs | Denial reversed as to bathroom, cistern and pump, and septic tank | 11/01/90 |
| Hoschaine, Darlene | Tonalea | 10/09/90 | Replacement of 25′x 16′ shack (used by family of 6 persons) with 42′ diameter hogan; plumbing, electrical wiring/hook-up, cistern with pump, septic tank, and drainage field | Denied on grounds that replacement structure commenced before permission sought | Reversed on appeal | 11/15/90 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Gap Sewer Lagoon | Cameron | 10/22/90 | Relocation and expansion of sewer lagoon based on adverse health and safety considerations; raw sewage currently discharged into wash | Ignored | On appeal, Hopis proposed that construction goes beyond what is needed to protect immediate health and safety of residents. Project approved by BIA 12/05/91 | |
| Secody, Grace | Tuba City | 02/12/91 | Replacement of elderly woman's burned out hogan; only structure remaining at homesite is a brush ramada | Denied | | 03/15/91 |
| Sewage Lagoon, Tuba City | Tuba City | 02/20/91<br>04/22/91 | Modifications to current lagoon to meet health and safety needs | No response on record | | |
| Bridge Surveys | Tuba City | 02/20/91 | Request by BIA to survey 6 bridge locations | Denied | | 04/22/91 |
| Mott, Anna | Bodaway/Gap | 05/07/91 | Emergency replacement of roof and internal electric wiring destroyed by fire | Approved, on condition that family not connect house to community electric power lines | | 05/17/91 |
| Dugi, Sherman and Louise | Cameron | 05/08/91 | Repairs to existing structure caused by fire | Approved | | 10/02/91 |
| Cameron Abandoned Mines Reclamation Project #1 | Cameron | 05/15/91 | Department of Interior proposed clean-up of contaminated abandoned uranium mines in Cameron area | Approved (following negotiation) | | 11/05/91 |
| Keebahe, Tom | Cameron | 06/19/91 | Repair/renovation of existing home (roof, windows, etc) | Approved | | 07/19/91 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| DAHC | Tuba City | 07/01/91 | Non-profit residential and treatment center for severely handicapped Native American children | Denied | To be built on Navajo allotted lands, excluded from Navajo-Hopi litigation. Renewed application of 02/13/92 also denied on 03/10/92 | 11/25/91 |
| Western Navajo Fair | Tuba City | 07/08/91 | Request to build temporary structures for the Western Navajo Fair | No response on record | | |
| Bedonie, Susan | Tonalea | 08/10/91 | Renovation and repair of existing house | Approved on condition that floor area of existing structure will not be increased | | 09/17/90 |
| Smith, Stanley | Tuba City | 10/01/91 | Replacement of burned out wood frame house | Approval limited to "replacement structure of the same type and size as the original residence" | | 10/15/91 |
| Manygoats, Marie | Tonalea | 10/21/91 | Replacement of seriously deteriorated home (860 sq. ft.) with slightly larger home (960 sq. ft.) | Denied, even though Hopi Tribe admits that structure is in "such poor condition to represent a threat to the safety of the residents." Approval limited to exact size (860 sq. ft.) replacement on grounds that no "health and safety" reason justifies increase in size | Continues to disapprove any request not meeting exacting "health and safety" standard | 12/13/91 |
| Whiterock, Jerry | Tonalea | 11/03/91 | Replacement of residence dangerous to health and safety of occupants | Approved ("We agree that the residence is in such poor condition that the safety of the residents is threatened, and that repairs are not feasible") | | 12/13/91 |
| John, Lorraine | Gap | 11/13/91 | Replacement of home destroyed by fire (same size, same location) | Approved | | 02/11/92 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Smith, Sadie | Kaibeto | 11/13/91 | Replacement of 21'x 13' shack, deteriorated beyond repair with two-bedroom home for family of 6; internal plumbing, cistern and drainage | Denied | | 01/16/92 |
| Widehat, Phyllis | Tuba City | 11/14/91 | Replacement of home destroyed by fire | Approval limited to "structure of the same size and type and without additional improvements" | | 02/11/92 |
| Martin, Mary | Bodaway/Gap | 11/15/91 | Replacement of home destroyed by fire (full/part-time residence for 6 adults and 7 children, all in same extended family); replacement house would have been smaller than original house | Denied | | 01/16/92 |
| Johnson, Ernest | Cameron | 12/02/91 | Replacement of existing home with similar structure | Approved | Structure located on lands excluded in 1934 Act litigation | 01/16/92 |
| Homer, Gary | Bodaway/Gap | 12/04/91 | Replacement of dilapidated home | Approved on condition that replacement structure be of same size and of same materials and that old structure be destroyed | | 01/16/92 |
| Curley, Lucinda and Neal | Tonalea | 12/05/91 | Replacement of existing hogan with substantially larger home. Note: Applicant is a member of the HOPI TRIBE married to a Navajo | Approved | Exception to Hopi Tribe's "general policy of permitting only same-size replacements" where applicant is a member of the Hopi Tribe | 01/16/92 |
| Black, Towlie | Bodaway/Gap | 12/13/91 | Replacement of existing hogan for elderly women with medical needs (on kidney dialysis); addition of plumbing and electricity | Denied request to hook up to community water and electric lines. Approved simple replacement | | 01/16/92 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Yellowhair, Loren | Tuba City | 12/16/91 | Replacement of burned-out mobile home (12' x 60') with a small (24' x 32') house | Denied (policy: refusal to replace mobile home with non-mobile home) | Revised application for same size trailer approved | 12/30/91 |
| Bilagody, Elizabeth and Harry | Tuba City | 01/02/92 | Renovation/repairs to existing home | Approved | The Bilagodys had applied for replacement home in 1982, but that request was denied pursuant to the Hopi "moratorium" | 02/11/92 |
| Tohonnie, Elsie | Black Falls | 01/15/92 | Replacement of small shack (deteriorated beyond repair) with small one-bedroom home with electricity, cistern, septic tank, and drainage field | Denied (requested replacement larger than current residence). Approved septic tank | Approved revised application for same size replacement | 02/27/92 |
| Homer, Joe | Bodaway/Gap | 01/16/92 | Replacement of deteriorated hogan with same-size structure; connection to sanitation facilities and utilities | Denied ("the health reasons given do not justify the need for the extensive improvements") | On 03/06/92, in light of Hopi denial, Mr. Homer modified his request, limited to same-size replacement with no utilities, which was approved | 02/27/92 |
| Haskey, Mike | Tuba City | 01/17/92 | Replacement of mobile home destroyed by fire with permanent house | Denied ("policy is limited to replacement structures of the same type") | | 03/10/92 |
| Sloan, Leonard and Family | Bodaway/Gap | 01/22/92 | Replacement of small mud hogan (330 sq. feet; on verge of collapse) with two bedroom home for family of six with medical problems | Denied replacement ("the number of occupants does not justify a larger structure"), but approved utility hook-ups | Reversed on appeal | 02/27/92 |
| Rock, Mabel | Tonalea | 01/23/92 | Replacement of existing hogan (deteriorated beyond repair) with smaller hogan/utilities at same location; diabetic Navajo in poor health | Approved | | 02/27/92 |

## Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Benally, Shirley | Tuba City | 02/06/92 | Addition to current residence; repair | Request for addition denied; Repairs approved | | 03/10/92 |
| Littlefoot, Bahe | Tonalea | 02/11/92 | Replacement of severely deteriorated frame house | Approved | | 03/10/92 |
| Cameron Abandoned Mines Reclamation Project #2 | Cameron | 02/25/92 | Department of Interior proposal to clean-up remaining contaminated abandoned uranium mining sites in Cameron | No response on record | Hopi council did not act because they lacked quorum. Waiver request sent to Secretary of Interior 04/08/92, approved | |
| Jean, Harry | Tuba City | 02/28/92 | Replacement of existing hogan (deteriorated beyond repair) with small one-bedroom home; connection to utilities (500 ft. away) | Denied. Revised application for same size replacement approved | | 04/09/92 |
| Littleman, Huskie | Coalmine Mesa | 03/02/92 | Replacement of hogan (deteriorated beyond repair) with hogan of same size for elderly couple with multiple health problems | Denied | | 04/09/92 |
| Bennett, Esther | Bodaway/Gap | 03/12/92 | Replacement of existing home (deteriorated beyond repair) with small one-bedroom house | Approved | Utilities not requested because of Hopi Tribe's position that direct medical need is required | 09/15/92 |
| Navajo Arts and Crafts | Cameron | 03/12/92 | Improvements to existing tribal arts and crafts enterprise | No response on record | | |
| Tsosie, Harry | Bodaway/Gap | 03/16/92 | Addition to existing home to relieve overcrowding (512 sq. ft.; 8 full-time residents); Repair to exterior walls (rotting fiberboard, intended for use in insulation) | Approved | | 04/22/92 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Cody, Rosemary | Cameron | 03/17/92 | Replacement of home | Approved | Rosemary's husband died awaiting approval. BIA approved homesite lease | 04/22/92 |
| Johnson, Lee | Cameron | 03/19/92 | Replacement of severely dilapidated and unstable residence (piece-meal assemblage of trailer parts and scrap wood) for 2 adults and 7 children); addition of cistern, drainage field, and septic tank | Approved | | 04/22/92 |
| Yazzie, Sally | Coalmine Mesa | 03/19/92 | Bathroom addition/electrical wiring to meet medical needs | Approved | | 04/22/92 |
| Mann, Alfred | Tonalea | 03/19/92 | Replacement of unsound hogan with one-bedroom house for family of 4; addition of electrical wiring and internal plumbing | Denied | Hopi Tribe approved revised application for same size replacement | 04/22/92 |
| Yazzie, Zella | Tuba City | 03/30/92 | Addition to mobile home to accommodate 9-person family; home repairs | Approved | | 05/22/92 |
| Edgewater, Zella | Tuba City | 04/14/92 | Replacement of dilapidated hogan and waterline hook-up for elderly woman | Approved | | 05/22/92 |
| Junction Enterprises | Cameron | 04/28/92 | Business site renewal and request for improvements | Ignored | Hopi Tribe approved 10/00/92 AFTER Freeze lifted. Hopi Tribe attempted to make itself a party to the lease, and added a Hopi employment preference provision | |
| Yazzie, Sandra | Cameron | 05/05/92 | Utility hook-ups for elderly, insulin dependent women | Approved | | 05/22/92 |

# Bennett Freeze: Record of Hopi Responses to Navajo Requests

| Name of Navajo/Project | Location | Date of Request | Type of Request | Hopi Response | Notes | Date of Response |
|---|---|---|---|---|---|---|
| Scott, Leonard | Tonalea | 07/23/92 | Addition of one bedroom to daughter's existing home; utility hook-ups for elderly, handicapped person | Approved | | 09/08/92 |
| Manychildren, Mary Lou | Gray Mountain | 07/31/92 | Replacement of trailer destroyed by tornado with two-bedroom house for family of 4 | Approved | | 08/11/92 |
| Boone, Allen | Cameron | 08/06/92 | Replacement of home damaged by tornado | Approved | | 09/08/92 |
| Benally, Millie | Tonalea | 08/12/92 | Replacement of collapsed hogan | Approved | | 09/08/92 |
| Keams, Madge | Cameron | 08/19/92 | Replacement of home damaged by tornado | Approved | | 09/08/92 |
| Colorado, Wilson | Cameron | 09/01/92 | Replacement of home damaged by tornado | Approved | | 09/08/92 |
| Bennett, Bobby James | Tuba City | 09/09/92 | Replacement of existing home (roof and walls caved-in) | Approved | | 09/15/92 |

| | Public Works Projects | | | | |
|---|---|---|---|---|---|
| | Project Number | Description | Date Submitted | Hopi Response | BIA Response |
| 1 | Tuba City Hospital/High School Complex | Construction of Greyhills High School and additional housing for Indian Health Service personnel | 6/00/1967 | denied | approved by BIA |
| 2 | Tuba City Mutual Help Housing | ROW for electric powerline extension to serve Tuba City Housing Project | 12/1/1971 | approved by Hopi Tribe | |
| 3 | Cameron Water and Sewer Extensions | Extend water and sewer to Cameron residents | 7/24/72; 6/28/76; 8/4/78 | no response | approved by BIA |
| 4 | Rare Metals Housing | Repair of water and sewer system at former Rare Metals Uranium Processing Site | 1/1/1974 | approved by Hopi Tribe | |
| 5 | Pasture Canyon Irrigation | Proposal to Improve Pasture Canyon irrigation system to benefit both Navajo and Hopi farmers | 3/5/1974 | denied | |
| 6 | Gap/Cedar Ridge Water and Sewer Systems | IHS proposal to provide water system to benefit 30 homes in Gap Area | 3/18/75; 4/4/75; 2/23/77 | ignored | approved by BIA |
| 7 | N 20 Right of Way | Survey Road (N 20) from Gap North to Coppermine | 4/23/1975 | denied | |
| 8 | N 21 ROW | Request to approve right-of-way for paving existing road (N 21) to serve Red Lake and Kaibeto communities, including BIA schools | 4/23/1975 | denied | |
| 9 | N 6120 Right of Way | Survey unpaved road (N 6120) from Cedar Ridge | 8/14/1975 | denied | |
| 10 | N 6130 Right of Way | Survey Road (N 6130) from Cedar Ridge to Gap | 8/14/1975 | denied | |
| 11 | N 6110 Right of Way | Survey unpaved road (N 6110) west of Highway 89 at Cedar Ridge | 8/14/1975 | denied | |
| 12 | Sewage Lagoon, Tuba City | Request to repair leaking sewage lagoon adjacent to Moencopi Wash | 12/30/1975 | unknown | |
| 13 | Allen Construction Co. | Request Permit to remove 700 cubic yards of gravel east of Moencopi Village | 00/00/1976 | approved by Hopi Tribe | |
| 14 | Van Zee Water and Waste Lines (IHS NA-74-551) | HIS proposal to provide adequate domestic water and waste disposal facilities for 14 families residing near Van Zee | 6/28/76; 11/22/76 | denied | approved by BIA |
| 15 | Red Lake Power Line | Request to provide electrical service to Red Lake Community Housing Project, school and medical facility | 8/7/1976 | denied | approved by BIA |
| 16 | Cameron Sewage Lagoon | Request for sewer line and sewage lagoon | 8/11/1976 | no response on record | approved by BIA |
| 17 | Kerley Valley Water Distribution | Request for sewer line and sewage lagoon | 8/11/1976 | denied | approved by BIA |
| 18 | Gap/Cedar Ridge Powerline | Request to provide electricity to homes in the Cedar Ridge Community | 8/11/1976 | ignored | approved by BIA |

Exhibit 24 to
United States' Motion
DOJ166

| | Public Works Projects | | | | |
|---|---|---|---|---|---|
| | Project Number | Description | Date Submitted | Hopi Response | BIA Response |
| 19 | Tuba City High School and Indian Health Service Hospital | Construction of Tuba City High School and Indian Health Service Hospital | 1/1/1977 | approved by Hopi Tribe | |
| 20 | Tappan Springs Water Line | HIS proposal to develop a water system to serve 11 Navajo families that reside in Tappan Springs Area | 2/23/1977 | ignored | approved by BIA |
| 21 | Moenave Water Distribution | Develop domestic water and sewer system to serve 12 Navajo families | 2/23/1977 | ignored | approved by BIA |
| 22 | Cedar Ridge Water Distribution | Develop water distribution system to provide water service to 30 families | 2/23/1977 | ignored | approved by BIA |
| 23 | Cedar Ridge Water Distribution | Community Water System to provide water and sewage services to 50 families which have never had a domestic water supply | 1/27/1978 | ignored | approved by BIA |
| 24 | Indian Health Service Water System | HIS proposal to develop a domestic water supply and sewer system to serve 23 families living near the Old Tuba City airport | 8/4/1978 | no response | approved by BIA |
| 25 | Rare metals Powerline | Extension of powerline to Rare Metals | 2/8/1979 | denied | |
| 26 | West Tuba City Water Distribution | IHS Proposal to develop community water system to provide domestic water to 31 Navajo families | 3/26/1979 | denied | approved by BIA |
| 27 | Preston Mesa Powerline | ROW for electric powerline extension to serve families in Preston Mesa | 8/30/1979 | ignored | approved by BIA |
| 28 | Kerley Valley Sewer Extension | Extension of existing water distribution system of approx. 3,500 feet | 4/11/1980 | approved by Hopi Tribe | |
| 29 | Tuba City Landfill | request for public landfill in accordance with Public Health Code | 7/8/1980 | record unclear | appears to be approved |
| 30 | Tappan Springs Powerline extension | request to extend electrical service to 3 families in Freeze Area | 8/13/1980 | no response | |
| 31 | NTUA Water Well/Forest lake Powerline | Two part request to drill another NTUA Water Well to serve the residents of the Tuba City area, and to extend the existing power line from Black mesa to Forest Lake | 6/18/1981 | approved by Hopi Tribe | |
| 32 | Tuba City Water Irrigation Project | no description | 00/00/1982 | approved in part by Hopi Tribe | |
| 33 | Cedar Ridge Pre-School | Proposal to build preschool facility for unserved area | 5/13/1982 | no response | |
| 34 | Gap/Bitter Springs Powerline | Extend existing NTUA powerline from Gap north to Bitter Springs Housing Project | 4/14/1983 | denied | |
| 35 | Rare Metals Uranium Mine Reclamation | Cleanup of uranium processing facility (Rare Metals Uranium Mine Reclamation) | 5/3/1983 | approved by Hopi Tribe | |
| 36 | Arizona Public Service | Hopi Letter to Arizona Public Service Company stating Hopi's view that providing electrical hookups would be in violation of the law | 6/23/1983 | blank | Not actual proposal |

| | Public Works Projects | | | | |
|---|---|---|---|---|---|
| | Project Number | Description | Date Submitted | Hopi Response | BIA Response |
| 37 | Arizona Public Service | request for easement for 12kv electric line | 3/21/1985 | no response | |
| 38 | Bodaway/Gap Water Extension | Extend existing water service to additional families | 10/19/1987 | no response | |
| 39 | Cameron School | Request by superintendent of school district for Hopi Tribal approval of Cameron School | 8/16/1988 | no response | |
| 40 | Western Navajo Fair | Request to build temporary structures for the annual Western Navajo Fair | 10/19/1988 | approved | |
| 41 | Coalmine Mesa Chapter House | Request for construction and renovations of projects within Chapter | 00/00/1989 | denied | Hopi Tribe did not actually deny, but instead stated that the request should come from the Navajo Nation |
| 42 | Cameron Vendor Village | Development of site for use by local arts and crafts vendors in Cameron | 1/3/1989 | unresolved | |
| 43 | State Highway 64 | Request for right-of-way easement | 1/10/1990 | no response | |
| 44 | Hidden Springs Water Rehabilitations Project | Develop artesian spring to conserve run off and eliminate seasonal water shortages. For family and livestock use. | 1/26/1990 | denied | |
| 45 | Gap Sewer Lagoon | Proposal to expand and renovate existing sewage lagoon to prevent further leaking and contamination | 2/16/1990 | denied expansion, but approved renovation | |
| 46 | Gap/Bodaway School Expansion | Replace existing primary school with new school | 2/28/1990 | denied | Hopi Tribe did not actually deny, but instead requested additional information |
| 47 | Bodaway Chapter House | Request to renovate Bodaway chapter house, which can no longer be used as community facility because of safety concerns | 4/9/1990 | approved by Hopi Tribe | |
| 48 | Billboards | Erect Billboards | 5/15/1990 | denied | |
| 49 | Coalmine Mesa Waterline Extension | Request to put in waterline extension to benefit District 3 permit holders grazing livestock south of well 3K-312 and U.S. Highway 264 and to prevent traffic accidents and resulting | 8/13/1990 | no response | |
| 50 | Cameron Sewage Lagoon Repairs | Proposal to remedy seepage from community Sewage Lagoon, which poses health hazards to humans and livestock | 9/24/1990 | approved by Hopi Tribe | |
| 51 | Coalmine Mesa Fire | Proposal to remedy health and safety concerns caused by underground mine fire burning in Coalmine Mesa | 9/26/90; 10/14/91 | approved by Hopi Tribe | |
| 52 | Western Navajo Fair | Request to build temporary structures for the annual Western Navajo Fair | 9/26/1990 | approved by Hopi Tribe | |
| 53 | Gap Sewer Lagoon | Relocate and expand sewer lagoon | 10/22/1990 | ignored | approved by BIA |
| 54 | Tuba City/Moenkopi Sewage Treatment Plant | Request for modifications | 2/20/1991 | approved by Hopi Tribe | |

Exhibit 24 to
United States' Motion
DOJ168

| | Public Works Projects | | | | |
|---|---|---|---|---|---|
| | Project Number | Description | Date Submitted | Hopi Response | BIA Response |
| 55 | Bridge Surveys | Request by BIA to survey 6 bridge locations | 2/20/1991 | denied | |
| 56 | Tuba City School | Request to drill for water | 5/2/1991 | no response | Hopi Tribe apparantely consented |
| 57 | Cameron Abandoned Mines Reclamation Project #1 | DOI proposed clean up of abandoned uranium mines in Cameron | 5/15/1991 | approved by Hopi Tribe | |
| 58 | Dine Association for Handicapped Citizens, Inc (DAHC) | Build residential and treatment center for severely handicapped Native American children | 7/1/1991 | denied | |
| 59 | Western Navajo Fair | build temporary structures for Western Navajo Fair | 7/8/1991 | no response | |
| 60 | Cameron Abandoned Mines Reclamation Project #2 | DOI proposal to clean-up remaining contaminated abandoned uranium mining sites in Cameron | 2/25/1992 | no response | approved by BIA?? |
| 61 | Navajo Arts and Crafts (Cameron) (NACE) | Improve existing tribal arts and crafts enterprise | 3/12/1992 | no response | |
| 62 | Junction Enterprises | Business site renewal and requests for improvements | 4/28/1992 | ignored | approved (I22) |
| 63 | Windmill #3A-149 -- Little Cowboy | replace storage tank and apparently waterline extension | 8/14/1996 | approved | |
| 64 | Windmill #3-T-541 -- Moenkopi Wash Area | replace storage tank | 8/15/1996 | approved | |
| 65 | Tonalea to Coalmine Mesa Powerline Extension | powerline extension | 8/14/1996 | denied | |
| 66 | Cedar Ridge Powerline Extension | powerline extension | 8/20/1996 | approved | |
| 67 | Tonalea Chapter Application for 12 bathroom additions | bathroom additions | unclear | approved | |
| 68 | Red Lake Waterline Extension | water line extension | unclear | approved | |
| 69 | Navajo Arts and Crafts | tribal arts and crafts enterprise | unclear | approved | |
| 70 | Waterline Extension | waterline extension | unclear | Hopi requested additional information | |
| 71 | Survey work (N608, N6731, N20, N21) | survey work | unclear | approved | |
| 72 | Solid Waste Transfer station | solid water transfer station for Gap/Bodaway Chapter | 4/28/1997 | approved | |

| | Public Works Projects | | | | |
|---|---|---|---|---|---|
| | Project Number | Description | Date Submitted | Hopi Response | BIA Response |
| 73 | White Mesa Regional Water System and associated ROW | Indian Health Services Projects NA-00-B03; NA-00-B48; NA-00-M79; NA-00-N24; NA-00-N25; NA-00-N26; NA-00-B83; Gopher Spring Extension | unclear | approved | |
| 74 | Enclosed Solid Waster Fille site and Associated Landfill Tract (Cedar Ridge) | Enclosed Solid Waster Fille site and Associated Landfill Tract (Cedar Ridge) | unclear | approved | |
| 75 | Rare Metals Water and Wastewater Project (NA-00-N10) | Rare Metals Water and Wastewater Project | 2/22/2001 | approved | |
| 76 | Cameron Sewer Lagoon Expansion and Associated Right of Ways (NA-98-860) | Cameron Sewer Lagoon Expansion and Associated Right of Ways | 11/00/2000 | approved | |
| 77 | Moenave Power Line Project | Moenave Power Line Project | unclear | approved | |
| 78 | Bodaway/Gap Elementary School | Bodaway/Gap Elementary School | unclear | approved | |
| 79 | White Mesa and Gopher Springs Extensions | unclear | unclear | approved | |
| 80 | Construction of water supply and waste disposal facilities with associated ROWs in | Construction of water supply and waste disposal facilities with associated ROWs in Southeast Cameron | 12/14/2000 | approved | |
| 81 | North Cameron Waterline extension project (SFA-15-00) | construction of water supply line, wasterwater disposal facilities, and bathroom additions for 25 homes with associated ROWs | 6/14/2000 | approved | |
| 82 | waterline extension (for David Begay) | waterline extension (for David Begay) | 2/25/1997 | approved | |
| 83 | waterline extension (8.5 miles) | waterline extension (8.5 miles) | 10/22/1997 | unclear | |
| 84 | Windmill #3K-329 -- Rock Pile | replacement of water well, well tower and water storage tank | 6/5/1999 | approved | |
| 85 | Gap Pre-School Construction | Gap Pre-School Construction | 5/13/1982 | approved | |
| 86 | Coal Mine Mesa housing development | Coal Mine Mesa housing development | unclear | denied | |
| 87 | Windmill #3K-325 (Owlhead Windmill) | repair windmill | unclear | unclear | |
| 88 | South Cameron mutual Help Seweage System | construction of sewer outfall line and sewage lagoon to serve the Mutual Help housing project and existing homes (55 homes) at Cameron | unclear | unclear | approved by BIA |
| 89 | Gap Trading Post | construct modern laundromat; convert building spaces to motel rooms; rmodel store interior and restrooms | unclear | unclear | |
| 90 | Junction Enterprises (Mini-Mart) | consent for renewal of the business lease; replacement and improvements to underground gasoline tank; renovations of and improvements to convenience store | 4/28/1992 | approved | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | **Name** | **Description** | **Date Submitted** | **Hopi Response (according to Plaintiff)** | **BIA Response** |
| 1 | Tso, Emmett | Replacement of burned out house | 00/00/1973 | Denied | |
| 2 | Nez, Renie | Application for new construction | 9/8/1976 | No response on record | |
| 3 | Zahaney, Rose | Provide electrical service to residence | 8/22/1978 | Denied | |
| 4 | Bennett, Bobby James | Hook up to electrical service | 1/7/1980 | Denied | |
| 5 | Lane, Keith & Dorothy | Request for approval of a monesite lease for family | 4/16/1980 | Denied | |
| 6 | Haskey, Mike | Replacement of burned out trailer | 00/00/1982 | Denied | |
| 7 | Saganitso, Victor Sr. | Replacement of existing house | 3/22/1982 | No response on record | |
| 8 | Keebahe, Norman | Replacement of inadequate Housing | 6/28/1982 | denied | |
| 9 | Bilagody, Stella | Replacement of 1-room shack | 7/6/1982 | Denied | |
| 10 | Mott, Billy | Replacement of existing two-room shack | 7/6/1982 | No response on record | |
| 11 | Techeeni, Jack and Mae | Replacement of dilapidated one-room shack | 7/6/1982 | Denied | |
| 12 | Yellowhair, Kahn | Room addition to existing residence | 7/6/1982 | No response on record | |
| 13 | Watson, Stella | Replacement of dilapidated hogan | 7/6/1982 | No response on record | |
| 14 | Nez, Chee | Replacement of stone hogan | 7/6/1982 | No response on record | |
| 15 | Tisi, Charley | Bathroom addition to existing residence | 7/6/1982 | No response on record | |
| 16 | Teacheenie, Jennie | Replacement for Deteriorated residence | 7/6/1982 | No response on record | |
| 17 | Keebahe, Norman | Request for approval of homesite lease | 7/28/1982 | No response on record | |
| 18 | Neztsosie, David | Request to build replacement house | 9/29/1982 | No response on record | |
| 19 | Kelly, Andrew Sr. | Request for waiver of homeside lease | 1/20/1983; 1/20/1984 | No response on record | |

Exhibit 24 to
United States' Motion
DOJ171

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 20 | Bilagody, Stella | Request for replacement house | 7/13/1984; 6/26/1984 | No response on record | |
| 21 | Mott, Anna | Replacement of dilapidated house | 7/13/1984; 6/26/1984 | No response on record | |
| 22 | Tacheeni, Jack and Mae | Replacement of dilapidated house | 7/13/1984; 6/26/1984 | No response on record | |
| 23 | Manygoats, Margaret | Replacement of dilapidated house | 7/13/1984; 6/26/1984 | No response on record | |
| 24 | Yellowhair, Kahn | Room addition to existing residence | 7/13/1984; 6/26/1984 | No response on record | |
| 25 | Means, Kee John | Connection to electric line | 10/16/1984 | approved | |
| 26 | Anderson, Bob | Use of Pasture Canyon water for HUD housing construction | 11/19/1984 | Denied | |
| 27 | Black, Emma | Replace hogan | 10/21/1985 | No response on record | |
| 28 | Maize, Henry | Replace hogan | 8/5/1986 | No response on record | |
| 29 | George, Kenneth | Replace hogan | 10/22/1986 | Denied | |
| 30 | Nez, Willie and Family | Replace hogan | 10/26/1987 | Denied | |
| 31 | Arizona, Hotachellie | Replace hogan | 00/00/1988 | approved | |
| 32 | Dodson, Raymond and Christine | Construction of electric line; hook up | 4/19/1988 | No response on record | |
| 33 | Black, Helen | House repairs | 9/7/1988 | Denied | |
| 34 | Johnson, Dorothy | House repairs and electricity hookup | 9/7/1988 | Denied | |
| 35 | Secody, Mary | House repairs and electricity hookup | 9/7/1988 | Denied | |
| 36 | Secody, Marie | House repairs and electricity hookup | 9/7/1988 | denied | Hopi Tribe appears to have approved, not denied |
| 37 | Blackhat, Alfred | Insulation for hogan | 9/7/1988 | Denied | Denied |
| 38 | Blackhat, John | Renovation of house; electrical hookup | 9/7/1988 | Denied | Denied |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 39 | Yazzie, Victoria | Electrical hookup | 9/7/1988 | Denied | Denied |
| 40 | Maze, Henry and Rena | Electrical hookup | 9/7/1988 | Denied | Denied |
| 41 | Hoschaine, Edward and Darlene | Electrical hookup | 9/7/1988 | Denied | Denied |
| 42 | Redhouse, Lee | Electrical hookup | 10/12/1988 | no response | Hopi Tribe appears to have approved |
| 43 | Secody, Marie | Renovation and addition | 10/12/1988 | approved renovations but not addition | |
| 44 | Stevens, Flora | Renovation of house | 10/28/1988 | no response | BIA approved |
| 45 | Goodman, Theresa | Repair and addition to house | 11/7/1988 | no response | BIA approved |
| 46 | Stevens, Flora | Request for reconsideration | 12/20/1988 | No response on record | BIA approved |
| 47 | Whitesinger, Paul | Electrical hookup | 12/22/1988 | denied | Hopi letter is not a denial |
| 48 | Homer, Marie | Replacement of home | 3/10/1989 | Denied | unclear (BIA requested additional information) |
| 49 | Shorty, Billy | Replacement of hogan | 3/10/1989 (resubmitted 10/9/1989) | denied | BIA approved |
| 50 | Dugi, Delfred | Replacement of house | 3/10/1989; 7/26/1989; (resubmitted 10/5/1989) | ignored | Hopi Tribe actually approved in part |
| 51 | Williams, Lester | Replacement of house | 3/10/1989 (resubmitted 10/9/1989) | Denied | |
| 52 | Dodson, Harry | Replacement of house | 3/10/1989 (resubmitted 10/9/1989) | denied | BIA approved |
| 53 | Bilagody, Stella | Replacement of house | 8/22/1989 | approved renovations but not addition | |
| 54 | Blackhat, John | Repair roof | 8/28/1989 | approved | |
| 55 | Begay, Glenmore | Replace hogan | 9/13/1989; 1/2/1990 | denied | Hopi Tribe reconsidered and granted in part |
| 56 | Dougi, Delfred | Replace trailer | 10/5/1989 | approved | |
| 57 | Begay, John and Sarah | Replace house | 2/13/1990 | approved | |

Exhibit 24 to
United States' Motion
DOJ173

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 58 | Williams, Lester | Water line hookup | 2/21/1990 | no response | Hopi Tribe actually approved |
| 59 | Manygoats, Bessie | Replacement of residence; electric hookup | 5/4/1990 | denied | Hopi Tribe actually approved |
| 60 | Yellowhair, Joe | Replacement of hogan | 5/4/1990; 10/22/1990 | Denied | |
| 61 | Loretta, John | Replace structures | 5/7/1990 | Denied | |
| 62 | Blackhat, Joe | Replace structures | 5/8/1990 | Denied | |
| 63 | Keebahe, Margaret | Replace hogan | 6/12/1990 | Denied | |
| 64 | Badonie, Susan | Construct house | 8/10/1990 | no response | Hopi Tribe actually approved |
| 65 | Dandy, Cora | repair house | 8/28/1990 | approved | |
| 66 | Farrell, James | Renovate and repair house | 8/31/1990 | approved | |
| 67 | Farrell, Betty | Renovate house and build hogan | 8/31/1990 | approved | |
| 68 | Begay, LaVonne | Replace burned-out home | 9/17/1990 | approved | |
| 69 | Adams, Bill | Replace hogan; add utilities | 9/18/1990 | approved in part | |
| 70 | Begay, Jessie Lee | Replace burned-out home and add utilities | 9/18/1990 | approved in part | |
| 71 | Yazzie, Gene and Lucinda | Replace burned out trailer | 9/20/1990 | approved | |
| 72 | Yazzie, Larry | Replace hogan | 10/2/1990 | denied | approved by BIA |
| 73 | Homer, Rose | Add bedroom and repair | 10/2/1990 | approved in part | approved by BIA |
| 74 | Hoschaine, Darlene | Replace shack | 10/9/1990 | denied | approved by BIA |
| 75 | Homer, Marie | Replace shack | 10/16/1990 | Denied | |
| 76 | Secody, Grace | Replace burned out hogan | 2/12/1991 | Denied | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 77 | Mott, Anna | Replace Roof | 5/7/1991 | approved | |
| 78 | Dugi, Sherman and Louise | Repair existing structure | 5/8/1991 | approved | |
| 79 | Keebahe, Tom | Repair existing structure | 6/19/1991 | approved | |
| 80 | Bedonie, Susan | Renovate and repair house | 8/10/1991 | approved | |
| 81 | Smith, Stanley | Replace burned out house | 10/1/1991 | approved | |
| 82 | Manygoats, Marie | Replace deteriorated home | 10/21/1991 | approved | |
| 83 | Whiterock, Jerry | Replace residence | 11/3/1991 | approved | |
| 84 | John, Lorraine | Replace burned out house | 11/13/1991 | approved | |
| 85 | Smith, Sadie | Replace shack | 11/13/1991 | Denied | |
| 86 | Widehat, Phyllis | Replace burned out house | 11/14/1991 | approved | |
| 87 | Martin, Mary | Replace burned out house | 11/15/1991 | Denied | |
| 88 | Johnson, Ernest | Replace house | 12/2/1991 | approved | |
| 89 | Homer, Gary | Replace house | 12/4/1991 | approved | |
| 90 | Curley, Lucinda and Neal | Replace house | 12/5/1991 | approved | |
| 91 | Black, Towlie | Replace hogan and add utilities | 12/13/1991 | approved in part | |
| 92 | Yellowhair, Loren | Replace burned out trailer | 12/16/1991 | denied | Hopi Tribe actually approved |
| 93 | Bilagody, Elizabeth and Harry | renovations | 1/2/1992 | approved | |
| 94 | Tohonnie, Elsie | replace shack | 1/15/1992 | approved | |
| 95 | Homer, Joe | replace hogan | 1/16/1992 | Denied | |

| Individual Tribal Members | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 96 | Haskey, Mike | replace mobile home | 1/17/1992 | Denied | |
| 97 | Sloan, Leonard and Family | replace hogan | 1/22/1992 | approved in part | BIA approved |
| 98 | Rock, Mabel | replace hogan | 1/23/1992 | approved | |
| 99 | Benally, Shirley | addition to residence and repair | 2/6/1992 | approved in part | |
| 100 | Littlefoot, Bahe | Replace deteriorated home | 2/11/1992 | approved | |
| 101 | Jean, Harry | replace hogan | 2/28/1992 (original); 6/17/1992 (revised) | approved | |
| 102 | Littleman, Huskie | replace hogan | 3/2/1992 | Denied | |
| 103 | Bennett, Esther | replace home | 3/12/1992 | approved | |
| 104 | Tsosie, Harry | add to home | 3/16/1992 | approved | |
| 105 | Cody, Rosemary | replace home | 3/17/1992 | approved | |
| 106 | Johnson, Lee | Replace building | 3/19/1992 | approved | |
| 107 | Yazzie, Sally | Bathroom addition to existing residence | 3/19/1992 | approved | |
| 108 | Mann, Alfred | replace hogan | 3/19/1992 (original); 6/16/1992 (revised) | approved | |
| 109 | Yazzie, Zella | add to home | 3/30/1992 | approved | |
| 110 | Edgewater, Zella | replace hogan | 4/14/1992 | approved | |
| 111 | Yazzie, Sandra | utility hookup | 5/5/1992 | approved | |
| 112 | Scott, Leonard | add bedroom | 7/23/1992 | approved | |
| 113 | Manychildren, Mary Lou | replace trailer | 7/31/1992 | approved | |
| 114 | Boone, Allen | replace home | 8/6/1992 | approved | |

Exhibit 24 to
United States' Motion
DOJ176

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 115 | Benally, Millie | replace hogan | 8/12/1992 | approved | |
| 116 | Keams, Madge | replace home | 8/19/1992 | approved | |
| 117 | Colorado, Wilson | replace home | 9/1/1992 | approved | |
| 118 | Bennett, Bobby James | replace home | 9/9/1992 | approved | |
| 119 | Zilth, Leo | construction of three-bedroom replacement structure | unclear | approved | |
| 120 | Dickens, Edward | construction of one-bedroom house | unclear | approved | |
| 121 | Preston, Lavon | replace structure | unclear | approved | |
| 122 | Hoschain, Hannah | replace structure | unclear | approved | |
| 123 | Secody, Tom | unclear | unclear | approved | |
| 124 | Yazzie, Kee | unclear | unclear | approved | |
| 125 | Watson, Lena | unclear | unclear | approved | |
| 126 | Attakai, Elroy | unclear | unclear | approved | |
| 127 | Hanks, Laura | unclear | unclear | approved | |
| 128 | Bennett, Esther | finish construction of house | 5/16/1996 | denied | |
| 129 | Dougi, Kee | finish construction of house | 5/16/1996 | denied | |
| 130 | Dougi, Jean | finish construction of house | 5/16/1996 | approved | |
| 131 | Begay, Lena | finish construction of house | 5/16/1996 | approved | |
| 132 | Jefferson, Lorraine | finish construction of house | 5/16/1996 | approved | |
| 133 | Lane, Henry | finish construction of house | 5/16/1996 | approved | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 134 | Tso, Billy | finish construction of house | 5/16/1996 | denied | |
| 135 | Grey, Tom | finish construction of house | 5/16/1996 | denied | |
| 136 | Shaw, Florence | finish construction of house | 5/16/1996 | approved | |
| 137 | Fowler, Mary | finish construction of house | 5/16/1996 | approved | |
| 138 | Onesalt, Edwin | home replacement | unclear | approved | |
| 139 | Dougi, Belle | home replacement | unclear | approved | |
| 140 | Farley, Lillie | installation of cistern and septic tank | unclear | approved | |
| 141 | Delmar, George | replace structure | unclear | approved | |
| 142 | Butler, Billy | replace structure | unclear | approved | |
| 143 | Hoover, Thomas | replace structure | unclear | approved | |
| 144 | Bennett, Ella | replace structure | unclear | approved | |
| 145 | Secody, Isabel | replace structure | unclear | approved | |
| 146 | Secody, Marlinda | utility hookup | unclear | approved | |
| 147 | Wilson, Joan | unclear | unclear | approved | |
| 148 | Bedonie, Gilbert | unclear | unclear | approved | |
| 149 | Tracy, Nita | unclear | unclear | approved | |
| 150 | Brown, Belinda | unclear | unclear | approved | |
| 151 | Begody, Pauline | replace structure | 2/22/1996 | approved | |
| 152 | Saliego, Kee | unclear | unclear | approved | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 153 | Begody, Westley | unclear | unclear | approved | |
| 154 | Belone, Wilfred | home site lease; construction of new home; utility hookup | 4/9/2003 | approved | |
| 155 | Yazzie, John B. and Shirley | new home with utilities | 11/13/2000 | approved | |
| 156 | Yazzie, Frank and Bessie | new home with utilities | 11/13/2000 | approved | |
| 157 | Teller, Darlene | home site lease; construction of new home | unclear | approved | |
| 158 | Roan, Elvan and Laura | home site lease; utility line hookup | 2/24/2004 | approved | |
| 159 | June, Jacqueline | replace burned out structure | 1/13/2004 | approved | |
| 160 | Begay, Judas and Nora | construct new home and utility hookup | 1/15/2004 | approved | |
| 161 | Goodman, Alice and Theresa | construct new relocation home and utility hookup | 1/15/2004 | approved | |
| 162 | Jasper, Lena | construct new home and utility hookup | 8/28/203 | approved | |
| 163 | Todacheene, Lance Yale | construct new home | unclear | approved | |
| 164 | Curley, Alex | water hookup | unclear | approved | |
| 165 | Badonie, James F. | replace home and utility hookup | unclear | approved | |
| 166 | Bilagody, Elvin and Bessie | utility hookup | unclear | approved | |
| 167 | Bia, Andrew and Cara Jean | home site lease; construction of new home; utility hookup | unclear | approved | |
| 168 | Billy, Llyd and Nora | home site lease; construction of new home; utility hookup | unclear | approved | |
| 169 | Allen, Rosie | home site lease; construction of new home; utility hookup | unclear | denied | |
| 170 | Bracker, Norma Jean | unclear | unclear | approved | |
| 171 | Bighorse, Darrell Reed | home site lease; construction; utility hookup | unclear | approved | |

Exhibit 24 to
United States' Motion
DOJ179

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 172 | Begay, Mamie Yazzie | homesite lease | unclear | approved | |
| 173 | Yazzie, Johathn and Corina | home site lease; construction; utility hookup | unclear | approved | |
| 174 | Nez, Ronald Herbert and Flora | unclear | unclear | denied | |
| 175 | Belone, Frank and Diane | utility hookup | unclear | approved | |
| 176 | Alcott, Mike and Hatathlie, Carol Jean | home site lease; construction; utility hookup | unclear | approved | |
| 177 | Belone, Patricia | construction of new home | unclear | approved | |
| 178 | Denetsosie, Lester and Zonnie | construction of new home | unclear | approved | |
| 179 | Burke, Jimmie and Irene | home site lease | unclear | approved | |
| 180 | Chee, Keith | construction of new home | unclear | approved | |
| 181 | Manywhisters, Sonny | construction of new home | unclear | approved | |
| 182 | Hanks, Emma | construction of new home | unclear | approved | |
| 183 | Begay, Leo H. | construction of new home | unclear | denied until further review | |
| 184 | Grey, Tom | unclear | unclear | approved | |
| 185 | Bennett, Esther | unclear | unclear | approved | |
| 186 | Hadley, Jerry | construction of new home | unclear | approved | |
| 187 | Keetso, Charlene | construction of new home | unclear | approved | |
| 188 | Sloan, Charlie | construction of new home | unclear | approved | |
| 189 | Chee, Rose | unclear | unclear | approved | |
| 190 | Scott, Doc | unclear | unclear | denied until further review | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | Name | Description | Date Submitted | Hopi Response (according to Plaintiff) | BIA Response |
| 191 | Hoover, Thomas and Anita | utility hookup | unclear | approved | |
| 192 | Little, Laura | unclear | unclear | unclear | |
| 193 | Cattlechaser, Dennis | unclear | unclear | unclear | |
| 194 | Bilagody, Elizabeth | water hookup | unclear | approved | |
| 195 | Keebahe, Tom | renovation and repiar work | unclear | approved | |
| 196 | Zahne, Dewey | replace burned out structure | 1/26/1996 | unclear | |
| 197 | Begay, Lena | replace burned out structure | 1/26/1996 | unclear | |
| 198 | Neztsosie, David | unclear | unclear | unclear | |
| 199 | Ashike, Violet | Repair and addition to house | 11/7/1988 | unclear | BIA approved |
| 200 | McCabe, Alfred, Sr. | Repair and addition to house | 11/7/1988 | unclear | BIA approved |
| 201 | Babbitt, Louise | powerline extension | unclear | unclear | |
| 202 | Shorty, Billy | construction of ceremonial structure | 1/9/1990 | unclear | |
| 203 | Williams, Lester | construction of ceremonial structure | 1/9/1990 | unclear | |
| 204 | Shorty, Billy | construction of replacement house | 2/5/1990; 8/10/1990 | approved | |
| 205 | Miles, Cecil | construction | unclear | denied | |
| 206 | Gleason, Mary Lou | construction | unclear | denied | |
| 207 | Dickerson, David | construction | unclear | denied | |
| 208 | Bahe, Benjamin | construction | unclear | denied | |
| 209 | Wilson, Harriet | construction | unclear | denied | |

| Individual Tribal Members | | | | | |
|---|---|---|---|---|---|
| | **Name** | **Description** | **Date Submitted** | **Hopi Response (according to Plaintiff)** | **BIA Response** |
| 210 | Lewis, Dennis | construction | unclear | denied | |
| 211 | Begay, James | construction | unclear | denied | |
| 212 | Begay, Percy | construction | unclear | denied | |
| 213 | Francis, Michael | construction | unclear | denied | |
| 214 | Coppermine First Baptist Church | homsite lease request | unclear | approved | |
| 215 | Bilagody, Michael S. | utility hookup | unclear | approved | |
| 216 | Preston, Johnny and Mary | homsite lease request | unclear | approved | |
| 217 | Preston, Lucita | homesite lease | unclear | approved | |
| 218 | Jean, Harry and Mae Lee | homesite lease | unclear | approved | |

COPY

**IN THE UNITED STATES**

**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION,<br><br>Plaintiff,<br>v.<br><br>THE UNITED STATES,<br><br>Defendant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 508-88L<br><br>Senior Judge Eric G. Bruggink |

**NAVAJO NATION'S RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES, REQUESTS FOR ADMISSION, AND REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF**

COMES NOW Plaintiff Navajo Nation ("Nation"), by and through its attorneys, and files its response to the above indicated discovery requests from Defendant United States of America. These responses are made for purposes of this action only, and in accordance with Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"). Further, they are filed (i) subject to, and without in any manner waiving, the Nation's objections as stated herein; and (ii) subject to the right of the parties to introduce evidence supplementing or explaining any of the matters referred to below.

Due to the volume of documents assembled and reviewed, it is possible that one or more documents that are privileged and/or otherwise not subject to production have been inadvertently disclosed. The Nation hereby reserves the right to assert privilege with respect to any such documents.

Exhibit 25 to
United States' Motion
DOJ186

In responding to the interrogatories and requests for production, the Nation has identified a particular document or documents as being responsive to one interrogatory or request for production. Due to the overlap of the questions and/or requests, any particular document may be responsive to multiple interrogatories or requests for production.

## I. GENERAL OBJECTIONS.

The Nation objects to the Defendant's discovery requests to the extent that the Defendant:

1. seeks information and materials protected by the attorney-client privilege, the deliberative process privilege and/or the work product privilege;

2. asks for a purely legal conclusion and is not proper under RCFC 33(c);

3. asks to identify "every relevant fact," which is overly broad and because the Defendant, as the party who initiated the actions relevant to the taking, is already well aware of most, if not all, of the facts relevant to the taking;

4. asks the Nation to set forth information that is provided in the documents produced and therefore unduly burdensome;

5. asks for information that the Defendant should already have in its possession either because the request was made to the Hopi Tribe and the Hopi Tribe was acting as the Defendant's agent or the request was made directly to the Defendant; or

6. asks for information that is not relevant to the pending claims and is not likely to lead to admissible evidence in this matter.

Without in any way waiving or limiting the generality of the foregoing objections, the Nation responds to the Defendant's discovery requests as follows:

## II. RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Please state the date on which You contend that the Subject Property was taken, and identify the event or events and every relevant fact on which Your contention is based.

**RESPONSE:**

The Nation contends that the Nation's claim for a temporary regulatory taking accrued on December 5, 2006, when Judge Carroll dismissed *Honyoama v. Shirley*, No. CIV 74-842-PHX-EHC, slip op. at 4 (D. Ariz. Dec. 5, 2006), that effectively lifted the freeze, thereby ending the temporary regulatory taking. *See Creppel v. United States*, 41 F.3d 627, 632 (Fed Cir. 1994); *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 34 (2005). Nevertheless, the economic effect of the regulations that severely and completely deprived the Navajo Nation of both the economic and beneficial use of the land occurred much earlier.

Facts and events relevant to the claim:

**1.** Act of June 14, 1934, ch. 521, 48 Stat. 960 (the "1934 Act"). The 1934 Act described the external boundaries of the Navajo Reservation and stated that

> [a]ll vacant, unreserved, and unappropriated public lands . . . in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon.

*Id.* The Court of Appeals has determined that "[t]he purposes, history, and language of the 1934 Act show an intent to withdraw all reservation land for the Navajos except for pockets occupied by Hopis." *Sekaquaptewa v. MacDonald*, 619 F.2d 801, 807 (9th Cir.1980). Based on the 1934 Act, the Navajo

**INTERROGATORY NO. 5:**

Please identify any and all Development or Construction Requests made by the Plaintiff to the Hopi Tribe from July 8, 1966 to present for any property subject to the Bennett Freeze. In addition to providing detailed information about the Development request, your answer should identify the Hopi Tribe's response to each Development request.

**RESPONSE:**

The Nation previously, and contemporaneously with submission of these answers, provided the Defendant with the documents it has collected to date responsive to this interrogatory. See discovery index attached hereto as Exhibit A. These documents provide detailed information about the Development requests and also provide the Hopi Tribe's response. In addition, the Nation is attaching a table setting forth the majority of the construction requests submitted to the Hopi Tribe from 1966 through 1992. See Exhibit B.

**INTERROGATORY NO. 6:**

For each Development or Construction Request made by Plaintiff from July 8, 1966 to present for which the Hopi Tribe did not provide its consent, please indicate whether Plaintiff sought approval from any federal government agency (including the Department of the Interior) for that Development or Construction Request. In addition to providing detailed information about the Development or Construction Request, your answer should identify the government's response to each Development or Construction Request.

**RESPONSE:**

The Nation previously provided the Defendant with the documents it has collected to date responsive to this interrogatory. See discovery index attached hereto as Exhibit A. These documents

**RESPONSE:**

The Nation has previously provided the Defendant with the documents it has collected to date responsive to this request for production. See discovery index attached hereto as Exhibit A.

**REQUEST NO. 10:**

Any and all correspondence to or from any entity regarding possible economic development or use of the land included within the Bennett Freeze from July 8, 1966 to present.

**RESPONSE:**

The Nation has previously provided the Defendant with the documents it has collected to date responsive to this request for production. See discovery index attached hereto as Exhibit A.

The discovery index and these Responses to Defendant's Second Set of Interrogatories and Requests for Production of Documents will be supplemented if and when additional information and/or documents are obtained or located by the Nation.

Dated: April 27, 2007

Respectfully submitted,

BRUCE R. GREENE
M. CATHERINE CONDON
Greene, Meyer & McElroy, P.C.
1007 Pearl St., Ste. 220
Boulder, Colorado 80302
(303) 442-2021 (phone)
(303) 444-3490 (fax)

PETER J. OSETEK
1104 Michigan Ave.
Ann Arbor, Michigan 48104
(734) 769-4500 (phone)
(734) 769-7699 (fax)

*Counsel for the Navajo Nation*

By: [signature]
Bruce R. Greene

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing *Navajo Nation's Responses to Defendant's Second Set of Interrogatories, Requests for Admission, and Requests for Production of Documents to Plaintiff* has been served upon the defendant by U.S. Mail, postage prepaid, this 27th day of April, 2007, addressed to:

William Shapiro, Tribal Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 98515

[signature]



Exhibit 25 to
United States' Motion
DOJ191

**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION, | ) | |
| | ) | No. 508-88L |
| Plaintiff, | ) | |
| v. | ) | Senior Judge Eric G. Bruggink |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**DECLARATION OF WILLIAM J. SHAPIRO**

I, WILLIAM J. SHAPIRO, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney in the Environment and Natural Resources Division of the United States Department of Justice and have been counsel of record in the above-titled case since August 16, 2001 (Doc. No. 64).

2. Since the inception of this lawsuit, the parties have exchanged a large number of documents informally and pursuant to formal discovery requests.

3. In December 2005, I prepared and transmitted to Plaintiff's counsel the United States' Second Set of Interrogatories, Requests for Admission, and Requests for Production of Documents.

4. On or about April 27, 2007, Plaintiff responded to those discovery requests. The United States attached a portion of Plaintiff's discovery response as Defendant's Exhibit 25 to its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, filed June 2, 2008 ("United States' Motion").

5. Interrogatory Number 5 of the above-referenced discovery requests asked Plaintiff to



Exhibit 26 to
United States' Motion
DOJ 192

"identify any and all Development or Construction Requests made by the Plaintiff to the Hopi Tribe from July 8, 1966 to present for any property subject to the Bennett Freeze." See Def.'s Ex. 25.

6. In response, Plaintiff referenced a discovery index that it had attached as "Exhibit A." See id.
7. In addition, Plaintiff attached a table, which it titled "Exhibit B." Plaintiff asserted that Exhibit B set "forth the majority of the construction requests submitted to the Hopi Tribe from 1966 through 1992." Id.
8. The United States attached Plaintiff's table of construction requests as Defendant's Exhibit 22 to the United States' Motion.
9. After receiving Plaintiff's discovery response, I attempted to locate and summarize all of Plaintiff's construction requests into one document.
10. The United States attached this summary exhibit as Defendant's Exhibit 24 to the United States' Motion.
11. Based on my review of the record, I believe that Defendant's Exhibit 24 contains Plaintiff's construction requests in the existing record, and accurately summarizes the existing record.
12. However, due to the volume of materials generated during discovery, the length of time involved in this case, and ambiguity in some documents, I was unable to verify the outcome of some proposal requests. In those cases where the outcome of a proposal was uncertain, I indicated "unclear" in Defendant's Exhibit 24.
13. Moreover, I was unable to verify that Plaintiff actually submitted some of the proposed development requests. For several proposals identified in Plaintiff's Exhibit B, Plaintiff did not provide the actual development request. Thus there is no independent evidentiary support

for Plaintiff's representations. However, for purposes of Defendant's Exhibit 24, I have assumed that Plaintiff actually submitted those proposals, despite the lack of supporting documentary evidence. Defendant reserves the right to challenge Plaintiff's representations at a later date, should it be necessary to do so.

14. Based on the information available to me as of this date, Defendant's Exhibit 24 summarizes the available documentary evidence in regard to Plaintiff's proposed construction requests made between 1966 and 2006.

Based on the information available to me, I certify, under penalty of perjury, that the foregoing is true and correct.

Dated: June 2, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, California 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)