93D CONGRESS : : : : 2D SESSION
JANUARY 21-DECEMBER 20, 1974

# SENATE REPORTS

## VOL. 1-8

MISCELLANEOUS REPORTS ON
PUBLIC BILLS, VIII

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

Calendar No. 1121

93D CONGRESS } SENATE { REPORT
2d Session } { No. 93-1177

# RESOLUTION OF NAVAJO-HOPI LAND DISPUTES

SEPTEMBER 25, 1974—Ordered to be printed

Mr. FANNIN, from the Committee on Interior and Insular Affairs, submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 10337]

The Committee on Interior and Insular Affairs, to which was referred the Act (H.R. 10337) to authorize the partition of the surface rights in the joint use area of the 1882 Executive Order Hopi Reservation and the surface and subsurface rights in the 1934 Navajo Reservation between the Hopi and Navajo Tribes, to provide for allotments to certain Paiute Indians, and for other purposes, having considered the same, reports favorably thereon with amendments and recommends that the Act as amended do pass.

The amendments are as follows:

1. Strike out all after the enacting clause and insert in lieu thereof the following:

That, (a) within thirty days after enactment of this Act, the Director of the Federal Mediation and Conciliation Service shall appoint a Mediator (hereinafter referred to as the "Mediator") who shall assist in the negotiations for the settlement and partition of the relative rights and interests, as determined by the decision in the case of *Healing* v. *Jones* (210 F. Supp. 125, D. Ariz., 1962, aff'd 373 U.S. 758, 1963) (hereinafter referred to as the "*Healing* case"), of the Hopi and Navajo Tribes (hereinafter referred to as the "tribes") to and in lands within the reservation established by the Executive order of December 16, 1882, except land management district no. 6 (such lands hereinafter referred to as the "joint use area"). The Mediator shall not have any interest, direct or indirect, in the settlement of the interests and rights set out in this subsection. The duties of the Mediator shall cease upon the entering of a full agreement into the records of the supplemental proceedings pursuant to section 3 or the submission of a report to the District Court after a default in negotiations or a partial agreement pursuant to section 4.

★(Star Print) 38-010 O

thence southwesterly 1,200 feet (in a straight line) following the 6,900 feet contour;

thence south 46 degrees east, 600 feet;

thence north 38 degrees east, 1,300 feet to the point of beginning, 23.8 acres more or less: *Provided*, That, if and when such spring is fenced, the Hopi Tribe shall pipe the water therefrom to the edge of the boundary as hereinabove described for the use of residents of the area. The natural stand of fir trees within such 2-mile radius shall be conserved for such religious purposes.

SEC. 21. Notwithstanding anything contained in this Act to the contrary, the Secretary shall make reasonable provision for the use of and right of access to identified religious shrines for the members of each tribe on the reservation of the other tribe where such use and access are for religious purposes.

SEC. 22. The availability of financial assistance or funds paid pursuant to this Act may not be considered as income or resources or otherwise utilized as the basis (1) for denying a household or member thereof participation in any federally assisted housing program or (2) for denying or reducing the financial assistance or other benefits to which such household or member would otherwise be entitled to under the Social Security Act or any other Federal or federally assisted program. None of the funds provided under this Act shall be subject to Federal or State income taxes.

SEC. 23. The Navajo and Hopi Tribes are hereby authorized to exchange lands which are part of their respective reservations.

SEC. 24. If any provision of this Act, or the application of any provision to any person, entity or circumstance, is held invalid, the remainder of this Act shall not be affected thereby.

SEC. 25. (a)(1) For the purpose of carrying out the provisions of section 15, there is hereby authorized to be appropriated not to exceed $31,500,000.

(2) For the purpose of carrying out the provisions of subsection (a) of section 19, there is hereby authorized to be appropriated not to exceed $10,000,000.

(3) For the purpose of carrying out the provisions of subsection (b) of section 19, there is hereby authorized to be appropriated not to exceed $500,000.

(4) For the purpose of carrying out the provisions of subsection (b) of section 14, there is hereby authorized to be appropriated not to exceed $5,500,000.

(5) There is hereby authorized to be appropriated annually not to exceed $500,000 for the expenses of the Commission.

(6) There is hereby authorized to be appropriated not to exceed $500,000 for the services and expenses of the Mediator and the assistants and consultants retained by him: *Provided*, That, any contrary provision of law notwithstanding, until such time as funds are appropriated and made available pursuant to this authorization, the Director of the Federal Mediation and Conciliation Service is authorized to provide for the services and expenses of the Mediator from any other appropriated funds available to him and to reimburse such appropriations when funds are appropriated pursuant to this authorization, such reimbursement to be credited to appropriations currently available at the time of receipt thereof.

(b) The funds appropriated pursuant to the authorizations provided in this Act shall remain available until expended.

2. Amend the title so as to read:

An Act to provide for final settlement of the conflicting rights and interests of the Hopi and Navajo Tribes to and in lands lying within the joint use area of the reservation established by the Executive order of December 16, 1882, and lands lying within the reservation created by the Act of June 14, 1934, and for other purposes.

## I. Introduction

The purpose of H.R. 10337, as amended, is to provide for the settlement of the conflicting rights and interests of the Hopi and Navajo Tribes in two areas of northeastern Arizona: the joint use area of the reservation established by the Executive Order of September 16, 1882,



and lands lying within the reservation established by the Act of June 14, 1934.

These lands have been the subject of disputes between the two tribes even prior to the 1882 Executive Order and the 1934 Act. In recent years these disputes were brought before the Federal courts and the Indian Claims Commission and an impressive array of legal arguments and historical, archaeological, and anthropological data has been presented by both tribes in support of their respective positions. The court has stated and, now, the tribes themselves are agreed that no final resolution can occur absent the enactment of legislation. The tribes, however, are not in agreement as to the substance of that legislation.

Against this background the Committee held extensive hearings over two Congresses. In the mark-up sessions which began on August 6, 1974, the Committee did not hew to the position of either of the tribes, but rather agreed to certain guiding principles which would have to be met in any equitable legislative resolution of the disputes. The Committee then proceeded to mark-up a clean proposal to reflect those principles. This proposal was ordered reported as an amendment in the nature of a substitute to H.R. 10337 on September 11, 1974.

This report begins with a cursory discussion of the background of the disputes. (Much fuller descriptions may be found in the printed Committee hearings and in the 118-page opinion of the District Court for the District of Arizona in *Healing v. Jones* (210 F. Supp. 125, 1962; aff'd 363 U.S. 758, 1963).) Following this discussion are a description of the alternative bills pending before the Committee, statements of the need for a legislative resolution, and a listing of the principles which the Committee employed in drafting H.R. 10337, as ordered reported. Among the other sections of this report are a brief summary of the provisions of the bill and a more detailed section-by-section analysis.

## II. Background

Both the Hopi and Navajo have occupied the American southwest for centuries. As the District Court noted in *Healing v. Jones* (see below): "No Indians in this county have a longer authenticated history than the Hopi" (210 F. Supp. 125, 134, D. Ariz. 1963, aff'd 363 U.S. 758, 1963). Archaeological evidence shows that groups ancestral to the Hopi were settled in Arizona and New Mexico before 1300 A.D. and perhaps as early as 600 A.D. In 1541 a detachment of the Spanish explorer, Coronado, visiting northeastern Arizona, encountered the Hopi living in mesa-top villages.

The Hopi still live in several villages in the same general area and pursue a life style not entirely dissimilar to that viewed by the Spanish explorers. The Hopi are a sedentary, village-based people, with an economy based on dry farming and grazing. Their crop fields are located near the villages in which they live. Besides raising crops, they also engage in livestock herding in areas near the mesas and travel to more distant points for ceremonial purposes, wood gathering, and hunting.

The Hopi tribe is a federally-recognized tribe, with a tribal government organized pursuant to the Indian Reorganization Act of 1934. The membership of the tribe is approximately 6,000 persons.

The time of the entry of the Navajo people into the Southwest is in question, but clearly the "recorded history of the Navajos does not extend as far back as that of the Hopi" (210 F. Supp. 125, 134). Available evidence suggests the Navajo were settled in northwestern New Mexico as early as 1500. They are mentioned in preserved journals for the first time in 1629; and it appears that they first entered what is now Arizona in the last half of the eighteenth century. Eventually, the Navajo spread into parts of what are now Arizona, New Mexico, and Utah. As a result of this process of migration and settlement, the Navajo came to surround the Hopi who had continued to reside in the same general area in northeastern Arizona.

Although some Navajos established farms which held them to fixed locations, in the main they were a semi-nomadic, grazing and hunting people who seldom gathered in cohesive communities. Families and kinship groups roamed rather extensive areas in search of forage and game. This required them to live in rude shelters known as "hogans" to which they returned whenever it was practicable. It is this migrating lifestyle which led to their occupation of large parts of northern New Mexico and Arizona and the particular lands presently under dispute.

The Navajo tribe is federally-recognized with a tribal government organized under governing documents adopted by the tribal council and approved by the Secretary of the Interior. The current membership is approximately 130,000.

### THE JOINT USE AREA

On December 16, 1882, President Chester A. Arthur signed an Executive order establishing a reservation of approximately 2,472,095 acres in the Territory of Arizona for the use and occupation of the Hopi (then called the "Moqui") and "such other Indians as the Secretary of the Interior may see fit to settle thereon". Principal among the reasons for establishing the reservation cited by the local Hopi Indian Agent, the Indian Inspector, the Commissioner of Indian Affairs, and the Secretary was the necessity to create a reservation for the Hopi in order to provide the Federal Government with jurisdiction to protect the Hopi from the pressures of Navajo migration, Mormon settlers, and white "intermeddlers". As early as this date, approximately 300 Navajo lived on the 1882 reservation.

In 1868, the United States entered into a treaty with the Navajo which granted to them a reservation to the east of what became the 1882 reservation. The western boundary of the Navajo reservation was defined with greater particularity in an Executive order issued on October 29, 1878. This line became the eastern boundary of the 1882 reservation. Additional land was added to the southwest of the Navajo reservation by another Executive order issued on January 6, 1880. With this addition the Navajo reservation contained about 11,875 square miles or 8,000,000 acres. However, as noted by the Court in the *Healing* case:

> Despite the vast size of the Navajo reservation at that time, this semi-arid land was considered incapable of providing support for all of the Navajos. Moreover, except for one or two places, the boundaries of the Navajo reservation were not distinctly marked. It is therefore not surprising that great numbers of the Navajos wandered far beyond the paper boundaries of the Navajo reservation as it existed in 1880. By 1882, Navajos comprising hundreds of bands and amounting to about half of the Navajo population had camps and farms outside the Navajo reservation, some as far away from it as one hundred and fifty miles. (210 F. Supp. 125, 134).



Part of this expansion occurred in the 1882 reservation and became a source of continued complaints by the Hopi to the Federal government. As relations between the Navajo and Hopi became increasingly hostile, several Administrations contemplated removal of all Navajo from the 1882 reservation and, in some instances, even initiated efforts to do so, including the sending of troops into the area. However, no removal ever occurred, and today, approximately 10,000 Navajo occupy and use the lands within the area.

By the Act of July 22, 1958 (72 Stat. 403), Congress authorized each tribe to institute or defend an action against the other in a three-judge court of the District Court of the District of Arizona "for the purpose of determining the rights and interests of such parties in and to said lands and quieting title in the tribes or Indians establishing such claims pursuant to such Executive order as may be just and fair in law and equity . . ." The result of this authorization was the September 28, 1962, decision in *Healing v. Jones* (210 F. Supp. 125, D. Ariz. 1962, aff'd 373 U.S. 758, 1963) in which the court held *inter alia* that:

> (1) Neither tribe obtained any vested rights in the land under the 1882 Executive order. The rights were vested in the tribes by the 1958 Act and, thereupon, became protected by the 5th Amendment to the Constitution.
>
> (2) By a 1943 administrative action establishing a grazing district for the exclusive use of the Hopi surrounding the Hopi villages, the Hopi obtained the exclusive right, subject to the trust title of the United States, to that area known as Land Management District No. 6.
>
> (3) Because of administrative action taken between 1937 and 1943, the Secretary impliedly settled the Navajo Tribe within the 1882 reservation under the authority of the Executive order.
>
> (4) The Hopi Tribe and the Navajo Tribe, subject to the trust title of the United States, have joint, undivided, and equal interests in the entire 1882 Executive order reservation except the Land Management District No. 6. This area is known as the "joint use area".
>
> (5) The 1958 Act did not confer authority on the Court to partition joint interests between the two tribes.

Despite the determination of equal and undivided interests in the joint use area in the *Healing* case, for all practical purposes, the Navajo Tribe has exercised exclusive control of the joint use area, including surface leasing and granting of rights-of-way since the 1962 decision. During the past ten years, the two tribes have attempted to negotiate a joint-use agreement, but negotiations have failed.

On March 13 1970, the Hopi Tribe petitioned the District Court to issue a writ of assistance enforcing the Hopi rights to the joint use

area in accordance with the *Healing* decision. The Court dismissed this petition in August 1970 on the ground that it lacked jurisdiction to issue process to enforce the judgment. On December 3, 1971, the Court of Appeals for the Ninth Circuit reversed this decision, holding that the District Court has authority to issue a writ of assistance and remanded the matter for further proceedings (*Hamilton* v. *Nakai*, 453 F. 2d 152). On May 22, 1972, the U.S. Supreme Court denied the Navajos' petition for a writ of certiorari.

On October 14, 1972, the District Court issued an order of compliance directing the Navajo Tribe, *inter alia*, to: afford the Hopi Tribe its proper possession and use of a joint, undivided, and equal share in the disputed area; reduce its livestock in the joint use area to the point where the Navajo Tribe is using no more than one-half the carrying capacity of the area; and administer the area jointly with the Hopi Tribe. The United States was ordered, *inter alia*, to submit plans for effectuating this order. On the same day the court issued a writ of assistance commanding the United States Marshal to serve a copy of the foregoing order upon the Navajo Tribe. The Navajo Tribe appealed from the court's order and then, at the court's request, submitted an alternative plan to implement that order. On April 23, 1973, the court rejected the Navajo plan and adopted the United States' plan for achieving true joint use of the disputed area. Among other things, the plan adopted provides for removal of all livestock from the joint use area save that essential for daily livelihood, for restricting further Navajo building in the area, and for platting of new management units for use in future land recovery programs. It is important to note, however, that this plan does not effect a partition of the joint use area, and the District Court's holding that it lacks the power to partition still controls its disposition of the case.

Finally, on September 12, 1974, the U.S. Court of Appeals for the Ninth Circuit firmly rejected appeals by the Navajo from the October 14, 1972, order of compliance and the plan incorporated in the April 23, 1972, order (*Hamilton* v. *MacDonald*. —F. 2d —. 1974).

The Navajo are in complete possession of the disputed area. Partition of the joint use area could result in the necessity of moving as many as 6,000 Navajo (estimates vary widely). The Navajo oppose this alternative on the grounds of the disruption which relocation would cause, particularly in light of the unfortunate, early history of official Indian relocation efforts, and the lack of any lieu lands for Navajo required to relocate. Among other things, they propose that the Navajo purchase the Hopi interest in the joint use area.

The Hopi position is that they are entitled to the one-half use of the land under the law. They feel that the only way to secure their legal right and to avoid the inequity and hardship which would be imposed on Hopi tribal members were they denied lands to which they are legally entitled is to have the surface partitioned equally to the two tribes.

### THE 1934 RESERVATION LANDS

In order to confirm Navajo interests in the Navajo Reservation which was continually enlarged by the 1878, 1880, and other Executive orders and Congressional enactments since the original



reservation was established by treaty in 1868, Congress enacted a statute defining the boundaries of the Navajo Reservation in Arizona (Act of June 14, 1934, 48 Stat. 960). After describing the lands to be included in the Navajo Reservation, the Act states that:

> All vacant, unreserved, and unappropriated public lands, including all temporary withdrawals of public lands in Arizona heretofore made for Indian purposes by Executive order or otherwise within the boundaries defined by this Act, are hereby permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon; however, nothing herein contained shall affect the existing status of the Moqui (Hopi) Indian Reservation created by Executive Order of December 16, 1882. (48 Stat. 960, 961.)

It is this language which has created the controversy and engendered a dispute between the Navajo and Hopi Tribes over the nature and extent of the latter's interest in the lands described in this 1934 Navajo Reservation Boundary Act.

In several respects, the dispute over the 1934 reservation lands differs from the dispute over the joint use area. The disputes arise from different actions of the Federal Government: the former being related to the 1934 Navajo Reservation Boundary Act and the latter to the 1882 Executive order. Furthermore, the 1934 reservation lands dispute was not addressed in the *Healing* decision.

The problems involved in the 1934 reservation lands and in the joint use area disputes are, however, substantially similar. The tribes are unable to agree on their relative rights and interests and have been unable to use the lands jointly in harmony. Both sides have marshalled an impressive array of arguments, legal, anthropological, and equitable, in defense of their positions. In brief (too brief to adequately describe the position of either side), both sides recognize that at the time of the enactment of the 1934 Navajo Reservation Boundary Act, the Hopi were residing in the village of Moencopi which is located immediately west of the 1882 reservation and wholly within the lands set aside in the 1934 Act. The Hopi argue that this fact and the "such other Indians as are already settled thereon" language of the 1934 Act, together with other historical data and governmental statements and papers, give them an undivided interest in the entire Navajo Reservation as established in the 1934 Act. They hold that the transfer of 243,000 acres, as proposed by H.R. 10337, as passed by the House of Representatives, is quid pro quo for a quit claim to any other interest they may have in the approximately 8.2 million acres of the 1934 reservation outside of the 1882 reservation. The Navajo position, based on differing interpretations and data, is that the Hopi are only entitled to that acreage they were occupying on the date of the Act (June 14, 1934), which the Navajo estimate to be 35,000 acres. Counsel for the Navajo have proposed language providing for the immediate partition of the 35,000 acres, but have communicated Navajo support for a judicial settlement of the 1934 reservation lands dispute proposed in a bill introduced by Senator Montoya (see section III below).

## III. Recent Legislative History

As it became apparent that the *Healing* decision, standing alone, could not resolve the Navajo-Hopi land disputes, Congress realized that its responsibilities to assist in the resolution of the conflicting claims to land were not terminated by the enactment of the 1958 Act authorizing the *Healing* suit. Furthermore, the District Court in the *Healing* case clearly stated that it was at a loss to separate the rights and interests in the disputed lands without additional legislation by Congress authorizing partition of those lands.

In the 92d Congress the House of Representatives approved H.R. 11128 which is similar in several major respects to H.R. 10337. H.R. 11128, in part, authorized the following:

1. Partition of the joint use land area by the Secretary of the Interior, with each tribe receiving approximately one-half of the land;
2. Relocation of the affected Navajo tribal members over a five-year period;
3. Compensation to the Navajo to the extent that they would be able to purchase a safe, sanitary replacement dwelling and;
4. Partition of the surface and subsurface of the 1934 reservation lands with a grant of 208,000 acres to the Hopi Tribe.

Following hearings on H.R. 11128 by the Senate Committee on Interior and Insular Affairs, the full Committee, in executive markup session, deferred action on the measure and, as an alternative, authorized the establishment of a three-member ad hoc committee drawn from the Committee's membership. The ad hoc committee's charge was to undertake a thorough and exhaustive review of the historical and legal background leading up to the land disputes and, further, to present proposed recommendations to the Committee for resolution of the disputes within 90 days of the convening of the 93rd Congress.

However, due to several unforeseen developments at the outset of the 93rd Congress, the Committee abandoned the ad hoc committee approach to the land disputes and referred the issue back to the Subcommittee on Indian Affairs to be handled within the Subcommittee's normal jurisdiction.

The Committee held two hearings on the Navajo-Hopi land disputes; first, at Winslow, Arizona, March 7 and 8, 1973, at which time the Subcommittee considered H.R. 1193 (introduced by Representative Steiger and identical to H.R. 11128); and second, at Washington, D.C., July 24, 1974, at which time the full Committee considered H.R. 10337, S. 2424, S. 3230 and S. 3724. A summary of these measures follows:

*H.R. 10337—House Passed Bill*

H.R. 10337, as passed by the House of Representatives on May 29, 1974, would grant to the District Court, in supplemental proceedings to *Healing* v. *Jones*, the jurisdiction to partition the surface of the joint use area between the Hopi and Navajo Tribes. To aid the Court in its determination, the bill establishes certain criteria for partition which include equal acreage and quality of land, insofar as practicable and, contiguity of lands partitioned and inclusion of the high Navajo population density areas in the portion partitioned to the Navajo so as to avoid as much disruption as possible.



H.R. 10337 would transfer to the Hopi, to be held in trust by the United States, approximately 243,000 acres of the 1934 reservation lands.

The House-passed bill provides that those Indians who reside on land that will be partitioned shall be relocated from such lands over a five-year period and authorizes $28,800,000 for this purpose.

H.R. 10337 directs the Secretary of the Interior to immediately commence reduction of the number of livestock in the joint use area to the usual range capacity as determined by standards established by the Secretary. To accomplish this the bill authorizes $10 million.

*S. 2424 (Senator Fannin)*

S. 2424 is similar in scope to H.R. 10337 except that, rather than the Federal District Court for the District of Arizona supervising the partition of the joint use area, the Secretary of the Interior is directed to perform that task. In addition there is no provision for compensation of those Hopi and Navajo who will be forced to relocate as a result of the partition, which means that no money is authorized for purchase, relocation and repurchase of homesites. (As the first action of the Committee's mark-up sessions on Navajo-Hopi legislation, Senator Fannin withdrew his bill in favor of H.R. 10337.)

*S. 3230 (Senator Montoya)*

S. 3230 would utilize a commission approach to resolve the issues in disputes. Briefly stated, this commission, composed equally of Navajo and Hopi, would undertake a study of the lands involved in the joint use area and determine which lands were used exclusively by the respective tribes and which lands were used by the Navajo for residential purposes and were also used by the Hopi for wood and coal gathering, religious ceremonies and hunting. The commission would report to the Secretary of the Interior the appraised value of the respective interests as determined by the study. Thereupon the Secretary, by order, would partition the interests to the disputed lands granting the Hopi easements for timber and coal gathering, ceremonial shrines and hunting, and compensating the Hopi Tribe for any interest it finally receives which is less than one-half of the total value of the joint use area. The bill provides for resolution of the 1934 lands dispute by mandating the District Court for the District of Arizona to partition the lands involved according to general principles of equity.

*S. 3724 (Senator Abourezk)*

S. 3724 would authorize the establishment of the Navajo-Hopi Development Commission. The Commission, in cooperation with federal departments and agencies, would plan, organize and implement social and economic development efforts designed to improve the life style of tribal members residing on the Navajo and Hopi Reservations.

The proposed measure would authorize a judicial partition of the joint use area through provisions similar to those included in H.R. 10337, as it passed the House of Representatives. S. 3724 also provides for the transfer of approximately 35,000 acres from the 1934 reservation lands to the Hopi Tribe.

Following the judicial partition of the joint use area, the Secretary of the Interior would be required to conduct a mandated census to determine the number of adult Navajo residing on the land partitioned to the Hopi Tribe, and the number of adult Hopi residing on the land partitioned to the Navajo Tribe.

Any person (Navajo or Hopi), enumerated through the census, who has resided since his birth in the joint use area and any surviving spouse of such person would be afforded a life estate on the residential site used by him on the date of enactment of S. 3724.

Those adult individuals who moved into the joint use area following their birth and prior to enactment of S. 3724 would be authorized to reside in the area for an equal period of time following the date of enactment S. 3724.

Any head of a household displaced as a result of S. 3724 would be guaranteed:

1. That his property would be purchased at fair market value;
2. That he would be provided reasonable moving expenses in accordance with section 202 of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (84 Stat. 1894); and
3. That his total reimbursement would equal the cost of a suitable replacement dwelling.

Each tribe woud be guaranteed fair rental payments for use by the other tribe's members of land partitioned to it.

The proposed bill authorizes the appropriation of such funds necessary to carry out its provisions.

The Department of the Interior expressed its support for H.R. 10337, if amended as indicated in their report to the Committee. In final testimony before the Committee, the Hopi Tribe recommended enactment of H.R. 10337 and the Navajo Tribe recommended enactment of S. 3230.

## IV. Need for Legislative Action

The prolonged dispute between the Navajo and Hopi Tribes over the joint use area has resulted in a heavy drain on the energies and financial resources of both tribes. Because of the tribal leaderships' preoccupation with this complex issue, social and economic development efforts which are so vital to the well-being of the Navajo and Hopi people have been unnecessarily delayed and frustrated.

Moreover, any attempt to launch an intensive range rehabilitation program to restore the badly overgrazed (estimated to be 400 percent overgrazed) joint use area appears to be stymied until such time as the broader issue is resolved.

Although the dispute over the 1934 reservation lands derives from a legal basis different from that concerning the joint use area, the fundamental issues and problems are similar and warrant resolution at this time.

The Federal Government has an opportunity to address solutions to these major issues which are products of its own actions and subsequent inaction. An unfortunate outgrowth of Federal inaction in resolving the joint use area and 1934 reservation lands disputes is that the Navajo and Hopi Tribes have been placed in adversary roles. This



is grossly unfair to both tribes who by necessity must maintain a harmonious relationship for their mutual well-being.

There are overriding moral, ethical and legal considerations which justify prompt Congressional approval of legislation designed to bring about a lasting resolution of the joint use area and 1934 reservation lands disputes.

## V. Committee Consideration of Legislative Alternatives

During its deliberations on the several proposals pending before the Committee, the members followed certain guiding principles. These principles were:

1. That justice and equity for the Hopi and Navajo people dictate an early resolution of the joint use area and the 1934 reservation lands disputes and swift Congressional approval of the necessary enabling legislation;
2. That the decision of the three-judge Court in the *Healing* case that the Navajo and Hopi Tribes have joint, undivided and equal rights and interests in the joint use area should in no way be disturbed or overridden by the provisions of any bill ordered reported by the Committee;
3. That no matter how successful a court might be in devising a fair and equitable judicial resolution of the joint use area dispute it would still be a dictated, rather than a voluntary, solution; and, therefore, that a voluntary settlement between the two tribes is distinctly preferable and that a final negotiation process should be provided and so structured to afford the tribes the opportunity to willingly negotiate such a settlement;
4. That, in the event the two tribes fail to reach a voluntary settlement of the joint use area dispute through the negotiating process, the dispute should be referred to the U.S. District Court for the District of Arizona for a compulsory judicial resolution;
5. That, despite the failure of past negotiation attempts, the two tribes, when faced with enacted legislation calling for a compulsory judicial resolution if a final, voluntary negotiation effort fails, may enter the negotiation discussions with a renewed desire to arrive at their own solution to the controversy;
6. That the environment most conductive to successful negotiations would be one that provides the two tribes with the maximum freedom to concur in any settlement or settlement provision which is not contrary to law or to the *Healing* decision;
7. That, if the negotiating process fails, the District Court should have the flexibility to tailor a final adjudication, including partition of the joint use area, consistent with its decision in the *Healing* case;
8. That any compulsory judicial settlement will, in all likelihood, include a division of the lands of the joint use area, rather than any arrangement which would call for continued joint use of, or the purchase by one tribe of the other tribe's interests and rights in, the entire joint use area;
9. That any such division of the lands of the joint use area must be undertaken in conjunction with a thorough and generous relocation program to minimize the adverse social, economic, and cultural im-

pacts of relocation on affected tribal members and to avoid any repetition of the unfortunate results of a number of early, official Indian relocation efforts;

10. That an immediate legislative resolution of the 1934 reservation lands dispute is preferable to beginning now for that dispute a duplication of the lengthy process initiated by the 1958 Act authorizing suit over the joint use area dispute; but that any immediate legislative resolution relating to the 1934 reservation lands must be accompanied by a relocation program identical to and for the same reasons as that suggested above for the joint use area; and

11. That because of the Federal Government's repeated failure to resolve the land disputes, the major costs of resolution should be properly borne by the United States.

The Committee, therefore, rejected the four pending measures, and ordered reported an amendment in the nature of a substitute to H.R. 10337 which contains provisions reflecting the foregoing principles.

## VI. Major Provisions of H.R. 10337 as Ordered Reported

The Navajo and Hopi Tribes, pursuant to sections 1, 2, and 3 of H.R. 10337, as ordered reported, are authorized to enter into a final negotiating process for resolution of the dispute concerning the joint use area. A Mediator, to be appointed by the Director of the Federal Mediation and Conciliation Service, would assist negotiating teams, appointed by the tribal councils of the Hopi and Navajo Tribes, in their negotiating endeavors.

These first three sections set forth procedures and schedules to govern the negotiating process and direct the Secretary of the Interior and departments and agencies of the Federal Government to render appropriate cooperation and assistance.

In the event the tribes should reach full agreement on the issues, the Mediator would cause such agreement to be entered into the records of the U.S. District Court as supplemental proceedings in the *Healing* case. A similar procedure is to be followed by the Mediator concerning any partial agreement reached between the tribes.

Although sections 1, 2 and 3 contemplate a net six-month negotiating period by the tribes, the period of time may exceed ten months due to various time elements established in these sections.

If the tribes fail to reach full agreement within the negotiating period or if either tribe is in default, the Mediator under section 4 is directed to prepare a report containing his recommendations for a plan of settlement of the joint use area dispute for submission to the U.S. District Court. The District Court is required to review the report and recommendations for conformity to the *Healing* case and H.R. 10337. Following the review of the report and the recommendations (which are not binding on the Court), the District Court is authorized to make a final adjudication, including partition of the joint use area, and enter the judgment in the supplemental proceedings of the *Healing* case.



Section 5 establishes guidelines to facilitate a negotiated agreement by the tribes pursuant to section 3 or to assist the Mediator in preparing his report pursuant to section 4.

Section 6 establishes guidelines to be followed by the Court in the event it is required to assume responsibility for resolution of the joint use area dispute.

These two sets of guidelines reflect the guiding principles discussed above in section V of this report, including the preferability of a negotiated settlement, the freedom of the tribes in the negotiations to concur in any settlement provisions they wish, the likelihood of a division of the land in the event judicial resolution is required, and the need to minimize adverse social, economic, and cultural impacts should such division occur;

Section 7 preserves the joint ownership by both tribes of coal, oil, gas and other minerals within and underlying the joint use area.

Section 8 partitions approximately 243,000 acres surrounding Moencopi from the reservation established by the 1934 Navajo Reservation Boundary Act and directs that the tract be held in trust for the Hopi Tribe. This provides an immediate legislative resolution to the 1934 reservation lands dispute.

Section 9 authorizes the Secretary to make allotments to Paiute Indians who are not members of the Navajo Tribe, who are located on the 1934 reservation lands, and who were either located there, or are descendants of Paiutes who were located there, on the date of enactment of the 1934 Act.

Section 10 states that lands partitioned to the two tribes pursuant to H.R. 10337 will be held in trust for the respective tribes.

Section 11 authorizes the Secretary of the Interior to transfer, upon the payment of fair market value, up to 250,000 acres of Bureau of Land Management lands in Arizona or New Mexico to the Navajo Tribe so as to restore a portion of the Navajo land base lost during partition.

Section 12 establishes a three-member independent Navajo and Hopi Indian Relocation Commission to administer any relocation of tribal members required by the resolution of the land disputes. It is hoped that the independent nature and focussed responsibilities of the Commission will insure that the settlement implementing authority will be sufficiently expert and possess all the requisite authority to develop a relocation program which will minimize the inevitable adverse social, economic, and cultural impacts.

Section 13 establishes the first task of the Commission as that of reporting to Congress within two years of a final order by the District Court resolving the joint use area dispute a relocation plan for lands partitioned in the joint use area and the area partitioned to the Hopi from the 1934 reservation lands. The plan is to take effect 30 days after its submission.

Section 14 directs the Commission to assume responsibility for effecting the relocation plan and to complete the relocation process within five years of its initiation. It also directs the Commission to make

relocation incentive payments of decreasing values each year after the plan is in effect to households which voluntarily enter into relocation contracts with the Commission. These payments are incentive payments only, payments and programs to make restitution of dwelling, improvements, etc. to the households subject to relocation are set forth in section 15.

Section 15 provides that the Commission will purchase for fair market value the habitation and improvements of each household required to relocate. Furthermore, the Commission is to make relocation payments to the households to cover their moving costs. Finally, the Commission is required to make up the difference to each household to insure that it will have the financial wherewithal to obtain "a decent, safe, and sanitary replacement dwelling adequate to accommodate such households." Alternative means for the Commission to carry out its responsibility to insure the availability of such replacement dwellings include construction or purchase of housing by the Commission.

Section 16 provides for the payment of fair rental value to the tribe to which lands are partitioned by the other tribe prior to completion of the relocation program.

Section 17 provides protection from relocation to members of either tribes who own allotments or who are Federal employees.

Section 18 authorizes suit for license fees and other revenues collected in, and the value of agricultural and grazing use of, the joint use area after the date of determination of joint interests in the area if such issues are not resolved in the settlement of the joint use area dispute. It also authorizes any further original, ancilliary, or supplementary actions to insure full settlement of the land use disputes.

In section 19 the Secretary is directed to undertake two programs: a program of stock reduction and range restoration in the joint use area (as noted earlier it may be as much as 400 percent overgrazed) to be commenced immediately and a program, to be conducted upon resolution of the land disputes, of surveying and fencing the partitioned lands.

Section 20 provides for Hopi use of a certain 23.8 acre tract in the joint use area for religious ceremonial purposes even if the tract is partitioned to the Navajo.

Section 21 directs the Secretary to make provision for the use of and right of access to identified religious shrines of either tribe in lands partitioned to the other tribe.

Section 22 insures that no financial assistance or funds paid under H.R. 10337 can be used as the basis for denying the recipient's participation in federally assisted housing programs or for denying or reducing social security benefits or benefits from other Federal or federally assisted programs. It also directs that the funds will not be subject to Federal or State income taxes.

Section 23 would allow exchange of reservation lands by the two tribes.

Section 24 provides that the remainder of H.R. 10337 shall remain in effect even if any part of it is declared invalid.

Section 25 provides the funding authorization (see section VII below for a discussion of authorization levels).

## VII. Cost of H.R. 10337, as Ordered Reported

During the July 24, 1974, hearing before the Interior Committee on H.R. 10337, the Interior Department was asked to furnish to the Committee current information as to the estimated costs of implementing this legislation. The Department estimated the costs for authorization purposes over the life of the bill to be $47,200,000 and the Committee included that amount in the sum to be authorized. The text of the response from the Department to the Chairman of the Committee concerning the costs is set forth in full in section XI of this report entitled "Executive Communications".

Subsequent to the final mark-up of H.R. 10337 on September 11, 1974, a representative of the Department suggested that the surveying and fencing program would cost an additional $200,000 because of the Committee decision to provide a legislative resolution for the 1934 reservation lands dispute. This conforming change, authorized at the final mark-up, was made in the reported bill.

Furthermore, when the Committee decided upon a six-month negotiation period and the appointment of a Mediator to assist the negotiations, it added a $500,000 authorization for the Mediator.

Finally, the Committee authorized an annual sum of $500,000 to support the activities of the Navajo and Hopi Indian Relocation Commission. Although the life span of the Commission cannot be determined with absolute certainty, the Commission is expected to have an eight year existence. Thus, the total authorization for the Commission would be $4,000,000.

The dollar total of funds which H.R. 10337, as ordered reported, would authorize to be appropriated is approximately $52,000,000. The subtotals are as follows:

| | |
|---|---|
| Relocation incentive payments (sec. 14(b)) | $5,500,000 |
| Purchase of dwellings and improvements, relocation expenses, and replacement dwellings (sec. 15) | 31,500,000 |
| Stock reduction and range restoration program (sec. 19(a)) | 10,000,000 |
| Survey and fencing program (sec. 19(b)) | 500,000 |
| Mediator expenses | 500,000 |
| Commission expenses (at $500,000 per year) | 4,000,000 |
| Total authorization | $52,000,000 |

All funds appropriated under these authorizations are to remain available until expended.

## VIII. Tabulation of Votes Cast in Committee

The votes on amendments to H.R. 10337 were taken by the full Committee in open mark-up sessions. As those votes were previously announced by the Committee, in accordance with the provisions of section 133(b) of the Legislative Reorganization Act of 1946, as amended, tabulation of the votes in this Committee Report is unnecessary. The unanimous vote to report H.R. 10337, as amended, was by voice vote.

## IX. Committee Recommendation

The Committee on Interior and Insular Affairs in open mark-up session on August 21, 1974, by voice vote unanimously recommended that H.R. 10337, as amended, be enacted.