motion that the gentleman from Maryland spoke about.

Mr. QUILLEN. Mr. Speaker, I yield 2 minutes to the gentleman from Texas (Mr. LOEFFLER).

Mr. LOEFFLER. Mr. Speaker, I thank the gentleman from Tennessee (Mr. QUILLEN) for yielding this time to me.

I wish to echo the remarks of many of the Members who have spoken already in an effort to delay consideration of the rule.

We have a caveat to all Members who have not had a chance to review the pending railroad deregulation bill. I happen to be one of the Members—there are three of us—who represent the city of San Antonio and who clearly know that this is not deregulatory in its own sense but is, rather, the perpetuation of a monopoly, the way we are currently viewing section 202. This is important to the consumers, for instance, of San Antonio.

I will, therefore, support the Bauman motion which will delay consideration of the rule until July 22. I urge my colleagues to do likewise, and I hope that in the interim period of time we might reach some accommodation where deregulation might be achieved without inordinate burden being placed upon the consumers who are captive shippers.

Again, Mr. Speaker, I urge my colleagues to adopt the Bauman proposal and join with the gentleman from Texas (Mr. ECKHARDT) and the gentleman from Texas (Mr. GONZALEZ) in their approach.

Mr. BEILENSON. Mr. Speaker, I yield 5 minutes to the distinguished chairman of the Committee on Rules, the gentleman from Missouri (Mr. BOLLING).

Mr. BOLLING. Mr. Speaker, I realized that this was being brought as I watched the television upstairs, and I frankly think that it was brought up too precipitously. That does not mean that it will not be brought up again before the Congress goes in recess.

But I am going to ask the gentleman from California (Mr. BEILENSON) as a favor to me, and with an understanding of the confusion that exists, to withdraw the rule.

Mr. Speaker, he can do that now, and if he chooses so to do, that is what will happen.

Mr. BEILENSON. Mr. Speaker, I withdraw House Resolution 716.

The SPEAKER pro tempore. The resolution is withdrawn.

## CONFERENCE REPORT ON S. 751, NAVAJO AND HOPI INDIAN RELOCATION AMENDMENTS ACT OF 1980

Mr. UDALL. Mr. Speaker, I call up the conference report on the Senate bill (S. 751) relating to the relocation of the Navajo Indians and the Hopi Indians, and for other purposes.

The Clerk read the title of the Senate bill.

The SPEAKER pro tempore. Pursuant to the rule, the conference report is considered as having been read.

(For conference report and statement, see proceedings of the House of June 17, 1980.)

The gentleman from Arizona (Mr. UDALL) will be recognized for 30 minutes, and the gentleman from California (Mr. CLAUSEN) will be recognized for 30 minutes.

The Chair now recognizes the gentleman from Arizona (Mr. UDALL).

### GENERAL LEAVE

Mr. UDALL. Mr. Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks on the conference report under consideration.

The SPEAKER pro tempore. Is there objection to the request of the gentleman from Arizona?

There was no objection.

Mr. UDALL. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I am pleased to bring to the House the report of the conference committee resolving the differences of the two Houses on the bill, S. 751, amending the Navajo-Hopi Land Dispute Settlement Act.

In 1974, we enacted legislation providing for the settlement of a long-standing dispute between the two tribes to approximately 2,000,000 acres of land. The 1974 act provides for the partition of the land between the two tribes and will result in the eventual relocation of over 800 families of Navajo.

This relocation process is and will continue to be an extremely traumatic event for the Navajo people. This is probably the largest forced relocation effort required by the Federal Government since the Indian removal policies of the 1800's.

Mr. Speaker, since the passage of the 1974 act, numerous defects and oversights have been identified in its implementation. S. 751, in the two versions passed by the Senate and House, sought to remedy those defects and oversights.

After extensive negotiations, the conferees on S. 751 have arrived at a reasonable compromise of the issues in disagreement.

The major points of disagreement relate to the provisions for added lands for the relocation of Navajo families and the provision for life estates for Navajo families living on lands partitioned to the Hopi tribe.

On both of these critical issues the conferees have achieved agreement and have worked out compromises which I think will go a long way toward easing the burdens and trauma of relocation for these Navajo families.

Mr. Speaker, I urge the House to adopt the conference report.

Mr. CLAUSEN. Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of the conference report on S. 751, the Navajo and Hopi Amendments Act of 1979.

Although the initial Senate and House versions of these amendments could be fairly described as pro-Navajo and pro-Hopi, respectively, the distinguished chairman of the Interior Committee, Mr. UDALL, and the majority and minority conferees of both bodies should be congratulated for producing a fair and well-balanced compromise between the two bills.

I share the hope and expectation of the conferees that these amendments will permit the necessary relocation of some 800 Indian families to go forward without further delay or undue hardship.

The history of the Navajo and Hopi dispute, the 1974 settlement and the current amendments is well-explained in the committee and conference reports, and I will not attempt to summarize it now.

I would note for the record, however, the statement of the managers regarding the provision in the conference report that authorizes continued payments in lieu of taxes on those public lands which may be transferred to the Navajo Tribe.

As a Member who was deeply involved in the origination of the Payments in Lieu of Taxes Act of 1976, I want to emphasize the position of the conferees that this provision results from very unique circumstances and should in no way be considered a precedent for treatment of other, existing Indian trust lands.

Mr. Speaker, I fully support the work of the conferees and I am pleased that reasonable solutions to the problems of implementing the 1974 settlement act have been worked out.

My appreciation of this accomplishment is tempered, however, by my regret at what caused it to be needed. It should not be forgotten that the principal cause of the long and often bitter dispute between two of America's ancient Indian tribes was the consistent failure of the Federal Government to pay appropriate attention to the administration of its responsibilities in Indian affairs. The accumulated cost of repairing the damage done by such inattention, in dollars alone in this case, as in others, is staggering.

The total dollar cost of the Navajo and Hopi settlement and relocation will no doubt eventually exceed $60 million. But the larger cost—to those 5,000 Indians who are legally compelled to move to provide a just solution to a problem not really of their making—is immeasurable.

This is especially so when one considers that these people are noted for their particular love for their land, and that many of them have lived on their land for generations. The lesson of all this seems clear—the Federal Government must exercise its responsibilities over Indians with great care.

Mr. LUJAN. Mr. Speaker, will the gentleman yield?

Mr. CLAUSEN. I yield to the gentleman from New Mexico.

Mr. LUJAN. Mr. Speaker, I want to thank my friend, the gentleman from California (Mr. CLAUSEN) for yielding. I will be very brief.

Mr. Speaker, this solution to the Hopi-Navajo problem is really one that should never have come about in the first place.

□ 1800

I think the solution is bad. I was on the conference for this particular piece of legislation, and I must say that I did sign the conference report because we have to do something to implement the provisions of the act of 1974. Nevertheless, I still believe that the solution imposed upon us by the legislation in 1974 is a bad solution. When people have to be moved from places where they were born and raised, it is not an equitable

Exhibit 5 to
United States' Motion
DOJ13

HeinOnline -- 126 Cong. Rec. 16822 1980

solution, so far as I am concerned. Not having any other alternative, Mr. Speaker, I therefore bow to the will of the majority as expressed in 1974 and at least support this as the only way that we can implement the carrying out of that policy. This legislation does that, and reluctantly I must support the legislation.

Mr. CLAUSEN. Mr. Speaker, I yield 2 minutes to the distinguished minority leader, the gentleman from Arizona (Mr. RHODES).

Mr. RHODES. Mr. Speaker, I hope that this conference report will be adopted. The subject, of course, is one which is well known to every resident of Arizona, New Mexico, Utah, and Colorado. We have had the problems between the Navajo and Hopi for many, many years, and I suspect that they may perhaps even antedate the advent of the white man on this continent.

If it is possible to do anything at all to actually assuage the feelings of these people against each other which they have had for so many years, then certainly we want to do it. I am satisfied that this bill is not a perfect bill. If it were it probably would not have gotten this far. But the facts are that it is the best bill which we can get, and it is a bill which I think will have a very good chance of building a solid foundation of good feeling between these two tribes who have not had those feelings about each other in the past, and I sincerely hope and I believe that we are taking the right step in the right direction.

Mr. Speaker, I urge adoption of the report.

Mr. CLAUSEN. I thank the minority leader for his advice and counsel.

Mr. Chairman, I yield 2 minutes to the gentleman from Utah (Mr. MARRIOTT), who played a key role.

Mr. MARRIOTT. Mr. Speaker, I rise in support of the conference report on S. 751, the Navajo and Hopi Indian Relocation Amendments Act of 1979.

These amendments modify the 1974 Navajo-Hopi Settlement Act, an act which Congress hoped would finally resolve the 100-year-old dispute between the two tribes over the use and occupancy of some 1.8 million acres of land in northeastern Arizona. The settlement provided for a Federal court to partition the disputed area, and for the relocation of each tribe's members residing on lands partitioned to the other.

Today, although the disputed land has been partitioned, nearly 700 Navajo families and a few Hopi families are still awaiting relocation. Problems in acquiring resettlement lands, in setting criteria for life estates for aged and disabled Indians for whom relocation would be an undue hardship, and insufficient authority for the Federal Relocation Commission to fulfill its responsibilities in moving 5,000 people, have combined to stall the relocation process.

The conference report on S. 751 contains a series of compromises between House and Senate bills with the common goals of facilitating the relocation of Indians from the partitioned areas and lessening the human costs of such a large-scale resettlement. As one of the conferees, I am pleased to state my belief that the product of the conference is fair to both tribes, balanced and workable. As is true of many good compromises, no party will receive all it sought in negotiations, nor will any party fail to benefit from the outcome. The compromises in S. 751 are not loved by either of the tribes, but they are nonetheless acceptable to both as perhaps the best that could be achieved under current political and fiscal realities.

I believe this legislation to be among the most important to be considered by this Congress. By enacting the original Navajo-Hopi settlement in 1974, Congress made a commitment to return to the Hopi Tribe much of their lands wrongfully lost through encroachment by Navajos. By the same token, Congress made a commitment to the Navajo Tribe to see that additional lands and basic amenities were provided for the people who would have to be relocated. For Congress to fail to enact S. 751 would be to renege on those commitments and to leave several thousand people in a legal and psychological limbo.

The ultimate cost of such an occurrence, in dollars and in human anguish, would certainly be far beyond any costs now contemplated. Thus, it is extremely important to the integrity of the Congress and the United States, as well as the interests of the Navajo and Hopi Indian Tribes, that the conference report on S. 751 be approved. I urge its speedy adoption.

REMARKS OF CONGRESSMAN DAN MARRIOTT

In 1974, after several years of great effort, the 93rd Congress passed P.L. 93–531, which has come to be known as the Navajo-Hopi Settlement Act. The 1974 Act was designed to bring an end to the century-old land dispute between the Hopi and Navajo Tribes involving millions of acres of reservation lands in Northeastern Arizona.

All of the land in question was aboriginally Hopi. Not until the mid-to-late 1700's did the Navajos enter the Hopi Area. Conflicts between the two tribes persisted over the years with the federal government only adding to the problems rather than assisting in a resolution.

In 1958 Congress adopted P.L. 85–547, which was designed to permit the tribes to quiet title to some of the lands in question. That litigation culminated in 1962 with the decision of *Healing* v. *Jones*, 210 F. Supp. 125 (D. Ariz. 1962). The *Healing* decision involved approximately 2.5 million acres and held that of the total amount, 600,000 acres were exclusively Hopi, but the balance was to be a joint-use area on a share and share-alike basis. That decision was affirmed by the U.S. Supreme Court on direct appeal. (373 U.S. 758 (1963)).

Following the *Healing* case, the Navajos refused to permit the Hopis to use or occupy any of the so-called Joint Use Area. As a result, the Hopis sought and obtained a court order in 1972. The Navajos refused to comply with that order, continuing to prevent the Hopis from any use of the 1.8 million acres of jointly owned lands. Eventually, the Navajos were held in contempt of court.

At approximately the same time, Congress saw the wisdom of passing the Settlement Act, which contained many features designed to end the protracted dispute. Some of those features included (1) a mandatory negotiating period, requiring the two tribes to seek resolution with the aid of a federal mediator; (2) authorization for the court to partition the lands between the two tribes should the negotiations fail to provide a resolution; (3) the creation of a Relocation Commission which is charged with the responsibility of developing a plan to facilitate the resettlement of Navajos from lands partitioned to the Hopis; (4) benefits for relocatees which will help to ease the inevitable hardships which accompany such a move; (5) permission for the Navajos to acquire an additional 250,000 acres to facilitate resettlement; and (6) other provisions which were aimed at resolving other aspects of the land dispute and related claims.

Following the passage of the Settlement Act on December 22, 1974, the tribes met with the federal mediator during a period exceeding six months. Unable to bring the parties to agreement, the mediator submitted his lengthy recommendations to the Arizona Federal District Court in December of 1975, calling for the equal partition of the surface lands of the Joint Use Area. The court held further hearings and finally, in February of 1977, entered its partition order, adopting many of the mediator's recommendations. After two appeals to the Ninth Circuit Court, it now appears that the district court's partition order has been upheld.

As contemplated under the Settlement Act and as required by the mediator's recommendations and the court's partition order, the land division will result in the mandatory relocation of approximately 700 Navajo families and a few Hopi families.

The relocation process was to have commenced no later than two years from the final partition order and is to take no more than five years from the starting date. The two-year lapse was designed to give the Commission an opportunity to prepare a report and plan. It is sad to note that already more than three years have passed since the final partition order and still no report has been produced by the Commission. This delay has in part been due to appeals by the Navajo Tribe. Currently, the Relocation Commission's report is not expected to be submitted to Congress until March 1981, a full six years after enactment of the initial settlement legislation. The amendments in S. 751 do not grant any additional time to the Commission, and we certainly do not condone the delays added to this already over-ripe problem.

In the face of the impending relocation, the Navajo Tribe has asked Congress to take one last look at the Settlement Act in an effort to minimize the inevitable burdens of the relocation. In the process of evolving these final amendments to the original act, the Hopis, too, have offered suggestions. Both tribes have been very helpful in working out these new amendments. Although neither tribe is completely satisfied with the end product, many of their concerns are addressed and accommodated.

It is especially significant to note that these amendments are intended to constitute a "last bite at the apple." In other words, the Congressmen and their staffs which have worked directly on this matter now expect the parties and the Relocation Commission to proceed with dispatch to conclude the partition and relocation. Further delay and further legislative tampering can only result in increasing the overall difficulties associated with this problem. The equities have been weighed and reweighed by the courts and by Congress. The balances have been struck on the basis of countless pages of documentary evidence and arguments and on the basis of scores of witnesses. These new amendments are designed with one primary aim: conclude the legislation and get on with the resettlement.

In this regard, the new amendments contain the following features:

Section 2(c) authorizes both tribes to

Exhibit 5 to
United States' Motion
DOJ14

HeinOnline -- 126 Cong. Rec. 16823 1980

bring an action for damages to some of the disputed lands. This section actually confirms authority granted in the 1974 Settlement Act, but because of confusion raised during litigation, the amendments were added by way of clarification. Actions for such damages have already been commenced. It is intended that these amendments will hasten the resolution of those claims. The 1974 Act gave maximum flexibility to the *Healing* supplemental proceedings to decide these issues or to defer to another judge if that proved desirable.

Section 3 provides very important language regarding tribal jurisdiction over the partition lands. Much of the frustration experienced by the Hopis has involved this issue. Outright interference by the Bureau of Indian Affairs over Hopi use and control of their partitioned lands has required these specific provisions which establish deadlines for assumption of full jurisdiction by the Hopi Tribe. The Secretary is charged with the responsibility to safeguard relocatees and life-estate tenants. But that responsibility is only meant to correct any cases of Hopi harassment (which have never yet occurred). It is ironic that this provision was included because history has shown that all the harassment has come from the Navajos with virtually no action by the Secretary to protect Hopis.

Nonetheless, this provision resolves some of the hitherto unfounded Navajo fears and may, indeed, also work for the protection of Hopis. The provision is not designed to give the Secretary of the Interior any powers to prevent the Hopis from obtaining the full and complete peaceful enjoyment of their restored lands. If the Secretary and/or Commission is unable to carry out its assignments, then it is essential that the Tribes have this full jurisdiction to make certain themselves that the relocation is accomplished within the statutory deadline.

Section 3(f) is designed to restore the status quo in the 1934 Reservation Area west of the 1882 Executive Order Area. By requiring both tribes to approve development in that area (except for limited exclusive areas where no joint consent is needed), neither tribe will be able to attain an unfair advantage over the other. Litigation regarding the title to these lands is presently ongoing and it is expected that the Hopis will also be partitioned a large tract of land in this area as well—larger by far than what was initially contemplated by H.R. 11128 in the ninety-third Congress. Such partition may result in additional relocations, which these amendments contemplate. The extent of such partition and relocation is not presently known, but the Navajos' position in the 1974 legislation has caused this uncertainty.

In 1974, rather than face the immediate partition of approximately 250,000 acres to the Hopis in this area by Congressional mandate, the Navajos opted for the present course of litigation, which will probably result in a much larger area being partitioned to the Hopis. The benefits and additional lands provided for the Navajos under the 1974 Act and these amendments are designed to resolve any Navajo hardships in the 1934 Reservation Area as well.

Section 4 provides for the addition of the original 250,000 acres to the Navajo Reservation plus another 150,000 acres, or a total of 400,000 acres of new reservation lands. While it is debatable whether any additional lands are really needed to accomplish relocation, the Navajos have claimed that these new lands are needed to relocate those who reside on lands partitioned to the Hopis.

Certainly, on the 16 million acre Navajo Reservation there is ample room for residences for the Joint Use Area Relocatee families and several hundred more from the 1934 Area. There is admittedly not enough room for those families to graze livestock, however. Because of the badly overgrazed nature of the entire area it is abundantly clear that no longer can the Navajo people expect to earn any significant part of their overall tribal income through ranching. These amendments recognize this fact of life. It is incumbent now upon tribal leaders to seek new sources of livelihood for their members. If this is not done, in the future the problem will be at their doors, not that of Congress.

Section 5 grants additional tools to the Relocation Commission and underscores Congress' intent that this Commission be, and be treated as a truly independent body, not subject to the indirect control of Interior as has occurred in the past.

Section 6 allows Congress ninety days (instead of 30 days as set forth in the 1974 Act) to review the relocation plan. It is expected that the Commission's plan will be reasonably complete, but it is recognized that many of the practical problems associated with the relocation cannot be fully anticipated until the resettlement process is actually underway. Consequently, the purpose of the Congressional review is not simply to criticize the details of the plan, but instead to make certain that relocation is actually moving forward without delay and without any major oversights.

Section 7 grants benefits to a limited group of Navajo trespassors who were evicted from executive Hopi lands in 1972.

Section 8 establishes final deadlines for the Secretary to accomplish surveying, monumenting, fencing and livestock reduction before the respective tribes take over these tasks. The Secretary's past failures in these areas are not condoned in any way by the amendments but it was felt that specific Congressional deadlines would encourage compliance with existing court orders in these areas and set dates on which the Tribes may take over these jobs.

Sections 9, 10 and 11 add further tools to the Commission to facilitate and expedite relocation. Section 11 specifically creates an annual fund which the Commission can divide between the two tribes for the purpose of helping both overcome problems created by the partition.

In addition, Section 11 provides authorization for a much needed Hopi High School and a Hopi Medical Center which is also desperately required to meet the increased activity and population in the area.

Exemptions from NEPA and FLPMA are included in section 11 to avoid any possibility that those two acts would be raised to obstruct relocation or the reclamation of the lands in question.

Section 11 also expands the government's willingness to absorb the expected litigation expenses which occur as a result of the legislation. This provision (as did Section 8 in the 1974 Act) recognizes the casual role played by the United States in these problems and also acknowledges the inherent conflict of interest that the United States has in attempting to represent either of these tribes in an action against the other.

The final provision in the amendments deals with life-estates to be granted to a limited number of physically disabled or aged residents of the lands partitioned to the other tribe. The Relocation Commission is responsible for the initial selection of these individuals. The original restrictions concerning life-estates as recommended by the mediator and adopted by the court are expanded considerably by the amendments and will clearly benefit individual Navajos. I am pleased to note that the conferees provided for up to ten life estates for those few Hopis living in the Navajo partitioned area who choose not to move.

It is possible that not all the problems relating to the life-estates will be resolved during the life of the Commission. While the conferees expect the Secretary to assume administration of life estates after the Relocation Commission expires, the courts will, of course, provide the ultimate back-up for the resolution of any problems. These amendments are intended to change only minimally with the prior pronouncements of the court on life-estates. It is intended that the other aspects of the court's orders will remain in full effect to the extent they are not contradicted by these statutory amendments.

In short, this "final tune-up" of the Settlement Act has been accomplished after much careful debate and study. All of the conferees, I believe, recognize that this relocation project will not be easy or pleasant. But we all recognize that in the interest of justice, it must be done. While the short-term costs of this task are considerable, in the long term, getting this job done now will save much in terms of human suffering and actual dollar outlay.

For all these reasons, I support S. 751 as reported by the Conference Committee and urge you to vote with me for passage.

Mr. CLAUSEN. Mr. Speaker, I have no further requests for time.

Mr. UDALL. Mr. Speaker, I yield myself 2 minutes, and I have no requests beyond that.

Mr. Speaker, I just want to thank the gentleman from Arizona, the distinguished minority leader, for his support. This has been a bipartisan project from the beginning. Our senior Senator, Senator GOLDWATER, worked closely with me in putting this thing together over the years, and our junior Senator was a member of the conference committee and signed the report.

So this is a good solution to a very ancient and complex subject. I strongly urge its approval by the House.

Mr. Speaker, if there are no further requests for time, I move the previous question on the conference report.

The previous question was ordered.

The SPEAKER pro tempore. The question is on the conference report.

The question was taken; and the Speaker pro tempore announced that the ayes appeared to have it.

Mr. ROUSSELOT. Mr. Speaker, I object to the vote on the ground that a quorum is not present and make the point of order that a quorum is not present.

The SPEAKER pro tempore. Evidently a quorum is not present.

The Sergeant at Arms will notify absent Members.

The vote was taken by electronic device, and there were—yeas 396, nays 15, not voting 22, as follows:

[Roll No. 369]

YEAS—396

| | | |
|---|---|---|
| Abdnor | Atkinson | Bingham |
| Addabbo | AuCoin | Blanchard |
| Akaka | Badham | Boggs |
| Albosta | Bafalis | Boland |
| Alexander | Bailey | Bolling |
| Ambro | Baldus | Boner |
| Anderson, Calif. | Barnard | Bonior |
| Andrews, N.C. | Barnes | Bonker |
| Andrews, N. Dak. | Beard, R.I. | Bouquard |
| Annunzio | Beard, Tenn. | Bowen |
| Anthony | Bedell | Brademas |
| Applegate | Beilenson | Breaux |
| Archer | Benjamin | Brinkley |
| Ashbrook | Bennett | Brodhead |
| Ashley | Bereuter | Brooks |
| Aspin | Bethune | Broomfield |
| | Bevill | Brown, Calif. |
| | Biaggi | Brown, Ohio |

Exhibit 5 to United States' Motion DOJ15

HeinOnline -- 126 Cong. Rec. 16824 1980