**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE NAVAJO NATION, Plaintiff, v. THE UNITED STATES, Defendant, | ) | No. 508-88L<br>Senior Judge Eric G. Bruggink |

**THE UNITED STATES' PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(1) of the Rules of the Court of Federal Claims, the United States hereby submits these Proposed Findings of Uncontroverted Fact in Support of its Motion For Judgment on the Pleadings or, in the Alternative, Motion for Summary Judgment.

**The 1882 Reservation**

1. The Navajo Reservation was created pursuant to a treaty executed in 1868 between the United States and the Navajo Nation. See Treaty Between the United States of America and the Navajo Tribe of Indians, art. II, June 1, 1868, 15 Stat. 667, 668 ("1868 Treaty").
2. The 1868 Treaty set aside the reservation "for the use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them." 1868 Treaty, 15 Stat. at 668.
3. Various executive orders and Congressional acts issued subsequent to the reservation's creation withdrew other lands that would eventually expand the reservation's boundaries. See Sekaquaptewa v. MacDonald, 448 F. Supp. 1183, 1185 n.1 (D. Ariz. 1978) (collecting orders and acts); see, e.g., Def.'s Ex. 3 (January 8, 1900 Executive Order withdrawing a large

area, which would eventually be included within the area to which the consent requirement applied, "from sale and settlement until further ordered," without describing a particular purpose for the withdrawn land).

4. On December 16, 1882, President Chester A. Arthur signed an Executive Order establishing a reservation of nearly two-and-a-half million acres in Arizona for the use and the occupation of the Hopi (then called the "Moqui") and "such other Indians as the Secretary of the Interior may see fit to settle thereon." Def.'s Ex. 2 at DOJ2.

5. Principal among the reasons for establishing the 1882 Reservation was to protect the Hopi Tribe from the pressures of Navajo migration, Mormon settlers, and non-Indian "intermeddlers." Def.'s Ex. 4 at DOJ7.

6. In 1958, Congress authorized the Hopi Tribe and the Navajo Nation to institute or defend a quiet title action against the other with respect to the 1882 Reservation Area. See Act of July 22, 1958, Pub. L. No. 85-547, § 1, 72 Stat. 403.

7. The Hopi Tribe and Navajo Nation immediately initiated conflicting quiet title actions in the United States District Court for the District of Arizona ("District Court"). See Healing v. Jones, 210 F.Supp. 124, 130 (D. Ariz. 1962).

8. In 1962, the District Court concluded, *inter alia*, that the Hopi Tribe and Navajo Nation had "joint, undivided, and equal interests in and to all of the 1882 reservation lying outside the boundaries of land management district 6," which the District Court concluded belonged exclusively to the Hopi Tribe. Id. at 132.

9. The District Court concluded that it lacked authority to partition the jointly-held portion of the 1882 reservation (called the "joint use area" or "JUA"). See id. at 190.

10. The District Court's decision established a *de facto* mutual consent requirement for future development on the JUA. See Def.'s Ex. 18 at DOJ51 (letter from Freddie Howard, Assistant Director of Navajo-Hopi Land Dispute Commission, to Roy Dan, Executive Director of Agency Housing Project Bureau of Indian Affairs, stating that problems in the former JUA "have greatly deteriorated due to the freeze imposed on September 28, 1962, by the Federal District Court").

11. In 1972, the District Court formally adopted the mutual consent requirement for proposed development within the JUA. See Def.'s Ex. 19 at DOJ55.

12. The Hopi Tribe and Navajo Nation participated in protracted legal proceedings to determine their respective rights to the JUA. See Clinton v. Babbitt, 180 F.3d 1081, 1083 n.2 (9th Cir. 1999) (listing eighteen opinions the United States Court of Appeals for the Ninth Circuit issued addressing the Hopi and Navajo interests in the 1882 Reservation lands); Sekaquaptewa v. MacDonald, 626 F.2d 113, 115 n.3 (9th Cir. 1980) (listing several cases involving disputes about the JUA).

**The 1934 Reservation Area**

13. On June 14, 1934, Congress enacted legislation to define the boundaries of the Navajo Indian Reservation. See Act of June 14, 1934, ch. 521, 48 Stat. 960 (the "1934 Act").

14. The 1934 Act provided that the defined area was "permanently withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other Indians as may already be located thereon." Id., 48 Stat. at 961.

15. At the time the 1934 Act was passed, members of the Hopi Tribe lived in the Village of Moenkopi and other areas within the boundaries of the land Congress described, and were, therefore, "'such other Indians' entitled to an equitable interest in the 1934 Reservation." Masayesva v. Zah, 816 F.Supp. 1387, 1393 (D. Ariz. 1992), rev'd in part on other grounds, 65 F.3d 1445 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996).

16. The Hopi Tribe and the Navajo Nation have disagreed about the interpretation of the 1934 Act since its passage. See Masayesva v. Zah, 65 F.3d 1445, 1450 (9th Cir. 1995), cert. denied, 517 U.S. 1168 (1996).

17. While the parties' appeal of the district court's decision in Healing was pending before the United States Supreme Court, see Jones v. Healing, 373 U.S. 758 (1963) (aff'g 210 F.Supp. 125 (D. Ariz. 1962)), the Hopi Tribe began to express concern to the Commissioner of Indian Affairs regarding the Hopi Tribe's rights to the 1934 Reservation Area. See Def.'s Ex. 6.

18. Referring to certain development projects the Navajo Nation proposed within the 1934 Reservation Area, the Hopi Tribe explained "that such development would definitely interfere not only with future development of the Hopi interests, but with present usage." Id. at DOJ16.

19. Accordingly, the Hopi Tribe requested "that the Hopi rights in the area be given proper consideration." Id.

20. In a June 11, 1966 letter to the Commissioner, the Hopi Tribe reiterated concerns over its ability to protect its rights in the western portion of the 1934 Reservation. See Def.'s Ex. 9.

21. The Commissioner referred the June 11, 1966 letter to the Associate Solicitor for Indian Affairs, and asked the Solicitor whether the Hopi Tribe had an interest in the 1934 Reservation Area. See Def.'s Ex. 10.

22. The Associate Solicitor advised the Commissioner that, "[w]hile it is clear that the Hopi have an interest in the area described in the 1934 Act, it is not possible for us to define the nature or extent of that interest." Id. at DOJ25.

23. The ongoing litigation over the 1882 Reservation Area, including the 1962 Healing decision, informed the Department of the Interior's response to the Hopi Tribe. See Def.'s Ex. 11 at DOJ26 (referencing the tribes' conflict over the 1882 Reservation Area).

24. Recognizing that the 1934 Act, like the 1882 Executive Order, did not define the Hopi's or Navajo's rights to the disputed land, Robert Bennett, Commissioner of Indian Affairs, expressed the need to preserve both tribes' rights to the 1934 Reservation Area. See id. at DOJ28.

25. On July 8, 1966, Commissioner Bennett issued an administrative policy that required the Hopi Tribe and the Navajo Nation to obtain the consent of the other tribe before undertaking any unilateral development in the portion of the 1934 Reservation Area directly west of the 1882 Reservation Area. See id. at DOJ28. This consent requirement became known as the "Bennett Freeze," and the effected area is hereinafter referred to as the "Bennett Freeze Area."

26. On October 31, 1967, the Department of the Interior amended its policy to allow the Commissioner to approve "public work type projects" within the Bennett Freeze Area without joint tribal approval. See Def.'s Ex. 12 at DOJ30.

27. Under this amended policy, "all proposed developments as outlined in [Bennett's] July 8, 1966, letter will be submitted to the Commissioner for determination as to whether they fall within the public works category, and otherwise for his information and consideration." Id.

28. In addition to announcing the new public works procedure, the October 31, 1967 memorandum approved the Two Grey Hill School and the Tuba City Hospital projects "since these public works type projects are so vitally needed to serve the best interests of the members of both tribes." Id. at DOJ31.

29. On December 28, 1970, the Department of the Interior eliminated the public work type project exception, effectively reinstating the terms of the original administrative order. See Def.'s Ex. 13.

30. On August 4, 1972, the Department of the Interior allowed Navajo development in an area immediately surrounding Tuba City to proceed without Hopi approval and also allowed Hopi development in the Moencopi vicinity to proceed without Navajo approval. See Def.'s Exs. 14-15.

31. On July 16, 1976, "in order to alleviate [the Freeze's] harsh impact" during the pendency of litigation between the tribes over the 1934 Act lands, the Department of the Interior agreed to review Navajo projects in the affected areas if the Hopi Tribe refused to consent or did not respond to the Navajo construction requests. Def.'s Ex. 17 at DOJ48.

32. Specifically, the Commissioner stated that he would "entertain a request for unilateral approval, on an ad hoc basis, for each project for which the Hopi Tribe has specifically refused to grant its consent or that failed to consider granting its consent within 30 days after being requested to do so." Id.

**The 1974 Settlement Act**

33. In 1974, Congress enacted legislation to "provide for final settlement of the conflicting rights and interest of the Hopi Tribe and the Navajo Nation to and in lands lying within the joint use area of the [1882 Executive Order Reservation], and . . . lands lying within the reservation created by the [1934 Act]." Pub. L. No. 93-531, 88 Stat. 1712 (preamble) (codified at 25 U.S.C. §§ 640d, et seq. (1974) ("1974 Settlement Act").

34. Among other provisions, the 1974 Settlement Act authorized the district court to partition the JUA. See 25 U.S.C. § 640d-3.

35. Pursuant to this authority, the district court partitioned the JUA in 1979. See Sekaquaptewa, 626 F.2d at 117-19.

36. "The 1974 Settlement Act required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission to pay for the major costs of such relocations." Clinton, 180 F.3d at 1084 (citing 25 U.S.C. §§ 640d-11 to 640d-14).

37. A lengthy and difficult period of relocation of more than 10,000 tribal members from the JUA followed the District Court's partition order. See id. at 1084-85.

38. The 1974 Settlement Act also afforded each tribe the right to bring suit against the other in the District Court to resolve the tribes' dispute about the 1934 Reservation Area. See 25 U.S.C. § 640d-7(a).

39. The tribes sued each other in 1974 in order to resolve their dispute about the 1934 Reservation Area. See Masayesva, 816 F.Supp. at 1393.

40. On April 5, 1978, the District Court held that, under the 1934 Act, the Hopis and Navajo tribes each held a one-half interest in all land that the Hopis possessed, occupied, or used in

1934 and the Navajos had exclusive trust title to the rest of the reservation. See Sekaquaptewa v. MacDonald, 448 F. Supp. at 1196.

41. In 1980, the Ninth Circuit reversed the district court's decision in part. See Sekaquaptewa v. MacDonald, 619 F.2d 801 (9th Cir. 1980).

42. The Ninth Circuit held that the Hopis had an exclusive interest – as opposed to a one-half interest – in the lands they possessed, occupied, or used in 1934, see id. at 808, and remanded the case for findings on what lands were encompassed in that description, see id. at 809.

43. The Ninth Circuit recognized the difficulty in that task, and acknowledged the possibility that the tribes may have used some land jointly in 1934. See id.

**The 1980 and 1988 Amendments to the Settlement Act**

44. In July 1980, two months after the Ninth Circuit remanded Sekaquaptewa, Congress amended the 1974 Settlement Act to codify the Bennett Freeze. See Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)) ("Any development of [certain] lands in litigation pursuant to [the Settlement Act] . . . shall be carried out only upon the written consent of each tribe.").

45. Consistent with the purpose of the original administrative rule, the purpose of the 1980 Amendment was to "preserve the parties' rights subject to a final adjudication." Masayesva, 816 F.Supp. at 1397.

46. In September 1988, following Navajo Tribal Chairman Peter MacDonald's efforts to implement an aggressive building campaign in the Bennett Freeze area, the District Court issued a preliminary injunction in Sidney v. MacDonald, No. 58-579 PCT-EHC (D. Ariz.). See Def.'s Ex. 20.

47. Finding that Chairman MacDonald's efforts would result in substantial damage to the Hopi Tribe, the District Court issued an injunction that, among other things, required the Navajo Nation to make "written application to the Hopi Tribe, with a copy to the Bureau of Indian Affairs, for any construction or development activities on the Bennett Freeze." Id. at DOJ71.

48. The District Court's order required any proposed development application to include specific information, "including location, estimated cost, and justification for the proposal." Id. at DOJ72.

49. In November 1988, shortly after the District Court's preliminary injunction order, Congress modified the terms of 25 U.S.C. § 640d-9 to create an exception for certain improvements, such as those for public health and safety and to create a limited appellate mechanism whereby a development proposal that had been declined might be appealed to the Secretary of the Interior. See 25 U.S.C. § 640d-9(f)(2)-(3).

50. In the 1988 Amendment, Congress provided that the consent requirement would not apply if the proposal "does not involve new housing construction" and if "the Secretary of the Interior determines that [the proposed project] is necessary for the health or safety of the Navajo Tribe, the Hopi Tribe, or any individual who is a member of either tribe." 25 U.S.C. § 640d-9(f)(3)(A).

**Conclusion of the District Court Litigation**

51. The District Court issued three decisions in 1992, designating certain discrete lands as belonging exclusively to either the Navajo Nation or Hopi Tribe, and partitioning the land that the two tribes had jointly used. See Masayesya v. Zah, 792 F.Supp. 1155 (D. Ariz. 1992); Masayesya v. Zah, 793 F.Supp. 1495 (D. Ariz. 1992); Masayesva v. Zah, 816 F.Supp.

1387 (D. Ariz. 1992).

52. In its September 25, 1992 decision partitioning the disputed lands, the District Court attempted to terminate the Bennett Freeze. See Masayesva, 816 F.Supp. at 1424 (ordering "[t]hat the 'Bennett Freeze' restriction on construction and development within the 1934 Reservation, and codified by 25 U.S.C. § 640d-9, is lifted").

53. In December 1995, the Ninth Circuit considered the three District Court decisions jointly, affirming the decisions in part and reversing them in part. See Masayesva v. Zah, 65 F.3d 1445 (9th Cir. 1995).

54. Among other findings, the Ninth Circuit vacated the District Court's lifting of the Bennett Freeze, and held that the "freeze remains in effect for the lands 'in litigation.'" Id. at 1460.

55. The Supreme Court denied certiorari in 1996, and the matter was remanded to the District Court for further proceedings. See Secakuku v. Hale, 517 U.S. 1168 (1996).

56. On March 31, 1997, the District Court entered an order approving a stipulation between the Navajo Nation and Hopi Tribe that provided that certain specified areas were no longer in litigation. See Joint Status Report, dated Sept. 30, 1997 (Doc. No. 40).

57. After the approval of the March 31, 1997 stipulation, approximately "700,000 to 800,000 acres remain[ed] subject to the [Bennett Freeze]." Id.

58. In November 2006, the Hopi Tribe and Navajo Nation reached a settlement agreement, which resolved the District Court litigation. See Def.'s Ex. 21.

59. On December 4, 2006, the District Court entered the agreement as an Order and Final Judgment of the Court. See id.

60. In its December 4, 2006 Order, the District Court lifted the Bennett Freeze in its entirety. See id. at DOJ77 ("The Court hereby finds that no lands are any longer 'in litigation' for purposes of 25 U.S.C. § 640d-9(f), and that the restrictions on development contained in that statute, commonly known as the 'Bennett Freeze,' are no further force or effect.").

**Plaintiff's Proposed Development on the Bennett Freeze Area Between 1966 and 2006**

61. Between 1966 and 2006, Plaintiff submitted several projects (approximately 218), which sought approval to replace, repair, or improve individual tribal members' homes that were located in the Bennett Freeze Area. See Def.'s Exs. 22-24, 26.

62. The Hopi Tribe or the Department of the Interior approved at least 141 of those project proposals. See id.

63. Between 1966 and 2006, Plaintiff submitted several projects (approximately 90), which sought approval to undertake certain public works projects, such as the paving of public roads, repairing or improving of public utilities, or extending electrical powerlines. See id.

64. The Hopi Tribe or the Department of the Interior approved at least 56 of those project proposals. See id.

65. Imposition and implementation of the Bennett Freeze did not result in a substantial economic impact on Plaintiff's property. See id.

66. Imposition and implementation of the Bennett Freeze did not result in an interference with Plaintiff's reasonable investment-backed expectations. See id.

Dated: June 2, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

s/ William J. Shapiro
WILLIAM J. SHAPIRO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, California 95814
(916) 930-2207 (phone)
(916) 930-2210 (fax)

MARK S. BARRON
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
601 D Street, NW
Washington, DC 20530
(202) 305-0490 (phone)
(202)305-0506 (fax)