# In the United States Court of Federal Claims

No. 88-508L
(Filed: February 27, 2009)

* * * * * * * * * * * * * * * * * * * *

THE NAVAJO NATION,

         *Plaintiff*,

v.

THE UNITED STATES,

         *Defendant.*

* * * * * * * * * * * * * * * * * * * *

Indian Trust Claim; Statute of Limitations; Claim Accrual; Temporary Regulatory Taking

---

*Scott B. McElroy*, *M. Catherine Condon*, Washington, D.C., and *Peter J. Osetek*, Ann Arbor, MI, for plaintiff.

*William J. Shapiro*, *Mark S. Barron*, Trial Attorneys, Civil Division, Department of Justice, Washington, D.C., *Ronald J. Tenpas*, Assistant Attorney General, Department of Justice, Washington, D.C., for defendant.

————

OPINION

————

BRUGGINK, *Judge*.

The Navajo Nation brings this action against the United States asserting a constitutional taking and a breach of trust. The suit originates in the federal government's decades-long efforts to delineate reservation lands between the Navajo and Hopi Tribes. These efforts were particularly difficult because the

tribes have not occupied physically separated lands. They have co-occupied some of the disputed lands. Plaintiff contends that these efforts resulted in such severe restrictions on the use of its lands that the government breached its fiduciary duties to the tribe and took its property on a temporary basis.

Both of plaintiff's claims stem from the same government action, namely, the Department of the Interior's ("DOI") alleged misinterpretation of the 1980 Amendment[1] to the 1974 Settlement Act.[2] The amendment, in general terms, had the effect of forcing the two tribes to live with a stay in place on the land pending the outcome of litigation resolving their respective rights. In 1982, the Hopi adopted a moratorium against all Navajo development proposals, including those relating to the repair and restoration of dilapidated Navajo structures in the area affected by the 1980 Amendment. Plaintiff argues that DOI's alleged acquiescence in the Hopi moratorium violated the government's trust duties to the Navajo, or, alternatively, caused a temporary taking of Navajo land and property.

The action was stayed for several years at the parties' joint request so that collateral litigation could be terminated. That litigation ended on December 4, 2006, triggering defendant's motion. *See Honyoama v. Shirley*, No. 74-842-PHX-EHC (D. Ariz. Dec. 4, 2006). Defendant argues that the complaint should be dismissed pursuant to Rule 12(b)(1), Rule 12(b)(6) or Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") either because it was filed too late or because it fails to state a claim upon which relief can be granted. The court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505 (2000).

Oral argument was held in Albuquerque, New Mexico on Thursday, January 8, 2009. For the reasons discussed below, defendant's motion for summary judgment is granted with respect only to plaintiff's breach of trust claim. We defer ruling on defendant's motion with respect to plaintiff's takings claim. Further briefing on the issue is outlined below.

---

[1] Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d–9(f) (1980)).

[2] Pub. L. No. 95-531, 88 Stat. 1712 (codified at 25 U.S.C. §§ 640d, *et seq.* (1974)).

BACKGROUND[3]

Accessing the dispute requires a recitation of the numerous treaties and statutes underlying the creation of the Navajo and Hopi reservations as well as the government's ongoing trust responsibilities to the tribes.

*The 1868 Navajo Reservation*

On June 1, 1868, President Andrew Johnson entered into a treaty with the Navajo Nation, setting aside a parcel of land commonly knows as the "1868 rectangle" for the "use and occupation of the Navajo tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them." Treaty with the Navajos, June 1, 1868, 15 Stat. 667.

Other parcels of land were thereafter set apart for the Navajo through executive orders and legislative actions, which served to expand the reservation's boundaries. *See*, *e.g.*, Exec. Order of Oct. 29, 1878; Exec. Order of Jan. 6, 1880; Exec. Order of May 17, 1884; Exec. Order of Jan. 8, 1900; Act of May 23, 1930, 46 Stat. 378; Act of Feb. 14, 1931, 46 Stat. 1161 (codified at 16 U.S.C. §§ 445 to 445b. In 1880, the Navajo reservation consisted of approximately eight million acres, which, in turn, created the eastern border of the reservation territory later granted by executive order to the Hopi in 1882. *See Healing v. Jones*, 210 F. Supp. 125, 134-135 (D. Ariz. 1962). The Navajo reservation also extended to the south and southwest of what would be the 1882 Hopi reservation, which is described below. *Id*.

*1882 Hopi Reservation*

President Chester Arthur, on December 16, 1882, signed an executive order establishing for the Hopi a reservation of approximately two-and-a-half million acres in Arizona which is commonly known as the "1882 Reservation." In this treaty with the Hopi (formerly known as the "Moqui"), President Arthur proclaimed that the 1882 Reservation was "for the use and occupation of the Moqui and such other Indians as the Secretary of the Interior may see fit to

---

[3] The facts are taken from the parties' undisputed proposed findings of fact and exhibits, as well as from prior reported decisions involving the tribes.

settle thereon."  Treaty with the Hopi, *Executive Orders Relating to Indian Reservations: 1855-1922* (Dec. 16, 1882).  The executive order of 1882, however, did not include the Hopi village of Moenkopi, located to the west of the reservation.  The 1882 Reservation is located in the center of the map at page five below and is marked with a rectangle outlined in black.

As the Navajo had "used and occupied parts of the 1882 reservation . . . from long prior to the creation of the reservation in 1882," the 1882 Reservation later became the subject of quiet title litigation between the Hopi and the Navajo.  *Healing*, 210 F. Supp. at 144-45.  In 1962, the United States District Court for the District of Arizona ("district court") determined that it lacked jurisdiction to partition the jointly-held land (known commonly as the "joint use area" or the "JUA").  *Id.* at 190.  Instead, the district court held that the two tribes had "joint, undivided, and equal interests in and to all of the 1882 reservation lying outside the boundaries of land management district 6 . . . ."  *Id.* at 132.  In 1972, the district court officially imposed a mutual consent requirement between the tribes for proposed development on the area.  *Hamilton v. MacDonald*, Civ. 579-PCT (D. Ariz. 1972).  The Hopi and the Navajo engaged in litigation regarding their respective rights to the JUA for decades after the mutual consent requirement was originally imposed.  *See Jones v. Healing*, 373 U.S. 758 (1963), *aff'g*, 210 F. Supp. 125 (D. Ariz. 1962); *Clinton v. Babbitt*, 180 F.3d 1081, 1083 n. 2 (9th Cir. 1999); *Sekaquaptewa v. MacDonald*, 626 F.2d 113, 115 n. 3 (9th Cir. 1980).  By 1934, however, the 1882 Reservation was completely surrounded by the expansion of Navajo lands.  This expansion created an entirely new and distinct conflict between the tribes, discussed below.

*The 1934 Navajo Reservation Extension*

Congress extended the boundaries of the Navajo Reservation on June 14, 1934 and created a joint interest in these additional lands for the Navajo and "such other Indians as may already be located thereon."  Act of June 14, 1934, ch. 521, 48 Stat. 960 ("1934 Act").  At the time, both Navajo and Hopi tribal members lived on the land covered by the 1934 Act.  *See Hopi Tribe v. United States*, 55 Fed. Cl. 81, 83 (2002).  The Hopi "lived in the Village of Moenkopi and used adjacent areas in 1934, and were 'such other Indians' entitled to an equitable interest in the 1934 Reservation."  *Masayesva v. Zah*, 816 F. Supp. 1387, 1393 (D. Ariz. 1992).  The map below depicts the Navajo and Hopi Reservations as they currently exist.  The expanded 1934 Navajo Reservation is depicted in light-red and medium-red as the lands surrounding

4

the 1882 Executive Order. The Hopi village of Moenkopi and the Navajo village of Tuba City are shown on the map in the medium-red area located just west of the 1882 Reservation area.



*1882 Reservation Area Litigation Effects on the 1934 Reservation Area*

On June 3, 1963, the Supreme Court affirmed the district court's ruling in *Healing* that the Navajo and the Hopi held the 1882 Reservation Area in joint and common ownership. *Healing*, 373 U.S. at 758, *aff'g,* 210 F. Supp. at 125. During the *Healing* litigation, the Hopi began to express concerns to DOI regarding their rights to the 1934 lands. In 1966, based on the Supreme Court's ruling in *Healing*, DOI Commissioner of Indian Affairs ("Commissioner") Robert Bennett wrote a letter answering the Hopi concerns about the 1934 Reservation Area to Navajo Area Director, Graham E. Holmes:

> The conflict between the Navajo and Hopi Tribes over their respective rights in the [1882 Reservation] was resolved by *Healing v. Jones* . . . . Thus, the ownership and rights in that particular area are forever settled insofar as this Bureau is presently concerned. All actions whatsoever taken by officials

of the Bureau . . . must be guided by the reality of common ownership.

Another problem which has perplexed the Bureau for years is the administration of [the 1934 Reservation Area] . . . .

. . . .

It is evident that the Government can no longer continue to administer the area as though it were owned solely by the Navajo Tribe . . . . [I]t does not appear reasonable to administer the total of the reservation area in Arizona, confirmed by the Act of June 14, 1934, as though it were jointly owned by the Hopi and Navajo Tribes.  Effective administration requires of me a prudent judgment.

Therefore, the following instructions shall apply only to that portion of the [1934] Navajo Reservation lying west of the [1882 Reservation] . . . .

. . . .

. . . No action shall be taken by an official of the Bureau that does not take full cognizance of the undetermined rights and interests of the Hopi Indians in the said area.  This will necessitate formal action by the Hopi as well as by the Navajo Tribe on all those cases which hypothecate the surface or subsurface resources for exploration, mining, rights-of-way, traders, or other use or occupancy authorized by permit, lease, or license.

Letter from Robert Bennett, Commissioner, to Graham E. Holmes, Navajo Area Director, dated July 8, 1966.

The mutual consent requirement set forth in Commissioner Bennett's letter for development in the 1934 Reservation Area became known as the "Bennett Freeze."  The affected area is the portion of the 1934 Reservation Area located directly west of the 1882 Reservation Area and is commonly referred to as the "Bennett Freeze Area."  This includes the location of the

Hopi village of Moenkopi and the Navajo village of Tuba City.  The Bennett Freeze Area is located on the above map in a medium-red color.

DOI amended the Bennett Freeze in 1967 to allow unilateral approval of public works projects by the DOI Commissioner.  *See* Letter from Robert Bennett, Commissioner, to Graham E. Holmes, Navajo Area Director, dated Oct. 31, 1967.  DOI simultaneously announced the approval of two new public works projects– the Two Grey Hills School and the Tuba City Hospital.  *Id.* In 1970, however, DOI eliminated the 1967 public works project exception, effectively reinstating the original mutual consent requirement of the Bennett Freeze.  *See* Letter from Acting Commissioner to Area Directors, dated Dec. 28, 1970.

The policy changed again in 1972 when DOI Assistant Secretary of the Interior, Harrison Loesch, wrote a letter exempting Moenkopi and Tuba City from the mutual consent requirement.  *See* Letter from Harrison Loesch, Asst. Secretary of the Interior, to Peter MacDonald, Navajo Tribal Chairman, dated Aug. 4, 1972; *see also* Letter from Deputy Commissioner to Area Directors, dated Aug. 15, 1972.  Thus, the Hopi Tribe could proceed with unilateral development in the Moenkopi vicinity, and the Navajo were allowed to develop without Hopi consent in Tuba City.  *Id.*

The Commissioner further modified the consent requirements in 1976 "in order to alleviate [the Freeze's] harsh impact during the pendency of the litigation" to permit an appeal to him of "any Navajo project . . . for which the Hopi Tribe has specifically refused to grant its consent . . . or that failed to consider granting its consent within 30 days after being requested to do so." Letter from Morris Thompson, Commissioner, to Chairman Peter MacDonald, Navajo Chairman, dated July 16, 1976.  The Commissioner's purpose in the modification was to reduce the "arbitrarily imposed obstacle to meeting Navajo needs."  *Id.*

*The 1974 Settlement Act*

Congress enacted legislation in 1974 which significantly impacted the tribes' competing interests in the 1934 Reservation Area.  Pub. L. No. 93-531, 88 Stat. 1712 (codified at 25 U.S.C. §§ 640d to 640d-31 (1974)) ("1974 Settlement Act").  The 1974 Settlement Act "required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission to pay for the major costs of such relocations."  *Clinton*, 180 F.3d

at 1084 (citing 25 U.S.C. §§ 640d-11 to 640d-14).  A lengthy and difficult relocation program of more than 10,000 tribal members followed after a district court order of partition.  *See id.*

Importantly for the present litigation, the 1974 Settlement Act also authorized the tribes to bring suit against each other in district court to resolve the dispute over rights within the 1934 Reservation Area.  *See* 25 U.S.C. § 640d-3; *see also Sekaquaptewa*, 626 F.2d at 117-119.   The authorized litigation began in 1974 and did not end until 2006, when the district court adopted a settlement agreement between the Navajo and the Hopi regarding land remaining under the Bennett Freeze.  *Honyoama v. Shirley*, No. 74-842-PHX-EHC (D. Ariz. Dec. 4, 2006).

*The 1980 Amendment to the 1974 Settlement Act*

Before the authorized litigation concluded, Congress in July 1980 amended the 1974 Settlement Act to codify the Bennett Freeze.  *See* Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)).  In part, the amendment stated:

> Any development of lands in litigation pursuant to section 8 of this Act . . . shall be carried out only upon the written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City.  Each such area has been heretofore designated by the Secretary.  'Development' as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

*Id.*  The purpose of the 1980 Amendment, like that of the original 1966 administrative freeze, was to "preserve the parties' rights subject to a final adjudication."  *Masayesva*, 816 F. Supp. at 1397.

DOI's Office of the Solicitor opined in June 1982 that the 1980 Amendment did not affect "ordinary maintenance and repair of existing structures" but instead prohibited "all new developments or new construction." Memorandum from William D. Back, DOI Acting Field Solicitor, to Superintendent, Western Navajo Agency, dated June 2, 1982.  According to DOI's Bureau of Indian Affairs ("BIA") Western Navajo Agency

8

Superintendent, Mr. Wilbur Wilkinson, "the [Bennett] freeze primarily impact[ed] the Navajo people as virtually all Hopis reside[d] in the Moencopi area which [wa]s exempt from the freeze."  Memorandum from Superintendent, Western Navajo Agency, to Asst. Secretary- Indian Affairs, dated June 17, 1986.  The 1980 Amendment did not provide for the possibility of appeal to the DOI Secretary of the Interior in cases in which the Hopi denied or failed to respond to a Navajo application for a development project in the Bennett Freeze Area.

Between July 1980 and August 1982, the Navajo submitted several public works project applications to the Hopi.  The Hopi granted consent for a well in Tuba City, an electrical line at some of the Tuba City wells, and an expansion of the Tuba City/Moenkopi landfill.  Hopi consent to Navajo development proposals suddenly ceased, however, following the Hopi Tribe's implementation of a development moratorium.

On August 26, 1982, the Hopi Tribal Council wrote a letter to the Western Navajo Agency Division of Social Services stating:

> The Hopi Negotiating Committee . . . unanimously voted to place a moratorium on any and all construction activities, more specifically within the Bennett Freeze Order Area (BFOA), until certain issues have been addressed satisfactorily surrounding current and potential construction activities in the litigated BFOA and the entire 1934 Reservation.  The Committee has postponed the processing of all construction applications for the BFOA for an indefinite period which will allow the Hopi Tribe to conduct a complete investigation on the matter.

Letter from Stanley Honahni, Chairman, Hopi Negotiating Commission, to Calvin Nez, Caseworker, Division of Social Services, dated Aug. 26, 1982.

At least eleven[4] Navajo requests for residential construction and repair were pending at the time of the Hopi's moratorium in August 1982.[5]  The Hopi

---

[4] Plaintiff and defendant disagree on the number of pending requests.

[5] Plaintiff concedes that it does not have standing to seek compensation on behalf of individual Navajo tribal members.  See Pl.'s Resp. at 2 n. 1

Tribe did not give its consent to any of these individual Navajo projects. *See* Def.'s Ex. 24 ("United States' List of Navajo Nation Proposals").

Upon the implementation of the moratorium in 1982, the Hopi Tribe began to monitor Navajo activity within the Bennett Freeze Area. In an effort to ensure Navajo compliance with the moratorium, the Hopi posted notices on individual Navajo residence sites considered to be in violation of the moratorium. The Hopi considered renovations and repairs of individual Navajo residences (called hogans) and the development of a water tank to be illegal activity. Claims against the Hopi for harassment of Navajo residents, impoundment of Navajo livestock, and destruction of individual hogans, also arose as a result of the tribe's moratorium enforcement efforts.

A Hopi employee, Patrick Dallas, participated in aerial reconnaissance over the freeze area as part of the Hopi enforcement effort. Mr. Dallas and other Hopi employees circled helicopters over suspect Navajo structures and then took photographs which they later used to conduct field visits. Some Hopi field visits resulted in field trip reports of the structure being reviewed.

By June 1986, concern regarding the Hopi moratorium had reached Mr. Wilbur Wilkinson, DOI's BIA Western Navajo Agency Superintendent. Mr. Wilkinson wrote a letter to the DOI Assistant Secretary- Indian Affairs regarding the moratorium:

> [A]ll activities in the Bennett Freeze Area need to be closely regulated to ensure compliance with existing regulations by each tribe . . . .
>
> . . . .
>
> . . . The Hopi Tribe has mercilessly pocket-vetoed nearly all Navajo requests requiring their consent. We request a review of the procedures established . . . on July 16, 1976, where the Commissioner will entertain and act upon requests which the Hopi Tribe has failed to respond to.
>
> . . . .

> . . . The overriding duty of the Federal Government is to deal
> with Indian people, wherever located, and that is and will
> continue to be the policy of the Navajo area.

Memorandum from Wilber Wilkinson, BIA Superintendent, Western Navajo
Agency, to Asst. Secretary - Indian Affairs, dated June 17, 1986.  In July, Mr.
Wilkinson followed up with a letter to the Hopi Agency Superintendent, Mr.
Alph Secakuku:

> [N]umerous complaints have been received by this office to the
> activities by Hopi Tribal employees in the 1934 Bennett Freeze
> Area.  These employees are posting notices on Navajo homes
> and improvements with reference to the freeze requirements.
>
> We are requesting your assistance in stopping the issuance of
> these notices and any other Hopi Tribal activities . . . .
>
> If the Hopi Agency and the Hopi Tribe are concerned with a
> specific activity in the 1934 Executive Order Area, then contact
> should be made to this office to investigate.
>
> As a reminder, the Hopi Agency and the Hopi Tribe does not
> have jurisdiction in Western Navajo Agency and further
> activities of this nature may be construed as unlawful.

Letter from Wilber Wilkinson, BIA Superintendent, Western Navajo Agency,
to Alph Secakuku, Agency Superintendent, Hopi Agency, dated July 2, 1986.

Mr. Wilkinson sent a letter on July 7, 1986, to the Western Navajo
Agency requesting a determination from the BIA and permission to "notify
local Navajo residents on . . . the Bennett Freeze Area that minor
improvements to their residence will not require Hopi consent . . . ."
Memorandum from Wilbur D. Wilkinson, Superintendent, Western Navajo
Agency, to William D. Back, Acting Field Solicitor, Navajo Area, dated July
7, 1986.  In October 1986, another request for a BIA policy statement on the
issue of Navajo home repairs was submitted by the Western Navajo Agency.
As of 1988, however, BIA had not adopted any change in policy on the issue.

BIA's Hopi Agency Superintendent, Mr. Alph Secakuku, responded to
Mr. Wilkinson's letters on July 9, 1986, stating that the Hopi Tribe has a "legal

obligation to protect the interests of its citizens" and that in order to protect Hopi interests, "tribal employees are in the area protecting the rights of the Hopi Tribe by posting notices on Navajo improvements which have not received Hopi Tribal consent . . . ." Letter from Alph Secakuku, Superintendent, Hopi Agency, dated July 9, 1986. Mr. Secakuku recommended that the Navajo obtain consent from the Hopi before attempting further development in the Bennett Freeze Area to minimize "local agitation and ill feelings." *Id.* Mr. Secakuku concluded his letter by stating, "[a]s a Federal government entity, the Bureau of Indian Affairs has a responsibility to protect all Indian citizens under its jurisdiction in an impartial manner." *Id.*

BIA Agency Superintendents for the Western Navajo Agency and the Hopi Agency met to discuss issues relating to development in the Bennett Freeze Area on July 29, 1986, and submitted their joint proposal to the Area Directors in the Navajo and Phoenix Areas. *See* Memorandum from Wilber Wilkinson and Alph H. Secakuku, Agency Superintendents, Western Navajo Agency and Hopi Agency, to Area Directors, Navajo Area and Phoenix Area, dated July 29, 1986. The proposal stated, in part, that:

> A very key issue has arisen in the discussions on new construction procedures. The once established procedures by Commissioner Morrison Thompson in 1976 whereby a proposal for new development that did not receive consent of both tribes could after 30 (later 60) days be forwarded to the Commissioner's Office for final consideration and determination. The procedure has not been specifically cancelled or superceded and it is our position that P.L. 96-305 did not have the effect of replacing other prior administrative procedures relating to the 1934 SOA. We assume the Assistant Secretary for Indian Affairs will entertain development requests such as public work type projects where consent is not granted by both tribes.
>
> Both tribes need a clarification of what constitutes a new development requiring both tribe's [sic] consent.
>
>    . . . .
>
> Recommendation: Any maintenance or betterment would not require with [sic] tribe's [sic] consent. Anything beyond

maintenance and/or betterment would require consent from each
respective tribes [sic].

*Id.* The policy recommendations were not implemented.

The Navajo Superintendent submitted a request to the Navajo Area
Director to implement clarifying policies on issues such as "new construction
procedures if Hopi Tribal consent is not attainable" as well as "the definition
of home improvements as it applies to existing homesite leases and residences"
on October 20, 1986. Memorandum from Agency Superintendent, Western
Navajo Agency, to Area Director, Navajo Area, dated Oct. 20, 1986. As late
as August 24, 1988, the Navajo Superintendent had not received a response to
this request.

On August 15, 1988, Navajo Tribal Chairman Peter MacDonald
announced in a letter to the Navajo-Hopi Indian Relocation Commission that
he would begin a building and relocation campaign called "Project Hope" on
behalf of the Navajo residing in the Hopi Partitioned Lands ("HPL") area and
in the Bennett Freeze Area, notwithstanding the 1980 Amendment restrictions:

> I am compelled by this reality to tell you that if I do not receive
> by August 25, 1988 the clearest possible commitment from the
> federal government to conduct the needed repairs and related
> construction, I will personally undertake to provide more
> suitable housing from [sic] those on the HPL, including
> resistors, and for those most in need on the Bennett Freeze, and
> especially to find housing, on the HPL itself if need be, for the
> refugee families who left the HPL but have no place else to go.
> I will spare no effort in this regard.

*Sidney v. MacDonald*, No. CIV 58-579, at 2 (1988). The United States
Department of Justice sought a preliminary injunction against Mr. MacDonald
and his building campaign on September 14, 1988. *Id*. On September 26,
1988, the district court issued an injunction. *Id.*

*The 1988 Amendment to the 1974 Settlement Act*

Less than two months later, on November 16, 1988, Congress amended
the 1974 Settlement Act again. Navajo and Hopi Indian Relocation
Amendments Act of 1988, Pub. L. No.  100-666, § 6, 102 Stat. 3929

(amending 25 U.S.C. § 640d-9(f)) ("1988 Amendment").  The amendment stated in relevant part:

> Each Indian tribe which receives a written request for the consent of the Indian tribe to a particular improvement, construction, or other development on the lands . . . shall respond in writing to such request by no later than the date that is 30 days after the date on which the Indian tribe receives the request.  If the Indian tribe refuses to consent . . . the response shall include the reasons why consent is being refused.
>
> . . . .
>
> [A]fter the Navajo Tribe or Hopi Tribe has refused to consent to such improvement, construction, or development . . . the Secretary shall, by no later than the date that is 45 days after the date on which such request is submitted to the Secretary, determine whether [it] is necessary for the health or safety of . . . either Tribe.

*Id.*  The 1988 Amendment thus created an appeals mechanism within DOI for tribes to challenge project application denials.

On July 8, 1991, Attorney General of the Navajo Nation, Ms. Donna M. Christensen, wrote a letter to the DOI Asst. Area Director for Indian Programs, stating, "[p]lease be advised that the Hopi Tribe has been posting residents of the Bennett Freeze area for making any repairs of existing structures."  Letter from Donna M. Christensen, Attorney General, Navajo Nation Department of Justice, to DOI Assistant Area Director, dated July 8, 1991.  In March 1992, the Hopi Tribe wrote in a letter to Mr. Roman Bitsuie,  Executive Director of the Navajo-Hopi Land Commission, that "the Hopi Tribe's position is, and always has been, that the construction restrictions imposed by 25 U.S.C. § 640d-9 apply to repairs and renovations of existing structures" and that "the Hopi Tribe will bring appropriate legal action if such activities occur."  Letter from Patrick Dallas, Vice-Chairman, Hopi Tribe, to Roman Bitsuie, Executive Director, Navajo-Hopi Land Commission, dated March 16, 1992.

On July 27, 1993, Attorney General of the Navajo Nation, Mr. Herb Yazzie, testified to the Subcommittee on Interior Appropriations of the United States Senate regarding the Navajo-Hopi land dispute.  *See* Supplemental

Statement of Herb Yazzie, Attorney General of the Navajo Nation, to the Subcommittee on Interior Appropriations, United States Senate, dated July 17, 1993. Regarding the 1988 Amendment, he stated, "[a]fter 1988, denials were generally phrased in terms of the Hopi Tribe's policy against approving any request not meeting the strict criteria of the 'health and safety' amendment." *Id*. Mr. Yazzie continued by giving a list of individual Navajo projects which the Hopi denied "applying its own unilaterally-decreed standard of 'direct medical necessity.'" *Id.*

On June 6, 1997, Department of Health & Human Services ("Indian Health Services") sought assistance from the Executive Director of the Navajo and Hopi Land Commission, Mr. Colbert Dayzie, in obtaining an easement for water lines to complete a water supply and waste-water project for which it had acquired funding in 1994. Letter from C. Lewis Fox, Jr., Chief, Sanitation Facilities, Navajo Area Indian Health Services, to Colbert Dayzie, Executive Director, Navajo and Hopi Land Commission, dated June 6, 1977. The Indian Health Services letter stated:

> In late 1992, when the Freeze area was partitioned, we were able to begin funding projects which we had suppressed in our priority system because of the land dispute. Now, as we understand it, the Hopi Tribe still has legitimate concerns in areas partitioned for exclusive Navajo use. If we are unable to get a Grant of Easement in a timely manner, we will deobligate funding from the projects (approximately $1.6 million and service to 250 existing homes) and move the funding to projects outside the Former Freeze Area.

*Id.* The easement was not timely granted to Indian Health Services and funding for the project was deobligated.

On March 31, 1997, the district court entered an order confirming a partial settlement agreement between the Hopi and the Navajo regarding the Bennett Freeze Area lands. *Secakuku v. Hale*, No. CIV 74-842 PCT EHC ORDER (1997). This settlement agreement, however, left 700,000 acres of land still subject to the 1980 Amendment restrictions. Joint Status Report ¶ 4, at 3 (Oct. 1, 1997). It was not until December 4, 2006 that the order and final judgment approving a stipulation between the Navajo and the Hopi was entered by the district court, lifting the freeze in its entirety, and resolving the

land dispute between the tribes.  *Honyoama v. Shirley*, No. CIV 74-842 PHX EHC (2006).

## PROCEDURAL HISTORY

Plaintiff filed its claim here on August 25, 1988, shortly before the enactment of the 1988 Amendment.  Defendant filed a motion to dismiss on April 7, 1989.  That motion was denied on March 28, 1990, although we permitted plaintiff to file an amended complaint, which plaintiff subsequently did on June 29, 1990.

The amended complaint sought relief for three distinct claims: (1) constitutional taking without just compensation, (2) breach of trust, and (3) denial of equal protection.  Plaintiff attributed these claims primarily to defendant's prohibition on Navajo development of "their land except with the consent of . . . the Hopi Tribe."  Pl.'s Amend. Cmpl. at 1.  Plaintiff argued that the claim commenced sometime after the beginning of the Hopi moratorium in August 1982, stating that "[t]he restrictions imposed by defendant, and its unlawful delegation of federal police power, are a continuing taking of plaintiff's property without just compensation" as well as a breach of trust and a denial of the tribe's equal protection rights under the Fifth Amendment of the U.S. Constitution.  *Id.*

From 1990-1993, the parties conducted discovery and submitted status reports apprising the court of the ongoing district court litigation concerning ownership of lands covered by the 1980 Amendment.  In March, 1996, defendant filed a motion for summary judgment.  Judge Roger B. Andewelt granted summary judgment for defendant as to the equal protection claim, but denied it with respect to the two remaining claims.  The case was stayed in 1997 pending resolution of the district court litigation.

In 2001, the case was reassigned to the undersigned judge.  In 2006, the district court litigation concluded.  In February 2008, we lifted the stay and defendant filed its pending motion to dismiss, or alternatively, for summary judgment.  Briefing on the motion concluded on December 1, 2008, and oral argument was heard in Albuquerque, New Mexico on January 8, 2009.  For the reasons discussed below, defendant's motion is granted in part.

16

DISCUSSION

Defendant contends that the six-year statute of limitations set forth in 28 U.S.C. § 2501 bars both of plaintiff's claims.  In the alternative, defendant argues that the breach of trust claim fails to state a claim because it is not grounded on a specific, money-mandating fiduciary obligation and that plaintiff's taking claim has a number of fatal conceptual problems.

Plaintiff's breach of trust and taking claims both have their origin in the 1980 Amendment, which codified the Bennett Freeze.  The breach of trust argument is premised on DOI's alleged misinterpretation of that legislation.  Plaintiff contends that it is the government's post-1982 failure to keep the Hopi from interfering with the Navajo's rights which constitutes the breach of trust.  The taking claim, as we understand it, alleges that the 1980 legislation made possible the subsequent taking of Navajo tribal property by the Hopi Tribe.  Although the complaint was filed in 1988, plaintiff contends that the taking claim did not ripen until at least 1982, with the Hopi moratorium.  From that point, it contends, a continuing claim has accrued until 2006.

Both claims are subject to a six-year limitations period.  *See* 28 U.S.C. § 2501.  Defendant contends that plaintiff has not alleged that the government has *done* anything after August 25, 1982, and that both claims are therefore untimely.

Plaintiff's explanations for why these claims are not untimely further calls into question their substantive underpinnings.  Consequently, resolving the timeliness issue becomes virtually impossible to separate from the question of whether plaintiff has stated a cause of action in either breach of trust or taking.  In the case of the breach of trust claim, we have to understand what plaintiff alleges were the government's duties to the tribe, and how and when those duties were breached.  Similarly, it is difficult to assess the taking claim without better understanding what plaintiff asserts were its property rights, and how and when they were taken.  In short, we cannot conclusively rule on when the causes of action accrued without better grasping the substance of the claims.

*1) The Breach of Trust Claim*

The Indian Tucker Act provides general consent for Indian tribes to sue the United States government in this court. *See* 28 U.S.C. § 1505. It does not, however, create a substantive right to recover money damages against the United States. Like any other claimant, an Indian tribe must demonstrate a specific statutory or regulatory source of substantive law that can fairly be interpreted as mandating compensation by the federal government. *United States v. Mitchell*, 463 U.S. 206, 216-217 (1983) ("*Mitchell II*"). A general trust relationship between the federal government and Indian tribes does not create the "money-mandating" fiduciary duty contemplated by *Mitchell II* to allow the recovery of damages. *Id.* at 225. Instead, a tribe must allege that the government breached a specific fiduciary duty which has its source in substantive law. *Id.* at 218-24.

The federal government's control or supervision of tribal assets is a key factor in the analysis of whether a rights-creating or duty-imposing statute or regulation exists. *Id.* It is not necessary that there be an explicit provision in the law providing for money damages for breach of the legal duty. *White Mountain Apache Tribe v. United States*, 537 U.S. 465, 474-75 (2003) ("*White Mountain Apache*"). Where a trust relationship is created through control or supervision given to the federal government, general trust law may then infer that Congress intended to remedy a breach of the obligation. *Id.* at 477.

Plaintiff assembles three sources of substantive law which it contends, when considered together, create fiduciary obligations which can be enforced through an action for money damages: (1) the four founding documents that created or defined the Navajo reservation's boundaries; (2) the Navajo-Hopi Rehabilitation Act of 1950, codified at 25 U.S.C. § 631; and (3) the 1974 Settlement Act, codified at 25 U.S.C. §§ 640d to 640d-31, as amended in 1980. According to plaintiff, these statutes create the trust obligation which plaintiff claims was breached beginning in 1982, with DOI's misinterpretation of the 1980 Amendment.

Plaintiff asserts that the 1980 Amendment did not cover ordinary repairs and routine maintenance of existing structures but merely regulated new developments. Plaintiff therefore posits that interpreting the 1980 Amendment as limiting DOI's authority and responsibility to protect Navajo interests in the repair of existing structures "directly contravenes the express language, purpose and intent of the 1980 Amendment." Pl.'s Reply at 2.

According to plaintiff, "the Department's inaction, and, indeed, acquiescence in the Hopi Tribe's unwarranted actions gave rise to the Navajo Nation's breach of trust claim against the United States." *Id.* at 3. Moreover, plaintiff claims that DOI failed to maintain the status quo in the Bennett Freeze Area, and therefore breached its trust relationship with the Navajo.

We analyze below each of the statutes upon which plaintiff relies to determine whether the statutes, taken individually or as a whole, impose a money-mandating trust duty on DOI.

### a) Four Navajo Foundational Documents

Plaintiff begins with the Treaty of Sept. 9, 1849, arts. I, IX, 9 Stat. 974; the Treaty of June 1, 1868, art. II, 15 Stat. 667; the Executive Order of May 17, 1884; and the Act of June 14, 1934, 48 Stat. 960, as sources of law which create a general trust relationship between the Navajo and the United States. *See* Pl.'s Resp. at 27-32. These are the founding documents which defined and expanded the Navajo reservation. Plaintiff concedes that the general trust relationship created in these documents is "not, in and of itself, sufficient to support the conclusion that there was a money-mandating obligation on the part of the United States in the event it failed to properly discharge its duties . . . ." Pl.'s Resp. at 27. This is consistent with the Federal Circuit decision in *Navajo Nation v. United States*, which, when analyzing these same treaties and executive orders, concluded that:

> [t]he substantive sources of law cited by the Nation contain explicit trust language. Because such language is necessary but not sufficient for an Indian Tucker Act breach of trust claim, we proceed to evaluate whether the network of statutes and regulations asserted by the Nation established specific fiduciary or other duties that can fairly be interpreted at mandating compensation for damages sustained.

501 F.3d 1327, 1341 (Fed. Cir. 2008) (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)).

It is necessary, therefore, to proceed to the two other sources of substantive law cited by plaintiff to determine whether one or both of these statutes, in conjunction with the founding documents, establishes a specific money-mandating fiduciary obligation on the part of the United States.

*b) The Navajo-Hopi Rehabilitation Act of 1950*

Plaintiff cites the Navajo-Hopi Rehabilitation Act of 1950, 25 U.S.C. § 631 ("Rehabilitation Act"), as a part of the "network of statutes that enumerate and impose upon the Department specific fiduciary duties for the benefit of the Navajo Nation and its members." Pl.'s Resp. at 31. The Rehabilitation Act authorized and appropriated $500,000 for the Secretary of the Interior to develop "a program of basic improvements for the conservation and development of the resources of the Navajo and Hopi Indians, the more productive employment of their manpower, and the supplying of means to be used in their rehabilitation . . . ." 25 U.S.C. § 631. Plaintiff argues that the DOI's implementation of the Rehabilitation Act in the "1980 Amendment area has been flatly inconsistent with Congress's articulated goals and the fiduciary standards it established and imposed upon the Secretary to implement." Pl.'s Resp. at 33.

Defendant cites the Federal Circuit's decision in *Navajo Nation v. United States*, 501 F.3d at 1341, for the proposition that the Rehabilitation Act is insufficient by itself as a money-mandating source of law. In *Navajo Nation*, the Federal Circuit considered whether the Navajo "had a cognizable money-mandating claim . . . against the United States for a breach of trust in a lease of the Nation's lands for coal mining." *Navajo Nation v. United States*, 501 F.3d at 1329. Plaintiff Navajo Nation relied, *inter alia*, on the Rehabilitation Act as the basis for its claim for relief. *Navajo Nation v. United States*, 501 F.3d at 1341.

While the Federal Circuit in *Navajo Nation* held that the government had a duty pursuant to the Rehabilitation Act to "keep the Nation informed regarding the development of its coal resources," the court did not find that this duty alone could be enforced through an action for money damages. *Id.* Instead, it was in the Surface Mining Control and Reclamation Act of 1977 ("SMCRA")[6] that the Federal Circuit found the key duty of the Secretary of the Interior, which was to "include and enforce terms and conditions requested by the Nation" as well as to "provide the Nation with representation in a matter related to coal mining operations." *Id*. at 1347. The Federal Circuit

---

[6] Pub. L. No. 95-87, 91 Stat. 445 (codified as amended in scattered sections of 30 U.S.C.S.).

acknowledged that the Rehabilitation Act "may contribute to the Nation's asserted network" but implicitly held that it did not on its own constitute the money-mandating statute necessary for plaintiff's recovery.  *Id*.  The Federal Circuit cited common law trust duties, the Rehabilitation Act, and the SMCRA as the network supporting a "cognizable money-mandating claim," while relying most heavily on SMCRA.  *Id*. at 1349.

Plaintiff's claims in the current case are distinguished from *Navajo* because here, there is no statute assigning specific management duties to the government comparable to SMCRA.  The founding documents and the 1980 Amendment to the 1974 Settlement Act, as we hold in our analysis below, do not confer upon the federal government the comprehensive control necessary to create a money-mandating fiduciary duty.  The Rehabilitation Act therefore fails to impose a rights-creating duty on the Secretary upon which plaintiff's claim can be founded.

### c) The 1974 Settlement Act, as Amended in 1980

Congress enacted the 1974 Settlement Act for the purpose of providing a method of settling the Hopi and Navajo Tribes' competing land claims in the JUA.  Notably, the Act authorized the district court to partition the JUA, which it did in 1979, by requiring tribes to move from lands partitioned to the other, and by setting up a commission to pay for relocations.  *See* 25 U.S.C. § 640d-3; *see also Clinton*, 180 F.3d at 1084.  The 1974 Settlement Act also permitted the two tribes to sue one another in district court to resolve their dispute over title to the 1934 Reservation Area.  *See* 25 U.S.C. § 640d-7(a).

Plaintiff points specifically to 25 U.S.C. § 640d-9(c), adopted as part of the 1974 Settlement Act.  This provision addressed the relocation of individuals between Hopi and Navajo portions of the reservation.  It vested in the Secretary of the Interior the authority to "take such action as may be necessary in order to assure the protection, until relocation, of the rights and property of individuals subject to relocation pursuant to this Act . . . or any judgment of partition pursuant thereto . . . ." 25 U.S.C. § 640d-9(c).  Whatever obligations this provision creates, however, related to individuals subject to relocation, not to the Navajo Tribe as a whole.  Moreover, the Federal Circuit affirmed that the relocation provisions of the 1974 Settlement Act did not "evince Congressional intent to create a trust."  *Begay v. United States*, 865 F.2d 230, 231 (Fed. Cir. 1988).

### d) The 1980 Amendment to the 1974 Settlement Act

The 1980 Amendment to the 1974 Settlement Act, as previously stated, was intended to "preserve the parties' rights subject to a final adjudication." *Masayesva*, 816 F. Supp. at 1397.  In relevant part, it provides:

> [a]ny development of lands in litigation pursuant to section 8 of this Act . . . shall be carried out only upon the written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City.  Each such area has been heretofore designated by the Secretary.  'Development' as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

25 U.S.C. § 640d-9(f)(1).  The question we must determine herein is whether the 1980 Amendment created a trust duty in DOI to prevent the Hopi from asserting its rights in the Bennett Freeze Area.

Defendant argues that the plain language of the 1980 Amendment grants authority over development decisions solely to the two tribes, encouraging Indian tribal autonomy and releasing governmental control over the Bennett Freeze Area in this respect.  It contends that "[w]hen Congress codified the consent requirement in 1980, it did not authorize the Department of the Interior to review proposed development projects" and therefore did not establish any additional fiduciary duties on the part of the federal government.  Def.'s Reply at 18.  Plaintiff, however, argues that "the United States exercised total control over [the land subject to the 1980 Amendment], either directly or acting through its *de facto* agent, the Hopi Tribe."  Pl.'s Resp. at 26.   Plaintiff therefore posits that "the 1974 Settlement Act, as amended in 1980, embodies the exact same type of control over the 1980 Amendment area that was evidenced in *Mitchell II* and *White Mountain Apache*."  Pl.'s Resp. at 28.

In *Mitchell II*, 463 U.S. at 206, the Supreme Court analyzed whether the United States was financially accountable to the Quinault Indian Tribe for breach of trust regarding mismanagement of the tribe's forest resources.  The Court determined that the statutes and regulations at issue in the case "clearly establish[ed] fiduciary obligations of the Government in the management and

operation of Indian lands and resources" even though express trust language did not exist. *Id.* at 225. Specifically, the Court noted that a section of the statute it was reviewing mandated the Secretary of the Interior's involvement in the payment of timber proceeds to the Indian owners, consideration of the best interest of the Indians, and "'manag[ement of] the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests.'" *Id.* at 224. This "elaborate control over forests and property belonging to Indians," deemed the Court, implied the existence of a fiduciary responsibility to the Indians beyond the minimum level of general trust duties, and therefore established a basis for the Quinault Indians to recover money damages for a breach of said responsibility. *Id.* at 225. In sum, the Court concluded that a money-mandating fiduciary duty may be implied if, and only if, a fair interpretation of the statute creates a right to ground a claim against the federal government for compensation. *Id.* at 217 (quoting *U.S. v. Testan*, 424 U.S. 392, 400 (1976)).

In *White Mountain Apache*, 537 U.S. at 465, the Court analyzed a statute granting the Secretary of the Interior rights to occupy buildings on White Mountain Apache tribal lands using the "fair inference" test set forth in *Mitchell II*. The Court reviewed the relevant statute to determine if it imposed a money-mandating fiduciary duty upon the federal government to maintain and preserve the buildings it used on the former Fort Apache Military Reservation. *Id.* The Court concluded in the affirmative, noting that the statutory language vested the United States with both general trust responsibilities and "the discretionary authority to make direct use of portions of the trust corpus." *Id.* at 475. The statute subjected the trust property to the authority and actual use of the Secretary of the Interior which, the Court posited, allowed the United States to obtain "daily occupation, and . . . control at least as plenary as its authority over the timber in *Mitchell II*." *Id.*

The present facts are clearly distinguishable from *White Mountain Apache* and *Mitchell II*. The 1980 Amendment to the 1974 Settlement Act did not confer on the federal government the type of control, authority, or resource management responsibilities that the Court identified in those cases. The Secretary of the Interior is mentioned only once in the 1980 Amendment, when referring to lands "heretofore designated by the Secretary." 25 U.S.C. § 640d-9(f)(1). Indeed, it could fairly be observed that the statute had the opposite import. Each tribe was left with apparently unfettered control of development by the other. This is fully consistent with the incontestable fact that in 1974, and again in 1980, ownership of the reservation lands was left unresolved.

23

The 1980 Amendment's total silence with respect to DOI's role in development decisions cannot fairly be construed as an assignment of affirmative powers, much less duties, to stop the exercise of a veto by one tribe.

When interpreting a statute, we must look first to the language of the statute, and attempt to "construe what Congress has enacted." *Duncan v. Walker*, 533 U.S. 167, 172 (2001). In the absence of "an 'extraordinary showing of contrary intentions,'" *Sharp v. United States*, 80 Fed. Cl. 422, 434 (2008) (citing *Glaxo Operations UK Ltd. v. Quigg*, 894 F.2d 392, 396 (Fed. Cir. 1990)), we will presume that the plain language of the 1980 Amendment expresses Congress' intent to remove control from the DOI and place it in the hands of the tribes with regard to development decisions. *See Bull v. U.S.,* 479 F.3d 1365, 1377 (Fed. Cir. 2007). The "unambiguously expressed intent of Congress" generally ends a discussion on legislative intent. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843 (1984).

Reviewing the legislative history of the 1980 Amendment does not reveal the necessary contrary intent of Congress. Indeed, in 1979, the Senate added a section to an earlier draft of the bill which would have given DOI review authority over proposed development projects denied by a tribe in the Bennett Freeze Area. S. Rep. No. 96-373, at 7-9 (1979):

> [d]uring the pendency of litigation in the [district court] . . . any new use or development of the lands contained within [the Bennett Freeze area] . . . shall be carried out only upon the written consent of the two tribes or upon the written approval of the Secretary: *Provided*, That if the Secretary approves such use or development over the objection of one of the tribes, that tribe may petition the district court having jurisdiction over the litigation for an order or orders prohibiting such use or development, including an order staying any such use until such matter is finally resolved by the court. In reaching a final decision regarding such petition the court shall consider the matter de novo to determine whether the proposed use or development would adversely affect the ultimate legal right of either tribe to partition based on use of land.

Navajo and Hopi Indians Relocations Amendments Act of 1979, S. 751, 96th Cong. § 3(e) (Oct. 24, 1979). Five days later, however, the House of

Representatives struck that language from the proposed legislation, and inserted in its place the following:

> [a]ny development of lands in litigation pursuant to section 8 of this Act . . . shall be carried out only upon the written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City.  Each such area has been heretofore designated by the Secretary.  'Development' as used herein shall mean any new construction or improvement to the property and shall include placement of mobile homes and buildings on the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

Navajo-Hopi Relocation Act, H.R. 5262, 96th Cong. § 3(d) (Oct. 29, 1979).

The final version of the 1980 Amendment adopted language strikingly similar to H.R. 5262, which omitted DOI review powers.  *See* Pub. L. No. 96-305, 94 Stat. 929 (codified at 25 U.S.C. § 640d-9(f) (1980)):

> Any development of lands in litigation pursuant to section 8 of this Act . . . shall be carried out only upon the written consent of each tribe except for the limited areas around the village of Moenkopi and around Tuba City.  Each such area has been heretofore designated by the Secretary.  'Development' as used herein shall mean any new construction or improvement to the property and further includes public work projects, power and water lines, public agency improvements, and associated rights-of-way.

*Id*.  DOI review authority was not adopted until the passage of the 1988 Amendment.  *See* Pub. L. No.  100-666, § 6, 102 Stat. 3929 (amending 25 U.S.C. § 640d-9(f)).

It is clear that the 1980 Amendment did not grant authority to DOI to intervene in Navajo-Hopi development decisions in the Bennett Freeze Area. The statute did not strengthen DOI's hand in reviewing Navajo development proposals denied by the Hopi, and it was silent as to DOI's role in the administration of development-related issues on the Bennett Freeze Area.  The

1980 Amendment expressly vests that authority in the Hopi and the Navajo Tribes.

### e) Conclusion

In sum, none of the statutory components cited by plaintiff individually impose a money-mandating fiduciary duty upon which its claim for relief may be grounded.  Nor do they collectively comprise a network of statutes which assign sufficient trust management responsibilities to the government to support a claim for money damages.  The very ambiguity of the condominium created by Congress in 1934 is illustrated by the continued vacillation by all parties, over decades, about whether it was possible or proper to limit the Hopi Tribe's role in Navajo development.   Such ambiguity is completely inconsistent with fairly interpreting the statutes as a rights-creating source of substantive law.  The 1974 and 1980 statutes were Congress' effort to end this ambiguity.  The litigation and the stay were remedies adopted by Congress to end the stalemate.  They are not grounds for an action in breach of trust suit against DOI for failure to referee what was a mare's nest of competing claims.

What this means is that, even if DOI misinterpreted the 1980 statutory language in some way, it was not assigned duties by that statute, or any preceding statutes, separately or in concert, so that a breach of those duties could be enforceable here with an action for money damages.  We note, in any event, as defendant points out, that the best evidence that DOI was not misinterpreting the statute was the district court's willingness in *Sidney v. MacDonald*, No. CIV 58-579, to enjoin the Navajo from unilaterally proceeding with its projects.

It is thus unnecessary to examine the statute of limitations defense, which raises disputed issues of fact.  Defendant's motion for summary judgment is granted on the issue of plaintiff's breach of trust claim.  We now turn to an analysis of plaintiff's takings claim.

## 2) Regulatory Taking Claim

The takings clause of the Fifth Amendment of the United States Constitution, "nor shall private property be taken for public use, without just compensation," can be enforced in this court with a claim for compensation. *See* U.S. Const. amend. V, cl. 4.  In this case, the Navajo Tribe asserts that its land has been, effectively, taken for public use because of the regulatory

impact of the 1980 Amendment.  *See Penn Central Transportation Co. v. City of New York*, 483 U.S. 104 (1978).  A successful claim of this sort would require plaintiff first to establish that it has a property interest, and then that the interest has been taken.  *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).

Plaintiff argues that "Congress recognized and vested, for the benefit of plaintiff and its members, a compensable property interest in the 1934 Reservation lands, except for pockets of land on which the Hope Tribe can prove its members were actually located in 1934."  Pl.'s Amend. Cmpl. ¶ 6. Plaintiff recognizes, however, that in 1974, "Congress authorized the Hopi Tribe to sue for a determination of its interest, if any, in the reservation established by the 1934 Act."  *Id.* ¶ 7.  While plaintiff argues that the vast bulk of the 1934 grant was never meaningfully subject to a claim of Hopi occupation, the effect of the 1974 Act, particularly when enforced by the 1980 Amendment, was to create a cloud on the Navajo's ownership rights in the entire area subject to the freeze, until the statutorily-authorized quiet title proceeding was resolved.  With hindsight, we now know that title was not resolved until the litigation over ownership was settled in 2006.

In its complaint, plaintiff identifies the 1980 Act as the source of the restriction on the tribe's ability to use its own land.  It recognizes that the "freeze statute has been in effect for almost ten years," and that it was preceded by "similar restrictions on development imposed by administrative order in 1966."  *Id.* ¶ 11.  Plaintiff goes on to argue, however, that the "freeze statute, *as applied*, has prohibited development and construction of new homes, sheds, corrals, roads, water lines, sewers, . . . businesses, and other critical facilities needed by plaintiff and its members."  *Id.* ¶ 15 (emphasis supplied).  Plaintiff also contends that the "*application* of the freeze statute" restricted repairs and renovations to such facilities.  *Id.* (emphasis supplied).

We interpret plaintiff's claims as set forth in its amended complaint to contend that the last affirmative action by the United States that could have constituted a taking was Congress' enactment of the 1980 Amendment. Plaintiff argues, however, that DOI misinterpreted the 1980 Amendment to permit the Hopi a more extensive veto than Congress contemplated.  Plaintiff also contends that "between 1982 [the Hopi moratorium] and the filing of this lawsuit, virtually no development was approved by the Hopi Tribe. . . ."  *Id.* ¶ 13.  Plaintiff therefore claims that DOI's policy of inaction in the protection

of Navajo interests after the 1982 Hopi moratorium constituted a temporary regulatory taking:

> From the plain language of the 1980 Amendment, it is clear that it was not a bar to development within the geographic area it governed, but instead permitted development so long as the Hopi Tribe consented.  Had the Hopi Tribe acted reasonably and consented to projects after 1980, and recognized the rights and needs of the Navajo Nation and its members, no taking would have occurred.  However, any hope that the Hopi Tribe would reasonably exercise its consent evaporated on August 31, 1982, when the Hopi Tribe imposed its blanket development moratorium . . . .

> . . . .

> Here, where Congress specifically delegated the approval process to the Hopi Tribe, the deprivation of the Navajo Nation's property interests was directly and substantially impacted by Congress itself.  The United States is liable because the Hopi Tribe misused the very power granted to it by Congress, which resulted in the taking of the Navajo Nation's property rights.

Pl.'s Resp. at 46, 57.  In the alternative, plaintiff argues that its takings claim accrued in December 2006 with the district court's lifting of the Bennett Freeze in its entirety.

This explanation of plaintiff's claim suggests at least four possible flaws.  First, plaintiff can only sue with respect to its own property interests, i.e., the land it owns as a tribe.  The scope of the claim, at a minimum, must be limited in that respect.  The tribe cannot recover compensation with respect to the impact on individual member's property.  Plaintiff concedes this fact.

The second problem is that the Hopi Tribe was the relevant actor in the alleged taking, not the United States.  The government's last affirmative act was Congress' enactment of the 1980 Amendment, which confirmed the Hopi's rights to oppose Navajo development projects.  Beyond 1980, it is the United States' *failure* to act that plaintiff alleges caused a taking.  Takings, of course, are founded on what the government did, not what it did not do.  For

28

the claim to have any viability, therefore, the Hopi would have to be treated as agents of the United States, a proposition which defendant has challenged.

This brings up the third problem with plaintiff's taking claim– timeliness. If the Hopi are not the agents of the United States, and if the last relevant action of the United States occurred in 1980, then the action would appear to be filed too late, unless there is some reason to delay the accrual of the cause of action until at least 1982. Plaintiff, of course, asserts that the claim did not accrue until the Hopi moratorium in 1982. Defendant contends, however, that this alleged "damage" to plaintiff began to occur well before the moratorium.

The fourth and most fundamental question is whether plaintiff is able to establish the necessary property ownership essential to a taking claim. The essence of the status quo- arguably from the inception of the 1934 Act, but certainly after 1974- is that neither tribe was able to assert with any finality what it owned. The very reason for the implementation of the Bennett Freeze and the 1980 Amendment was the intolerable ambiguity as to how much land would have to be set aside for the Hopi. Before that problem was solved, the Navajo could only assert its rights through litigation. Litigation was not complete as of 1980, however, nor was it complete in 1982. Indeed, title to the Bennett Freeze Area was not conclusively established between the tribes until 2006.

The briefing heretofore, although extensive, has only addressed the first three of these apparent difficulties with the taking claim. It has not addressed the last question raised, namely, how plaintiff can assert a taking claim if the very essence of the legislation which forms the basis of the claim precludes any definitive assertion of the Navajo Tribe's title to the land. Although defendant points out in its briefing that plaintiff has not plead with particularity what property interest it claims has been taken, the larger question raised by the court has not been briefed. We therefore consider it appropriate to offer plaintiff an opportunity to address the fourth potential flaw in its taking claim prior to ruling on defendant's motion.

Accordingly, we defer ruling on defendant's dispositive motion insofar as it seeks dismissal of the taking claim. Plaintiff is directed to file a supplemental brief, limited to ten pages of text, in which it responds to the court's concerns. Plaintiff may also address any other outstanding issues at the same time. Defendant may file a sur-reply of comparable length.

CONCLUSION

For the reasons stated above, we grant defendant's motion for summary judgment with respect only to plaintiff's breach of trust claim. We defer ruling on defendant's motion with respect to the takings claim.  Plaintiff's sur-response brief on the takings claim shall be filed on or before March 27, 2009. Defendant's sur-reply shall be filed on or before April 10, 2009.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge